Approved: _____
DANIEL C. RICHENTHAL/RAHUL MUKHI/JANIS M. ECHENBERG
Assistant United States Attorneys

Before:   THE HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

     - v. -                       :

JOHN W. ASHE,                     :
FRANCIS LORENZO,                  :
NG LAP SENG,                      :
  a/k/a "David Ng,"               :
JEFF C. YIN,                      :
  a/k/a "Yin Chuan,"              :
SHIWEI YAN,                       :
  a/k/a "Sheri Yan," and          :
HEIDI HONG PIAO,                  :
  a/k/a "Heidi Park,"             :
                                  :
                   Defendants.    :

- - - - - - - - - - - - - - - - x

**15 MAG 3562**

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 371, 666,
1956, and 2; and
26 U.S.C. § 7206(1)

COUNTIES OF OFFENSE:

NEW YORK
WESTCHESTER



U.S. DISTRICT COURT
FILED
OCT 05 2015
D.S.
S.D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JASON P. ALBERTS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation ("FBI"),
and charges as follows:

## COUNT ONE

(Conspiracy to Bribe a United Nations Official)

     1.   From at least in or about 2011, up to and including in or
about December 2014, in the Southern District of New York and
elsewhere, FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," JEFF C.
YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG
PIAO, a/k/a "Heidi Park," the defendants, and others known and
unknown, willfully and knowingly did combine, conspire, confederate,
and agree together and with each other to violate Title 18, United
States Code, Section 666.

2.    It was a part and an object of the conspiracy that FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng" ("NG"), JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, and others known and unknown, would and did corruptly give, offer, and agree to give a thing of value to a person, with the intent to influence and reward an agent of an organization, in connection with a business, transaction, and series of transactions of such organization, involving a thing of value of $5,000 and more, while such organization was in receipt of, in a one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, in violation of Title 18, United States Code, Section 666(a)(2), to wit, LORENZO, NG, YIN, YAN, and PIAO agreed to pay and to facilitate the payment of bribes to an individual serving as President of the United Nations General Assembly and the Permanent Representative to the United Nations ("UN") for Antigua and Barbuda ("Antigua"), in exchange for official actions on behalf of businessmen.

### Overt Acts

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.    On or about February 24, 2012, defendants FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a "Yin Chuan," caused the Permanent Representative to the UN for Antigua, in exchange for payments, to introduce a document at the UN in support of a real estate project being developed by NG.

b.    On or about June 3, 2014, NG, LORENZO, and YIN arranged for a $200,000 wire payment to a private bank account belonging to the President of the UN General Assembly in exchange for the President making a foreign visit to NG in his official capacity in order to discuss progress on the real estate project being developed by NG.

c.    On or about July 25, 2012, YAN and PIAO arranged for a $300,000 wire from a co-conspirator not named as a defendant herein ("CC-1") to a private bank account belonging to the Permanent Representative to the UN for Antigua in exchange for advocating for CC-1's business interests with Antiguan government officials.

d.    On or about November 4, 2013, YAN and PIAO arranged for a $200,000 wire to a bank account belonging to the President of

the UN General Assembly from another co-conspirator not named as a
defendant herein in exchange for the President attending a private
conference in his official capacity.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Payment of Bribes)

4.   From at least in or about 2011, up to and including in or
about December 2014, in the Southern District of New York and
elsewhere, FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng,", JEFF C.
YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG
PIAO, a/k/a "Heidi Park," the defendants, corruptly gave, offered,
and agreed to give a thing of value to a person, with the intent to
influence and reward an agent of an organization, in connection with
a business, transaction, and series of transactions of such
organization, involving a thing of value of $5,000 and more, while
such organization was in receipt of, in any one year period, benefits
in excess of $10,000 under a Federal program involving a grant,
contract, subsidy, loan, guarantee, insurance, and other form of
federal assistance, to wit, LORENZO, NG, YIN, YAN, and PIAO,
facilitated and arranged for the payment of bribes to an individual
serving as the President of the United Nations General Assembly and
the Permanent Representative to the United Nations for Antigua in
exchange for official actions on behalf of businessmen.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT THREE

(Conspiracy to Commit Transportation Money Laundering)

5.   From at least in or about 2011, up to and including in or
about December 2014, in the Southern District of New York and
elsewhere, SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a
"Heidi Park," the defendants, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree together
and with each other to violate Title 18, United States Code, Section
1956(a)(2)(A).

6.   It was a part and an object of the conspiracy that SHIWEI
YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the
defendants, and others known and unknown, would and did knowingly
transport, transmit, and transfer, and attempt to transport,

3

transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside of the United States and to a place in the United States from and through a place outside of the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, the bribery of a public official, in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit, YAN and PIAO agreed to transmit payments to the then-Prime Minister of Antigua through Antigua's Ambassador to the United Nations in return for official actions.

(Title 18, United States Code, Section 1956(h).)

## COUNTS FOUR AND FIVE

(Subscribing to False and Fraudulent U.S. Individual Income Tax Returns)

7.     On or about the dates identified below, in the Southern District and elsewhere, JOHN W. ASHE, the defendant, willfully and knowingly, did make and subscribe to U.S. Individual Income Tax Returns, Forms 1040, for the tax years set forth below, which returns contained and were verified by the written declaration of ASHE that they were made under penalties of perjury, and which returns ASHE did not believe to be true and correct as to every material matter, to wit, ASHE fraudulently omitted a total of more than $1.2 million of income from his tax returns, including bribes received and the purported salary ASHE paid himself as President of the United Nations General Assembly, thereby substantially understating his total income as set forth below for the years set forth below:

| Count | Approximate Filing Date | Tax Year | Approximate Income Omitted |
|-------|-------------------------|----------|----------------------------|
| Four  | April 15, 2014          | 2013     | $462,350.00                |
| Five  | April 15, 2015          | 2014     | $796,329.28                |

(Title 26, United States Code, Section 7206(1), and Title 18, United States Code, Section 2.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

8.     I have been a Special Agent with the FBI for approximately six years, and I have been personally involved in the investigation of this matter, which has been handled jointly by Special Agents of the FBI and the Internal Revenue Service—Criminal Investigation.

9.    This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my review of email correspondence,[1] my analysis of bank of records, my examination of documents and reports by others, my interviews of witnesses, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## OVERVIEW

10.    As set forth in greater detail below, this case involves businesspeople paying bribes to defendant JOHN W. ASHE, at the time when he served as the United Nations Ambassador for Antigua and Barbuda and as the 68th President of the United Nations General Assembly. These bribes were facilitated by, among others, defendants FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," who arranged for the transmission and laundering of over $1 million of bribery money from sources in China.  In exchange for the bribes, ASHE agreed to and did perform official actions for businessmen who were seeking benefits from the UN and the government of Antigua and Barbuda.  Among other things, ASHE accepted over $500,000 of bribes facilitated by LORENZO and YIN from NG, who was seeking to build a multi-billion dollar, UN-sponsored conference center in Macau, China (the "UN Macau Conference Center").  In exchange for these payments from NG, among other actions, ASHE submitted a UN document to the UN Secretary General, which claimed that there was a purported need to build the UN Macau Conference Center.  In addition,  ASHE received over $800,000 in bribes from various Chinese businessmen arranged through YAN and PIAO and, in return for these bribes, ASHE supported these businessmen's interests within the United Nations and with senior Antiguan government officials, including the country's then-Prime Minister (the "Prime Minister"), with whom ASHE shared a portion of the bribe payments.

---

[1]    The emails cited herein were obtained pursuant to search warrants of the personal Yahoo, Gmail, and AOL email accounts for defendants JOHN W. ASHE, FRANCIS LORENZO, JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park."

11.   To funnel and help conceal the bribes to defendant JOHN W. ASHE, defendants NG LAP SENG, a/k/a "David Ng," JEFF C. YIN, a/k/a "Yin Chuan," SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," along with others, used non-governmental organizations ("NGOs") in the United States, which were purportedly established to promote the UN's mission and/or development goals.

12.   During the course of the scheme, defendant JOHN W. ASHE solicited and received bribes in various forms, including payments to third-parties to cover ASHE's personal expenses, such as a family vacation and construction of a basketball court at his house in Dobbs Ferry, New York.   ASHE also solicited a portion of his bribes to be paid to two business bank accounts that ASHE opened at two major American banks, in the name "John Ashe dba John Ashe PGA 68," and "Office of the President of the General Assembly PGA 68 Operating Account," for the purported purpose of raising money for his UN General Assembly Presidency ("PGA Account-1" and "PGA Account-2," together, the "PGA Accounts").   ASHE was the sole signatory on both of the PGA Accounts.   From in or about 2012, up to and including at least in or about 2014, ASHE received over $3 million in the PGA Accounts from both foreign governments and individuals.   During the same time period, ASHE withdrew more than $1,000,000 from the PGA Accounts and transferred the money to his and his wife's personal bank accounts. ASHE also used money transferred from the PGA Accounts to pay for his personal expenses, such as paying the mortgage on his house in Dobbs Ferry, paying his BMW lease payments, and buying luxury items such as Rolex watches.   The majority of the funds that ASHE withdrew from the PGA Accounts were in the form of checks made out to ASHE that ASHE signed himself, and had "salary" listed in the check memo line.   During the same period of time, ASHE failed to report sufficient income to the Internal Revenue Service ("IRS") to account for the self-described salary and other funds he withdrew from the PGA Accounts.   In total, ASHE underreported his income to the IRS by more than $1.2 million dollars in tax years 2013 and 2014 alone.

