Fb5dngh

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4               v.                         15 Cr. 0706(VSB)

5   NG LAP SENG,

6                Defendant.

7   ------------------------------x

8
                                          November 5, 2015
9                                         3:05 p.m.

10
    Before:
11
                        HON. VERNON S. BRODERICK,
12
                                          District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  JANIS ECHENBERG
17       DANIEL C. RICHENTHAL
             Assistant United States Attorneys
18
    BRAFMAN & ASSOCIATES, P.C.
19       Attorneys for Defendant
    BY:  BENJAMIN BRAFMAN
20       JACOB KAPLAN

21           – also present –

22  SA Ryan Carey, Federal Bureau of Investigation

23  John Lau and Patsy Ong,
         Cantonese Language Interpreters
24

25

Fb5dngh

1          THE CLERK:  In the matter of the United States of

2    America versus Ng.

3          Counsel, please state your name for the record.

4          MS. ECHENBERG:  Good afternoon, your Honor.  Janice

5    Echenberg for the government.  With me at counsel table is my

6    colleague Daniel Richenthal and Special Agent Ryan Carey of the

7    FBI.

8          THE COURT:  Good afternoon.

9          MR. BRAFMAN:  Good afternoon, your Honor.  For the

10   defendant, Mr. Ng, Benjamin Brafman and Jacob Kaplan from my

11   firm.  Good morning, sir -- good afternoon, sir.

12         THE COURT:  Good afternoon.

13         Mr. Ng, can you hear and understand -- you may be

14   seated.  Can you hear and understand the interpreter?

15         THE DEFENDANT:  I understand.

16         THE COURT:  OK.  Thank you.

17         OK.  Let me review for the parties the materials I

18   have in connection with today's bail conference.  I have the --

19   Mr. Brafman's letter of November 3rd.  I have the government's

20   response of November 4th.  The government attached a copy of

21   the October 22nd bail hearing we had.  I have a copy of the

22   bail order that I issued on the 23rd of October, a copy of the

23   actual bond, as well as the order I issued yesterday to the

24   parties.

25         Is there anything else that I should have?  Yes?

Fb5dngh

1          MR. BRAFMAN:  No, your Honor.  I think you have

2    everything.  And if the Court permits, we might be able to

3    shorten these proceedings if I were permitted to please begin

4    by responding to the questions in the Court's order unless you

5    prefer to proceed in a different way.

6          THE COURT:  No.  I was going to ask that the parties

7    respond to those questions.

8          So, Mr. Brafman, if you would like to go first, go

9    right ahead.

10          MR. BRAFMAN:  Yes.  Your Honor, I am going to do it in

11    the order of your order to make it easier.

12          And just for the record, so that we don't confuse the

13    interpreter, the person identified as Sun Yuan, Y-u-a-n, I

14    think it's easier if we refer to her as Crystal, which is the

15    name that she is known by, C-r-y-s-t-a-l.  Jason, the name is

16    Jason.  And Ng Fei, F-e-i, Lan, L-a-n, who is the defendant's

17    daughter, we can refer to her as Janet.  I think it will make

18    things easier for the reporter and all of us as well.

19    Certainly me.

20          THE COURT:  OK.  Go ahead.

21          MR. BRAFMAN:  Your Honor, with respect to the first

22    question, the answer is no.  None of the suretors were

23    interviewed, to my knowledge, by anyone at the United States

24    Attorney's office, because I think, as your Honor will recall

25    and as I think the government will concede because my associate

Fb5dngh

1    had a conversation with at least one of the prosecutors today,

2    the purpose of them signing as suretors, which came very late

3    in the proceeding, was not because they were believed to be

4    financially solvent to be able to secure a $50 million bond but

5    for the moral suasion, if you will, that having the defendant's

6    family on the bond was an additional incentive for him not to

7    flee.  So none of them were interviewed by the United States

8    Attorney's office.  And, if interviewed, your Honor, they

9    would, quite frankly, not be able to produce the kind of

10   financial documentation that you might otherwise consider as an

11   appropriate suretor in a case like this.

12          THE COURT:  Sure.  I mean, part of the rationale for

13   me asking the question is that in addition to the questions

14   that go directly to financial wherewithal, there are also

15   questions related to employment and other things, which would

16   have, I think, or could have -- some of these issues may have

17   come to light in part because of that.

18          MR. BRAFMAN:  Well, let me make that part easier.

19   Because with question two, our original request was that Ms. --

20   Crystal be able to travel to China both for the medical

21   concerns addressing her son and also her mother and that she

22   also be permitted to work.  We are prepared to withdraw the

23   request that she be permitted to work without at all conceding

24   the suggestion that her working at this company has anything

25   whatsoever to do with the defendant and the charges in this

Fb5dngh

1    case.

2              The company employs, to my knowledge, more than a

3    thousand people.  She works in the human resources position,

4    and to my knowledge, your Honor, she has nothing to do with

5    this case.  But to make things easier for the Court and to ease

6    the concern of the government, she is prepared not to go to the

7    company and not to work there for any of the 40 days or 30

8    days, or whatever your Honor allows her, to go to Beijing -- to

9    China and then to Beijing, because with the status of her son,

10   it becomes more difficult and she is really going primarily to

11   address the medical issues in this case.

12             So we revise that request and it certainly makes it

13   easier.