## RELEVANT INDIVIDUALS AND ENTITIES

### JOHN W. ASHE

13.   From in or about 1989, up to and including in or about December 2014, JOHN W. ASHE, the defendant, served in various positions at the Permanent Mission of Antigua to the UN, which is located in New York, New York.[2]   Beginning in or about May 2004, ASHE

---

[2]      ASHE no longer serves as a diplomat representing Antigua or any

served as the Permanent Representative of Antigua to the UN. During all times relevant to this Complaint, ASHE has been a lawful permanent resident ("LPR") of the United States and has maintained a house in Dobbs Ferry, New York, which is located in Westchester County. Based on my review of ASHE's immigration file, I have also learned that when ASHE applied to become an LPR, in or about October 2000, ASHE waived in writing his assertion of any immunity that would otherwise accrue to him based on his occupational status as a diplomat.

14.   I know from witness interviews and my review of publicly available sources that on or about June 13, 2013, JOHN W. ASHE, the defendant, was elected as the 68th President of the UN General Assembly ("UNGA") for a one-year term beginning in or about September 2013 and ending in or about September 2014. The UNGA is comprised of all 193 UN Member States, which elect a rotating President from one of the Member States on an annual basis. Among other things, the UNGA President presides over the current UNGA session and represents the UNGA at various international economic and cultural forums.

15.   I know from publicly available records that during each of the years relevant to this Complaint, the United States Government provided the UN with federal funds in excess of $10,000.

**FRANCIS LORENZO, NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a "Yin Chuan"**

16.   From in or about 2004, up to and including the present, defendant FRANCIS LORENZO has been the Deputy Permanent Representative to the United Nations for the Dominican Republic. Based on my review of immigration records, I learned that LORENZO

---

other country. I understand from my discussions with the United States Department of State that, at most, ASHE enjoys residual official act immunity based on his former status as a diplomat from Antigua from in or about February 2000 to in or about December 2014 and as President of the United Nations General Assembly from in or about September 2013 to in or about October 2014. ASHE's service in these positions provides immunity only for conduct within the scope of his official positions, which must be affirmatively asserted in any judicial proceeding, to the extent he is permitted to do so notwithstanding an immunity waiver he executed in connection with becoming a U.S. legal permanent resident in or about October 2000. Official act immunity does not provide protection from arrest and does not cover conduct outside the scope of one's official position, such as the filing of false personal U.S. tax returns.

immigrated to the United States from the Dominican Republic in or about 1985. In or about 1991, LORENZO became a naturalized United States citizen. I understand from the United States Department of State that, like defendant JOHN W. ASHE, LORENZO enjoys official act immunity, which must be asserted affirmatively and provides for immunity from criminal prosecution only for official acts taken in connection with LORENZO's diplomatic position.

17.  In addition to being the Deputy Permanent Representative to the United Nations for the Dominican Republic, investigation to date has revealed that, since in or about 2009, defendant FRANCIS LORENZO has also received funds from and served as an agent for defendant NG LAP SENG, a/k/a "David Ng," a Chinese national and the head of a major real estate development company based in Macau (the "Macau Real Estate Development Company"). In or about 2009, NG founded a particular NGO ("NGO-1") based in New York, New York, and made LORENZO the "Honorary President." Since that time, NG has regularly paid LORENZO a $20,000 monthly salary and has also sent additional payments to a company in the Dominican Republic for which LORENZO's sibling serves as the general manager. According to its website, NGO-1 is purportedly a "21st century media platform" whose mission is to advance the implementation of the UN's Millennium Development Goals. The NGO-1 website posts and links to content, largely from external sources, relating to the UN, development, and other topics. I know based on my review of documents that NG has funded NGO-1 since its creation, and has wired or caused to be wired more than $12 million from Macau to bank accounts of NGO-1 in New York, New York.

18.  Defendant JEFF C. YIN, a/k/a "Yin Chuan," is the principal assistant to defendant NG LAP SENG, a/k/a "David Ng," and also has used the title of Assistant to the General Manager of NGO-1. YIN is a naturalized United States citizen who was originally born in China, and resides in China. For at least several years, YIN has assisted NG with, among other things, communicating on his behalf, wiring money to the United States, making travel plans to and from the United States, and arranging meetings for NG in the United States. YIN serves as NG's principal interpreter when NG is in the United States, travels with him to the United States, and is generally present for meetings NG has in the United States, taking notes and handling documents, among other things.

19.  Based on my review of documents and my conversations with other law enforcement agents, I know that defendant JEFF C. YIN, a/k/a "Yin Chuan," has frequently traveled to the United States with defendant NG LAP SENG, a/k/a "David Ng," with large amounts of cash.

For example, on or about March 6, 2014, YIN and NG arrived at John F. Kennedy International Airport ("JFK") with $300,000 in cash. Approximately five weeks later, on or about April 18, 2014, YIN and NG arrived at JFK with $300,000 in cash. Approximately two months later, on or about June 13, 2014, YIN and NG arrived at Teterboro Airport in New Jersey with $390,000 in cash. More recently, on or about July 5, 2015, YIN and NG arrived by private plane in Anchorage, Alaska with $900,000 in cash. Two days later, YIN and NG flew on to New York City. On or about the following day, YIN and NG met with defendant FRANCIS LORENZO met at a hotel in New York, New York. Most recently, on or about September 16, 2015, YIN and NG arrived by private plane in Anchorage, Alaska with $500,000 in cash. They then flew on to New York.[3]

### SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park"

20.   Defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," are naturalized United States citizens who were born in China and who reside principally in China. Based on my review of documents, I know that YAN and PIAO are associated with several businessmen in China. YAN is also the Chief Executive Officer of an NGO ("NGO-2"), previously based in Washington, D.C., now based in New York, New York, and PIAO is NGO-2's Finance Director. NGO-2 is purportedly an organization created to promote global and sustainable economic development. In August 2013, YAN and PIAO began paying defendant JOHN W. ASHE approximately $20,000 a month in connection with his serving as the "Honorary Chairman" of NGO-2.

---

[3]     Based on my participation in the arrests, I know that NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a "Yin Chuan," the defendants, were arrested on or about September 19, 2015, and charged in Complaint 15 Mag. 3369 with conspiracy to make false statements and to defraud the United States arising from their travels to the United States with large amounts of cash and explanations provided to authorities regarding that cash.

## THE BRIBERY SCHEME

### *ASHE RECEIVES PAYMENTS ARRANGED BY LORENZO IN EXCHANGE FOR OFFICIAL ACTIONS ON BEHALF OF NG*

NG and LORENZO Make Payments to ASHE In Return For ASHE Promoting
NG's Business Dealings With The Government of Antigua

  21. As described in more detail below, in or about the Spring of 2011, NG LAP SENG, a/k/a "David Ng," and FRANCIS LORENZO, the defendants, began making payments to JOHN W. ASHE, the defendant, and ASHE's wife in return for, among other things, ASHE using his official position to obtain for NG potentially lucrative investments in Antigua.

  22. Based on my review of emails and other documents, I have learned that in or about the Spring of 2011, defendant FRANCIS LORENZO asked defendant JOHN W. ASHE to travel to China to meet with defendant NG LAP SENG, a/k/a "David Ng," about potential investment opportunities for NG in Antigua.  After initially declining LORENZO's invitation, when it did not appear that ASHE would be compensated for taking the meeting, ASHE agreed to make the trip after LORENZO informed ASHE that NGO-1, which was at least in substantial part funded by NG, would pay for ASHE and ASHE's family to take an unrelated family vacation to New Orleans, Louisiana.  On or about April 4, 2011, after ASHE agreed to fly to China to meet NG, ASHE emailed LORENZO a travel itinerary for ASHE, his wife, and two children, which included first-class plane tickets from New York to New Orleans and a hotel reservation for $850.00 per night.  LORENZO later emailed ASHE that NGO-1 would pay for the trip through ASHE's travel agent.

  23. Based on my review of emails and travel records, I know that after defendant FRANCIS LORENZO told defendant JOHN W. ASHE that NGO-1 would pay for ASHE's family vacation to New Orleans, ASHE traveled to Hong Kong and Macau between April 17 and 20, 2011.  According to a post-trip report sent to LORENZO by another NGO-1 employee, during the trip, ASHE and others met with "private sector" individuals in Macau, which is where defendant NG LAP SENG, a/k/a "David Ng," was based.  On April 20, 2011, ASHE emailed LORENZO from the Hong Kong airport as ASHE was about to board his flight home and told LORENZO, "Thanks again to you and Ng for everything."  Shortly after arriving in New York from his meeting with NG in Macau, ASHE and his family left for the family vacation to New Orleans for which LORENZO agreed to pay.

24.   On April 26, 2011, less than a week after defendant JOHN W. ASHE returned from Macau -- and the day after he returned from the family vacation to New Orleans -- ASHE emailed defendant FRANCIS LORENZO and offered to set up a meeting between defendant NG LAP SENG, a/k/a "David Ng," and a particular Antiguan government minister ("Antiguan Minister-1").  Specifically, ASHE emailed LORENZO that "[d]uring the visit to Macao/Hong Kong it just occurred to me that it would be good idea if [Antiguan Minister-1] could visit and meet Ng, [a second Chinese businessman] and possibly [a third Chinese businessman].  Let me know what you think and if there's a date in early June you would want me to suggest to the Minister."