14             Your Honor, with respect to your question was either

15   party aware that Jason had announced any job offer, let me

16   answer as best I can and as candidly as I can.  Mr. Mo, who is

17   not here, who is the principal person who we have been using to

18   debrief people, although Jason speaks in English, we were aware

19   that he had a job opportunity in China.  He has just graduated

20   in May from the University of Southern California.  His family

21   lives in China.  And he has been offered a position at a

22   company that has nothing whatsoever to do with Mr. Ng.

23             Mr. Ng didn't get him the job.  Mr. Ng didn't

24   recommend him.  And this is sort of like working for AIG.  It

25   is an enormous insurance trust company.  He has an entry-level

Fb5dngh

 1   position, but because he is bilingual and a college graduate

 2   from America he is an interesting commodity in China.  They've

 3   offered him a fairly good job.  And when he took the offer it

 4   was before Mr. Ng's arrest.  He asked them to extend the

 5   starting date because he drives, he is a citizen, he knows his

 6   way around the city.  He flew here because the family was with

 7   them.  None of them really speak English besides Janet, but she

 8   has never driven in New York City.

 9           So he came here.  The job is waiting for him.  He

10   wants to take the job.  It has nothing whatsoever to do with

11   Mr. Ng's company.  As your Honor will recall, because I reread

12   the minutes of the hearing -- and I reread the minutes of the

13   hearing just to be careful that I not misspeak -- I think at

14   the end of the hearing, what happened was your Honor ultimately

15   suggested or directed that whoever is going to live in the

16   apartment surrender their travel documents so the defendant

17   would not have access, obviously, to any travel documents.  The

18   Court said quite clearly at page 85 that if there were travel

19   requirements, they could make an application to get them back.

20   They are not charged with any offenses.

21           And Jason, in particular, is a son of a family friend.

22   And you asked that relationship, and I will tell you -- I will

23   go through the questions with respect to him.  So we were aware

24   that he had had a job offer.  I did not know the extent of the

25   commitment.  I can't speak for Mr. Mo.  I do know now that it

Fb5dngh

1  involves a company which I can identify for you, and it has

2  absolutely nothing whatsoever to do with Mr. Ng.  It's called

3  Ping An -- P-i-n-g, An, A-n -- Insurance Group Company of

4  China.  As I understand it, it is an enormous company involving

5  many, many thousands of employees.  And Mr. Jason has an

6  entry-level position, and he didn't get it at the request or at

7  the referral of Mr. Ng.  And Mr. Ng has no involvement in that

8  company whatsoever.

9          Jason never worked at any time as Mr. Ng's personal

10  assistant except since he's been in the apartment, he helps.

11  He buys groceries.  He does the things that people would

12  normally do if they are not under house arrest.  And he has

13  been helping us, quite frankly, as an interpreter in

14  communicating.  And he's been very helpful, as I understand it,

15  to the Guidepost people, who, when there is no interpreter, he

16  and Janet help them in terms of their direction.  But he was

17  never employed by Mr. Ng or any of Mr. Ng's companies.

18          Your question six, how does --

19          THE COURT:  Just so it's clear, why I asked that

20  question is I believe that when -- and, if need be, we can get

21  the Pretrial Services Officer on the phone rather than if there

22  is something that comes up.  My understanding, though, is that

23  when the officer was visiting, I guess, I'm not sure if it was

24  for a phone setup or some reason, that when he met Mr. Meng, I

25  think he asked, you know, who are you, and I think the response

Fb5dngh

1    was I'm Mr. Ng's personal assistant.

2                MR. BRAFMAN:  Yes.  And since he has come to the

3    United States after his arrest, that is a truthful, accurate

4    statement.

5                THE COURT:  OK.

6                MR. BRAFMAN:  However, it is not in the same vein as

7    Mr. Yin, the defendant, who worked for Mr. Ng as a personal

8    assistant who is charged in the case.

9                And this is a cultural issue.  He is an indentured

10   servant, if you will, running errands for the family of a

11   personal nature -- cleaning, getting clothes for him, helping

12   with the travel prior to his release, driving the children to

13   the MDC because they have no way of knowing how to get there.

14   So to that extent, he viewed himself at the time and I view him

15   as a personal assistant.  He also, quite frankly, has been my

16   personal assistant because I can't interview Mr. Ng outside of

17   Mr. Mo without either Janet or Jason.  But he's not lying to

18   Pretrial.  It was his interpretation of what he saw as his

19   role.

20               And in terms of did Mr. Ng know -- or how does Mr. Ng

21   know Mr. Meng's parents, they have been friends for 30 years.

22   They have real estate partnerships that they have invested in

23   together.  Jason's parents have nothing whatsoever to do with

24   South-South News or the company that's in the heart of this

25   case, that China has, you know, billions of people.  And I know

Fb5dngh

the government seems to think that Mr. Ng controls China, there
are many people there who are successful business people who he
invests with who are just real estate people.

So he had met Mr. Ng's son many years ago.  And the
question that you have, is there any documentary evidence
demonstrating that Mr. Meng is Mr. Ng's Godson, the answer is
no.  Let me again explain because this is a cultural not
disconnect but a cultural statement.

THE COURT:  Sure.

MR. BRAFMAN:  Mr. Ng is very fond of Jason, as I think
are all of us who have come to meet him and know him.  He is
bright.  He is smart.  He is a citizen.  He is a college
graduate.  And he has a very good future.  I'm referred to in
conversations now by Mr. Ng and his family as the family uncle.
I am not his uncle but that's how they refer to me.