25.   Based on my review of emails and travel records, I know that following defendant JOHN W. ASHE's trip to Hong Kong and Macau to meet with defendant NG LAP SENG, a/k/a "David Ng" (and the vacation to New Orleans which he demanded in return), ASHE traveled to Antigua between April 26, 2011 and April 29, 2011.  On or about April 30, 2011, after ASHE returned from Antigua, ASHE emailed defendant FRANCIS LORENZO to inform him that ASHE had arranged for the then-Antiguan Prime Minister to meet with NG and others about "concrete investment opportunities, including the immediate acquisition of hotel properties."  In the same email, ASHE told LORENZO that ASHE was expecting to spend $30,000 in connection with the upcoming construction of a private basketball court at ASHE's house in Dobbs Ferry, in Westchester County, New York, commenting "[l]et's discuss on Monday."

26.   Based on my review of emails and travel documents, I know that on or about June 20, 2011, defendant FRANCIS LORENZO and two other NGO-1 employees made a trip to Antigua, which was arranged by defendant JOHN W. ASHE.  E-mails reflect that during his trip to Antigua, LORENZO met with the Prime Minister.  Following the trip, ASHE sent an email to LORENZO about LORENZO's discussion with the Prime Minister concerning the Prime Minister's travel to New York in September 2011, nominally to attend an award ceremony to be hosted by NGO-1.

27.   During the same period of time that defendant JOHN W. ASHE agreed to arrange meetings between defendant NG LAP SENG, a/k/a "David Ng," and defendant FRANCIS LORENZO and the Prime Minister, ASHE continued to solicit payments from LORENZO in connection with the construction of the private basketball court on ASHE's property.  For example, on September 9, 2011, ASHE emailed LORENZO that his family had "obtained final approval from our Village's Planning Board to proceed with the construction of the basketball court" and that ASHE would keep LORENZO informed about the estimated construction cost

from the contractor.  On October 18, 2011, ASHE emailed LORENZO the contractor's proposal for the basketball court, which included a $20,000 down payment due to the contractor.  ASHE told LORENZO that ASHE would be grateful if LORENZO "could make [arrangements] for a check in the amount be mailed directly to [the contractor] (at the address given at the top of the proposal) prior to [LORENZO's] departure to [Hong Kong]."

28.   In addition to soliciting payments for his family vacation and basketball court installation, in or about May 2011, defendant JOHN W. ASHE arranged through defendant FRANCIS LORENZO to begin paying ASHE's wife as a purported "consultant" for NGO-1.  On May 19, 2011, ASHE sent LORENZO an email stating "here's the banking information for the consultant option we decided on" followed by bank account information for an account belonging to ASHE's wife.  I know from my review bank records, that between January 2011 and at least December 2014, NGO-1 paid ASHE's wife $2,500 per month.  According to tax filings made by ASHE and ASHE's wife, ASHE's wife claims to work as a "climate change consultant" for NGO-1, although based on my review of NGO-1's documents and emails I have been unable to determine what actual work, if any, ASHE's wife has actually done for NGO-1.  In fact, based on my review of emails, I know that LORENZO and other NGO-1 employees regularly emailed ASHE himself, and not ASHE's wife, when the monthly $2,500 check to ASHE's wife was ready to be picked up at NGO-1's offices in New York, New York.

29.   At the same time that defendant JOHN W. ASHE and his wife were receiving payments and gifts from NGO-1, ASHE arranged for the Prime Minister to meet with defendant NG LAP SENG, a/k/a "David Ng," in New York.  Based on my review of emails and travel records, at the request of ASHE, NGO-1 paid for first-class airline tickets for the Prime Minister and six other Antiguan officials to fly to New York during the week of September 2011, when both NGO-1's "award ceremony" and the annual UNGA meeting was taking place.[4]  Based on my review of travel records and other documents, I know that the Prime Minister traveled to New York between September 18, 2011 and September 25, 2011 and NGO-1 paid for the airfare for the Prime Minister and his delegation as well as their hotel rooms in New York.  Based on my review of travel records, I also know that NG arrived in New York on or about September 18, 2011.  On September 20, 2011, ASHE emailed defendant FRANCIS LORENZO that "[t]he PM has confirmed his availability for

---

[4]    ASHE also requested that NGO-1 pay for the Prime Minister to travel to other cities within in the United States during the week following the UNGA meeting in 2011.

the proposed meeting with the investor on Thursday [September 22, 2011]."

## NG and LORENZO Continue Payments to ASHE and His Wife In Exchange For an Official UN Document From ASHE in Support of NG's Macau Conference Center

30.   As described below, beginning in or about September 2011, following payments to defendant JOHN W. ASHE from the NGO funded by defendant NG LAP SENG, a/k/a "David Ng," and arranged through defendant FRANCIS LORENZO, for ASHE's official action in promoting NG's business interests in Antigua, NG and LORENZO arranged for additional payments to ASHE so that ASHE would use his position representing a member state at the United Nations to cause the UN to promote a conference center in Macau being developed by NG.

31.   Based on my review of e-mails and other documents, I know that since at least 2010, defendant NG LAP SENG, a/k/a "David Ng," and the Macau Real Estate Company have been encouraging the development of an expansive conference facility in Macau, which they have touted as "The Permanent International Conference Center for the United Nations South-South Cooperation."  According to a brochure for the UN Macau Conference Center, the multi-billion dollar center is proposed to house, among other things, a "Global Business Incubator," which "will serve as a facilitator to governments and the private sector to build the capacity of South-South countries to leverage innovation and creativity in achieving the Millennium Development Goals."

32.   I know based on my review of emails and other documents that in the months following September 2011 defendant JOHN W. ASHE began advocating for the development of the UN Macau Conference Center of defendant NG LAP SENG, a/k/a "David Ng."  Based on my review of emails, I know that on November 11, 2011, a "development consultant" for NGO-1 (the "NGO-1 Development Consultant") drafted a letter purportedly addressed from the Antiguan Prime Minister (the "November 2011 Letter"), which highlighted the supposed importance of developing a Global Business Incubator such as the one anticipated to be housed by NG's UN Macau Conference Center.  The NGO-1 Development Consultant emailed the November 2011 Letter to ASHE for his approval and copied defendant FRANCIS LORENZO.  After receiving the November 2011 Letter, ASHE gave his approval for the November 2011 Letter and told the NGO-1 Development Consultant that NGO-1 was authorized to sign the letter on behalf of the Prime Minister.

33.  Approximately one month after authorizing the November 2011 Letter in support of the Global Business Incubator being developed by defendant NG LAP SENG, a/k/a "David Ng," defendant JOHN W. ASHE solicited additional payments from NG through defendant FRANCIS LORENZO.  Specifically, on or about December 19, 2011, ASHE emailed LORENZO and another employee of NGO-1 (the "NGO-1 Employee") to request that NG begin contributing funds to ASHE's anticipated UNGA Presidency.  In the email, ASHE told LORENZO and the NGO-1 Employee, in sum and substance, that ASHE had recently received the endorsement of the UN Group of Latin American and Caribbean States, which he believed meant that his election as the UNGA President in June 2013, some 18 months later, was virtually guaranteed.  ASHE further stated that NG had indicated when they met in China that NG would "assist" ASHE in "whatever way necessary" to make ASHE's Presidency a "success."  ASHE then stated he was faced with the "daunting task" of raising sufficient funds to "ensure that my tenure as PGA is a successful one" and that "[a]gainst this backdrop, Ng's promise to assist is indeed very welcome and absolutely essential."  ASHE attached to the email a document outlining his official powers as the expected UNGA President and ASHE's goal of soliciting more than $3,000,000 for his Presidency.  ASHE asked LORENZO and the NGO-1 Employee to pass on the proposal to NG.

34.  I know from my review of emails that on February 9, 2012, defendant FRANCIS LORENZO emailed defendant JOHN W. ASHE to propose that they meet the next day.  Later that same night, the NGO-1 Development Consultant emailed LORENZO a draft document to be submitted by ASHE to the UN Secretary General claiming that Antigua and other countries had recently launched a Global Business Incubator such as the one proposed to be housed by defendant NG LAP SENG, a/k/a "David Ng's" UN Macau Conference Center (the "Draft UN Document").  On February 15, 2012, the NGO-1 Development Consultant sent LORENZO an updated version of the Draft UN Document, which LORENZO then forwarded to ASHE.  Three minutes after sending ASHE the Draft UN Document, LORENZO sent ASHE an email stating, "John remember to send your driver tomorrow afternoon to pick up the check."  Bank records reflect that on February 15, 2012, NGO-1 wrote a $2,500 check to ASHE's wife that was then deposited into ASHE and his wife's joint bank account on February 16, 2012.

35.  I know from my review of emails that, between February 15, 2012 and February 23, 2012, defendants JOHN W. ASHE and FRANCIS LORENZO and the NGO-1 Development Consultant exchanged several revisions and comments to the Draft UN Document, which, in sum and substance, promoted the launching of a Global Business Incubator, identical to

14

the one defendant NG LAP SENG, a/k/a "David Ng," was seeking to be housed by the UN Macau Conference Center.