He believes -- and Jason will tell you -- that
"godson" is appropriate suggestion of how they view each
other's relationship.  Mr. Ng sees Jason as a brilliant young
man and a very nice young man.  The family and he get along,
and he's the son of very dear friends.  So he has been
introduced to me as his godson.  I have heard both of them use
that term, but there is no church service or documentation or
any clergy who has confirmed that fact.

So to the extent that we used the term, I used it
correctly, but I want the Court to understand that it might be

Fb5dngh

1    different from how someone in the United States might make

2    someone their godson either at a baptism or at a --

3              THE COURT:  My question, again, didn't necessarily go

4    to any religious significance.  I do understand that that could

5    be in part the reason why or the rationale for someone being a

6    godfather or a godson.

7              What I was really trying to get to, I think, and they

8    revolve around sort of what Mr. Meng, his employment situation

9    was, whether or not he in fact was a friend of the family,

10   godson or not, as opposed to someone who actually had been

11   assisting Mr. Ng for more than just the time period he has been

12   in the United States.

13             MR. BRAFMAN:  I think what we're dealing with is he's

14   known him for three years.  The relationship is three years

15   old, but he knows him as a son of a family friend.  When this

16   happened and he was arrested and remanded -- and I ask your

17   Honor to recognize that Mr. Ng is 68, has never been in trouble

18   before, never been in jail -- suddenly he was remanded in a

19   place where he spoke no English.  His two daughters -- his

20   daughter and his daughter-in-law left their children at home,

21   flew to the United States, and were essentially lost, to be

22   candid with you, in how to navigate them and deal with this

23   process of remand.  Mr. Ng was moved from the MCC, then to the

24   MDC.  I'm not faulting anyone.

25             And Jason took it upon himself -- he was in LA at the

Fb5dngh

1    time because he has family there as well, and he came to the

2    United States and he put his job on hold.  And to his credit,

3    he helped them.  He drove them to the MCC, then to the MDC.

4    They were all living in that apartment.

5              So the suggestion of them wanting to live there

6    because he's living there, that's the only place they lived

7    since they came to the United States after his arrest.  So that

8    was the next question, I think, to answer your Honor's order of

9    questions eight and nine.  The daughter and the daughter-in-law

10   came to the United States to help their father-in-law and came

11   after his arrest and have lived in that apartment, because it's

12   the only residence that the family owns.  And they lived there

13   prior to his being released, and they continue to reside there

14   now to assist him.

15             So what I think has happened, Judge, is we have an

16   issue that I'm sorry to burden the Court with, but we have a

17   six-year-old son of Crystal who lives in Macau, and her mother

18   was primarily in charge of taking the child to special

19   treatment from China to -- from Macau to Beijing, where the

20   specialists are.  He has a severe renal failure problem that

21   requires him to either go every month or every month, depending

22   on the test results, for treatment.  The treatment can last an

23   hour or four days or a week depending on his being responsive.

24   He's in the crisis period.  And her mother has now deteriorated

25   herself and can no longer do this.

Fb5dngh

1          And I think what your Honor will recall, we offered

2     Janet Ng, who is the defendant's daughter, as a suretor.  She

3     speaks English.  She has been living in the apartment.  She was

4     the first person we mentioned.  And then when we asked

5     permission for the other two people, who were not intended by

6     us to be suretors and we didn't offer them as suretors, we

7     asked permission for them to live in the apartment, what your

8     Honor then ruled -- and I think, quite frankly, correctly -- is

9     that they need to understand that when they live in the

10    apartment they have to be abiding by the same conditions as

11    everybody else -- no cell phones, they have to not have

12    visitors who aren't approved.  And so that your Honor knows, so

13    far, this has been flawless.  And I know the government refers

14    to one night when the defendant was late, and let me tell you,

15    sir --

16          THE COURT:  That is OK.  I've actually spoken to the

17    Pretrial Services Officer.

18          MR. BRAFMAN:  There was some confusion.

19          THE COURT:  There was misunderstanding.

20          MR. BRAFMAN:  And he was never out of custody of

21    Guidepost.  And I will also tell you one thing they don't

22    remember but I remember because that was the night of the

23    rainstorm several -- at that night and traffic was just dead

24    throughout the city.  But he was not anywhere he wasn't

25    supposed to be.  He was coming from Mr. Mo's office downtown

Fb5dngh

1    back to the apartment.  They had him there like 6:05.

2              Since then there have been no visitors to the

3    apartment whatsoever except Mr. Mo, myself, Mr. Kaplan for

4    legal issues.  He has gone nowhere without approval of

5    Pretrial.  The only place he has gone is to Mr. Mo's office and

6    on several occasions, with their approval, and to a doctor for

7    a complete physical, because he has a deteriorating diabetic

8    condition, with Pretrial permission.

9              And I'm authorized by the gentleman from Guidepost to

10   represent to you, if you ask, that throughout the period of

11   being in the apartment, the family has been very cooperative,

12   very respectful, very easy to deal with, and has not done

13   anything to raise any concern of those whatsoever.

14             So our request is as follows.

15             THE COURT:  Mm-hmm.

16             MR. BRAFMAN:  These people are not being asked to be

17   removed as suretors.  Both Crystal and Jason are prepared to

18   remain as suretors.  And to the extent that the moral suasion

19   on the defendant is not to hurt his family if he were to

20   violate the conditions of his bail, he would know that he is

21   costing his daughter-in-law and Jason, who is a United States

22   citizen, the liability of up to $50 million, and that's the

23   reason they were suggested as suretors as well.