36.    On February 24, 2012, after defendant JOHN W. ASHE and his wife had received approximately $38,000 in cash payments from NGO-1, and had solicited other things of value such as a family vacation and the private basketball court described above, ASHE introduced a UN document in support of the Global Business Incubator, which was substantially identical to the Draft UN Document sent to ASHE by defendant FRANCIS LORENZO.  Specifically, on February 24, 2012, ASHE signed UN Document Number A/66748 (the "Official UN Document"), a letter from ASHE to the UN Secretary General concerning the Global Business Incubator.  In the Official UN Document, ASHE stated that the Antiguan Prime Minister and other heads of state had decided to launch a Global Business Incubator at a meeting hosted by NGO-1 on September 23, 2011.  The Official UN Document claimed that there was "a need for a Global Business Incubator, to harness the potential of small businesses through ICT [information and communications technologies] and through greater access to global markets. . . . The Global Business Incubator will serve as a facilitator for Governments and the private sector in building the capacity of developing countries to leverage innovation and creativity in achieving the [UN] Millennium Development Goals."  After submitting the Official UN Document, ASHE emailed a copy to LORENZO and stated, "As agreed, the request has been submitted."  On March 26, 2012, after the Official UN Document had been processed and assigned a formal document number, ASHE emailed a copy of the Official UN Document with the document number to LORENZO and said, "The final product."

37.    After defendant JOHN W. ASHE sent the Official UN Document in support of the UN Macau Conference Center to the UN Secretary General, defendant FRANCIS LORENZO, NGO-1, and defendant NG LAP SENG, a/k/a "David Ng," used the document to promote the building of the UN Macau Conference Center.  For example, March 20, 2012, LORENZO forwarded the Official UN Document to the Secretary General of the International Telecommunication Union, which is a specialized agency of the UN dedicated to information and communication technologies. On April 18, 2012, LORENZO forwarded the Official UN Document again, this time to an executive at UN Habitat.  And on October 23, 2012, LORENZO forward the Official UN Document to an investment banking firm based in Hong Kong. In each of these instances, LORENZO used the existence of the Official UN Document to imply that the conference center NG was seeking to develop was likely to be supported in some fashion by the United Nations.

15

<u>LORENZO and YIN Arrange for Additional Payments From NG to ASHE and
His Wife To Obtain Additional Official UN Support for NG's UN Macau
Conference Center</u>

38.    As described in more detail below, between in or about
January 2013 and through defendant JOHN W. ASHE's UNGA Presidency,
which ended in or about September 2014, defendants NG LAP SENG, a/k/a
"David Ng," JEFF C. YIN, a/k/a "Yin Chuan," and FRANCIS LORENZO
arranged for hundreds of thousands of dollars in additional payments
to ASHE so that ASHE would continue to push for UN support for NG's
Macau Conference Center.

39.    I know from my review of emails that, after defendant
FRANCIS LORENZO successfully arranged for defendant JOHN W. ASHE to
submit the Official UN Document in support of the UN Macau Conference
Center in or about February 2012, defendants NG LAP SENG, a/k/a "David
Ng," and JEFF C. YIN, a/k/a "Yin Chuan," later became impatient with
the pace of LORENZO's continued progress towards the development of
the UN Macau Conference Center.  For example:

a.    On January 5, 2013, YIN emailed LORENZO with the
subject line "From Ng."  YIN said that NG had instructed YIN to write
LORENZO and that NG wanted to meet with LORENZO in New York the
following week.  YIN added that NG's "top priority right now" was the
UN Macau Conference Center and that NG wanted LORENZO to prepare a
brochure for the UN Macau Conference Center that included the "UN's
approval document."

b.    On January 29, 2013, after LORENZO's meeting with NG
in New York earlier that month, YIN sent LORENZO another email with
the subject line "Urgent Matter."  YIN told LORENZO, "The urgent
matter as of now is that Mr. Ng has given you a deadline to complete
the task of obtaining approval for the Convention Center project."
YIN added that "your 30k for month of jan will be wired tomorrow,
along with Feb, so that makes it 60 to be received."  LORENZO replied
"Jeff I started working on it and I am waiting for the transfer to
speed the process."[5]

---

[5]    I know from my review of bank records and emails, that beginning
in or around this time LORENZO began receiving monthly wire transfers
from NGO-1 of $30,000 per month to a company based in the Dominican
Republic for which LORENZO's sibling serves as the general manager.
These payments were in addition to the approximately $20,000 per month
that LORENZO received from NGO-1 as his salary as President of NGO-1.

c.     On June 1, 2013, YIN emailed LORENZO and told LORENZO that NG wanted to meet with him the next afternoon.   YIN told LORENZO that one of the topics to be discussed with NG was a "project update."

40.    Following these repeated demands from defendants JEFF C. YIN, a/k/a "Yin Chuan," and NG LAP SENG, a/k/a "David Ng," that progress be made on the UN Macau Conference Center, defendant FRANCIS LORENZO arranged for defendant JOHN W. ASHE to approve a revised Official UN Document (the "Revised Official UN Document"), which specifically promoted NG's Macau Real Estate Company as the developer for the proposed Global Business Incubator.  Specifically, I have learned the following from my review of emails and other documents:

a.     On May 23, 2013, LORENZO emailed ASHE a draft of the Revised Official UN Document, which was substantially similar to the original Official UN Document, except that, in addition to promoting the Global Business Incubator, ASHE's letter to the UN Secretary General added a paragraph that stated, "I am pleased to inform you that in response to the recommendation [for a Global Business Incubator], [the Macau Real Estate Company] of China has welcomed the initiative and will serve as the representative for the implementation of the permanent Expo and meeting Center for the country of the south [sic].   This is one of the first centres in the network of incubator centres in a public-private partnership with the support of and leading partner [NGO-1]."  In his email to ASHE, LORENZO told ASHE that, "[a]fter speaking with [a particular UN official ('UN Official-1')] in reference to the paragraph that need to be inserted in the letter he said that the letter will be the same the only thing that they will do is put Rev.1 and add the paragraph. He said that it will be easy this way."

b.     On June 5, 2013, after emailing the document to ASHE, LORNEZO emailed the draft Revised Official UN Document to UN Official-1 and added in the body of the email:  "As per our conversation enclose [sic] see the letter that I sent you before so you can advise me if it is ready."  UN Official-1 emailed LORENZO back the next morning and told him that the document would be issued by Monday, June 10, 2013.

c.     On Monday, June 10, 2013, another UN employee emailed LORENZO and ASHE the final Revised Official UN Document.   The Revised Official UN Document was substantially similar to the draft version sent by LORENZO to ASHE as described above.   Specifically, the Revised Official UN Document was a letter from ASHE to the Secretary General promoting the development of a center built by NG's Macau Real Estate

Company to host a Global Business Incubator. The Revised Official UN Document had the same UN document number as the original Official UN Document but contained a footnote claiming that the document was supposedly reissued for "technical reasons."

        d.   I know from my review of bank records that between on or about January 1, 2013 and the date that ASHE's Revised Official UN Document was issued, ASHE and his wife received approximately $100,000 from NGO-1. In addition to ASHE's wife monthly $2,500 payment, on February 15, 2013, NGO-1 wrote a $25,000 check to ASHE directly. Moreover, beginning in or about April 2013, ASHE started receiving $10,000 a month from another NGO related to NGO-1 for which LORENZO is also the President ("NGO-3").

    41.   After defendants JOHN W. ASHE and FRANCIS LORENZO arranged for the Revised Official UN Document in support of defendant NG LAP SENG, a/k/a "David Ng's" UN Macau Conference Center, NG and defendant JEFF C. YIN, a/k/a "Yin Chuan," continued to demand that further progress be made towards the development of the project. For example, I know from my review of emails the following:

        a.   On July 22, 2013, YIN emailed LORENZO and told LORENZO that NG wanted a "[p]rogression report for the Expo/Meeting Center" as soon as possible. On July 25, 2013, LORENZO emailed YIN that "[i]n reference to the Center I am waiting for you to send me the proposal so I can move forward with the [NGO-1] Unit and UN HABITAT I have met with them already and they are waiting to see the proposal with the financing."

        b.   On August 29, 2013, YIN emailed LORENZO and told LORENZO that NG would be in New York the next day to discuss with LORENZO the update on the "Expo/Meeting center."

        c.   On November 19, 2013, YIN sent LORENZO another email demanding that progress be reported on the UN Macau Conference Center because NG was "extremely un-satisfied with the progression." YIN further told LORENZO that unless progress was made, "[t]he wire will be on halt."