24             Miss Crystal is asking permission to go to attend to

25   her mother and to her son.  The government I think initially

Fb5dngh

said they would consent to two weeks.  It takes almost two days

to get there and two days to get back and the treatment

requires travel as well.  And what they plan to do, just so the

Court is aware, is, if given permission, they plan to return

with their children, if he is healthy enough to travel, so that

they could all spend the holiday period in New York with the

children's grandfather.  And assuming the child is well enough

to travel, that's their present plan.  If not, she'll come back

without them and have to make other arrangements with family

members to deal with the medical issues.

        So I think this is more in the form of a humanitarian

request from people who the record will reflect the Court only

suggested that they be suretors because we wanted them to be

able to live in the apartment.  And to the extent that they now

are suretors, they are not asking to be removed from the

responsibility.  As a practical matter, I know the government

will say, Well, once they're in China, why would they come

back?  But the whole purpose of them being suretors was not to,

you know, because they are financially responsible to meet the

needs.  The moral part is still, you know, heavy duty.

        And at the end of the day, Judge, they -- the mother

needs to go back -- the mother needs to go back, the child is

sick, and I don't want this kid to lose a good job with a real

future because he tried to be a good boy and help the family

during the crisis.

Fb5dngh

1              And to the extent that we should have alerted your

2      Honor to some of these issues before agreeing to them to be

3      housed in the apartment, to be honest with you, they didn't

4      manifest themselves until a couple of days ago when I wrote the

5      letter.  The child began to deteriorate.  It's a very difficult

6      situation for her to be so far apart.  And she was willing to

7      do that because when she came to the United States, she had no

8      idea whether her father would ever be released, whether her

9      father was going to be remanded forever.  So, you know, she

10     stepped up to the plate, got on a plane and came here to help

11     him, to her credit and to Jason's credit, and now we're asking

12     for them to be able to go back, consistent with your Honor's

13     suggestion at the time of the hearing that if they needed to

14     travel, they should come to court, which is what we're do.

15              THE COURT:  OK.  Thank you.

16              Let me sort of give a little bit of insight as to the

17     rationale behind some of my questions.

18              Mistakenly, you know, when I heard they were living

19     there, I probably assumed more in the domicile context than I

20     should have, and by that I mean that they were in fact living

21     there.  In other words, they didn't -- that it was more than

22     just them coming here for the purpose of assisting Mr. Ng after

23     his arrest.  Obviously, I was incorrect in that assumption.  In

24     other words, I thought they were going to be residents of the

25     apartment.  That wouldn't have changed probably the actual

Fb5dngh

1    requiring them to be suretors, but I would have probably not

2    asked all of the questions that I did.

3            But let me hear from the government.

4            MS. ECHENBERG:  Thank you, your Honor.

5            So I don't think I need to take us back through the

6    entire prior proceeding, but we obviously spent a lot of time

7    on this defendant's bail conditions and they are significant.

8    And at least to the government an important part of them was

9    that three people who are close to the defendant were going to

10   be suretors on his bond and were going to be here in the United

11   States with him.  Obviously, one of the things we argued

12   heavily is that this defendant has no ties to the United

13   States.  And so we were reassured by the fact that your Honor

14   had ordered that three of his close family members or family

15   friends would both live with him, give up their travel

16   documents, and sign the bond for moral suasion.

17           As you know, the defendant has been out for a single

18   week, going on two weeks now, and has only traveled to and from

19   his lawyer's office but is going to start to receive approved

20   visitors soon.  And so there is really no track record yet to

21   be certain that he's going to be compliant, although he has

22   essentially been compliant in the few days that he has been

23   out.  When we were told that basically two of the three

24   cosigners wanted to leave the country and one of them didn't

25   want to return, that changed the calculation for us

Fb5dngh

1      significantly.

2              But I think we can simplify what we're arguing about.

3      The government does not want to stand in the way of a mother

4      tending to her sick child and to her mother, and we had offered

5      two weeks.  We are willing to be flexible about that so that

6      she can do what she needs to do to care for her family.  What

7      we cared strongly about was, first, that she not do any work on

8      behalf of Mr. Ng when she is in Macau.  It sounds like the

9      defense has pulled off of that request and so we are happy

10     about that.  But we also don't want Miss Yuan and Mr. Meng gone

11     at the same time.  We don't want two-thirds of the suretors out

12     of the country.  Because whether or not they are saying they

13     are willing to remain suretors, there is virtually no way for

14     the government to enforce the bond on them if they are gone.

15             And so I think we can address Miss Yuan and we can

16     figure out something that is reasonable for her travel if the

17     government can be assured that Mr. Meng is not going to be

18     allowed to leave the country until she returns without

19     incident.

20             I would note with respect to her two things.  That,

21     one, is the government wants to clarify and, two, that I think

22     it is important for your Honor to understand.  Your Honor asked

23     the first three questions were addressed to either party.

24             THE COURT:  Yes.

25             MS. ECHENBERG:  And the answer on behalf of the

Fb5dngh

1    government for number one and number three is no.  We did not

2    interview these individuals because they were purely for moral

3    suasion, and we did not have any idea about this job offer

4    until we were alerted by defense counsel.  Obviously, it would

5    have influenced the positions that we took at the bail hearing

6    once your Honor had decided that these three individuals would

7    be suretors.

8         With respect to number two, we do want to clarify the

9    position that we took in our letter.  And when we said in our

10   letter that we were unaware that Ms. Yuan or Ms. Sun worked for

11   Mr. Ng's company, we were speaking on behalf of myself and

12   Mr. Richenthal.  We followed up with our agents after your

13   Honor asked this question, and we learned that there was a very

14   brief interview of Ms. Sun at the time of the defendant's

15   arrest so that they could return some items to the defendant.