    42.   Following these continued demands by defendants JEFF C. YIN, a/k/a "Yin Chuan," and NG LAP SENG, a/k/a "David Ng," that defendant FRANCIS LORENZO show progress on the development Macau Conference Center, LORENZO arranged for defendant JOHN W. ASHE to travel to Macau with other UN officials to meet with NG in exchange

for a $200,000 payment to one of ASHE's PGA Accounts.  Specifically,
I have learned the following:

        a.    On or about January 22, 2014, LORENZO emailed YIN and
told him that LORENZO had met with ASHE's office and that the best
dates for ASHE to visit Macau were March 22 and 23, 2014.   YIN
responded, "Let me confirm with Ng, is this an official or un-official
visit?"  LORENZO responded, "Un official."  Later, on or about
February 18, 2014, YIN wrote LORENZO again and said that NG had changed
his mind and was requesting that ASHE's visit to Macau be an "official
visit."

        b.    On or about March 3, 2014 -- three days before NG and
defendant YIN landed at JFK with $300,000 in United States currency,
as described in paragraph 19 -- YIN emailed LORENZO and told LORENZO
to meet NG at a restaurant on March 6, 2014.  YIN further told LORENZO
"we have a few things that have been outstanding for a long time:
. . . Iternary [sic] and flight info for the PGA [President of General
Assembly] group, to confirm arrival time March 22 . . . [and]  History
and progression of the approval document for the Expo Center."

        c.    On March 4, 2014, LORENZO emailed ASHE a formal
"Special Invitation" from the Macau Real Estate Company and NGO-1
for ASHE to travel to Macau between March 22 and March 23, 2014.
According to the invitation, ASHE would be accompanied on the trip
by ASHE's "Chef de Cabinet," who is also the Permanent Representative
of a different country to the UN, and ASHE's Special Assistant to
the President.  According to the "Preliminary Agenda" for the trip,
on March 22, 2014, ASHE and the other UN officials were scheduled
to arrive at the Hong Kong Airport, where they would be greeted by
the Macau Real Estate Company, and then they would be flown by
helicopter to Macau.  Later that day they would attend a meeting and
presentation by the Macau Real Estate Company at one of the company's
real estate development sites to be followed by a "formal dinner."
After spending the night at a luxury hotel in Macau, ASHE's delegation
would then fly back home the next day.

        d.    On March 5, 2014, ASHE emailed LORENZO in response
to the formal invitation.  ASHE wrote that "I am asking [NG] to make
a contribution the the [sic] Office of the PGA if he wants me to go
out of my way to visit Macau to see his project.  . . . Even though
Ng has made a lot of empty promises in the past, I am willing to travel
to Macau to see his project, since it is important to him.  But it
has to made absolutely clear to him that I will not go unless I see
the funds - funds which are NOT for my personal use but to help run
the PGA office.  Period.  Please let them know that I am requesting

somewhere between $100 K and $250K to be deposited in the following account: [information for PGA Account-2]." As described above, and set forth in detail below, even though ASHE claimed that the funds he was requesting from NG in order to travel to Macau were not for his personal use, the PGA Accounts were set up by ASHE personally and he transferred almost $1,000,000 from the PGA Accounts to his other personal bank accounts.

      e.    On or about March 20, 2014, YIN sent an email to an email account that appeared to belong to a travel company based in Hong Kong. YIN's email stated, among other things, "My guests are from the United Nations," and then listed four individuals, including ASHE, LORENZO, ASHE's Chef de Cabinet, and ASHE's Special Assistant.

      f.    I know from my review of travel records, that ASHE, ASHE's Chef de Cabinet, and ASHE's Special Assistant flew to Hong Kong on or about March 22, 2014 and flew back to New York on or about March 23, 2014, which is consistent with the agenda contained in the "Special Invitation" from NG's Macau Real Estate Company and NGO-1 to ASHE.

      g.    In April 2014, shortly after ASHE and LORENZO's meeting with NG in Macau, NG set up a non-profit Delaware corporation (the "Delaware Corporation") with NG as its Chairman and LORENZO as its President. According to documents I have reviewed, the Delaware Corporation is purportedly "a nonprofit organization that was launched during the sixty-sixth session of the General Assembly, in response to the [Revised Official UN Document]. [The Delaware Corporation] has been appointed to serve as the representative for the implementation of the permanent expo center. It is one of the first centres in the network of incubator centres in public-private partnership, with the support of leading partner [NGO-1]."

      h.    On or about May 22, 2014, approximately two months after ASHE's visit to meet NG in Macau, LORENZO emailed YIN the following: "Jeff[,] see the bank account of the PGA [President of General Assembly] office. Try to send that wire as soon possible and when you send it let me know so I can advise him. There are a lot of things that need to be done here. He want to know when Ng will come here[.] I am working to get the things we need[.]" Following the text of the email, LORENZO listed the bank account information for ASHE's PGA Account-2. On June 2, 2014, ASHE forwarded the information for PGA Account-2 to LORENZO again.

i.    I know based on my review of bank records that, on or about June 3, 2014, NGO-1 wired $200,000 to ASHE's PGA Account-2.[6] I also know that between January 2014 and June 2014, during the time that ASHE agreed to meet with NG and visit his project in Macau with other UN officials, NGO-1 and NGO-3 had paid approximately $50,000 to ASHE and his wife.

42.    Based on, among other things, my review of emails, I know that construction has not yet started on the UN Macau Conference Center.   I know from my review of a brochure for the UN Macau Conference Center that the project had been scheduled to "launch" at an event hosted by the Macau Real Estate Company on December 20, 2014, in conjunction with a "High-Level Partnership Forum On The Importance of Creative Economy South-South Cooperation and ICT To Achieve Sustainable Development."   According to the brochure, the "Opening Address" for this program was scheduled to be given by ASHE.

43.    On or about September 19, 2015, following his arrest on the charge described above, defendant JEFF C. YIN, a/k/a "Yin Chuan," waived his *Miranda* rights and was interviewed by the FBI.   During the interview, which was recorded, YIN told FBI agents, among other things, that his co-defendant, NG LAP SENG, a/k/a "David Ng," viewed the building of the UN Macau Conference Center as NG's "legacy" in Macau.   YIN further admitted that NG, assisted by YIN, had made payments to obtain official action from the UN on this project.

### YAN AND PIAO ARRANGE PAYMENTS TO ASHE IN EXCHANGE FOR OFFICIAL ACTIONS ON BEHALF OF VARIOUS CHINESE BUSINESSMEN

44.    Based on my review of emails and travel records, I know that defendant JOHN W. ASHE traveled to Hong Kong in April 2012, where ASHE met with defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park."   ASHE's meeting with YAN and PIAO was in or around the same time period that ASHE had stated to defendant FRANCIS LORENZO, in sum and substance, that ASHE was virtually assured of being elected the UNGA President and that he was hoping to secure more than $3,000,000 for his Presidency.   After meeting ASHE in Hong Kong, YAN and PIAO, as described in more detail below, arranged for hundreds of thousands of dollars of bribes to be paid to ASHE in return for, among other things, ASHE taking official action on behalf of

---

[6]    Five days later, on or about June 8, 2014, ASHE emailed LORENZO and stated: "Going to Antigua on Thursday to vote and would need to take something for the PM.  Hope I can have the $26 K in cash before then."

various Chinese businessmen seeking to obtain lucrative investments
and government contracts in Antigua and elsewhere.

## YAN and PIAO Facilitate a $300,000 Bribe to ASHE On Behalf Of a Chinese Media Executive

45.   Shortly after JOHN W. ASHE, the defendant, met with
defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a
"Heidi Park" in Hong Kong in April 2012, YAN and PIAO facilitated
a $300,000 payment to ASHE on behalf of a co-conspirator not charged
herein ("CC-1"), a Chinese media executive seeking to invest in
Antigua and potentially to obtain Antigua citizenship for himself
or others.  Specifically, I have learned the following based on my
review of emails, bank records, and other documents:

a.   On or about May 29, 2012, YAN emailed ASHE to report
that "I think we have secured USD3M," to which ASHE responded "[in]
view of the new and positive developments, I look forward to meeting
with you in New York or somewhere else if that is possible."

b.   On or about July 17, 2012, ASHE met with YAN and PIAO
in New York.  The next day, ASHE emailed YAN and PIAO the account
information for PGA Account-1 and stated "please find below the
related info for the matter we discussed yesterday to get the ball
rolling."  ASHE added that "this will be the account for the PGA
funding as well."  YAN emailed ASHE back, "Great!  Thanks!" and PIAO
emailed ASHE, "I shall get to work on it right away."

c.   On July 23, 2012, YAN sent the following email to ASHE,
copying PIAO: "Dear John, a quick note to let you know that I will
send first $300.000 to the account this week.  Sheri."  The next day,
on July 24, 2012, PIAO sent an email to ASHE, with a copy to YAN,
stating the following: "Just got the notice that the $300,000 will
be in your account by tomorrow, please check to receive.   This 300,000
is from [CC-1], 10% of 3M just to show his goodwill."  In response
ASHE wrote "Will inform the bank.  Thanks for the efforts."

d.   On or about July 25, 2012, PGA Account-1 received a
$300,000 wire from a particular individual ("Individual-1") who is
an American citizen based in the United States and is a business
associate of YAN and PIAO, who YAN and PIAO have repeatedly asked
to wire money on their behalf at times relevant to this Complaint.
Following receipt of the wire, ASHE wrote to YAN and PIAO: "I wish
to confirm receipt of the first tranche of funds in the amount of
$300,000."

e. The next day, on July 26, 2012, ASHE sent an email to YAN and PIAO telling them, in sum and substance, that ASHE would travel to Antigua to advocate for CC-1's business interests with Antiguan government now that CC-1 had paid $300,000. In particular, ASHE stated the following to YAN and PIAO, in relevant part:

. . . .

This bring [sic] me then to [CC-1] and more importantly this initial contribution of $300,000. As I recall from our discussions, these funds were intended as a show of "good faith" by him re. his interest in developing a base/hub in Antigua and Barbuda AND (equally important) enable me to demonstrate to my interlocutors that he is indeed serious. To be totally upfront then, the funds in question will allow me to "start the conversation" (my exact words when we last met) when I visit Antigua in the next week or so.

. . .