16   And she did mention that she worked for Mr. Ng.  So we did as a

17   collective entity know that prior to the bail hearing.

18        What we learned in doing some research online today is

19   that it appears that Ms. Sun sits on the board of one of

20   Mr. Ng's companies and is possibly an executive director of a

21   real estate-related entity.  So I'm not sure how that comports

22   with her having a human resources job.  That is at least some

23   information that we found that was publicly available.  So we

24   continue to assert that she should not be allowed to do any

25   work or go to the offices while she is there, and it sounds

Fb5dngh

1   like the defense is not asking for that.

2              With regard to Mr. Meng, or Jason, the equation

3   becomes a little bit more complicated, because we've also been

4   looking at him a little bit, you know, since he was proposed as

5   a suretor.  And what we found was that there are more than two

6   dozen currency transaction reports involving him.  There is a

7   tremendous amount of cash that is moving among Australia, China

8   and the United States.

9              Just to take one example, we saw a $50,000 deposit

10  into an account of his, a cash deposit.  So if he is a recent

11  college graduate who is unemployed, that seems inconsistent

12  with the large amount of money.  There are currency transaction

13  reports and other reports we see that reflect total deposits

14  into one California account that he is associated with more

15  than $2 million.

16             THE COURT:  I'm sorry.  Just back up.  The total

17  deposits?

18             MS. ECHENBERG:  Into A single California bank account

19  that he is associated with of more than $2 million.

20             THE COURT:  And when you say "associated with," what

21  do you mean?

22             MS. ECHENBERG:  It is his personal account, your

23  Honor.

24             THE COURT:  OK.  Is the $2 million in the account now,

25  do you know?

Fb5dngh

1              MS. ECHENBERG:  I don't know.  This is a report that

2      is recent, but I cannot say standing here today that that money

3      is in that account right now.

4              THE COURT:  OK.

5              MS. ECHENBERG:  We can certainly endeavor to find out.

6              And so because of all of this money moving in and out

7      of his accounts, because he seems to, at least to our

8      knowledge, very recently have this job in China, we're

9      concerned about what he might do when he goes there and whether

10     or not -- I mean, he doesn't intend to come back.  So the fact

11     is that if he leaves, we are essentially down to two cosigners

12     rather than three.  We have concerns about what he might do

13     when he leaves, but we also have concerns about being left with

14     two suretors rather than three.

15             And I would note that the three visitors to the

16     apartment that the government has now approved were presented

17     to us as family friends.  So the defendant has family friends

18     who live in New York City, although they I believe asserted at

19     the original bail hearing that there was no one else who could

20     possibly sign this bond.  There are at least three people who

21     intend to visit the apartment who have been presented to us as

22     family friends and who we vetted.  One of them was described by

23     Mr. Ng's daughter during this brief interview that I mentioned

24     as an uncle.  Again, that may just be a term of endearment.

25     But, again, there are other people who could replace Mr. Meng

Fb5dngh

1     if your Honor is inclined to essentially release him from the

2     bond.

3              THE COURT:  OK.  All right.

4              MR. BRAFMAN:  Can I just say something?

5              THE COURT:  Sure.

6              MR. BRAFMAN:  Briefly.

7              THE COURT:  Yes.

8              MR. BRAFMAN:  First of all, there is no suggestion,

9     nor is there any evidence, Mr. Jason Ng -- we said this at the

10    bail hearing, I believe --

11             THE COURT:  Mr. Meng.

12             MR. BRAFMAN:  I'm sorry.  Jason.  We said this at the

13    bail hearing, that his family has assets but he doesn't.

14             THE COURT:  Yes.

15             MR. BRAFMAN:  His family is very wealthy.  And when

16    you fill out a Currency Transaction Report in the United

17    States, you are not trying to hide the money.  And not all cash

18    transactions suggest illegality.  They are buying a lot of real

19    estate.  Whether they comply with tax laws or not has nothing

20    to do with this matter.

21             THE COURT:  Mr. Brafman, I wasn't taking it as

22    illegality.  I recognize that in light of your comment that his

23    family is involved in real estate, that it may not be a hundred

24    percent sort of his money, in a sense, or he may have some

25    interest in it.  I don't know.

Fb5dngh

1          I apologize.  I interrupted you.  Go ahead.

2          MR. BRAFMAN:  I'm just saying the suggestion that they

3    have no problem with his daughter-in-law going but they want to

4    keep him from going, he had this job offer before Mr. Ng was

5    arrested.  He has put it on hold to help Mr. Ng.  It wasn't

6    intended for him to sacrifice his career over it and to have

7    him stay here until she returns because that suggests to them

8    that there's more reason for Mr. Ng to stay.  The overwhelming

9    consideration that one gets from reading the hearing minutes,

10   your Honor, is that the defendant is on electronic bracelet,

11   locked in an apartment with two armed guards full-time 24/7

12   barring the only door in and out of the apartment.  And to that

13   extent, whether Jason is there or not, he can't leave and he

14   hasn't tried to leave.

15         We have recently submitted several people who we have

16   vetted.  They have wanted to visit Mr. Ng.  And in compliance

17   with the Court's directive, we gave the names and addresses,

18   telephone numbers, Social Security numbers to the government to

19   vet.  They had vetted them.  I have not met any of these people

20   myself.