After our discussions last week, and given the long lead time it takes to get things moving - even in a small country such as my own - I had already alerted my interlocutors in Antigua to anticipate [CC-1]'s "show-of-good faith." It was against this backdrop that my visit to Antigua was planned.

f. On August 4, 2012, ASHE emailed YAN and PIAO that he would be traveling to Antigua in the coming days. ASHE told YAN and PIAO that he was traveling to Antigua in order "to begin the 'conversation' on [CC-1's] initiative with the folks down there. As you can see it is a very short visit, the sole purpose of which is to get my superiors to focus on the this [sic] important initiative and to lay the groundwork for [CC-1's] future meeting with the decision makers on my side. Most - if not all - of the initial contribution you have forward to account will be used on this trip so any additional contribution(s) to the account before Thursday would be most welcomed."

g. Three days later, on or about August 7, 2012, ASHE sent an email to YAN and PIAO stating, in relevant part:

I am trying to . . . opening a direct channel to the top decisionmaker, the Prime Minister (with whom I will be meeting, one-on-one when I arrive in Antigua on Thursday). The plan is to sell [the Prime Minister] on the initiative AND arrange for him to meet with [CC-1] (and co.), either here in NY in September, when he (the PM) comes up for the UN General next month, to be followed by a visit by [CC-1] (and co) to Antigua in early October.  This way, the PM will determine whether or not he needs to involve other levels of government and at what time.

. . .

. . . As an aside, my brother heads the Financial Services Regulatory Commission (FSRC), which is the independent authority responsible for approving the establishment of offshore banks (a goal of [CC-1], you may recall) and the Minister of Finance is a high school classmate of mine. The point here is that, after [CC-1] meets the Prime Minister and he subsequently travels to Antigua, he will be able to meet all the folks who matter.

  h. ASHE traveled to Antigua between on or about August 9, 2012 and August 11, 2012.  On the same day that ASHE returned from Antigua he emailed YAN and PIAO the following, in relevant part:

Madam S/Madam H,

Just returned from Antigua about 90 mins ago and thought I better pen this while it is fresh in mind.

Although I was only in Antigua for 48 hrs I did managed [sic] to meet with all the key decision makers to discuss [CC-1]'s plans; that I had the initial resources in hand as proof of his intentions (and which have now been fully utilized), certainly served the intended purpose of focusing minds and getting the conversation started.  Ends result: I have been given the green light to fully engage [CC-1] and to mutually agree on a way forward.  . . .

PIAO replied to ASHE's email:  "Thank you for the wonderful news, only you can bring this matter up to the highest level within such a short time.  Sheri met with [CC-1] earlier today, and gave him a briefing, he was very pleased to hear the good news."

46.   From my review of bank records for PGA Account-1, I know that defendant JOHN W. ASHE disbursed the bulk of $300,000 payment from CC-1 discussed above as follows:

a.   ASHE sent $100,000 to the Prime Minister, in a series of five $20,000 checks

b.   ASHE sent approximately $13,000 to the political party of the Prime Minister.

c.   ASHE paid approximately $40,000 to a BMW dealership in Manhattan, where ASHE signed a lease for 2013 BMX model X5.

d.   ASHE paid approximately $35,000 to a credit card company used by him and his wife.  ASHE used the money to pay off balances that he and his wife had accumulated from charges for purchases such as online shopping, restaurants, massages, video games, sporting goods, and his wife's personal travel.

e.   ASHE transferred $20,000 to his joint bank account with his wife and withdrew another $13,500 in cash.

## YAN and PIAO Begin Monthly Payments to ASHE After He Is Elected UNGA President

47.   Based on my review of emails and other documents, I know that after defendant JOHN W. ASHE was elected UNGA President in June 2013, defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," began making monthly payments of approximately $20,000 to ASHE under the guise of being the "Honorary Chairman" of NGO-2 with which ASHE had no prior involvement or knowledge. Specifically, I have learned the following from my review of emails, bank records, and other documents:

a.   On or about August 2, 2013, ASHE, YAN, and PIAO arranged to have dinner at a restaurant in New York, New York.  Later that same night, ASHE sent YAN and PIAO two emails, one titled "PGA Banking Info" and the other titled "Personal Banking Info," which respectively contained the account information for ASHE's PGA Account-2 and one of his personal bank accounts jointly held with his wife.  In response to ASHE's personal bank account information, PIAO replied to ASHE and YAN, "Will get on it right away."

25

   b.   On Saturday, August 3, 2013, PIAO sent another reply to ASHE and YAN to ASHE's email with his personal bank account information stating, "It is done.  Waiting to score."

   c.   On or about August 5, 2013, ASHE's joint bank account with his wife received a wire of $19,975 from a company associated with YAN and PIAO.  ASHE replied on Monday morning, August 5, 2013, "Wish to confirm receipt of US $19,975.00 today to my personal bank account and to thank you profusely for delivering on your promise re. the same.  Grateful if you could provide me with a bit of info on the body on which I have been designated to serve as Honorary Chairman."  PIAO replied "Glad that we finally are able to implement our good will, this is just a start :)," and told ASHE that they would provide him with the information about the organization for which he would be "Honorary Chairman."  Following the initial payment to ASHE in August 2013, YAN and PIAO began paying ASHE $19,975 per month for his purported role as "Honorary Chairman" of NGO-2, which is an organization run by YAN and PIAO supposedly to promote sustainable global development.

## YAN and PIAO Arrange Additional Payments to ASHE in Exchange For Official Actions On Behalf of a Chinese Security Company

   48.   Defendant JOHN W. ASHE formally assumed the role as the 68th President of UNGA in September 2013.  Based on my review of emails, bank records, and other documents, I know that on September 17, 2013, ASHE and the UN Secretary General hosted a reception to mark the opening of the 68th Session of UNGA.  At ASHE's request, defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," arranged for a Chinese security technology executive ("CC-2") to send wires of approximately $100,000 to ASHE's PGA Account-2, supposedly to reimburse ASHE for half the cost of the reception.  Approximately one month later, ASHE accompanied CC-2 and PIAO to Antigua so that CC-2 could seek to sell his product to Antiguan officials.  Specifically, I have learned the following:

   a.   On September 4, 2013, ASHE emailed YAN and PIAO that plans were "well underway" for the September 17 reception, although the Secretary General's office had asked ASHE to pay for the reception in its entirety.  ASHE told YAN and PIAO that he "warmly welcome[d] your generous offer to share half the cost of this reception with me."

   b.   On September 12, 2013, PIAO emailed ASHE, with a copy to YAN, a list of attendees for the reception.  The list included YAN

26

and PIAO themselves, CC-2, and another Chinese media executive.   Next
to CC-2's name PIAO noted that CC-2 was the "sponsor."

        c.   On September 16, 2013, ASHE's PGA Account-2 received
three wires from a particular bank in China (the "Chinese Bank")
totaling approximately $100,000.  The memo for each of the wires
stated "Beijing Sponsorship," and the memo for one particular wire,
in the amount of $9,985, specifically noted that it originated from
CC-2.  That morning, PIAO sent an email to ASHE, copying YAN, informing
ASHE that "[o]ur office" had wired the funds from Beijing three days
earlier.  ASHE emailed YAN and PIAO confirmation that he had received
the funds.  Later that day, PIAO emailed ASHE, again copying YAN, and
told ASHE that PIAO, ASHE, and CC-2 had "a very pleasant visit to
your office this morning" and they were "warmly received."  PIAO added
that CC-2 had decided to visit to Antigua and that he had also wanted
to make a "small contribution" the Prime Minister's upcoming trip
to New York for the UNGA meeting through ASHE.  ASHE replied to PIAO,
"[l]et me know what he has in mind re. the PM's trip when we meet
tomorrow."

        d.   Approximately one month later, YAN and PIAO arranged
for PIAO, ASHE, and CC-2 to travel to Antigua together so that CC-2
could meet Antiguan officials about a possible business deal.   On
October 22, 2013, PIAO emailed ASHE and YAN and said that "the purpose
of the visit to Antigua is about to 'help' a Chinese company [the
"Chinese Security Company"] to invest $20m in Antigua to build a
national internet security system."  Later that day, PIAO emailed
ASHE and YAN information about the Chinese Security Company and told
ASHE that their agenda for the trip was "1. Meeting with the relevant
ministers to present the proposal  2. If your country is interested,
we would like have an one page meeting memo to show the interest from
your government.  3. Invite Chinese Ambassador to have lunch or dinner
to brief him on this project,  4. Invite your country Ministers to
visit China and meet with the top leader of [The Chinese Security
Company]."

        e.   On October 22, 2013, ASHE emailed PIAO and YAN with
the subject line "Trip to Antigua."  ASHE said that "[t]he Minister
will be at the airport to meet you on arrival tomorrow.  He is quite
keen to hear the proposal so his staff will take you to a nearby tech
facility so that you can make the presentation.  See you onboard.
Cheers."  A few minutes later ASHE sent another email to PIAO and YAN
and stated "[f]orgot to add that, as a testament to your importance,
the Minister also wanted you to know that he would be available to
meet with at 10:00 a.m. on Wednesday, October 30, in Washington D.C.
for any follow-up discussions for tomorrow's meeting."

        f.    On October 23, 2013, ASHE and PIAO traveled to Antigua
from New York.   CC-2 flew to Antigua on or about the same date from
Beijing.  ASHE and PIAO subsequently returned to New York the
following day.

        g.    Following the trip to Antigua, ASHE also facilitated
a meeting between executives for Chinese Technology Company and
officials of Kenya, where the Chinese Technology Company was also
looking for business.  On October 30, 2013, PIAO emailed ASHE with
a copy to YAN, telling ASHE that CC-2 was in Nairobi, Kenya, where
he would be joined by other individuals from the Chinese Technology
Company, and that "they hope you can arrange them to start meeting
with someone from the Ministry of Internal Affairs."  ASHE replied
"Noted."  On November 3, 2013, PIAO emailed ASHE, with a copy to YAN,
and said that even though CC-2 had not yet received a call from a
particular senior Kenyan foreign official, YAN and PIAO thanked for
ASHE for "making such an effort" to set up the meeting for the Chinese
Technology Company since "now [the Chinese Technology Company]
recognizes our strong government connection."