21         THE COURT:  OK.

22         MR. BRAFMAN:  And I have never discussed with them

23   whether they would or would not agree to be a suretor.

24         THE COURT:  OK.  This is my thought on it and it's

25   going to require probably some work by the parties and some

Fb5dngh

thought.  You know, look, I understand that Mr. Ng's

daughter-in-law came here, and, as I mentioned, I had thought

she was living here.  So I was surprised that she was living

here because she had children in China, and that was something

that in fact I actually discussed with my chambers but I took

it for what it was.  But having said that, obviously -- and the

government doesn't object that she be able to go back to tend

to whatever health needs of her family -- with regard to

Mr. Meng, what I would like, Mr. Brafman, for you to do is to

determine whether or not any of the three individuals who are

friends, whether or not they would be willing to sign the bond.

        Mr. Meng is not going to come back.  I'm not inclined

to take actions that would lead him to lose this job.  However,

I would like, if there is -- if he has some documentation of

the job, I would like to see that, in other words, whether it

is a job offer or whatever, I don't know what it might be.  But

what I'm looking to do is to have another cosigner.  Mr. Meng

can remain on the bond but it would be someone else who is

here.

        Because, obviously, yes, he was obviously signed

because of, you know, moral suasion, but, you know, to the

point that you raised, if someone is in another country and

outside the reach of the government, outside the reach of the

government in connection with any of their finances, although I

understand there currently is an account here, there would be

Fb5dngh

1   less -- there is less of an impact on an individual, and so

2   what I am looking for is to get another cosigner to sign the

3   bond.

4           MR. BRAFMAN:   OK.   Can we do this, Judge, only because

5   of the crisis involving the child?   There doesn't seem to be

6   any -- I will explain and prevail on Jason to remain here until

7   there is a suretor who is substituted who is satisfactory to

8   the government.   We will try and do that as expeditiously as

9   possible.   I will try and get whatever documentation we can in

10  the event we are not able to substitute him as a suretor.

11          But Miss Crystal has tried her best to deal with the

12  situation long distance and it is falling apart.   So if the

13  Court is inclined to allow her to travel, then she would like

14  to leave as quickly as possible and be able to get her

15  documents back from Pretrial even today, if your Honor permits,

16  because it's a long trip and the kid needs to get to Beijing

17  and she needs to get him there, and her mother is in failing

18  health as well.   So I am prepared to accept what I can get

19  today, and I appreciate your Honor's concern and patience.   But

20  since the government doesn't seem to object to her travel, the

21  question is only how long she gets to be there.

22          And what we'd like to ask is that she be permitted to

23  leave tonight, if possible, or tomorrow, as soon as she gets

24  her travel documents, with the understanding that she would

25  come back on or before December 19th, because that will allow

Fb5dngh

1    her to bring the children back, who will then be on school

2    holiday.  She has a 10-year-old daughter as well.  Bring her

3    children back.  She is also going to bring back Janet's

4    children, who will remain here throughout, but she wants to be

5    with the children for the holiday, and then surrender her

6    travel documents again when she comes back and arrange for

7    someone else to take the children back to China.

8                THE COURT:  OK.

9                MR. BRAFMAN:  So if she can leave as early as today or

10   tomorrow, get her documents as soon as your Honor notifies

11   Pretrial that she can obtain them, we will delay the travel of

12   Jason until we have a substitute suretor who is satisfactory to

13   your Honor hopefully in the next day or two.

14               THE COURT:  OK.  All right.  Let me -- I just have a

15   quick -- because I did request, just so the parties know, from

16   Pretrial to get copies of the passports of the cosigners.  And

17   I don't pretend to know what visas, but does Mr. Meng have a

18   work visa as opposed to --

19               MR. BRAFMAN:  He is a United States citizen.

20               THE COURT:  No.  Work visa for China?

21               MR. BRAFMAN:  Can he answer you, your Honor, himself?

22               THE COURT:  Sure.  You may need to come up a little so

23   that the court reporter can hear you.

24               MR. MENG:  No.  I don't have a work visa now, but I

25   would like to apply for a work visa once I go to the job

Fb5dngh

1    because I need to talk to the human resource people.  I need

2    like a document and I can apply for a work visa.  I have a

3    10-year visa now.

4               THE COURT:  Yes.  I noticed that you have a Q2 visa,

5    which I understand --

6               MR. MENG:  So I need to exit the country every three

7    months or every four months.

8               THE COURT:  120 days, yes.  OK.

9               MR. MENG:  Thank you, Judge.

10              THE COURT:  All right.  Thank you.

11              So let me hear from the government with regard to -- I

12   mean, I would lean towards allowing -- well, we're going to --

13   I'm going to allow --

14              MR. BRAFMAN:  Crystal.

15              THE COURT:  -- Crystal, Ms. Sun Yuan, to go back.  I

16   don't know whether -- does she have airline tickets now?

17              MR. BRAFMAN:  We have as a precaution not booked them

18   and paid for them but she has a reservation for tonight,

19   subject to your Honor's approval.  So we did that only because

20   these are not easy tickets to book and it is a very long trip.

21   But, obviously, they are not paid for but will be if your Honor

22   gives her permission.

23              THE COURT:  And when she returns, where are all of

24   these people going to stay?