        h.    Two days later, on November 5, 2013, ASHE emailed YAN
and PIAO: "I have been in touch with [a particular Kenyan UN official
('Kenyan UN Official-1')] . . .  and informed him of your desire to
meet with him when he's in Beijing.  He has agreed and will be providing
me with his contact details once he gets there on Thursday.  Once he
does, I will forward you the same so you (and/or the [Chinese Security
Company] reps) can meet with him.  BTW he has indicated that Kenyan's
[sic] [senior intelligence official] is now keen to meet with the
[Chinese Security Company] reps when the latter return to Nairobi."
On November 7, 2013, ASHE emailed YAN and PIAO that "[Kenyan UN
Official-1] informs that he is available with [the Chinese Technology
Company] reps on Saturday afternoon," and provided YAN and PIAO with
the Kenyan UN Official-1's contact information.  ASHE added "[t]he
ball is now in your court but please let me know if anything is needed
from my end to make it happen."

        i.    On November 9, 2013, YAN emailed ASHE that she had
"a very interesting dinner with [Kenyan UN Official-1] and the
conversation was productive."  Later that day, ASHE told PIAO and YAN
that he had received an update on their meeting from Kenyan UN
Official-1 and that Kenyan UN Official-1 informed ASHE that he would
seek to make arrangements for the Chinese Technology Company "to meet
with those who are best placed to make a decision on the procurement
of the equipment . . . ."  Later the same day, ASHE emailed YAN and
PIAO and asked for the dates for when the Chinese Security Company

                                  28

individuals would next be in Kenya so that ASHE would be able to "keep the pressure up" on Kenyan UN Official-1.

> j. In December 2013, ASHE solicited $100,000 from PIAO and YAN supposedly in order to pay for his staff's holiday party. On December 4, 2013, ASHE emailed YAN:

> > Re. the promised $100K, may I suggest the following approach re. remitting it to me. If the entire amount is to be sent in one shot then it's best to send it to the PGA account and then I can withdraw it in installments without raising any questions by the bank. This is my preferred approach since that account has been used for large amounts and would not raise any red flags.
> > . . .

> > Thanks...and lots of love

> k. On December 11, 2013, YAN emailed ASHE that $100,000 was being sent to one of the PGA Accounts. On December 12, 2013, PGA Account-2 received a $100,000 wire from Individual-1 who, as described above, is a United States-based business associate of YAN and PIAO, who YAN and PIAO have repeatedly asked to wire money on their behalf at times relevant to the Complaint.

> l. On December 23, 2013, ASHE arranged for a conference call between executives from the Chinese Security Company and two Antiguan Ministers. After the call, PIAO emailed ASHE, with a copy to YAN, and said that during the call the parties agreed on a further schedule of meetings and visits after which they would sign a memorandum of understanding ("MOU") and "move forward according to the implementation framework."

> m. On January 16, 2014, ASHE emailed PIAO that he needed some possible dates "for the visit by the [Chinese Security Company] folks to visit Antigua, pronto. The plan is to have them meet with the Ministers and sign the MOU. The Prime Minister may also participate in the meeting- depending on the date of the visit and his schedule."

> n. On April 2, 2014, PIAO wrote ASHE and informed him that the Chinese Security Company "team" would be arriving in Antigua on April 4, 2014. On April 6, 2014, ASHE emailed PIAO and YAN and said that a senior Antiguan national security minister had told him

that he had met with the Chinese Security Company executives and that the Minister had signed the final version of the MOU with the Chinese Security Company.  ASHE added "Bottom line: there is now a signed MOU between the Government of Antigua and Barbuda and [the Chinese Security Company]."  The subject line of ASHE's email to YAN and PIAO was "Delivering on a promise."[7]

        o.    Based on my review of records for PGA Account-2, I know that during the same period that ASHE was receiving payments from CC-2, YAN, and PIAO to facilitate the Chinese Security's Company business interests in Antigua and elsewhere, ASHE sent the Prime Minister himself approximately $170,000 from PGA Account-2.

<u>YAN and PIAO Arrange For a $200,000 Payment to ASHE in Exchange For Attending a Conference in China In ASHE's Official Capacity</u>

    49.    I also know from review of emails that after defendant JOHN W. ASHE became UNGA President, defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," also arranged for a $200,000 payment to ASHE in exchange for ASHE making an official appearance at a conference in China being organized by a Chinese real estate developer ("CC-3").  Specifically, from my review of emails, bank documents, and other documents, I have learned the following:

        a.    On October 18, 2013, PIAO emailed ASHE, with a copy to YAN, and told ASHE that PIAO and YAN had been working on obtaining additional funds for ASHE.  PIAO told ASHE that "an old friend of Sheri who is extremely wealthy" was organizing an international conference in Guangzhou, China (the "Guangzhou Conference"), and that PIAO and YAN had suggested that ASHE be invited to the conference.  PIAO attached a program for the conference that listed several current and former government officials as invited attendees, including ASHE. ASHE replied that the Guangzhou Conference was "very tempting indeed" and that he might make it, but that his entire "team" would need to accompany him.  YAN replied to ASHE that she had "[j]ust talk[ed] to Heidi, she is going to write to you.  In short, all the people who travel with you will be covered by the man and plus."  PIAO then replied to ASHE that "[w]e are sure that he will cover the cost of your team," and requested information about ASHE's team and travel plans.

---

[7]    The prior day, ASHE wrote YAN and PIAO and requested that they secure "the almost $300K" that ASHE supposedly needed to organize a concert at the UN.  ASHE also requested that the Chinese Security Company pay for street lights and iPads for the Antiguan government.

b.    On or about October 24, 2013, YAN emailed ASHE and
PIAO and stated "[a]ccording to our strategy plan, [CC-3]'s office
emailed me the invitation to John this morning . . . I will ask $200,000
for this trip. . . ." A few minutes later, YAN emailed ASHE, with
a copy to PIAO, a draft invitation from CC-3 to ASHE to attend the
Guangzhou Conference. YAN told ASHE that the invitation had been
approved by CC-3, and YAN added that "[a]s you may see that I purposely
add some words on future relationship between you and him, that will
establish a good platform for you today and tomorrow." The draft
invitation was addressed from CC-3 to ASHE as UNGA President and,
in addition to inviting ASHE to the Guangzhou Conference, CC-3 stated
that, "After attending this Summit, I wish that you would remember
that you have a sincere friend in Guangdong Province – the economic
powerhouse in China. And your friend here has the pleasure to offer
you a permanent convention venue for the UN meetings on the
sustainability and climate changes in the efforts to fully realize
the Millennium Development Goals, as well as for the 193 members of
the UN to convene for multilateral discussions on the topics of
priority concerns."

c.    On October 27, 2013, PIAO emailed ASHE and YAN and
told ASHE that "in order to have [CC-3] to wire the money to 68th PGA
account, we suggest that you write a courtesy letter (in 68th PGA
letterhead) to [CC-3] to accept his invitation, and in the letter
also list out the name and title for all the people to be travelling
with you, in order to make the logistic arrangement for them." The
next day, ASHE emailed the "courtesy letter" to CC-3 suggested by
PIAO. The letter was addressed to CC-3 from ASHE and was on official
UNGA President letterhead. In the letter, ASHE told CC-3 he was
pleased to accept CC-3's invitation to him and his team to attend
the Guangzhou Conference. ASHE stated that at the conference ASHE
would "deliver a statement on the topic of 'Identifying the Parameters
of the Post-2015 Development Agenda.'" ASHE then listed four UN
officials that would attend the conference with him and asked CC-3
to contact his special assistant to "finalize the logistical
arrangements."

d.    On October 29, 2013, PIAO emailed ASHE and YAN and
told ASHE that "in order to get the funding wired in ASAP," PIAO and
YAN recommended that instead of asking CC-3 to contact ASHE's special
assistant to make the "logistical arrangements," that ASHE revise
his letter to CC-3 to ask that the arrangements be made through YAN.
Later that day, PIAO emailed ASHE again, copying YAN, asking ASHE:
"As for the $200K from [CC-3], which account would you like it to
be wired to? The 68 PGA? Please advise." ASHE replied to PIAO and

YAN that the money should be wired to the "PGA account" and attached a revised letter to CC-3. In the revised letter, ASHE told CC-3 to have his staff "contact my Adviser on Economic Matters, Ms. Shiwei Yan, to finalize the logistical arrangements for the trip."

   e. Later that same day, ASHE sent two "letters of appointment" to YAN and PIAO, which were back-dated to the prior month, September 2013. In one letter, on UNGA President letterhead, ASHE informed each of YAN and PIAO that they had each been appointed "Adviser, Economic Matters" in ASHE's office. In the other letter, on Antiguan government letterhead, ASHE informed YAN and PIAO that they had each been appointed as "Adviser to Office of the Prime Minister of Antigua and Barbuda on matters pertaining to investments in Antigua and Barbuda from the entire Asia region." In the email enclosing the letters, ASHE stated, "I believe these complete the outstanding requests that were made to me."[8]

   f. On November 3, 2013, YAN emailed ASHE, with a copy to PIAO, telling ASHE that "Guangzhou has been wired 200k to PGA office today" and that "25k" had been wired to ASHE's travel agent. YAN also asked for the name of UN security personnel who would be traveling with ASHE to the Guangzhou Conference. On November 4, 2013, ASHE's PGA Acccount-2 received a $200,000 wire from China from one of CC-3's companies. That morning ASHE emailed YAN: "[c]an confirm receipt of $200k to the PGA."

   g. On November 17, 2013, ASHE attended the Guangzhou Conference. According to the agenda for the conference, ASHE gave a speech to the conference and then gave media interviews on global economic development.