25              MR. BRAFMAN:  Well, the children, if she brings back

Fb5dngh

1   the children, they are going to stay a hotel nearby.  There are

2   several hotels less than two blocks from the apartment, and

3   Mr. Ng will remain in the apartment.  And to the extent that

4   your Honor requires the people to stay there, I don't know what

5   the purpose --

6        THE COURT:  No.  I mean, for the additional cosigners

7   and, actually, if we can see -- however many are willing to

8   sign, I would like to sign.  So at least one but, you know, two

9   would be better.  They do not need to stay in the apartment.

10       MR. BRAFMAN:  Those people have their own residences I

11  have since learned.

12       THE COURT:  Just to be clear, it wasn't necessarily --

13  I wasn't thinking it would be a requirement that people live

14  there.

15       MR. BRAFMAN:  I understand.

16       THE COURT:  But since they were living there, it was

17  something that I thought we needed to take certain steps.

18       OK.  Let me hear from the government, and I want to in

19  part hear about the working for the company.  I mean, as I

20  understand it, Ms. Yuan is not going to work for the company

21  when she is back in China.  I want to get a sense of what the

22  government's position about her working, if that isn't -- I

23  mean my understanding is the parties agree, although they may

24  not agree as to exactly what her responsibilities are but they

25  agree that that is a job that she has.

Fb5dngh

1          MR. BRAFMAN:  Yes.  But, Judge, if I may?  Since she

2     is not going to work for the company during the period that she

3     is there and that is a specific direction, I would like to

4     submit in writing exactly what she -- this is a massive

5     company, and to the extent that your father owns companies --

6     and it is plural, "companies" and most of them have nothing to

7     do with this case -- it is quite common for family members to

8     have, you know, jobs.  She is a bright woman.  She is a

9     talented woman.  Her husband works for one of the companies.

10    So I'd like to get this information correctly.  Mr. Mo is not

11    here.  He is the primary interpreter.  I would like to submit

12    something in writing.  The government can then respond rather

13    than me winging it.

14         THE COURT:  How about -- no one should wing it.  But

15    how about this?  You have a conversation with them and see if

16    you can come to some sort of agreement before you involve me.

17         MR. BRAFMAN:  That is fine.

18         THE COURT:  You know, I don't know what the nature of

19    her job is.  I don't know what the nature of it is and whether

20    she would be able to do it whether here or in China, but that's

21    something I think the parties need to be -- and I don't know

22    the exact nature of the government's concern, and to the extent

23    they have concern, you may be able to alleviate that concern.

24         MR. BRAFMAN:  Very good.

25         THE COURT:  I just don't know.

Fb5dngh

1          MR. BRAFMAN:  We will get the information, meet and

2     talk with the government, and if we can't come to an

3     understanding, we will involve your Honor, if necessary.  And

4     in the interim during her trip, which hopefully begins tonight

5     if she can get her documents back from Pretrial, she

6     understands completely that she is not to go to the office, she

7     is not working there, and that trip is to help her family.

8          THE COURT:  Yes.  OK.

9          Let me hear from the government.

10         MS. ECHENBERG:  Your Honor, I think we're fine with

11    what's being contemplated right now.  And given that the child

12    apparently has a school holiday on December 19th, we are

13    sympathetic to that.  We didn't know that fact previously.  So

14    we have no problem with that.

15         We would ask your Honor just to explicitly order,

16    because I believe Crystal is in the courtroom --

17         MR. BRAFMAN:  She is.

18         MS. ECHENBERG:  -- so we would ask that you explicitly

19    order her on the record that she is not to go to the offices,

20    any of the offices, she is not to engage in any work related to

21    any of Mr. Ng's companies while she is there.

22         I agree with Mr. Brafman that we should take some time

23    to understand exactly what her role is and whether it raises

24    further concerns for us.  We learned almost as we were walking

25    to court today about her role on the board and being an

Fb5dngh

1    executive director of the company.  So, we want to look into

2    that more.  We are certainly interested to hear what

3    Mr. Brafman has to say about that, and we can hopefully make a

4    joint proposal to your Honor about how to proceed.

5              THE COURT:  OK.  I think I am going to need -- could I

6    prevail on the interpreters to help me in this regard?  Well --

7              MR. BRAFMAN:  She doesn't speak English.

8              THE COURT:  Could you come forward.  This is Crystal.

9    It is Sun Yuan or Crystal Yuan, Y-u-a-n.

10             Miss Yuan, I understand that you have agreed not to

11   work when you return to your homeland.  So let me just be clear

12   as to what the parameters of that will be.  OK?

13             So I'm ordering that you not work in any of the

14   offices of the businesses that you work for, that you not

15   engage in any work while you are there either over the phone,

16   electronically, or in any means.  And obviously, you know, I'm

17   sorry about the health issues with your family members, but you

18   should spend your time -- and this is not an order -- but you

19   should spend your time dealing with their health issues.  And

20   we expect you back on or before December 19th.

21             OK?

22             MS. SUN:  OK.

23             THE COURT:  All right.  Thank you.

24             MR. BRAFMAN:  Thank you, Judge.

25             Your Honor, is she able to go to Pretrial, and is she

Fb5dngh

1   going to need something from you to get it or Ms. Williams to

2   get the travel documents?

3           THE COURT:  She may.  We may need to do an order, but

4   we can do that fairly quickly, I think.

5           MR. BRAFMAN:  Thank you very much.

6           THE COURT:  I don't know what the whole process is.  I

7   know that they are secured I think in a safe.  So I'm not

8   sure -- so I'm hopeful that you will be able to get it today

9   but I can't promise that.