---

[8] Based on my discussions with the Department of State, I understand that YAN and PIAO, who are naturalized United States citizens, were later accredited as diplomatic advisers for the period between September 2013 and September 2014, based on these backdated appointments by ASHE. At most, YAN and PIAO accordingly have residual official act immunity during this time period. As described above and below, YAN and PIAO facilitated the bribes to ASHE in their personal capacities, and as executives of NGO-2 -- seeking the diplomatic status conferred by ASHE simply as a way to expedite bribe payments -- and, in any event, many of their actions predated September 2013.

## LAUNDERING OF BRIBERY FUNDS

50.  Based on my review of bank records and other documents,
I know that payments described above facilitated by defendants SHIWEI
YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," to
defendant JOHN W. ASHE were transmitted from China as part of the
scheme to promote the bribery of the Antiguan Prime Minister detailed
above, and that steps were taken to conceal the source and nature
of the payments.[9]  For example:

a.   The $300,000 payment by CC-1 to ASHE in July 2012 to
PGA Account-1, which was facilitated by YAN and PIAO, a/k/a "Heidi
Park," in exchange for ASHE advocating for the business interests
of CC-1 to the Prime Minister, was sent by wire from Individual-1's
domestic bank account after which YAN and PIAO reimbursed
Individual-1's bank account in China.  As noted above, approximately
$100,000 was then sent to the Prime Minister in Antigua from PGA
Account-1.

b.   The $100,000 payment by CC-2 to ASHE in September 2013
to PGA Account-2, which was facilitated by YAN and PIAO in exchange
for ASHE advocating for the business interests of the Chinese Security
Company in Antigua, was sent by wires from the Chinese Bank in China.
As noted above, approximately $170,000 was sent to the Prime Minister
in Antigua from PGA Account-2, including $20,000 during the month
after CC-2 wired $100,000 to the account.

## ASHE'S FAILURE TO FULLY REPORT HIS INCOME TO THE IRS

51.  Based on my review of the IRS Forms 1040 jointly filed by
defendant JOHN W. ASHE, and his wife, a United States citizen, for
tax years 2013 and 2014, I know that ASHE failed to report income
sufficient to account for his payments from, among other things:
(i) his self-described monthly salary as UNGA President; (ii) his
and his wife's monthly payments from defendants NG LAP SENG, a/k/a
"David Ng," FRANCIS LORENZO, and JEFF C. YIN, a/k/a "Yin Chuan,"
through NGO-1 and NGO-3; and (iii) his monthly payments from
defendants SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a
"Heidi Park," through NGO-2.  Specifically, I learned the following
from my review of ASHE's tax returns and my review of bank records:

---

[9]    From my review of documents, I know that bribery of a public
official is illegal in Antigua under the Prevention of Corruption
Act, which was enacted by the Antiguan Parliament on November 5, 2004.

a.   On or about April 15, 2014, ASHE and his wife jointly filed their Form 1040 for tax year 2013.  ASHE reported his total income as $220,500 and his wife's income as $30,000, which ASHE declared was true and correct under the penalty of perjury.  In fact, I know based on bank records, that during 2013, ASHE was paid approximately $810,000 from the following sources: (i) $274,881.03 by the Government of Antigua & Barbuda; (ii) $25,000 by NGO-1; (iii) $119,850 by NGO-2; (iv) $90,000 by NGO-3; and (v) at least $300,000 in what ASHE described as "salary" payments and alleged reimbursements from PGA Account-2, which was funded in large part by bribe payments, as described above.  In total, ASHE and his wife underreported their income by at least approximately $462,350.00 for year 2013.

b.   On or about April 15, 2015, ASHE and his wife jointly filed their Form 1040 for tax year 2014.  Just as the prior year, ASHE again reported his total income as $220,500 and his wife's income as $30,000, which ASHE declared was true and correct under the penalty of perjury.  In fact, I know based on bank records, that during 2014, ASHE was paid approximately $1,050,000 from the following sources: (i) $179,562.09 by the Government of Antigua & Barbuda; (ii) $69,925 by NGO-2; (iii) $120,000 by NGO-3; and (iv) at least $678,904.28 in what ASHE described as "salary" payments and alleged reimbursements from PGA Account-2, which was funded in large part by bribe payments, as described above.  In total, ASHE and his wife under reported their income by at least approximately $796,329.28 for year 2014.

52.   Based on my review of emails between defendant JOHN W. ASHE, his wife, and a friend, who works as an accountant and assisted ASHE and his wife to prepare their tax returns in various years, including in calendar years 2013, 2014, and 2015 (the "Accountant"), and my conversations with the Accountant, I have learned the following:

a.   In or about Spring 2013, in connection with the preparation of ASHE's federal tax return for tax year 2012, the Accountant had conversations with ASHE and his wife concerning the existence of PGA Account-1.  The Accountant understood that PGA Account-1 account was used for ASHE's UNGA Presidency.  The Accountant was not told that ASHE had transferred funds from PGA Account-1 to personal accounts or used such funds to pay for personal expenditures.

b.   Also in or about Spring 2013, in connection with the preparation of ASHE's federal tax return for tax year 2012, the Accountant was presented with a Schedule C (Profit or Loss from Business) for PGA Account-1, containing certain amounts.  A few days

later, the Accountant was given another Schedule C, also for tax year 2012, by ASHE and his wife, with different figures. Neither ASHE nor ASHE's wife provided a basis for the changed figures. ASHE and his wife requested that the Accountant adjust the gross receipts and expenditures reported for PGA Account-1 so that the net profit reported was zero. The Accountant, who acceded to this request, was not provided with documentation supporting the request.

      c.   In or about Spring 2014, the Accountant again assisted ASHE and his wife to prepare their federal tax return, for tax year 2013. Neither ASHE nor his wife informed the Accountant that ASHE had opened PGA Account-2 and had transferred funds from it into one or more personal accounts. As they had the prior year, ASHE and his wife provided the Accountant with certain figures of income and expenses, and then changed those figures, without explanation or documentation. For example:

      i.   On March 25, 2014, ASHE's wife sent an email to the Accountant, copying ASHE, and told the Accountant that, with respect to the reporting of ASHE's income, "it should be increased from last year but not by too much," even though ASHE's income had increased by approximately $500,000 since the prior tax year.

      ii.   On April 1, 2014, ASHE's wife sent a draft tax return to ASHE and the Accountant, which reflected a gross income of approximately $225,000 (significantly less than their actual gross income), and told ASHE to "please reflect on gross income amount," because "as it stands we owe a sizable amount now." One week later, ASHE's wife sent ASHE their final tax return (the same return they filed with the IRS), which reduced their gross income to approximately $161,000, even less than their already significantly underreported income in the draft tax return.

      d.   In or about Spring 2015, the Accountant again assisted ASHE and his wife to prepare their federal tax return, for tax year 2014. Neither ASHE nor his wife informed the Accountant that ASHE still had PGA Account-2 and had transferred funds from it into one or more personal accounts.

      e.   The Accountant never informed ASHE or his wife that income ASHE received was tax-exempt by virtue of his position or that ASHE did not need to report income he received. On the contrary, the Accountant informed ASHE and his wife that they needed to report all income.

        f.    Although the Accountant prepared returns for ASHE and his wife in calendar years 2013, 2014, and 2015 (for tax years 2012, 2013, and 2014), ASHE and his wife filed the returns with the IRS themselves.

        53.    Based on my review of bank records and credit card records for defendant JOHN W. ASHE and his wife, I know that during the years that ASHE and his wife were significantly underreporting ASHE's income, ASHE and his wife made several expensive purchases, such as the following:

        a.    In 2013 and 2014, ASHE repeatedly ordered expensive hand-tailored suits and clothing from a company in Hong Kong (the "Clothing Company"). For example, in June 2014, ASHE had total charges from the Clothing Company in the amount of approximately $59,000.

        b.    In or about July 2013, ASHE and/or his wife purchased a membership to a luxury vacation club in South Carolina for approximately $69,000.

        c.    On or about March 16, 2014, ASHE and/or his wife purchased two Rolex watches for approximately $54,000.

        d.    In or about September 2014, ASHE paid 24 months of the lease of a new BMW X5, paying approximately $40,000.

        e.    Between in or about October 2013 and March 2014, ASHE and/or his wife made approximately six purchases from Gucci stores totaling more than $5,000.

    WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of JOHN W. ASHE, FRANCIS LORENZO, SHIWEI YAN, a/k/a "Sheri Yan," and HEIDI HONG PIAO, a/k/a "Heidi Park," the defendants, and that they be imprisoned or bailed, as the case may be, and that NG LAP SENG, a/k/a "David Ng," and JEFF C. YIN, a/k/a

"Yin Chuan," the defendants, be imprisoned or bailed, as the case may be.

JASON P. ALBERTS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
5th day of October, 2015

THE HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

37