10          MR. BRAFMAN:  If she gets there now -- I've done this

11  before.  If she gets there now and they get something from the

12  Court, they'll get it to her, and my associate Jacob will go

13  with her to make sure that she knows where she is going and how

14  to get back.

15          THE COURT:  You may want to -- just in case, because I

16  think if there is anything else we need to deal with, why don't

17  they start heading over there now.

18          MR. BRAFMAN:  They are.

19          THE COURT:  OK.  Wait.  Let me hear from the

20  government.  Ms. Echenberg, do you want to say something?  Did

21  I miss something that you wanted me to cover with you?

22          MR. RICHENTHAL:  Could we have one moment to confer?

23  I'm sorry, your Honor.

24          THE COURT:  OK.

25          (Pause)

Fb5dngh

1    MS. ECHENBERG:  So one point clarifying with regard to

2  this individual, we don't want her even visiting the offices,

3  physically going to them at all.  I think that was clear in

4  what you ordered.

5    MR. BRAFMAN:  I think it is clear in the order.  She

6  has no interest in visiting them.  I will revisit the issue

7  when she comes back as to whether or not she should be able to

8  continue working for the company once we know exactly more --

9  much more information to give your Honor and the government.

10    THE COURT:  OK.  This is what I would suggest.  It's

11  fine to communicate -- look, I don't want there to be any

12  misunderstanding where she goes to visit friends there and all

13  of a sudden, you know, there is some application when she gets

14  back.

15    MR. BRAFMAN:  Right.

16    THE COURT:  So I just think it needs to be clear.  I

17  don't need to necessarily order it, Mr. Brafman, but we have

18  the interpreter here.  If you could communicate that to her,

19  that that includes visiting any of the places of work.

20    The other thing I would ask you to do is during the

21  interim not wait until she returns on the 19th but engage in a

22  conversation with the government between now and then.

23  Obviously, you may need to speak with her to get details, but

24  engage -- start the conversation because --

25    MR. BRAFMAN:  We will.

Fb5dngh

1          THE COURT:  -- you know, because if she comes back on

2     the 19th, in reality, we're probably not dealing with this

3     until, you know, after the holidays, and it might be better if

4     you have a sense of what the issues are.

5          MR. BRAFMAN:  Your Honor, we would have more

6     information available to you today, but we were trying to

7     divide some of the work.  Mr. Mo is giving a speech out of town

8     today.  He was spending a substantial amount of time trying to

9     develop this information, and sometimes I'm an exhibit in the

10    room when he is doing that because it is in Mandarin and it is

11    hard for me to pick up.  But I will --

12         THE COURT:  Are you Exhibit A?  Exhibit 1?  The

13    defense usually goes with letters.

14         MR. BRAFMAN:  I hope I'm Exhibit A, Judge, but it

15    don't matter at that point.

16         Your Honor, I will get you the information well before

17    the 19th or get it to the government.

18         THE COURT:  And I am around.  So if there are any

19    issues with regard to the potential other suretors, the

20    individuals who are now on the visitor list, just let me know.

21    I'm confident that the parties will be able to work through

22    that.

23         MR. BRAFMAN:  I think so.  Thank you very much.

24         THE COURT:  Yes?

25         MS. ECHENBERG:  So we have one comment about the

Fb5dngh

1    additional cosigners.

2                THE COURT:  Yes.

3                MS. ECHENBERG:  First, we would very much like your

4    Honor to order that there be two additional cosigners.

5                THE COURT:  I will order two.

6                MS. ECHENBERG:  And, also, we want to interview those

7    cosigners and evaluate whether they are financially

8    responsible.

9                THE COURT:  Let me just -- that's fine, you could

10   interview the cosigners.  I think I mentioned at the

11   October 22nd that I was fine with interviewing the cosigners.

12               My view is you interview all cosigners whether or not

13   you believe them to be financially responsible because

14   sometimes it is helpful.  It is also helpful, I think, in

15   emphasizing what the nature of signing a bond is.  Even though

16   I know it happens across the street, I think people need to

17   understand the implications of that, because, you know, as

18   parties have pointed out, you know, in connection with another

19   case I have, I had the application to revoke somebody's bond

20   and that's put family members on the hook for a substantial

21   amount of money.

22               So is there anything else that we need to do?

23               MR. BRAFMAN:  May Mr. Kaplan leave --

24               THE COURT:  Yes.

25               MR. KAPLAN:  Thank you, Judge.

Fb5dngh

1    THE COURT:  Could I just ask if you could just
2 communicate that no visiting.
3    MR. BRAFMAN:  Yes.
4    (Pause)
5    She understands, your Honor.
6    THE COURT:  OK.  Thank you.
7    OK.  Is there anything else that we need to do?
8    MR. BRAFMAN:  I don't believe so, sir.
9    MS. ECHENBERG:  Not from the government, no.
10    THE COURT:  OK.  All right.  So, Mr. Brafman, we'll
11 start taking care of putting together whatever paperwork we
12 need in order for the passport to be released.
13    MR. BRAFMAN:  I appreciate your attention to this,
14 Judge. Thank you very much.
15    THE COURT:  All right.
16    MS. ECHENBERG:  Your Honor, this relates to a
17 different defendant and this may have come over email already
18 but I haven't seen --
19    THE CLERK:  It is done.
20    MS. ECHENBERG:  It is done for Mr. Yan?
21    THE CLERK:  Yes.
22    THE COURT:  OK.  I signed the bond.
23    MS. ECHENBERG:  Yes, your Honor.
24    THE COURT:  OK.  Thank you very much.
25                                        -   -   -