**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:15-CR-00706 (VSB) |
| v. | |
| NG LAP SENG, et al. | |

## SENTENCING MEMORANDUM SUBMITTED ON BEHALF
## OF DEFENDANT NG LAP SENG

Andrew M. Genser
Chang Liu
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Attorneys for Defendant Ng Lap Seng*

**TABLE OF CONTENTS**

Page

INTRODUCTION......................................................................................................1

BACKGROUND .......................................................................................................4

I.      EARLY YEARS (1948-1963) ........................................................................4

II.     YOUTH: 1963-1979 .....................................................................................6

III.    EARLY BUSINESS SUCCESS: 1979-1993 ................................................8

IV.   COLLAPSE AND REBOUND: 1993-2015....................................................9

V.    MR. NG'S CARE FOR HIS EMPLOYEES...............................................11

VI.   CHARITY AND GOOD WORKS ..............................................................14

      A.     Macau...................................................................................................15

      B.     Hometown............................................................................................16

      C.     China and Beyond................................................................................19

      D.    Supporting Social Impact Projects......................................................21

      E.     Collection of Chinese Antiques ...........................................................23

      F.     Summary of Charity and Good Works .................................................24

VII.   FAMILY AND HEALTH.............................................................................25

ARGUMENT.............................................................................................................30

I.      LEGAL STANDARD AT SENTENCING ..................................................30

II.     SENTENCING GUIDELINES ANALYSIS.................................................31

      A.     Value of Bribes Under §2C1.1(b)(2) ...................................................32

      B.     Multiple Bribes Under §2C1.1(b)(1) ...................................................35

      C.     Elected Public Official Under §2C1.1(b)(3).........................................36

      D.    Role in the Offense Under §3B1.1(a) ..................................................37

      E.     Guidelines Calculation.........................................................................39

III.    CONSIDERATION OF THE FACTORS SET FORTH IN 18 U.S.C. §3533
          WARRANTS LENIENCY .........................................................................40

A.      Mr. Ng's History and Personal Characteristics .................................................. 41

     1.      Outstanding Character ................................................................. 41

     2.      Compassion and Charity ............................................................ 42

     3.      Age and Health ......................................................................... 43

     4.      Isolation and Language Difficulties ........................................... 44

     5.      Deportable Alien ....................................................................... 45

     6.      Family Ties and Employees ....................................................... 46

     7.      Remorse and Acceptance of Responsibility ............................... 49

B.      The Nature and Circumstances of the Offense ................................................ 49

C.      Loss Calculation .............................................................................................. 55

D.      Deterrence, Respect for the Law, and Just Punishment ................................... 56

     1.      Deterrence and Respect for the Law .......................................... 56

     2.      Just Punishment ........................................................................ 58

E.      Need to Protect the Public from Further Crimes ............................................. 60

F.      Need to Avoid Unwarranted Disparity ............................................................ 61

**CONCLUSION** ................................................................................................................ **64**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Flores v. S. Peru Copper Corp.*,
   414 F.3d 233 (2d Cir. 2003).........................................................................50

*Gall v. United States*,
   552 U.S. 38 (2007) (Scalia, J., concurring) ...............................................55

*Kimbrough v. United States*,
   552 U.S. 85 (2007)........................................................................................30

*Koon v. United States*,
   518 U.S. 81 (1996).................................................................................30, 46

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016)............................................................................34, 62

*Molina-Martinez v. United States*,
   136 S. Ct. 1338 (2016)..................................................................................31

*Pepper v. United States*,
   562 U.S. 476 (2011).......................................................................................30

*Rita v. United States*,
   551 U.S. 338 (2007) (Scalia, J., concurring) .............................................55

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006)....................................................55, 57

*United States v. Algahaim*,
   842 F.3d 796 (2d Cir. 2016).........................................................................56

*United States v. Arshad*,
   239 F.3d 276 (2d Cir. 2001)....................................................................35, 36

*United States v. Autery*,
   555 F.3d 864 (9th Cir. 2009) .......................................................................61

*United States v. Baron*,
   914 F. Supp. 660 (D. Mass 1995) ...............................................................44

*United States v. Bruno*,
   No. 1:09-cr-00029-GLS (N.D.N.Y. June 1, 2010), Doc. No. 304....................63

*United States v. Carmona-Rodriguez*,
   No. 04-cr-667-RWS, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)..................60

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)................................................................30

*United States v. Charry Cubillos*,
  91 F.3d 1342 (9th Cir. 1996) ............................................................46

*United States v. Colon*,
  45 F. App'x 210 (3d Cir. 2002) ........................................................45

*United States v. Coppola*,
  671 F.3d 220 (2d Cir. 2012)..............................................................32

*United States v. Cunningham*,
  985 F.2d 575 (9th Cir. 1993) (unpublished) ....................................51

*United States v. DeBeir*,
  186 F.3d 561 (4th Cir. 1999) ............................................................45

*United States v. DeJesus*,
  2016 WL 4443145 (D. Conn. Aug. 19, 2016) ..................................39

*United States v. Edwards*,
  595 F.3d 1004 (9th Cir. 2010) ..........................................................56

*United States v. Emmenegger*,
  329 F. Supp. 2d 416 (S.D.N.Y. 2004)..............................................55

*United States v. Farouil*,
  124 F.3d 838 (7th Cir. 1997) ............................................................46

*United States v. Germosen*,
  473 F. Supp. 2d 221 (D. Mass. 2007) ..............................................61

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ......42

*United States v. Hamilton*,
  323 F. App'x 27 (2d Cir. 2009) ........................................................44

*United States v. Hernandez*,
  No. 03-cr-1257-RWS, 2005 WL 1242344 (S.D.N.Y. May 24, 2005)..............60

*United States v. Howe*,
  543 F.3d 128 (3d Cir. 2008)..............................................................41

*United States v. Jacobs*,
  3:07-cr-00090-JBA (D. Conn.) ........................................................51

*United States v. Jacobs*,
  550 F. Supp. 2d 302 (D. Conn. 2008)...............................................51

*United States v. Kloda*,
    133 F. Supp. 2d 345 (S.D.N.Y. 2001) ............................................................. 48

*United States v. Lata*,
    415 F.3d 107 (1st Cir. 2005) ......................................................................... 43

*United States v. Lauersen*,
    362 F.3d 160, *vacated and remanded*, 543 U.S. 1097 (2005) ............................ 39

*United States v. Lehmann*,
    513 F.3d 805 (8th Cir. 2008) ......................................................................... 47

*United States v. Litvak*,
    No. 3:13-cr-00019-JCH (D. Conn. July 23, 2014), Doc. No. 273 ..................... 56

*United States v. Loman*,
    597 F. App'x 518 (10th Cir. 2015) ................................................................. 62

*United States v. Lopez-Salas*,
    266 F.3d 842 (8th Cir. 2001) ......................................................................... 45

*United States v. Martin*,
    520 F.3d 87 (1st Cir. 2008) ..................................................................... 46, 47

*United States v. McDonnell*,
    792 F.3d 478 (4th Cir. 2015) ......................................................................... 62

*United States v. McDonnell*,
    No. 3:13-cr-00012-JRS (E.D. Va. Jan. 6, 2015), Doc. No. 604 ........................ 62

*United States v. Milikowsky*,
    65 F.3d 4 (2d Cir. 1995) ............................................................................... 48

*United States v. Morales*,
    972 F.2d 1007 (9th Cir. 1992) ....................................................................... 41

*United States v. Munoz-Nava*,
    524 F.3d 1137 (10th Cir. 2008) ..................................................................... 47

*United States v. Nellum*,
    No. 2:04-cr-30-PS, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) ................. 46, 61

*United States v. Patel*,
    164 F.3d 620 (2d Cir. 1998) (summary order) ................................................. 48

*United States v. Ranum*,
    353 F. Supp. 2d 984 (E.D. Wis. 2005) ........................................................... 41

*United States v. Renzi*,
    4:08-CR-00212 (D. Ariz. Oct. 28, 2013) ........................................................ 63

*United States v. Restrepo*,
   999 F.2d 640 (2d Cir. 1993)......................................................................46

*United States v. Schroeder*,
   536 F.3d 746 (7th Cir. 2008) ...................................................................47

*United States v. Serafini*,
   233 F.3d 758 (3d Cir. 2000)......................................................................42

*United States v. Smith*,
   27 F.3d 649 (D.C. Cir. 1994) .............................................................45, 46

*United States v. Smith*,
   359 F. Supp. 2d 771 (E.D. Wisc. 2005) ...................................................47

*United States v. Somerstein*,
   20 F. Supp. 2d 454 (E.D.N.Y. 1998) ........................................................48

*United States v. Soumano*,
   318 F.3d 135 (2d Cir. 2003)...............................................................35, 36

*United States v. Stevenson*,
   834 F.3d 80 (2d Cir. 2016).......................................................................37

*United States v. Stevenson*,
   No. 1:13-cr-00161-LAP (S.D.N.Y. May 23, 2014), Doc. No. 133 ................62

*United States v. Stevenson*,
   No. 13-cr-00161-LAP (S.D.N.Y. May 15, 2014), Doc. No. 130.....................63

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) (Calabresi, J., concurring)....................................30

*United States v. Takai*,
   941 F.2d 738 (9th Cir. 1991) ...................................................................51

*United States v. Toback*,
   No. 01 CR. 410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005)............48

*United States v. Vaughn*,
   430 F.3d 518 (2d Cir. 2005)......................................................................32

*United States v. Vigil*,
   476 F. Supp. 2d 1231 (D.N.M. 2007), *aff'd*, 523 F.3d 1258 (10th Cir.
   2008) ....................................................................................................58

*United States v. White*,
   663 F.3d 1207 (11th Cir. 2011) ................................................................37

*United States v. Whitehead*,
   532 F.3d 991 (9th Cir. 2008) ...................................................................55

*United States v. Willis*,
    322 F. Supp. 2d 76 (D. Mass. 2004) ............................................................................44

**Statutes**

8 U.S.C. §1182(a)(2) ............................................................................................................61

18 U.S.C. § 656 ....................................................................................................................52

18 U.S.C. § 1005 ..................................................................................................................52

18 U.S.C. § 1014 ..................................................................................................................52

18 U.S.C. § 1344 ..................................................................................................................51

18 U.S.C. §1956 ...................................................................................................................39

18 U.S.C. §3533 ...................................................................................................................40

18 U.S.C. §3553 .............................................................................................................39, 56

18 U.S.C. §3553(a) ...................................................................................................30, 43, 47

18 U.S.C. §3553(a)(1) ....................................................................................................41, 49

18 U.S.C. §3553(a)(2)(A) ....................................................................................................56

18 U.S.C. §3553(a)(2)(B) ....................................................................................................56

18 U.S.C. §3553(a)(2)(C) ...............................................................................................60, 61

18 U.S.C. §3553(a)(2)(D) ....................................................................................................44

18 U.S.C. §3553 (a)(6) ...................................................................................................44, 61

18 U.S.C. § 3624(c)(1) .........................................................................................................45

U.S.S.G., ch. 1, pt. A(1)(4)(b) .............................................................................................49

U.S.S.G. §2A1.2 ...................................................................................................................62

U.S.S.G. §2A3.1 ...................................................................................................................62

U.S.S.G. §2B1.1(b)(1)(E) ....................................................................................................39

U.S.S.G. §2C1.1 cmt. ...........................................................................................................49

U.S.S.G. §2C1.1 cmt. n.2 ...............................................................................................35, 36

U.S.S.G. §2B1.1(b)(1)(H) ....................................................................................................31

U.S.S.G. §2C1.1(a)(2) ....................................................................................................31, 39

U.S.S.G. §2C1.1(b)(1) ...................................................................... 31, 35, 36

U.S.S.G. §2C1.1(b)(2) .............................................................. 31, 32, 35, 39

U.S.S.G. §2C1.1(b)(3) ...................................................................... 31, 36, 37

U.S.S.G. §2S1.1 ............................................................................................ 39

U.S.S.G. §2S1.1(a)(1) ................................................................................. 31

U.S.S.G. §2S1.1(b)(2)(B) ..................................................................... 31, 39

U.S.S.G. §3B1.1(a) ............................................................................... 31, 37

U.S.S.G. §5H1.1 .......................................................................................... 43

**Other Authorities**

8 C.F.R. § 287.7 ........................................................................................... 46

Major Bailey W. Brown, III, *The Battle for Japan, 1944-45*, Army Law.,
    September 2009, at 48 ........................................................................... 4

Charter of the United Nations, June 26, 1945, 59 Stat. 1031, T.S. No. 993
    (1945), Arts. 10-17 .............................................................................. 50

David Weisburd et al., *Specific Deterrence in a Sample of Offenders
    Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) ...................... 57

Fed. Bureau of Prisons, Program Statement: Inmate Security Designation and
    Custody Classification No. P5100.08, Ch. 5, at 9 (2006),
    https://www.bop.gov/policy/progstat/5100_008.pdf ......................... 45

Hao Qian, *From Status-Based Privilege to Old Age Security: Rethinking
    Public Pension Reform in China*, 82 UMKC L. Rev. 967 (2014) ...................... 4

John Braithwaite, *Crime, Shame and Reintegration* 69 (1989) ............................... 57

John S. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. Times, June 24, 2003 ........................... 46

Kari Madrene Larson, A Lesson in Ingenuity: Chinese Farmers, the State, and
    the Reclamation of Farmland for Most Any Use, 7 Pac. Rim L. & Pol'y J.
    831 (1998) ............................................................................................ 5

*Macau billionaire Ng Lap-seng is convicted of bribery and laundering in UN
    corruption case*, South China Morning Post (Jul. 28, 2017),
    http://www.scmp.com/news/china/society/article/2104421/macau-
    billionaire-ng-lap-seng-convicted-us-jury-un-bribery-case ......................... 58

*Ng Lap Seng Convicted in United Nations Bribery Case*, Macau Daily Times
    (Jul. 31, 2017), https://macaudailytimes.com.mo/ng-lap-seng-convicted-
    united-nations-bribery-case.html .......................................................... 58

Peter Jan Honigsberg, *Linguistic Isolation: A New Human Rights Violation Constituting Torture, and Cruel, Inhuman and Degrading Treatment*, 12 Nw. U. J. Int'l Hum. Rts. 22 (2014) ................................................................ 44

Rebecca D. O'Brien and Nicole Hong, *Macau Developer Found Guilty in U.N. Bribery Case*, the Wall Street Journal (Jul. 27, 2017), https://www.wsj.com/articles/macau-developer-found-guilty-in-u-n-bribery-case-1501195859 ........................................................................... 58

Suzanne Pepper, CIVIL WAR IN CHINA: THE POLITICAL STRUGGLE, 1945-1949 (1978) .................................................................................................. 4

Tom Hancock, *Chinese billionaire Ng Lap Seng convicted in UN bribery case*, Financial Times (Jul. 28, 2017), https://www.ft.com/content/31037500-7340-11e7-aca6-c6bd07df1a3c ........................................................................ 58

United Nations Office of Internal Oversight Service, Audit of the Management of the Trust Fund in Support of the Office of the President of the General Assembly (March 22, 2016)*, available at* https://oios.un.org/page/download/id/473 ......................................................... 38

United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing* ............................................. 60

Zvi D. Gabbay, "Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime," 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) .................................................................................................. 57

# **INTRODUCTION**

Mr. Ng Lap Seng has led a remarkable life: born to extreme poverty in a remote peasant village in China and with barely any education, he overcame unimaginable challenges to build a string of successful businesses, surviving and persevering despite repeated devastating setbacks throughout his life. And yet what emerges most clearly and distinctly from his saga (and as reflected in the numerous letters of support from his family, friends and colleagues) is not his astounding perseverance in the face of hardship, but rather his fundamentally kind, selfless and compassionate nature. Humble and mindful of the hardships he has endured, Mr. Ng has dedicated himself throughout his life to care for and provide for his family, countrymen, and others throughout greater Asia and the world. It is no exaggeration to say that he has personally improved the lives of thousands upon thousands of underprivileged and vulnerable people in Asia and beyond, not only through his thoughtful and extremely generous charitable donations, but through innumerable acts of personal kindness throughout his life. Few among us have done as much for others as Mr. Ng has done. Indeed, the events of which the Court learned at Mr. Ng's post-conviction bail hearing, in which Mr. Ng tried tirelessly to comfort and save the life of one of the very men assigned to ensure his confinement when that man was stricken by a heart-attack, was not some fluke or anomaly: it was the natural expression of Mr. Ng's fundamentally good, kind and caring nature. His good character, generosity, basic decency and his extraordinary life of good works deserve consideration and merit significant leniency.

Although the jury found that Mr. Ng's efforts to support the Macau Conference Center project crossed a line into the criminal, when placed in the larger context of his life, it becomes evident that his conduct in this case flowed from his long history of seeking to do good for others. And largely for that reason, the conduct here is unique in the annals of bribery or money-laundering cases. Mr. Ng was not convicted of bribing a government official to

1

exercise actual executive, legislative or judicial authority to award him a financial advantage. Rather, Mr. Ng was convicted of paying bribes for an expression of support from the United Nations General Assembly—a body with no executive or legislative power and no sovereign jurisdiction—for the ***idea*** that his company would develop a conference center in Macau. That project would benefit the United Nations and the economies of Macau, China and the South-South nations, it was consistent with the stated missions and goals of the United Nations, and it was supported by many of its member states. The expression of support for this idea would neither enable Mr. Ng to obtain funds from the United Nations (he sought none) nor create any enforceable rights or privileges. All that expression of support would have allowed him to do (assuming the governments of Macau and China permitted the project to go forward) would have been to take on substantial financial risk and work in order to develop a world-class facility the use of which he would have provided to the United Nations for free. Given the obvious time, expense and risk involved in pursuing a project of this scope, the possibility of any net economic benefit to Mr. Ng was necessarily remote and speculative, and cannot reasonably explain why he would have chosen to commit himself to ***this*** real estate project as opposed to any other. Rather, it is far more reasonable to conclude that Mr. Ng's motivations were patriotic (to enhance the political and economic standing of Macau and China in the region) and philanthropic (to foster economic development in Macau and the South-South nations and thereby improve the lives of perhaps millions of people). In short, this case is far outside the heartland of bribery and money laundering cases, and the differences alluded to above weigh heavily in favor of leniency.

Mr. Ng is now 69 years old and suffering from a number of medical conditions. There is no chance of recidivism. He has lost his liberty and been subject to the severe anxiety, stress

and expense of this case for almost three years.[1]  He has watched his business wither in his absence, forcing him to sell off substantial real estate assets to try to keep things afloat.  Mr. Ng and his family have been devastated by this case and all they want is to be reunited in China.

The twenty-plus years of incarceration suggested by the Probation Department's Guidelines calculation is out of all proportion to both common sense and the requirements of justice for this case, especially in light of the weighty countervailing factors described above and the many redeeming qualities that Mr. Ng has displayed throughout his life.  The Probation Department itself recognizes as much, and recommends a far lower sentence of 72 months; but, we respectfully submit, even that is far too harsh given all of the circumstances warranting leniency here.  Even a sentence at that level would be substantially disproportionate to sentences imposed in other bribery and money laundering cases.  In fact, in numerous cases involving far more egregious conduct, including cases involving sitting elected officials in the United States who engaged in long-running corruption and bribery, defendants have been sentenced to jail terms of two to three years.

Given Mr. Ng's good character and extraordinary life of charity and good works, and the various unique aspects of this case described in greater detail herein, we respectfully ask the Court to impose a non-jail sentence and let Mr. Ng return to his family in China.  Mr. Ng can assure the Court that, once in China, he would not seek to return to or conduct business in the United States, nor is it likely that he would be permitted to do so even if he tried.  Such a sentence would be sufficient, and no more than necessary, to do justice in this case.

---

[1]   Mr. Ng recognizes that some of that time was due to sentencing adjournments that he requested, and he does not seek leniency based on those adjournments.

**BACKGROUND**

I.      **EARLY YEARS (1948-1963)**

Ng Lap Seng was born on June 26, 1948 to an impoverished family in Guangdong, China. The Chinese Civil War was raging at the time, and an eight-year war with Japan had just ended three years before in 1945. The many years of warfare had destroyed the economy and disrupted the agriculture of China.[2] As a result, food and other necessities of life were scarce. Mr. Ng's mother was the only one in her family who did not die from starvation during the war. The eighth of nine children, Mr. Ng was one of only four who survived to adulthood, the others being Mr. Wu Pengsheng, Mr. Wu Jusheng, and Ms. Wu Li'e.

Mr. Ng's family lived in a village located in the area of Jiujiang, Nanhai within the Guangdong province. Mr. Ng's father made his living by selling pork to local villagers. He carried the slabs of meat on his shoulder and travelled around the region on foot to make sales. Mr. Ng's mother was a homemaker who primarily took care of Mr. Ng and his siblings. She was in poor health due to childbearing, malnutrition, and depression from the deaths of five of her children. Mr. Ng's father was the sole source of income for the family, and his meager earnings were far from sufficient to put enough food on the table for everyone. His family was often on the brink of starvation.

In 1949, the Chinese Civil War ended and the Communist regime took over the country. Shortly afterwards, the young regime started a campaign to redistribute the land owned by landlords and rich farmers among all farmers on an egalitarian basis under the Land Reform

---

[2]    *See generally* Suzanne Pepper, *Civil War In China: The Political Struggle*, 1945-1949 (1978)*; see also* Hao Qian, *From Status-Based Privilege to Old Age Security: Rethinking Public Pension Reform in China*, 82 UMKC L. Rev. 967, 980 (2014) ("[In 1949,] China was a poverty-stricken agrarian society with an economy in collapse after a century of foreign occupation and a series of civil wars."); Major Bailey W. Brown, III, *Retribution: The Battle for Japan, 1944-45*, Army Law., September 2009, at 48, 49 ("Since Japan's efforts in China and elsewhere sought primarily to strip occupied lands of food and raw materials for the benefit of Japan's people, occupying forces were inhibited from treating their conquests humanely, even had they wished to do so.") (citations and quotations omitted).

Act of 1950.[3]  In the process, the State used intimidation and confiscation, and, in many cases, imprisonment and execution, to enforce the redistribution program.[4]

Because Mr. Ng's family leased out a small piece of farmland they had inherited, the government wrongfully targeted them as members of the landlord class, despite their poverty. Mr. Ng's parents were brought on stage, where they were accused and ridiculed as class enemies.[5]  The village confiscated Mr. Ng's family's house and land, and drove the family out of the village.[6]  Mr. Ng's family, now homeless, wandered from village to village in hunger, eventually squatting in an abandoned cottage.[7]  The family had to sleep on patches of grass on the bare earth.[8]

Mr. Ng's father soon fell ill and became bedridden.  His mother, already frail, became mentally unstable and attempted to commit suicide with all her children.  One day, after dividing a piece of pancake into four pieces for her children, she tied up their hands with ropes, pulled them into a fishpond, and whispered that she would rather drown her children than see them starve to death.  By chance, several villagers heard the children's screams as their mother was drowning them in the pond and saved their lives.[9]

---

[3]  *See generally* Kari Madrene Larson, *A Lesson in Ingenuity: Chinese Farmers, the State, and the Reclamation of Farmland for Most Any Use*, 7 Pac. Rim L. & Pol'y J. 831, 834 (1998).

[4]  *See id.*; *see also* Julia Strauss, *Morality, Coercion and State Building by Campaign in the Early PRC: Regime Consolidation and After, 1949-1956*, China Quarterly 891 (2006).

[5]  *See* Exhibit 39 (Support Letter from Wu Jusheng); Exhibit 42 (Support Letter from Wu Pengsheng). For letters written in Chinese, the exhibits attached are English translations of Chinese originals with the translator's certificate attesting to the translations' truth and accuracy.  The original letters are on file with counsel, and can be provided upon request.

[6]  Exhibit 42 (Support Letter from Wu Pengsheng).

[7]  *Id.*

[8]  Exhibit 40 (Support Letter from Wu Li'e).

[9]  Exhibit 42 (Support Letter from Wu Pengsheng).  *See also* Exhibit 40 (Support Letter from Wu Li'e); Exhibit 39 (Support Letter from Wu Jusheng).  Due to the age of Mr. Ng's siblings and the time that has passed, there are minor inconsistencies in their recollection of their stories from the 1950s.  In most cases we adopt Mr. Wu Pengsheng's version because he was the oldest among the siblings and likely has a better recollection of events from that time.

Although Mr. Ng and his siblings survived, they continued to suffer from lack of food and basic support. The family at one point relied on the charity of a villager who could only give food to the family surreptitiously because the family still bore the stigma of being considered landlords.[10] Mr. Ng's siblings had to gather food by catching fish and shrimp in the river at sunrise, and Mr. Ng himself worked with his siblings to gather food and fuel at night while he was attending elementary school during the day.[11]

Mr. Ng was a "caring, diligent, and thoughtful" brother who put up a strong front during this period of extreme hardship and did his best to help his family.[12] His eldest brother, Wu Pengsheng, recalls that:

> One winter, it was particularly cold. Our shabby clothes could not protect us from the freezing weather. Without shoes, our bare frozen feet were red and painful. However, every time when we returned home after catching fish, my youngest brother would prepare hot fish soup for my second brother and me, and boil hot water so that we could take a hot bath. Every time I was pleased that I had such a caring, diligent and thoughtful little brother. Hard as our days were, we felt warm having the whole family together.

Exhibit 42 (Support Letter from Wu Pengsheng).

## II.    YOUTH: 1963-1979

In or about 1963, after he graduated from primary school (the equivalent of 5th grade in the United States), Mr. Ng dropped out of school to help provide for his family.[13] He felt it was time for him to start working full-time, especially because he had already received the most education of anyone in his entire family.[14]

---

[10]    Exhibit 42 (Support Letter from Wu Pengsheng).

[11]    *Id.*

[12]    Exhibit 40 (Support Letter from Wu Li'e)

[13]    *Id.*

[14]    *Id.*

After dropping out of school, Mr. Ng took on whatever work was available. Among other things, he worked on a small construction team with his brothers and cousins, and built small brick dwellings in the village and the surrounding areas. During that period, the construction team worked from 7:00am until sunset, because there was no lighting during the evening. All work was done manually, and the team did not own any electric machinery. To build a dwelling, the team had to move all the construction materials and bricks by hand. On average, even for such hard work, each team member earned about $3.50 (about 25 Chinese yuan) per week.[15] A member of the construction team fondly remembers Mr. Ng as "upright, hard-working and never preoccupied with his personal gains or losses." Exhibit 45 (Support Letter from Wu Yaonian). He would charge less when he built shacks for poor families, although he was himself living in poverty.[16]

Mr. Ng gave all the money he earned from his work to his mother to support the family.[17] He would also help his siblings to care for their children. In particular, when his niece, Guan Muzhen became seriously ill, Mr. Ng rode her on a bicycle to a hospital tens of miles away to see a doctor, due to the limited medical resources in the area. Mr. Ng took such trips frequently during a period of three to four years.[18]

Mr. Ng was enterprising by nature and always tried to improve the living conditions of those around him. For example, his village used to have a single log bridge that was dangerous for children and the elderly, and it was Mr. Ng who organized a campaign to build a stone bridge to replace it. Mr. Ng also organized the villagers to dig several wells so that the

---

[15]  Exhibit 45 (Support Letter from Wu Yaonian)

[16]  *Id.*

[17]  *See id.*; *see also* Exhibit 42 (Support Letter from Wu Pengsheng)

[18]  Exhibit 40 (Support Letter from Wu Li'e).

community could have access to fresh water instead of the polluted water from the river.[19]  His work greatly improved the life of his community.

In the summer of 1974, Mr. Ng was introduced to Ms. Pan Nuanhe (also known as Pun Nun Ho), who was from a neighboring village.  Although Mr. Ng was penniless, Ms. Pan still fell in love with him because of his "diligence, intelligence, [and] kindheartedness."  Exhibit 25 (Support Letter from Pan Nuanhe).  They were married in 1976 and had two sons and a daughter.  Mr. Ng was so poor that he wore borrowed clothes and a pair of slippers to his own wedding, and he built his own home—a shack with no running water or toilet, and with empty holes instead of proper doors and windows—using abandoned bricks.[20]

## III.    EARLY BUSINESS SUCCESS: 1979-1993

In search of more opportunities, Mr. Ng moved to Macau (a Portuguese territory at the time) in June 1979 with only $13.00 ($100 HKD) in his pocket.  His wife and children later joined him at the end of the same year.  When Mr. Ng arrived in Macau, the Chinese Cultural Revolution had just ended and China was on the cusp of a new economic era ushered in by the reform policies being adopted by the Chinese government.  Mr. Ng observed that every day there were tens of thousands of people who travelled to Macau and brought back clothes to sell in China.  He saw this as a business opportunity and started his business career in Macau as a street vendor selling excess inventory of clothes.  During that time, Mr. Ng worked more than ten hours a day without earning much income.

Not long afterwards, Mr. Ng leased a vacant clothing factory in Macau.  He borrowed money to pay for the rent and started a business.  Some people from his village also came to Macau, and Mr. Ng offered them a place to stay and employed them to sell clothes.  At the height of this period, there were as many as thirty to forty people from his village working for

---

[19]    Exhibit 45 (Support Letter from Wu Yaonian).

[20]    Exhibit 25 (Support Letter from Pan Nuanhe).

him as street vendors selling clothes.  His wife still remembers the family's early days in

Macau:

> Both [my husband and I] were born to poor families and had nothing
> when we arrived in Macau.  We achieved what we have now from
> nothing by our diligent work.  The process is full of difficulties,
> setbacks, hardships and sorrows.  We could only live in a clothing
> factory with our two sons at that time since we were too poor to rent
> a room.  We had to get up at 6:00 am before the workers starting the
> work and went to sleep until 10:00 pm after all workers leaving the
> factory.  It was really a hard time.

Exhibit 25 (Support Letter from Pan Nuanhe).

In the early 1980s, Mr. Ng transitioned from selling clothes to selling fabric, and

through his diligence, soon became one of the largest fabric suppliers in Macau.  By 1983, he

had earned a total of approximately $3.8 million.  His business success was interrupted in 1989

by the Tiananmen Square Protest and the economic downturn that followed.  The people living

in Hong Kong and Macau at the time were losing confidence in the government, which led to

a further economic depression.  Mr. Ng's fabric was not selling and quickly piled up in the

warehouse.  However, he saw an opportunity in the real estate market, as land prices had

plummeted due to the poor economy.  Mr. Ng therefore decided to give up his clothing business

and invest in real estate.  He partnered with other business people and made significant

purchases of land and properties, including the Nam Van Lakes project, the biggest real estate

development in Macau at the time.  By 1993, the real estate market had rebounded and prices

rose exponentially.  Mr. Ng and his partners sold much of their real estate holdings and made

significant profits.

## IV.    COLLAPSE AND REBOUND: 1993-2015

After this initial success, Mr. Ng worked to expand his real estate ventures in China.

From 1993 to 2003, he developed projects in multiple cities, particularly Zhuhai and

Guangzhou.  At one point, he juggled as many as 30 projects at the same time in Guangzhou,

China.

The market, however, slowed down soon after 1993. A particularly sharp economic downturn occurred after the 1997 Hong Kong financial crisis. Then came the SARS epidemic in 2003, which dealt a devastating blow to China's real estate market. Mr. Ng's real estate business, which was already struggling due to overexpansion, collapsed.

At the time of these tremendous financial difficulties, Mr. Ng also suffered his biggest personal loss, when, in 1998, his second son, Wu Binnian, was killed in a tragic car accident in Canada, where he was attending college. Mr. Ng was very close with Wu Binnian and loved him dearly (as he loves all his children), and this loss had a profound and devastating impact on him. Mr. Ng was hospitalized for two strokes shortly after his son's death. Pan Nuanhe recalls:

> What's worse, towards the end of the 1990s, my husband was in debt for over HK$ 6 billion. For a long time, debt collectors chased after us. No one showed us sympathy. What we received was abuse and insults. To avoid the collectors, we kept our doors shut and stayed in home, spending time by playing poker between the two of us. Because of my son's death and the huge debt, we were both upset, and my husband's health constantly deteriorated. But even at such a difficult time, my husband was taking care of me and thinking about my feelings. . . . I once contemplated suicide. But thinking that my husband had suffered strokes, that my children were still young, and that despite the many difficulties, my husband was loyal to me, I decided not to leave the world.

Exhibit 25 (Support Letter from Pan Nuanhe).

Although he was faced with financial crisis, personal tragedy, and deteriorating health, Mr. Ng did not give up. He came back to work three weeks after he was hospitalized following his second stroke.[21] His secretary, who has worked for him for almost 30 years, notes that Mr. Ng "has never bowed to difficulties and has stood up again and again after falling down." Exhibit 49 (Support Letter from Zheng Xiuli).

---

[21]   Exhibit 7 (Support Letter from Guan Dongwen).

Although Mr. Ng was under enormous financial stress, he did not declare bankruptcy, but instead strove to repay all of his debts. At that time, many of his business partners had stopped investing and abandoned their joint ventures due to their strained cash flow. Mr. Ng, however, continued operating his company and did his best to repay his loans, often using his own property to pay off his company's debts.[22] Wong Kwok Kuen, who worked at a bank to which Mr. Ng owed more than $3.8 billion HKD (approximately $487 million USD), remembers that, despite a "lack of recurring income for five years," Mr. Ng "tried every way to keep all the interest current." Exhibit 36 (Support Letter from Wong Kwok Kuen).

In 2003, in the midst of one of the worst economic downturns in Macau, Mr. Ng attempted to reestablish his previous success. Land values in Macau had once again plummeted. Mr. Ng and his business partners leveraged all they could and again made significant new investments in land and property, once again betting all on the future. The investment paid off: the economy started to pick up after 2003 and real estate values rose again. By 2013, Mr. Ng and his business partners were able to pay off all of their debts and owned properties and holdings worth more than $1 billion.

## V.     MR. NG AND HIS EMPLOYEES

The letters filed on Mr. Ng's behalf reveal his care for and support of his employees during difficult times. Ma Xiaolong, a driver in Mr. Ng's company, thinks that "there must be no, or very few, successful businessmen who treat ordinary employees so well as Mr. Ng." Exhibit 17 (Support Letter from Ma Xiaolong). A human resource administrator for Mr. Ng for 23 years, Liang Siyuan, states that Mr. Ng approved her maternity leave even though such leave was not required under local law, and gave her an extra month's pay to buy nutrition supplements before she went on leave. Ms. Liang believes these acts of generosity "fully

---

[22]     Exhibit 48 (Support Letter from Zeng Xianxuan).

demonstrated a boss' concern over his employees" and gave Ms. Liang and her colleagues "a sense of belonging."  Exhibit 15 (Support Letter from Liang Siyuan).

Mr. Ng's former employees also revere Mr. Ng for his kindness and compassion.  Lili Choi, who left Mr. Ng's company in 2002, remains grateful to Mr. Ng for the effect he had on her, and considers Mr. Ng "a very important person" who "changed the course of my life."  Exhibit 4 (Support Letter from Lily Choi).  Zeng Xianxuan, who left Mr. Ng's company in 2001, states that Mr. Ng was not only his boss, but also his mentor.  He remembers that, when he took a leave to study in Australia, Mr. Ng provided financial and personal support.  Mr. Zeng further states: "Mr. Ng treats quite well the employees of the company, and is very willing to provide guidance and support to juniors and train young people.  Meanwhile, Mr. Ng is very willing to delegate powers to lower levels, and although lower levels make mistakes, Mr. Ng would try to take the responsibilities and would not dismiss employees recklessly.  Besides, Mr. Ng pays special attention to senior workers, and despite of winding up of the company due to business difficulties, he would never delay payment of salaries to the employees."  Exhibit 48 (Support Letter from Zeng Xianxuan).

Mr. Ng's employees respect him as "industrious," "kind," and "responsible" in conducting business.  Exhibit 48 (Support Letter from Zeng Xianxuan).  His business associates attributed his success to his personal integrity.  Cen Zhaoxiong, who worked for Mr. Ng between 1993 and 1998, comments:

> As far as Mr. Ng was concerned, one of his most extraordinary qualities is righteousness.  Doing business at that time was not as standard as the present.  Then it was guaranteed mainly by personal integrity.  A businessman without honesty and good reputation would certainly not go far.  It was due to his righteousness and honesty that a continuous flow of people were willing to help him to grow his enterprise bigger and bigger.

Exhibit 3 (Support Letter from Cen Zhaoxiong).

Mr. Ng is widely appreciated by his employees as a caring boss. People who have worked for him often describe him as "kind," "nice," and "easy to get along with." Exhibits 49 and 14 (Support Letters from Zheng Xiuli and Liang Siyuan). Mr. Ng is personable and "can call everyone by names." Exhibit 15 (Support Letter from Liang Siyuan). He trusts those who work for him. Zeng Xianxuan, who worked for Mr. Ng for over 12 years, recalls that:

> Mr. Ng also totally trusts others and is of human touch. Before going on business trips, he would always give me the signed blank check for convenience of work. Mr. Ng often says, "do not suspect the person when you use him/her. Do not use a person if you suspect him/her," and has great confidences in employees, managers, shareholders and business partners.

Exhibit 48 (Support Letter from Zeng Xianxuan).

Mr. Ng has shown similar kindness and support for his personal staff as well. His children's nanny, who left her job to look after her own children, describes Mr. Ng's generosity:

> We were so poor that we could not even pay for tuition for my children. When my boss Mr. Ng found out my hardship, he willingly paid for the tuition. At that time, he also experienced financial crisis in his business, and he had trouble getting money to pay salary to his workers. But he comforted me saying that he would try to figure out a way to help, and managed to give me $4,000 HKD worth of money, which consisted of MOP, RMB, and HKD, with the HKD part borrowed from others. . . . When I received the money from him, I burst into tears.

Exhibit 41 (Support Letter from Wu Meiqing). Ms. Wu Meiqing's daughter, Doris Leong, later became Mr. Ng's god-daughter. Mr. Ng's "teaching and encourag[ement]" helped Doris eventually graduate at the top of her high school class and allowed her to attend the University of Macau on a scholarship. Exhibit 14 (Support Letter from Leong Ka I (Doris Leong)).

Mr. Ng's former massage therapist tells a story about how Mr. Ng cared for him and saved his life when he passed out while waiting for Mr. Ng in a restaurant:

> All of a sudden, I felt shortness of breath and everything turned dark before my eyes. I asked the waiter for help. The waiter went to notify Mr. Ng. I felt very weak then, but I could vaguely see him, a nearly 70 year-old man, run out from his room to help me. He asked the waiter to call 120 (Chinese emergency first-aid number), and he

also took out his herbal heart medication that he kept for his emergency use and fed it into my mouth. He massaged my head and hand to help me. Such a rich and successful man was willing to do this for a poor person like me. He warmed my heart and brought me to tears. I was speechless. I went to a hospital and I was diagnosed with pneumothorax. Mr. Ng knew that my family is poor. He actively offered to pay for my medical expenses.

Exhibit 35 (Support Letter from Wang Zhanhu). The kindness Mr. Ng showed Zhanhu is consistent with his conduct during his home detention in this case, when he tried his best to save the life of his security officer John Prindle, who collapsed from what was later determined to be a massive heart attack. Mr. Ng did not even think of trying to take advantage of the situation; instead, he immediately assisted another security officer in administering CPR and offered his own heart medicine. *See* August 3, 2017 Letter from Andrew J. O'Connell to Andrew M. Genser, Doc. No. 615, Ex. 2.

## VI.   CHARITY AND GOOD WORKS

Mr. Ng is known for his strong support of charities and the public interest, as letters of support from Mr. Ng's family, friends, employees, and business partners confirm. As his wife, Pan Nuanhe, summarizes: "He has helped numerous people, whether they are from his hometown or in Macau, Chinese or foreigners. As long as they seek help from him, he tries his best to help them. He has built roads, factories, schools, hospitals and ancestor halls for his hometown; sponsored many Chinese art organizations to tour in Macau and Taiwan; donated multiple times for disasters in mainland China; paid the costs of birth, old age maintenance, hospital and death for people in his family; and sponsored many friends. . . . These are all out of his altruism and genuine heart." Exhibit 25 (Support Letter from Pan Nuanhe). A summary of Mr. Ng's documented donations from 1993 to 2016 shows that during that period of time, he donated more than $20 million dollars to various social organizations to support charity,

poverty reduction, and disaster relief, and to promote the arts, science, social sciences, and other areas of public welfare.[23]

A.    **Macau**

Guan Weilin, a successful businessman and public figure in Macau, states that he believes Mr. Ng is "enthusiastic about charity, and is a trustworthy and honest person," who "has made many efforts contributing to society, supporting all charitable activities [and] has promoted the development of Macao in many areas such as culture, sports, charitable organizations, and supporting youth business entrepreneurs' development."  Exhibit 10 (Support Letter from Guan Weilin).

In part because of his difficult childhood, Mr. Ng has devoted particular focus to the cause of youth development.  For example, Mr. Ng donated a total of approximately $300,000 to the Scout Association of Macau for its activities and equipment in 2011 and 2013, a total of approximately $160,000 to the Macao Youth Federation, and approximately $120,000 to construct the Hou Kong Middle School.

Relatedly, Mr. Ng has made donations to a number of cultural and sports organizations.  Zeng Xianxuan, a former employee of Mr. Ng, observes that: "Mainly supported by gambling, Macau is a place where teenagers may pick up bad habits.  Therefore, Mr. Ng provides vigorous supports to cultural and sports activities and sponsors art troupes to perform in Macau, and funds teenager football teams, volleyball teams and basketball teams and so on. . . which delivers positive energy to young people in Macau."  Exhibit 48 (Support Letter from Zeng Xianxuan).

As he observed that Macau's homogeneous economic development limited opportunities for youth, making it hard for them to move up the social ladder, Mr. Ng launched the "Supporting Ten Thousand Youth Entrepreneurship" initiative, which provides training,

---

[23]    *See* Exhibit 59 (list of Mr. Ng's donations).  Receipts and supporting materials can be provided upon request.

entrepreneurship guidance, venture investment, and financial services to young entrepreneurs in Macau. Guan Weilin, director of the initiative, states that the program has helped many young people start new businesses and become successful in Macau.[24]

Other donations to charity organizations include, for example, more than $1 million to the Macau Women's United Association (Associacao Geral das Muheres de Macau), more than $250,000 to Associacao de Beneficencia Tung Sin Tong, a local charity organization, and more than $200,000 to the Charity Foundation of Macau Daily for its March for Charity event in 2007, 2008, 2009, 2010 and 2013. Jorge Valente, a prominent lawyer in Macau, observes that most of Mr. Ng's donations were not publicized: Mr. Ng "makes donations out of his generous heart and not to show-off or for others to know he is a benefactor. He takes pleasure in making other people happy." Exhibit 34 (Support Letter from Jorge Neto Valente). The president of Kiang-Wu Hospital of Macau, Ung Pui Kun, recalls that Mr. Ng, at his first meeting with her, expressed his willingness to actively support any charitable events that required assistance. Ms. Ung noticed that Mr. Ng "very generously support[ed] all non-governmental charitable organizations" in Macau, while maintaining a low profile. To the Kiang-Wu Hospital alone, Mr. Ng made donations through his companies of more than $500,000. Exhibit 33 (Support Letter from Ung Pui Kun).

**B.      Hometown**

Although he made his career in Macau, Mr. Ng did not forget his hometown, the poor village where he grew up.[25] Since 1991, Mr. Ng has made contributions that helped to finance an expansion of the local hospital;[26] to establish a high school which has graduated thousands

---

[24]   Exhibit 10 (Support Letter from Guan Weilin).

[25]   *See* Exhibit 51 (photo of Mr. Ng's home village).

[26]   *Id.; see also* Exhibit 53 (photo of the Sun Kian Ip Outpatient Building of Foshan Ninth Hospital).

of students;[27] to build a basketball court and a recreational room;[28] to construct a memorial hall for the Ng family ancestors;[29] and to revive an award-winning, world-class dragon boat team that has provided employment for 30 local families.[30]  The villagers of his hometown consider Mr. Ng as a "true friend and philanthropist" who "shows continuous solicitudes to his hometown and friends."  Exhibit 9 (Support Letter from Guan Nengkun).

A villager observes: "Mr. Ng Lap Seng always bears in mind the hometown raising him and his fellow villagers, and started to give back the moment he made money.  Every road, every bridge and every memorial archway in Shangxi village and Huangji Riyao village were imbued with his painstaking endeavors.  He not only provided funds but also monitored the constructions on site, who has made indelible contributions to the residential and living environment of the fellow villagers as well as the charitable causes of the whole village."  Exhibit 29 (Support Letter from Pan Zhandi).  Mr. Ng's many contributions have led a former resident of his hometown to call Mr. Ng "a key figure and spiritual leader for charities" and a "persistent guardian for the sick and vulnerable people in Jiujiang."  Exhibit 11 (Support Letter from Guan Xinyuan).

On a more personal level, Mr. Ng has offered direct help to many villagers in his hometown.  He often comes back to his village to visit the local people and follow up regarding their life.[31]  He always remembered the villagers who saved him from his mother's attempted suicide in the 1950s, and the villager who secretly offered his family food that helped them survive.  Ever since the 1980s, when he achieved financial success, Mr. Ng has paid financial

---

[27]  Exhibit 11 (Support Letter from Guan Xinyuan); Exhibit 13 (Support Letter from Kwan Hung Sie); *see also* Exhibit 52 (photo of the Sun Kian Ip Building of Nanhai Jiujiang Vocational Training School).

[28]  Exhibit 16 (Support Letter from Liang Zhirui).

[29]  *Id.*

[30]  Exhibit 50 (Support Letter from Zhu Wenquan); Exhibit 11 (Support Letter from Guan Xinyuan).

[31]  Exhibit 9 (Support Letter from Guan Nengkun).

contributions to these villagers to repay their kindness.[32]  Later on, Mr. Ng provided stipends to all the elderly citizens in his hometown, so that they can live without worries.  Perhaps even more impressive, when distributing those stipends, Mr. Ng did not exclude those who participated in the persecution of his family when he was a child.  His nephew, Wu Quannian, recounts a story:

> Once when my uncle visited an elder aged over 80 (NOTE: already passed away now) and presented a donation to him, the elder held his hand and cried.  When asked why, the elder pointed to his heart and said, 'During the Cultural Revolution, I was among the people who [accused] your family.  You not only did not bear a grudge, but give me money to sustain my late years.  This convicts me and makes me feel guilty!'  My uncle said, 'Brother, it has all passed.  Let it go!'  Hearing this, the elder held up his thumb, praised my uncle for forgiving him, and said that my uncle was a man with fortune and morality.[33]

Exhibit 43 (Support Letter from Wu Quannian).

Mr. Ng also provided financial and personal support to those whose lives were affected by illness, accidents, and the loss of family members.[34]  Hu Yingkui, a resident of Nanhai, one of the many people Mr. Ng helped:

> In 2005, my husband was diagnosed with cancer at the hospital.  All of a sudden, the heavy burden of life completely fell on me.  My son had school, my husband had to see doctors, what could I do?  I did not have a lot of education.  All I did was ordinary work.  The pressure from life made me breathe uneasily.

---

[32]  Exhibit 42 (Support Letter from Wu Pengsheng).

[33]  Exhibit 43 (Support Letter from Wu Quannian).

[34]  *See, e.g.*, Exhibit 2 (Support Letter from Cen Chanyi) (stating that Mr. Ng gave her "a second life" by connecting her with doctors and paying for her medical expenses); Exhibit 27 (Support Letter from Pan Shengtai) (Mr. Ng reached out to comfort and financially support him after he was disabled from a work accident); Exhibit 28 (Support Letter from Pan Yuanju) (Mr. Ng reached out to comfort and emotionally support him after his wife passed away); Exhibit 37 (Support Letter from Wu Danian) (Mr. Ng helped to comfort and financially support his father when his father was diagnosed with cancer); Exhibit 46 (Support Letter from Wu Zhunian) (Mr. Ng rushed back from Macau to his hometown and accompanied Wu Zhunian to a better hospital when he suffered a severe injury from a traffic accident).  *See also* Exhibit 29 (Support Letter from Pan Zhandi); Exhibit 13 (Support Letter from Kwan Hung Sie), Exhibit 38 (Support Letter from Wu Haolin and Wu Zhuolin); Exhibit 40 (Support Letter from Wu Li'e); Exhibit 43 (Support Letter from Wu Quannian); Exhibit 45 (Support Letter from Wu Yaonian).

Perhaps heaven heard my appeal. Mr. Ng and his wife learned of my misfortune. They rushed back especially to comfort us, to talk to us, and gave us financial help.

. . .

Unhappy things in life happened one after another. I also fell ill in 2007. All of a sudden there was no one at home working, and there was no source of income. I was truly defeated. Mr. Ng immediately called to express sympathy after he learned of it. He persuaded me not to give up, not to be afraid, and reassured me that all the difficulties would soon pass. It was due to the encouragement and support from Mr. Ng and his wife, regardless of whether it was financially or ideology, Mr. Ng gave us the biggest assistance.

. . .

Because of Mr. Ng's concerns, I was able to walk out of my difficulties and despair one step at a time. Under Mr. Ng and his wife's concern and care, my son gradually grew up and finished his studies. We are now able to be independent financially. This is all because of Mr. Ng's help.

Exhibit 12 (Support Letter from Hu Ying Kui).

### C. China and Beyond

Mr. Ng's charitable contributions were not limited to Macau or his hometown. All over China, he donated to a variety of programs, including more than $1.5 million for the maintenance of historical sites in Ruijin, more than $1.5 million for the construction of transportation facilities in Guangzhou, and approximately $500,000 for disaster relief for floods and earthquakes all over China.[35]

Because Mr. Ng dropped out of school when he was young, he has wanted to make sure that other children do not have to miss what he missed. Education for youth has therefore been a focus of his charity work. In particular, he had a long collaboration with Beijing Meijiang Education Foundation to help children in remote and rural areas of China. From 2005 to 2010, Mr. Ng made donations of over $1.6 million through the foundation to "help the students in

---

[35] *See* Exhibit 59 (list of Mr. Ng's donations).

poverty in the Frontier regions of China, populated by ethnic minorities, to finish their study

and grow up in health."  Exhibit 18 (Support Letter from Meijiang Foundation).  As the

Foundation's staff recounts:

> In 2005, Mr. Ng Lap Seng sponsored five Uyghur girls in Atushi of
> Xinjiang Kizilsu and provided them with funding from then on.  In
> 2006 and 2007, Mr. Ng Lap Seng sponsored 18 Khalkhas senior high
> students in the Third Middle School of Xinjiang Kizilsu and helped
> them finish senior high studies.  In 2007, learning that many children
> from farming families in Akto County often were too poor to have
> breakfast, Mr. Ng Lap Seng made his capital contributions and set
> up a "Breakfast Project" to provide funds to 5,179 students there and
> supplied every student with breakfast of 1 yuan's value every day;
> In 2008, Mr. Ng Lap Seng further provided nutrition subsidies of 1
> yuan per day per student for nearly 4,000 disadvantaged students in
> various Tibetan schools in Shigatse and Naqu of Tibet, and Guoluo
> Prefecture and YuShu Prefecture of Qinghai.

*Id.*  One girl who received Mr. Ng's help through the Meijiang Foundation was able to attend

college and is now working as a middle school teacher.  She states that the help from the

Meijiang Foundation and Mr. Ng made it possible for her to get to where she stands, and

"lightened up [her] future."  Exhibit 44 (Support Letter from Wu Rong).  In addition to

providing financial support, Mr. Ng personally traveled all the way from Macau to Xinjiang (a

15-hour trek) to observe the living conditions of the girls he was asked to support.[36]  The girls

kept in touch with Mr. Ng through letters.[37]  Several years later, when he was informed of a

reunion of the girls taking place in Beijing, Mr. Ng "flew over to Beijing from Macau for this

special trip to meet up with his 'family members' from Xinjiang.  They hugged each other and

---

[36]   Exhibit 18 (Support Letter from Meijiang Foundation); Exhibit 32 (Support Letter from Tse Sum Ping
(Candice).

[37]   *See, e.g.*, Exhibit 47 (letters from Yingying, a recipient of Mr. Ng's charity donation, to Mr. Ng).  Yingying
does not know about Mr. Ng's conviction in the United States.

cried. Although they didn't meet up with each other often, their connections were constantly there." Exhibit 18 (Support Letter from Meijiang Foundation).[38]

Mr. Ng's charity has inspired others to follow in his footsteps. After coming with Mr. Ng to visit a village where Mr. Ng had made donations through the Meijiang Foundation, Candice Tse, who is Mr. Ng's god-daughter, similarly sponsored the education of a young girl in the village.[39] Mr. Ng's daughter-in-law, Crystal Sun, has also become involved in charity organizations.[40] Mr. Ng's influence has also extended to his business partners and colleagues, some of whom started their own charity initiatives.[41] Cen Zhaoxiong, for example, states:

> Mr. Ng has influenced me significantly because I learned from him how to help others and how to do things. His diligence, resilience (despite of rises and falls of his businesses) and vision touched me deeply. More importantly, Mr. Ng never thought of returns by helping others. As one of the numerous people influenced by Mr. Ng, I also actively learn from Mr. Ng, and try to make contributions to the society. I started my business in 1999, but only in 2003, I launched the Charity Foundations of Guangzhou Times Property, which . . . has sponsored 13 Hope Schools, donated 2 general hospitals, 1 comprehensive welfare building and 1 kindergarten, and helped over 3,000 patients with cataract to undergo surgeries for free and regain vision, helped 30,000 students from poor families to accomplish their study, and made a cumulative donation of over RMB 30 billion [approximately $45 million USD]. All these charitable activities are actually inspired by Mr. Ng.

Exhibit 3 (Support Letter from Cen Zhaoxiong).

### D.    Supporting Social Impact Projects

In his business operations, Mr. Ng took particular interest in supporting those projects with public interest impacts. Between 1997 and 2003, Mr. Ng pursued several major projects

---

[38]    *See also* Exhibit 54 (photo of Mr. Ng meeting a girl he sponsored through the Meijiang Foundation in Beijing).

[39]    Exhibit 32 (Support Letter from Tse Sum Ping (Candice)).

[40]    Exhibit 30 (Support Letter from Crystal Sun).

[41]    *See, e.g.*, Exhibit 30 (Support Letter from Cen Zhaoxiong); Exhibit 4 (Support Letter from Lily Choi); Exhibit 48 (Support Letter from Zeng Xianxuan).

that were socially meaningful, yet had limited prospects for financial return.  Zheng Xiuli,

Mr. Ng's long-time secretary, recalls:

> When we were at the hardest time of the shortage of funds, we built
> the Lotus Bridge ("Ponte Flor de Lotus").  In 2000, our boss, as a
> member of Economic Development Commission funded the
> government of Macau, helped the government to build the Macao
> International Trade City so that the products of small and medium
> domestic enterprises can enter the international market so the local
> businesses in Macao can have more business opportunities and
> create more employment opportunities.

Exhibit 49 (Support Letter from Zheng Xiuli).  At that time, Mr. Ng was experiencing a

shortage of funds, and so were his business partners on these projects.  However, Mr. Ng "tried

every means at all costs to raise funds so as to accept the construction project and complete the

project by the specified time," "with the purpose of supporting the development of the society."

Exhibit 49 (Support Letter from Zheng Xiuli).  The Lotus Bridge built by Mr. Ng's company

"has added greatly to Macao's advancement."  Exhibit 10 (Support Letter from Guan Weilin).

As the trial record shows, Mr. Ng has financially supported South-South News, a 24-

hour access digital media platform that covered various events related to South-South

development and the United Nations and conducted interviews with world leaders and United

Nations officials.  *See* Tr. 2319; 2131-37.  The original goal of South-South News was to

"showcase the positive news and stories of the global south, reporting on the policy making

that facilitate[s] development on different regions from the United Nations, supporting events

that promoted public-private partnerships, reporting on the advancement[] of the UN

Millennium Development Goals, [and] co-producing the South-South Awards (an awards show

showcasing countries of the south)."  Exhibit 6 (Support Letter from Fabio Dillman).

South-South News was recognized for its efforts in the UN community.  A letter from

Yiping Zhou to Mr. Ng listed several UN events that Mr. Ng's company and foundation helped

to organize, including the UN-HABITAT's World Urban Campaign launching ceremony in

Hong Kong and the South-South News High-level Meetings on ICT's and Cybersecurity in

Hong Kong, both attended by high-level UN officials.[42]  As Fabio Dillman, an employee of

South-South News who met Mr. Ng through that organization, recalls:

> Throughout those encounters with Mr. Lap Seng, I understood his vision and the importance of supporting developing countries and developing programs at the United Nations. . . .  During the first 2-3 years of operation of South-South News, Mr. Lap Seng supported most of the initiatives presented to him by the company directors. As a result of this, we were recognized by the United Nations for our work.  Other media companies who covered the United Nations also respected us.  We even were asked to collaborate with the United Nations media outlets to help disseminate information on different programs and events.

Exhibit 6 (Support Letter from Fabio Dillman).

### E.  Collection of Chinese Antiques

Since the mid-19th century, Chinese artifacts and antiques were acquired in large

quantities by European colonialists.  Today, many of these valuable artifacts, some regarded as

national treasures of China, are in the possession of Western collectors.  In the last several

decades, Mr. Ng and his company have devoted significant resources and effort to bringing

these artifacts back to China.  The result is an extensive collection of antiques in many

categories, including religious statues, bronzes, china, paintings, seals, jewelry, and other

objects.[43]

After bringing these artifacts back to China, Mr. Ng did not merely lock them away for

his private enjoyment, but wanted the public to have the opportunity to appreciate the beauty

of Chinese art and to learn more about China and its history through these objects.  Mr. Ng has

published several books in China to show the contents of his collections and to explain their

aesthetic value and historic significance.  He has also organized public exhibitions and donated

---

[42]  *See* Exhibit 60 (letter from Yiping Zhou to David Ng dated January 28, 2015, previously marked as DX 4031 but not admitted in evidence).

[43]  *See* Exhibit 55 (photo of part of Mr. Ng's collection of Buddhist statues); Exhibit 56 (photo of part of Mr. Ng's collection of bronzes).

some of his collections to the public, including in 2013 when he donated five Tang-style murals to the Chinese government after hosting an exhibition of part of his painting collection. Mr. Ng intends to donate much of his collection to public museums so that the Chinese public can access them.

### F.    Summary of Charity and Good Works

As the preceding examples show, Mr. Ng has been dedicated to a vast array of charitable causes. At every stage of his life, he has tried to improve the conditions of his community and to help those in need, even when he himself was in need. The same kindness shone through when he was poor as well as after he became successful. In poverty, he would charge less when he built homes for poor families, *see* Exhibit 45 (Support Letter from Wu Yaonian); with success, he has donated millions to care for the poor, the sick and the elderly, *see* Exhibit 10 (Support Letter from Guan Weilin). As Janet Ng, Mr. Ng's daughter, recalls: "From childhood to adulthood, regardless of family members, friends or strangers, when my dad learned that they had difficulties and need help, my dad would certainly offer assistances." Exhibit 20 (Support Letter from Janet Ng).

Moreover, as his resources expanded, Mr. Ng helped not only those close to him but also those thousands of miles away. He showed the same benevolence to those of his village who needed help in times of health and personal crisis, *see, e.g.*, Exhibit 12 (Support Letter from Hu Ying Kui); Exhibit 46 (Support Letter from Wu Zhunian), as he showed to minority children in remote areas of China, *see* Exhibit 18 (Support Letter from Meijiang Foundation).

From his youth to his old age, from poverty to success, Mr. Ng has been consistently devoted to charity, and his charitable contributions have extended all over China. Over the past several decades, Mr. Ng has donated more than $20 million to various organizations focusing on areas including education, health, transportation, disaster relief, culture, and youth

athletics.[44]  His contributions were further multiplied by those whom he inspired to join in the pursuit of these charitable causes.  *See, e.g.,* Exhibit 3 (Support Letter from Cen Zhaoxiong); Exhibit 4 (Support Letter from Lily Choi).  It is no exaggeration to say that "thousands of people" have benefited from Mr. Ng's various charitable efforts.  Exhibit 10 (Support Letter from Guan Weilin).

## VII.  FAMILY AND HEALTH

Mr. Ng is 69 years old, and suffers from poor health.



These conditions, coupled with Mr. Ng's age, suggest that close monitoring and careful management may be necessary for his health.

Mr. Ng currently lives in an apartment in New York City.  His wife of more than 40 years, Pan Nuanhe, lives in Macau.  The couple had two sons and one daughter.  Mr. Ng's eldest son, Alex, is now running the family business.  Alex is married to Crystal Sun, with whom he has a son and a daughter.  Mr. Ng's daughter, Janet, also participates in the operation of the family business.  She is now married to Hermoso Nocom, with whom she has three sons and a daughter.  Mr. Ng's second son, Wu Binnian, was killed in an automobile accident in 1998.[45]

---

[44]  *See* Exhibit 59 (list of Mr. Ng's donations).

[45]  *See* Exhibit 57 (photo of Mr. Ng with his wife and three children in (1998)).

Mr. Ng is very close with his three surviving siblings: Wu Pengsheng, his eldest brother, age 79; Wu Jusheng, his second-eldest brother, age 72, and Wu Li'e, his sister, age 73.[46]  His five additional siblings died at a very young age, due to malnutrition and lack of medical care. Mr. Ng takes care of his surviving siblings and pays for their expenses.  Given their age and the difficulties they suffered when they were young, they have various health problems and have incurred significant medical expenses that Mr. Ng has paid.  Wu Pengsheng, for example, has had four heart surgeries, which cost Mr. Ng hundreds of thousands of dollars in medical expenses, including approximately $100,000 in 2017 alone.  In 2015, after hearing the news of Mr. Ng's arrest, Wu Jusheng had a heart attack, and barely survived after seven hours of emergency operations in the hospital.  Mr. Ng paid for all of the resulting medical costs.[47]

Mr. Ng not only supports his siblings, but is also the central pillar of his extended family.  Every year he would organize a family retreat for his whole extended family, so that they could celebrate Christmas or the Chinese New Year together.[48]  He has provided employment opportunities and financial support to various family members, including his nephew, his niece, and his wife's relatives.[49]  Additionally, Mr. Ng often pays for the medical expenses of his extended family members.  Janet Ng, Mr. Ng's daughter, states:

> From 2009 to today, the mother of my sister-in-law sought treatments for hepatitis B type IB, and domestic costs alone amounted to RMB 600,000, and subsequent fees and costs for medical treatments in US and Hong Kong for Ankylosing Spondylitis were up to HKD 1,500,000.  Moreover, my eldest paternal uncle (elder brother of my father) had heart disease in the 1990s, and my eldest aunt (wife of the elder brother of my father) suffered from hyperthyroidism two years ago and my aunt developed kidney disease this year, and my father paid all medical costs.  In addition, my aunt (sister of my father)

---

[46]  *See* Exhibit 58 (photo of Mr. Ng with his siblings).

[47]  Exhibit 39 (Support Letter from Wu Jusheng).

[48]  Exhibit 15 (Support Letter from Liang Siyuan).

[49]  *See, e.g.*, Exhibit 8 (Support Letter from Guan Muzhen), Exhibit 24 (Support Letter from Pan Jiechu), Exhibit 26 (Support Letter from Pan Rongdi), Exhibit 42 (Support Letter from Wu Pengsheng), Exhibit 39 (Support Letter from Wu Jusheng), Exhibit 40 (Support Letter from Wu Li'e).

had to undergo surgery due to heart disease in 2015 and cost HKD 600,000. All other payments are too numerous to be enumerated one by one.

Exhibit 20 (Support Letter from Janet Ng).  As simply put by Wu Pengsheng, "the entire family depends on him for living."  Exhibit 42 (Support Letter from Wu Pengsheng)

Alex Ng, Mr. Ng's son, describes his father as:

a man who shows sincere solicitudes for the family.  When anyone in the family needs him, regardless of major event or triviality, he would always spare no efforts to help them patiently and considerately, so the whole family trusts my father very much.  Consequently, regarding business operation or interpersonal relationships, or launching of new menus, people would habitually solicit for his suggestions and draw his wisdom.  To us, my father also likes talking with us when having rests.  His kindness and amiableness let us feel the paternal love and coziness of home, and he is our life mentor whose sagacity, strength and caring are examples that my siblings and I should learn from.

Exhibit 19 (Support Letter from Alex Ng).  Janet agrees that her father "[leaves] no one behind" when it comes to family members in need of help.  Exhibit 20 (Support Letter from Janet Ng).

In Mr. Ng's absence, the pressure of running the family business has overwhelmed his children.  As Mr. Ng's wife states: "Since my husband was detained, my son has been taking charge of the company on his behalf.  However, because he has little experience, he did not know the rationales of the business or how to deal with the matters.  My son is under immense pressure and suffers from insomnia and had to take sleeping pills to fall asleep.  I was concerned that he might not be able to bear it."  Exhibit 25 (Support Letter from Pan Nuanhe).  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

In addition, Mr. Ng's business has suffered immeasurably in his absence.  As Mr. Ng's wife states, after Mr. Ng was arrested, "banks and lenders all came to us, asking for closure of our accounts and earlier repayments.  Under such circumstances, we had no choice but sell our

real estate to save my husband. . . . This hurts my family, company and all the employees greatly. If my husband cannot return to Macau to take over the business, in addition to the adverse impacts, this would create many disputes in the projects and interpersonal relationships and in our business." Exhibit 25 (Support Letter from Pan Nuanhe). ████████████

████████████████████████

████████████████ Because many of Mr. Ng's loans are secured through his personal relations and reputation, without his presence in Macau, much of the debt has been called in for early repayment. This has been severely detrimental to the health of Mr. Ng's companies that employ scores of innocent employees. Many of the employees are Mr. Ng's extended family members who may have difficulty finding similar employment opportunities elsewhere.

A close family friend also observes that after Mr. Ng's arrest,

> "his family was deeply concerned and worried. This has affected Mrs. Ng and their son both physically and mentally. Because of the long distance between the United States and Macao, it was hard to visit him all the time. This also creates extra burden for the family. Mrs. Ng cried more than once to me to express her worries. Recently, when the guilty verdict [was] declared, the whole family [was] overwhelmed. All members of the family sunk in despair. Their only hope is that he will receive leniency during sentencing. Such that Mr. Ng Lap Seng, the family's pillar, can have an opportunity to return to his home in Macao and take care of his family."

Exhibit 10 (Support Letter from Guan Weilin).

The separation of Mr. Ng from his family since his arrest has caused real pain to the family, because Mr. Ng "is such an extraordinary father that he is an indispensable part of our life." Exhibit 19 (Support Letter from Alex Ng). Ms. Pan Nuanhe, says she has not been able to sleep soundly for the past two years, and "weep[s] heavily" when she thinks about Mr. Ng. Exhibit 25 (Support Letter from Pan Nuanhe). As Alex Ng concludes his letter: "I hope your honor could give me an opportunity to care for this old man, who has dedicated his precious

years to his family and society and has struggled all his life."  Exhibit 19 (Support Letter from Alex Ng).

Given that Mr. Ng, his siblings, and his wife are all elderly, the family is terrified that they may never see Mr. Ng return home in their lifetimes.  Wu Pengsheng, the eldest brother of Mr. Ng, says:  "I am 80 years old and I spend every day in the hospital getting IV and take medicine to sustain my life.  My two feet are getting more and more swollen.  I don't know how long I can live and I do not know whether I can see my youngest brother face to face again."  Exhibit 42 (Support Letter from Wu Pengsheng).  Ms. Pun Nuanhe, who believes she may have only ten years to live, pleads: "I sincerely hope [Y]our [H]onor can give my husband an opportunity to come home and for us to spend the rest of lives together . . ."  Exhibit 25 (Support Letter from Pan Nuanhe).

**ARGUMENT**

## I.    LEGAL STANDARD AT SENTENCING

As the Court knows, the law requires it to impose a sentence that is "sufficient, but not greater than necessary," 18 U.S.C. §3553(a), in order to provide "the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). The sentencing court must consider the whole range of factors in 18 U.S.C. §3553(a), including among other things that the sentence imposed should "reflect the seriousness of the offense," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. §3553(a). The Court also must consider "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant," "the need to avoid unwarranted sentence disparities," and "the kinds of sentences available." *Id.*

Although the Court must consider the United States Sentencing Guidelines ("Guidelines") as part of the sentencing process, the Guidelines are advisory only and merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). District courts have "wide discretion to impose a non-Guidelines sentence." *United States v. Stewart*, 590 F.3d 93, 182 n.17 (2d Cir. 2009) (Calabresi, J., concurring). The circumstances need not be "extraordinary" to justify a non-Guideline sentence. *See Cavera*, 550 F.3d at 190. As the Supreme Court has explained: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)) (internal quotation marks omitted).

## II.     SENTENCING GUIDELINES ANALYSIS

We respectfully submit that Mr. Ng's sentence should not turn on the Guidelines, because other considerations, including his good character, lack of prior convictions, extraordinary commitment to charity and family, and the unique nature of the underlying conduct, are far more meaningful and significant considerations.  To the extent they do figure in the Court's determination of an appropriate sentence, the Guidelines should be calculated correctly, and as shown below, we respectfully submit that the PSR's "erroneous, and higher, Guidelines range set the wrong framework for the sentencing proceedings."  *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016).

The PSR calculated Mr. Ng's Total Offense Level as follows:

| | | |
|---|:---:|:---:|
| Base Offense Level | **12** | U.S.S.G. §2S1.1(a)(1); U.S.S.G. §2C1.1(a)(2) |
| Offense Involved More than One Bribe | **2** | U.S.S.G. §2C1.1(b)(1) |
| Value of the Payments Obtained Were More than $550,000 but less than $1.5 Million | **14** | U.S.S.G. §2C1.1(b)(2); U.S.S.G. §2B1.1(b)(1)(H) |
| Offense Involved an Elected Public Official | **4** | U.S.S.G. §2C1.1(b)(3) |
| Conviction for Money Laundering | **2** | U.S.S.G. §2S1.1(b)(2)(B) |
| Leadership Role in the Offense | **4** | U.S.S.G. §3B1.1(a) |
| Total Offense Level | **38** | |

PSR ¶¶112-120.  Mr. Ng has no prior criminal history of any kind, placing him in Criminal History Category I.  PSR ¶129.  The advisory Guideline range under this calculation is 235 to

293 months' imprisonment. PSR ¶163. We respectfully submit that the PSR significantly overstates the offense level.

### A. Value of Bribes Under §2C1.1(b)(2)

The PSR's determination that the offense involved bribes that totaled more than $550,000 but less than $1.5 million is unsupported. Indeed, there is no indication in the PSR of how that estimate was calculated, other than the statement in ¶100 that the government asserts that range for the amount involved. But the government must do more than merely assert its preferred figure—it must actually prove the amount it asserts. *See United States v. Vaughn*, 430 F.3d 518, 525 n.3 (2d Cir. 2005) (Sotomayor, J.) (explaining that "the government [bears] the burden of proving facts relevant to sentencing"). The evidence here is nowhere near sufficient to carry that burden. *Cf. United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012) (calculation of loss amount "must be grounded in the evidence and not derive from mere speculation").

The government has failed to prove by a preponderance of the evidence that any specific payment constituted an actual or intended bribe that should be included in the amount calculation under U.S.S.G. §2C1.1(b)(2). Moreover, and independently, while the PSR mentions various payments to Ashe and Lorenzo, it does not specify which of those payments are included in the estimated amount involved. Indeed, many of those payments plainly should not be included. For instance, even the government does not suggest that Mr. Ng should be penalized for the "over $800,000 in bribes from various [other] Chinese businessmen" that Ashe received "through PIAO and YAN," which were never mentioned at trial and which had nothing to do with Mr. Ng. PSR ¶¶21, 64-97. Likewise, the government does not suggest that Mr. Ng should be penalized for the $10,000 per month that Ashe began receiving in 2013 from the IOSSC, *see* PSR ¶¶52, 61, an organization that was wholly unrelated to Mr. Ng. *See* Tr. 2459-60.

While the PSR notes that Lorenzo received a salary of $20,000 per month for his work at South-South News since 2009, PSR ¶27, the evidence at trial showed that, even by Lorenzo's account, much of that salary was perfectly lawful. South-South News began to pay Lorenzo that salary well before the alleged bribery scheme began in 2011, *see* PSR ¶¶2-7, and Lorenzo admitted that he performed legitimate work for South-South in exchange for that salary. Tr. 1487-89; *see* Tr. 797, 1492-93, 2129-38, 2452-54; GX 331; DX 889 (describing work for South-South News); *see also* Tr. 3586 (government admission that Lorenzo was paid in part for "acting as the president of South-South News"). In fact, Lorenzo made clear that he did not consider payments he received for his service as president of South-South News to be bribes; rather, he only considered amounts that were for "obtaining or acting or going to the UN and getting whatever letter or steps needed to be taken on the process of the expo and meeting center or any other letter that was needed." Tr. 1488. But there is a complete absence of proof that **any** specific amount he received was for that purpose, let alone proof that Mr. Ng understood that any particular amount was for that purpose as opposed to payment for his work as president of South South News. *See* Tr. 1488-89 (testimony by Lorenzo showing he could not designate any specific amount of the money he received as being for an illegal purpose).

The same is true of the additional payments of $30,000 per month that Lorenzo began receiving on an irregular basis in early 2013 through Terra Trading. *See* PSR ¶48. As the evidence at trial showed, much of that money was used for lawful marketing and consulting work to support the proposed convention center, and no specific amount was ever identified as a bribe. *See, e.g.*, Tr. 2444-48, 2456-59; GX 123. Moreover, the trial evidence strongly indicated that Mr. Ng considered those payments perfectly legitimate; indeed, he insisted on a

written contract memorializing the agreement under which those payments were made. *See* Tr. 973-74, 987; GX50, 57.[50]

As for payments to Ashe, the PSR notes that South-South News paid for Ashe and his family to travel to New Orleans, a trip that (according to the government) costs $9,670. PSR ¶32; *see* Tr. 895-96; GX 1502. The government claimed at trial, and the PSR states, that South-South News paid for that trip in exchange for Ashe agreeing to travel to China in April 2011 for meetings in Macau. PSR ¶¶ 32-33; *see* Tr. 884. Even assuming the evidence could establish Mr. Ng's awareness of the payment, it would not qualify as an illegal bribe, because "merely arranging a meeting or hosting an event to discuss a matter" does not qualify as an "official act" of the type required to show bribery. *McDonnell v. United States*, 136 S. Ct. 2355, 2375 (2016). This donation therefore cannot be included in calculating the amount involved.[51]

Neither can the $200,000 donation that South-South News made to the account for the Office of the President of the General Assembly be considered in calculating the bribe amount. PSR ¶¶ 54, 61; GX 187; *see* Tr. 498, 1313; GX 1502.[52] As far as the evidence at trial showed, even assuming Mr. Ng was aware of that donation, he had no reason to believe it would be spent on anything other than appropriate UN business. *See* Tr. 1309-14 (testimony that Ashe told Lorenzo the money was needed for a concert at the UN); *see also* GX 21, 153 (emails from

---

[50] The PSR inaccurately states that "defense counsel contends that payments to Terra Trading were not monthly, but irregular, since some of the payments were for legitimate purposes." PSR ¶ 48. We did not contend suggest any causal link between the irregularity of the payments and the legitimate purposes. We in fact contend that all of those payments were made for legitimate purposes.

[51] The PSR also notes that Ashe sought payments from Lorenzo for a home basketball court, *see* PSR ¶¶ 35-37, but there was no evidence that Mr. Ng ever knew about or agreed to such payments or that they were ever made, and the government admitted at trial that it "ha[d]n't alleged that the basketball court was a bribe." Tr. 914.

[52] As noted above, there is no evidence this donation was made in exchange for Ashe traveling to Macau to meet with Mr. Ng. Even if there were, merely arranging a meeting is not an "official act" that can support a bribery charge. *McDonnell*, 136 S. Ct. at 2375. On the other hand, the PSR mistakenly states that "defense counsel contends that this $200,000 payment was . . . funds provided to cover the cost of ASHE's travel to Macau." The PSR misstates our position: we did not and do not contend that the payment was to cover the cost of Ashe's travel to Macau. *See* PSR ¶ 61.

Ashe requesting contributions "NOT for my personal use but to help run the PGA office"). The fact that Ashe may have later misused the funds he received, *see* PSR ¶¶23, 57, cannot demonstrate that Mr. Ng's contribution was intended as a bribe.

As for the payments to Ashe's wife Cherian in her role as a consultant to South-South News, there was no evidence that Ng was aware of these payments when they began. *See* Tr. 897-99, 2317. And as with the other payments mentioned in the PSR, the government has not shown these payments were intended as bribes in exchange for any specific official action. In any event, even if the government were able to carry its burden as to these salary payments after January 2014 when Lorenzo allegedly told Mr. Ng about the payments, they involved a total amount of $32,500—far less than the $550,000 that would trigger a fourteen-level enhancement.

### B.    Multiple Bribes Under §2C1.1(b)(1)

The offense did not involve more than one bribe within the meaning of §2C1.1(b)(1), and the resulting two-level increase under §2C1.1(b)(2) should not apply. As the authoritative Guidelines commentary explains, "[r]elated payments that, in essence, constitute a single incident of bribery … are to be treated as a single bribe." U.S.S.G. §2C1.1 cmt. n.2. In making that determination, the relevant factors include "(1) whether the payments were made to influence a single action, (2) whether the pattern and amount of payments bear the hallmarks of installment payments because they constitute partial payments of a fixed final sum, and (3) whether the method for making each payment remains the same." *United States v. Soumano*, 318 F.3d 135, 137 (2d Cir. 2003) (citations omitted) (quoting *United States v. Arshad*, 239 F.3d 276, 280-82 (2d Cir. 2001)). The first factor weighs decidedly against finding multiple bribes: according to the government, all the alleged bribe payments were made to influence the single action of "obtaining Formal UN support for the Macau Conference Center." PSR ¶¶2-7; *see also* Tr. 3880. Application of the second and third factors would depend to some extent on

which payments, if any, the Court determines were shown to be bribes.  As shown in Part II.A *supra*, the salary paid to Lorenzo, payments to Terra Trading, Ashe's travel to New Orleans, and the contribution to Ashe's PGA account, and any personal gifts to Ashe from Lorenzo or South-South News have not been shown to be bribes attributable to Mr. Ng.  It is reasonable to conclude that, at most, the jury convicted Mr. Ng on the basis of the consulting payments to Cherian, although Mr. Ng contends that even as to these, the evidence does not establish they were bribes within the meaning of the relevant statutes.  Assuming arguendo that this was the basis for Mr. Ng's conviction, the second and third factors would also weigh against finding multiple bribes, as these payments were in the nature of fixed, regular installments and were all made in the same way.[53]  As such, under *Soumano* and *Arshad*, these payments cannot justify an enhancement under §2C1.1(b)(1).

### C.    Elected Public Official Under §2C1.1(b)(3)

The offense did not involve an elected public official under the Guidelines and the resulting four-level increase under §2C1.1(b)(3) should not apply.  The only "elected public official" mentioned in the PSR is the Prime Minister of Antigua and Barbuda, and there is no evidence that Ng ever paid any bribe to that official.  On the contrary, the sparse allegations regarding that official in the original indictment, *see* Doc. No. 38, at 8-10, were dropped in the second superseding indictment, *see* Doc. No. 322, and the government made no attempt to prove them at trial, *see* Tr. 2987.

As for the two bribe recipients that the government *did* seek to assert at trial, Lorenzo and Ashe, neither of them qualifies as an "elected public official" under §2C1.1(b)(3).  Lorenzo was appointed (not elected) to his position as ambassador from the Dominican Republic, *see*

---

[53]    To be sure, the government has not claimed that these installment payments were meant to add up to any fixed final sum.  But installment payments based on an ongoing retainer agreement are just as much "[r]elated payments that, in essence, constitute a single incident of bribery" as installment payments on a fixed sum.  U.S.S.G. §2C1.1 cmt. n.2.

Tr. 685, and there is no evidence that he held any elected official position. The addendum to the PSR suggests that the Probation Department agrees with the government that this enhancement should apply because Ashe was elected the 68th President of the General Assembly. *See* PSR at 41. However, internal UN selection process, where Ashe was "appointed by acclamation," cannot make Ashe an "elected public official" for purposes of §2C1.1(b)(3). *See* Tr. 212, 245 (explaining that Ashe was not chosen in a contested election); *cf. United States v. Stevenson*, 834 F.3d 80, 84 (2d Cir. 2016) (section 2C1.1(b)(3) applies to an official "who has been elected to office and not simply appointed to a public position"); *United States v. White*, 663 F.3d 1207, 1217 (11th Cir. 2011) (section 2C1.1(b)(3) applies to protect "representative self-government" and the public trust "conferred … in an election").

Mr. Ng also objects to the apparent determination in ¶101 that Ashe was in a high-level decision-making position. On the contrary, the PGA is a largely ceremonial position whose official duties include little more than maintaining order, if required, during debates in the General Assembly. *See* GX 706 at 10-11 (Rule 35 of the Rules of Procedure of the General Assembly). The PGA "remains under the authority of the General Assembly" in exercising his functions, and cannot even vote on matters before the General Assembly. *Id.* at 11 (Rules 36-37). Moreover, the General Assembly itself—unlike a true legislative body—generally adopts only non-binding resolutions rather than binding mandates, *see* Tr. 237, making the role of the PGA even less like that of an elected public official.

### D.     Role in the Offense Under §3B1.1(a)

Mr. Ng was not an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. To begin with, the criminal activity here did not involve five or more participants and was not otherwise extensive. The PSR gives no explanation for that determination, other than its statement that Ng "oversaw the activities of the co-defendants, along with other co-conspirators." PSR ¶118. That statement is imprecise;

of the individuals listed at PSR ¶¶12-16 as "co-defendants," there are at least two (Piao and Yan) that Mr. Ng clearly did not oversee and that were not involved at all in the criminal activity attributed to Ng. The Addendum to the PSR instead suggests that the "five individuals" at issue are Ng himself, Ashe, Lorenzo, Yin, and Cao Yanxia (also known as Forest Cao). *See* PSR at 41. But even if the evidence at trial were sufficient to implicate the first four of those individuals in the alleged conspiracy—which it was not—it was clearly insufficient to show that Cao was a member of the same conspiracy. On the contrary, the trial evidence clearly showed that Cao sought to promote his own competing UN center instead of the Macau center. *See, e.g.*, Tr. 953-57, 2505-12, 2860-64.

The government also has not carried its burden to show that Mr. Ng was an organizer or leader of the relevant criminal activity. To be sure, the evidence at trial made clear that Mr. Ng was a leader of *legitimate* efforts to develop a permanent UN-sponsored conference center in Macau; but the government certainly has not shown that he was the leader of the alleged *criminal* scheme to obtain an expression of support for the project through bribery. On the contrary, the evidence indicates that Ashe and Lorenzo were engaged in an active campaign to obtain funds from Ng (and from other individuals) for their own purposes, and that they repeatedly diverted legitimate payments to their own use. *See, e.g.*, PSR ¶¶22-23, 42, 57 (describing how Ashe solicited funds and converted them for personal use), ¶¶32-39, 56-57 (describing arrangements made by Ashe and Lorenzo); Tr. 2290-97, 2393-94 (evidence showing Lorenzo used his South-South News corporate credit card for personal expenses); *see also* United Nations Office of Internal Oversight Service, Audit of the Management of the Trust Fund in Support of the Office of the President of the General Assembly ("OIOS Report") ¶¶17, 19, 25 (March 22, 2016), *available at* https://oios.un.org/page/download/id/473 (noting that Ashe solicited funds from United Nation member states). The status of Ashe as the true leader

of the purported bribery scheme is further underlined by his simultaneous organization of the second, unrelated bribery scheme described in the PSR.  *See* PSR ¶¶64-97.

### E.    Guidelines Calculation

For the reasons given above, the defense submits that an appropriate calculation would be:

| | |
|---|---|
| Base Offense Level - §§2C1.1(a)(2), 2S1.1: | 12 |
| Adjustment for 18 U.S.C. §1956 Conviction - §2S1.1(b)(2)(B): | 2 |
| <u>Total Offense Level:</u> | <u>14</u> |

Given an offense level of 14 and criminal history category I, the appropriate Guideline range for Mr. Ng is 15 to 21 months.  In the alternative, if the Court were to find the government had carried its burden to prove that the payments by South-South News to Dr. Anilla Cherian after January 2014 constituted a (single) bribe, that would require a four-level increase to the offense level, based on the $32,500 amount involved.  *See* GX 1502; U.S.S.G. §§2B1.1(b)(1)(E), 2C1.1(b)(2).  That increase would lead to a total offense level of 18, producing a Guideline range of 27 to 33 months.  This calculation incorporates an adjustment for the money-laundering conviction under §2S1.1(b)(2)(B).[54]

For the reasons explained in Part III, *infra*, a sentence of imprisonment of any length would be a disproportionate punishment because a downward departure is warranted under

---

[54]    To the extent the Court decides that some of the other enhancements proposed by the PSR should apply to Mr. Ng, we submit that the enhancements overlap in a way that overstates the offense.  *See United States v. Lauersen*, 362 F.3d 160, 166 (2d Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1097 (2005). In *Lauersen*, the Second Circuit observed that the Guidelines do not intend "to preclude a sentencing judge from considering a departure when a combination of substantially overlapping enhancements has a significant effect on sentencing ranges at the higher end of the sentencing table." *Id.* at 166.  The proposed enhancements based on the involvement of an elected public official, the loss amount, multiple bribes, and Mr. Ng's leadership role all overlap and should warrant a downward departure or variance. *Cf. id.* at 162-163 (holding a downward departure permissible because "[m]ost fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive"); *see also United States v. DeJesus*, 2016 WL 4443145, at *2 (D. Conn. Aug. 19, 2016) (imposing non-Guideline sentence below Guideline range based on *Lauersen*).

U.S.S.G. §5K2.0 (Grounds for Departure) and a downward variance is appropriate given the sentencing factors that the Court must consider under 18 U.S.C. §3553.

### III. CONSIDERATION OF THE FACTORS SET FORTH IN 18 U.S.C. §3533 WARRANTS LENIENCY

As the discussion of Mr. Ng's personal background shows, his kind and compassionate character, his lifelong dedication to charity and good works, his advanced age and poor health, his commitment to his family, the impact this case has already had on Mr. Ng and his family and the further devastating impact that a significant jail term would certainly have, all militate heavily in favor of leniency. And perhaps even more important than all of those weighty considerations, the fact that Mr. Ng's motivation here was fundamentally to serve his country and improve the lot of millions of people in Macau and the South-South nations, rather than to advance his narrow personal gain, further supports leniency. Considerations of deterrence, promotion of respect for the law, and just punishment also counsel toward leniency, particularly in view of the unique nature of this case and the suffering Mr. Ng has already endured. Finally, the need to avoid sentencing disparities in similar cases also counsels for leniency. Defendants convicted of far more disturbing conduct have received sentences of a mere fraction of the PSR's Guideline calculation. The Probation Department has agreed that Mr. Ng's case presents several grounds for a variance, and recommends a 72-month imprisonment notwithstanding its calculation of a Guideline range of between 235 to 293 months. *See* PSR ¶¶ 163, PSR at 44. We respectfully submit that even that recommendation is still far too harsh, and that full consideration of this submission, the supporting letters, and the factors supporting a downward variance, counsel in favor of a far more lenient sentence. Indeed, we respectfully submit that, considering all of the factors discussed below, the needs of justice would be amply served by a sentence of time served.[55]

---

[55]    Mr. Ng was in custody from September 19, 2015 to October 26, 2015.

**A.     Mr. Ng's History and Personal Characteristics**

1.     Outstanding Character

In determining the particular sentence to be imposed, 18 U.S.C. §3553(a)(1) directs the Court to consider the "history and characteristics of the defendant."  A downward variance can often be appropriate where a defendant has no criminal history.  *See United States v. Morales*, 972 F.2d 1007, 1011 (9th Cir. 1992) (noting that "a district court may depart below Criminal History Category I in instances where the court concludes that the offense of conviction is a single aberrant act of criminal behavior").  Courts have imposed a sentence below the Guideline range where the offense conduct was an aberration that is at odds with the defendant's life and character.  *See, e.g.*, *United States v. Ranum*, 353 F. Supp. 2d 984, 991 (E.D. Wis. 2005) (imposing non-Guideline sentence in light of, among other factors, the defendant's "otherwise outstanding character").

As the letters in his support show, Mr. Ng has consistently demonstrated the highest moral standards and is known in his community for his honesty and integrity.  He has no criminal history of any kind.  People who have worked with him describe him as "trustworthy and honest," Exhibit 10 (Support Letter from Guan Weilin), "honest, truthful and kind-hearted," Exhibit 5 (Support Letter from Chow Kam Wing), and a person of "genuine good character and true generosity," Exhibit 34 (Support Letter from Jorge Neto Valente), who "conducts his business with integrity and honors his promises," Exhibit 48 (Support Letter from Zeng Xianxuan).  As Cen Zhaoxiong explains, the success of his business is a testament to his honesty and loyalty.[56]  The fact that Mr. Ng has lived a life of integrity and honesty supports a downward variance.  *See, e.g., United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (affirming downward variance where defendant committed an "isolated mistake" in an otherwise "honorable and lawful life").

---

[56]     Exhibit 3 (Support Letter from Cen Zhaoxiong).

2.      Compassion and Charity

Mr. Ng's many prior good deeds highlight the aberrational nature of his conduct here. As the sentencing letters in support of Mr. Ng show, he has made tens of millions of dollars in donations over the past several decades to various organizations. His donations helped to build schools and hospitals, to provide disaster relief for floods and earthquakes, to maintain historical sites, and to promote culture and sports. As described in detail above, literally thousands of people have benefited from Mr. Ng's donations.

In addition to giving money, Mr. Ng's charitable work has extended to devoting his time and resources to help others. He "has provided help to many people in need that approach him, even to some he is not so well acquainted with, whenever he was asked and shown the necessity." Exhibit 34 (Support Letter from Jorge Neto Valente). In many cases, Mr. Ng not only provided financial assistance but also personally reached out to provide comfort and support to those in distress. Several letters from villagers recount stories of Mr. Ng travelling back from Macau to his hometown just to talk to those affected by accidents or illness, and to provide them comfort and encouragement.[57] Mr. Ng's exceptional compassion and his good works compel a downward variance. *See United States v. Serafini*, 233 F.3d 758, 774-75 (3d Cir. 2000) (affirming downward variance where the facts showed the defendant "as an exceptionally giving person" whose acts were not "just giving money" but "were acts of giving time, of giving one's self"); *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (varying downward when the court "ha[d] never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need" and "[t]he Guidelines virtually ignore this measure of the man," so "the Guidelines must take second place to section

---

[57] *See, e.g.,* Exhibit 12 (Support Letter from Hu Ying Kui); Exhibit 28 (Support Letter from Pan Yuanju); Exhibit 46 (Support Letter from Wu Zhunian).

3553(a), which requires a court to take account of a defendant's character in imposing sentence").

Throughout his life, Mr. Ng has consistently shown mercy to others. He has forgiven those who participated in the persecution of his family during his childhood, and provided subsidies to assist them in their old age.[58] When his employees have made mistakes, he has given them second chances instead of firing them.[59] Even for those who defrauded him and swindled him out of more than $300,000, Mr. Ng has written letters to the sentencing court to plead for leniency.[60] Just as Mr. Ng has shown mercy to others, the people whose lives he has touched now plead that he should receive mercy because "Mr. Ng has helped others for his life, and now he is the one needing help." Exhibit 8 (Support Letter from Guan Muzhen).

3. Age and Health

Courts have also recognized age and infirmity as legitimate grounds for a downward variance. *See, e.g.*, *United States v. Lata*, 415 F.3d 107, 113 (1st Cir. 2005) (age and infirmity are grounds for downward variance for a defendant over 60 years old). The Guidelines similarly provide that "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. §5H1.1.

Mr. Ng is 69 years old. As the PSR recognizes, a lengthy sentence would "effectively amount to a life sentence," and this consideration alone warrants a downward variance. PSR ¶181. As noted above, Mr. Ng also suffers from poor health due to his advanced age. ███ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ Many district courts have applied variances or

---

[58]    Exhibit 43 (Support Letter from Wu Quannian).

[59]    Exhibit 48 (Support Letter from Zeng Xianxuan).

[60]    Exhibit 8 (Support Letter from Guan Muzhen).

departures for defendants of similar age and infirmity. *See, e.g.*, *United States v. Willis*, 322 F. Supp. 2d 76, 84-85 (D. Mass. 2004) (sentencing 69-year-old defendant with a variety of medical conditions to home detention and electronic monitoring); *United States v. Baron*, 914 F. Supp. 660 (D. Mass 1995) (finding downward departure under §§5H1.1 and 5H1.4 was appropriate for a 76 year-old defendant with medical conditions that could be made worse through incarceration). The Second Circuit has even vacated a sentence that failed to account for a defendant's age in determining the risk of recidivism. *See United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) (summary order) (vacating sentence because "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines").

### 4. Isolation and Language Difficulties

A recent academic article explains that "an inmate who is unable to communicate through language with the prisoners in neighboring cells suffers isolation" and "would seemingly suffer symptoms and effects similar to what other detainees in isolation suffer." Peter Jan Honigsberg, *Linguistic Isolation: A New Human Rights Violation Constituting Torture, and Cruel, Inhuman and Degrading Treatment*, 12 Nw. U. J. Int'l Hum. Rts. 22, 35 (2014). A detainee without adequate English proficiency may be misunderstood by guards, unable to effectively report or respond to abuse or to explain medical conditions and needs, and may sometimes be administratively separated from the general prison population. *See id.* at 41-42, n. 125. Mr. Ng stands to suffer such isolation because he can only speak, read, and understand English to an extremely limited extent, and because the language he speaks is "not readily spoken by the BOP [Bureau of Prison] inmate population or BOP personnel." *See* PSR ¶181. This factor weighs in favor of a downward variance. *See* 18 U.S.C. §3553(a)(2)(D) (court must consider the need to provide the defendant with needed medical care in the most

effective manner); 18 U.S.C. §3553 (a)(6) (court must consider the need to avoid unwarranted sentence disparity).

5.    Deportable Alien

As a Chinese citizen, Mr. Ng faces an unwarranted increase in the severity of his sentence due to his status as a deportable alien. The majority of circuits recognize that a "defendant's alienage could serve as the basis for departure 'where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence.'" *United States v. DeBeir*, 186 F.3d 561, 569 (4th Cir. 1999) (quoting *United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994)); *see also United States v. Colon*, 45 F. App'x 210, 212 n.2 (3d Cir. 2002) (unpublished) (acknowledging that "deportable alien status can give rise to a downward departure when it results in extraordinary hardship that places the defendant outside the 'heartland' of the Sentencing Guidelines, unless the applicable guideline presumes a defendant who is a deportable alien (*i.e.*, in cases involving certain immigration offenses)"); *United States v. Lopez-Salas*, 266 F.3d 842, 847 (8th Cir. 2001) ("[A]lien status and the collateral consequences flowing therefrom may be an appropriate basis for departure.").

The offenses for which Mr. Ng has been convicted are not, by their nature, committed only by deportable aliens. As a non-citizen, Mr. Ng now faces harsher sentencing circumstances than a citizen convicted on the same facts. In particular, should Mr. Ng be incarcerated, the Bureau of Prisons ("BOP") will block his access to two critical benefits afforded to citizens. First, BOP policy makes noncitizens categorically ineligible for placement in a minimum security facility, where Mr. Ng (given his complete lack of criminal history or any other security risk) would otherwise be likely to serve his term. Instead, because of his alienage, Mr. Ng will have to be placed in a more restrictive low-security prison (or some other higher-security facility). *See* Fed. Bureau of Prisons, Program Statement: Inmate Security Designation and Custody Classification No. P5100.08, Ch. 5, at 9 (2006),

https://www.bop.gov/policy/progstat/5100_008.pdf. Second, as a non-citizen, Mr. Ng may be prohibited from spending the final portion of his prison term, as a citizen would, "under conditions . . . that will afford the prisoner a reasonable opportunity to adjust to and prepare for his reentry into the community." *See Smith*, 27 F.3d at 651; *see also* 18 U.S.C. § 3624(c)(1). Perhaps even more troubling, as an alien with a felony conviction, Mr. Ng may be subject to an immigration detainer; if so, then even after Mr. Ng completes any term of incarceration, he would continue to be detained so that Immigration and Customs Enforcement ("ICE") could further investigate his immigration status or take him into custody. *See* 8 C.F.R. § 287.7. Downward departure is warranted in such circumstances. *See United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997); *United States v. Charry Cubillos*, 91 F.3d 1342 (9th Cir. 1996); *Smith*, 27 F.3d at 649.[61]

### 6. Family Ties and Employees

Mr. Ng's extraordinary ties to his family are also "pertinent to crafting an appropriate sentence." *United States v. Nellum*, No. 2:04-cr-30-PS, 2005 WL 300073, at *4 (N.D. Ind. Feb. 3, 2005). As John Martin, former U.S. Attorney and later District Judge for the Southern District of New York, observed in retiring from the bench:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration. For a judge to be deprived of the ability to consider all of the factors that go into formulating a just sentence is completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice.

John S. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. Times, June 24, 2003, at A31. Courts have often varied downward under the Guidelines based the potential impact of a sentence on

---

[61] The Second Circuit rejected a downward departure based on a deportable alien's condition of confinement and post-imprisonment detention in *United States v. Restrepo*, 999 F.2d 640, 645 (2d Cir. 1993). However, the decision in *United States v. Koon*, 518 U.S. 81 (1996) "generally informs us that the district courts enjoy broad discretion in deciding whether to depart when the particular facts of the case are outside the 'heartland' of Guidelines cases" and so undermines the logic of *Restrepo*. *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (citations and quotations omitted).

members of a defendant's family. In *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008), for example, the district court sentenced a defendant to considerably less than the lower end of his Guideline range because of his law-abiding life and close family relationships. *Id.* at 89-90. The First Circuit upheld this variance as reasonable, explaining that district courts "may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence." *Id.* at 93. In *Martin*, those circumstances, including the defendant's "commitment to religion and family" and "the reciprocal commitment exhibited by his family," increased "the likelihood of meaningful rehabilitation . . . to a level meriting some weight in the section 3553(a) calculus." *Id.* at 94.

Other courts have also varied a sentence downwards based on a defendant's caretaking responsibilities. *See, e.g.*, *United States v. Munoz-Nava*, 524 F.3d 1137, 1142-43 (10th Cir. 2008) (affirming downward variance in part due to defendant's role as "primary caretaker and sole supporter" of his son (internal quotation marks omitted)); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (affirming downward variance based on the negative impact incarceration would have on defendant's son); *United States v. Smith*, 359 F. Supp. 2d 771, 776-782 (E.D. Wisc. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds, because the defendant had been in a stable relationship for several years, supports his children, cares for his mother and obtained letters as to his good character from members of his community). And at least one Court of Appeals has reversed a district court's out-of-hand rejection of a defendant's familial obligations as a basis for a variance. *See United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008).

A downward variance is appropriate in this case because incarcerating Mr. Ng would have significant negative impacts on the rest of his family, including his innocent wife, children, grandchildren, siblings, and all those who depend on him as their "economic pillar" and "spiritual backbone." Exhibit 40 (Support Letter from Wu Li'e). Mr. Ng has been devoted

to his family.  He is "an extraordinary father" and an indispensable part of the life of the family. Exhibit 19 (Support Letter from Alex Ng).  Mr. Ng's family would suffer an unusually severe impact from Mr. Ng's incarceration because of his role in conducting the family business, which has suffered since his arrest and may further deteriorate without Mr. Ng's guidance.[62] Moreover, the severe impact on the family in this case is unusually large given Mr. Ng's support of his whole extended family, including his nephews, nieces, cousins, and others in his clan.[63]  These extraordinary circumstances make a variant sentence particularly applicable here.

Another extraordinary aspect of the case here is the significant harm that incarceration would impose on scores of innocent employees of Mr. Ng who depend on the continued success of his companies for their livelihood.  Mr. Ng's businesses have already suffered in his absence over the past three years, bleeding cash and being forced to sell millions of dollars in assets to cover expenses.  Returning Mr. Ng to China would allow him the chance to revive his companies and set them on a sustainable path, providing needed jobs and financial security for the many people who depend on them.  *See United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995) (affirming downward departure based on extraordinary hardship that imprisoning the defendant would cause for his employees); *United States v. Toback*, No. 01 CR. 410 (RWS), 2005 WL 992004, at *6 (S.D.N.Y. Apr. 14, 2005) (granting downward departure where the defendant's "daily guidance and input keep the business thriving; conversely, his removal would cause extraordinary hardship on those who are employed by him"); *see also United States v. Patel*, 164 F.3d 620, at *3-4 (2d Cir. 1998) (summary order); *United States v. Kloda*,

---

[62]    *See* Exhibit 49 (Support Letter from Zheng Xiuli), Exhibit 19 (Support Letter from Alex Ng).

[63]    *See* Exhibit 42 (Support Letter from Wu Pengsheng); Exhibit 40 (Support Letter from Wu Li'e); Exhibit 43 (Support Letter from Wu Quannian).

133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001); *United States v. Somerstein*, 20 F. Supp. 2d 454, 460-462 (E.D.N.Y. 1998).

      7.      Remorse and Acceptance of Responsibility

Finally, without waiving any defenses and arguments on appeal, and without waiving Mr. Ng's Fifth Amendment rights, we expect that Mr. Ng will express his deep sense of remorse and regret regarding how he conducted his efforts to support the Macau Conference Center and will address the Court directly at the sentencing hearing. In addition, Mr. Ng is not challenging the PSR's recommendation of a fine or restitution.

**B.      The Nature and Circumstances of the Offense**

The offense-specific considerations also warrant a downward variance based on the nature of the offense. The Court must consider the "nature and circumstances of the offense" in determining the sentence to be imposed. 18 U.S.C. §3553(a)(1). Similarly, as the policy statement in the Guidelines makes clear, sentencing courts should "treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G., ch. 1, pt. A(1)(4)(b). As a result, "[w]hen a court finds an atypical case"—that is, "one to which a particular guideline linguistically applies but where conduct significantly differs from the norm"—"the court may consider whether a departure is warranted." *Id.*

Mr. Ng's conduct falls outside the "heartland" of the typical bribery case. In the typical bribery case, the object of the bribe is "commercial advantage," "issuance of a license to which the recipient is not entitled," "obstruction of justice," or similar goals. *See* U.S.S.G. §2C1.1 cmt., background. Here, however, Mr. Ng's objective, according to the government's theory, was just to obtain official United Nations support for a conference center he hoped to build in Macau. *See* Second Superseding Indictment ("SSI") ¶13. What Mr. Ng sought essentially was a statement by the United Nations, stating that it approved or supported the idea of the Macau

Conference Center. That statement is not a concrete license, was consistent with United Nation's goals and missions, and was not intended for Mr. Ng's own commercial advantage. On the contrary, the statement Mr. Ng sought was at most an affirmation of support for a project that would benefit the public good. That puts this case miles away from any typical bribery conviction.

Any official statement or approval from the United Nations or any of its departments would not be binding on China or Macau, where Mr. Ng hoped to build the conference center. Indeed, the United Nations General Assembly lacks executive, legislative or judicial power over any jurisdiction, and is largely an advisory body.[64] The government's repeated assertions that the UN documents circulated by John Ashe to the UN General Assembly in this case (A/66/748 and A/66/748*) were "important," *see, e.g.*, Tr. 3885, 3890, does not alter the fact that they were non-binding "communications" that merely provide "information that the member state wishes to make public in the United Nations." Tr. 314-15. The official United Nations support sought (and received) by Mr. Ng, therefore, was not something akin to a license which gives concrete rights and privileges, nor was it something that provided any assurance of commercial advantage. Unlike a typical bribery case, that is, none of the officials involved in this case had any ability to exercise any form of decisive or coercive government power in favor of the bribe payer.

In addition, the Macau Conference Center project was consistent with the missions and goals of the United Nations. The official communications to the General Assembly at issue in this case both referred to the Millennium Development Goals, a project that the United Nations

---

[64] According to the Charter of the United Nations, the General Assembly's power is limited to considering and discussing issues brought before it and making recommendations on those issues. *See* Charter of the United Nations, June 26, 1945, 59 Stat. 1031, T.S. No. 993 (1945), Arts. 10-17. As the Second Circuit has observed, "apart from certain internal arrangements such as the Organization's budget and other internal and financial matters . . . the General Assembly's resolutions would not be binding on States," and "General Assembly documents are at best merely advisory." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 260-61 (2d Cir. 2003).

and John Ashe as the PGA were committed to advancing regardless of any alleged bribery involving Mr. Ng. *See* Tr. 1893, 2513. Moreover, the Nairobi Outcome Document, which was adopted as a General Assembly resolution, specifically encouraged the establishment of "South-South centres of excellence," "with a view to improving South-South knowledge-sharing, networking, mutual capacity-building, information and best practices exchanges, policy analysis and coordinated action among developing countries on major issues of common concern." *See* DX 491 at 6. The Macau Conference Center project was consistent with the goals set out in the Nairobi Outcome Document. Mr. Ng, therefore, merely sought support for a project that the United Nations would have supported in any event under its own stated mission and plans. The worst accusation that the government could level at Mr. Ng was that he tried to avoid the "massive bureaucracy" of the United Nations and accelerate the process. *See* Tr. 3945. That objective is quite different from an ordinary bribery cases, where the defendant typically seeks to alter (not just accelerate) government decisions, and also typically seeks some substantial and direct financial benefit. *See, e.g.*, *United States v. Jacobs*, 3:07-cr-00090-JBA (D. Conn.), Doc. No. 179 (imposing non-guideline sentence of 4 months' incarceration "given the defendant's low level of culpability and serious medical condition" when the defendant bribed police officers to apprehend a fugitive); *see also United States v. Jacobs*, 550 F. Supp. 2d 302, 305 (D. Conn. 2008) (describing the offense conduct).

Mr. Ng's primary motivation here was not for his own commercial benefit or improper ends, but rather "to provide pro bono support to 133 countries, and to establish a never ending world expo in China to serve the South-South countries." GX 1321-TX. The "absence of pecuniary gain by" Mr. Ng is just as unusual here as it was in *United States v. Takai*, 941 F.2d 738, 741, 743, 744 (9th Cir. 1991), and the absence of "kickbacks or other personal profit" is just as atypical in this context as it was in the bank-fraud context in *United States v.*

*Cunningham*, 985 F.2d 575, at *3 (9th Cir. 1993) (unpublished), both of which held that these factors favored a departure.[65]

Although the government argued that Mr. Ng hoped to benefit from separate real-estate holdings in Macau or ancillary facilities to be constructed as part of the Macau Conference Center project, *see* Tr. 3881-82*,* any such benefit would have been speculative, uncertain, and indirect at best.  In making that argument, the government placed particular emphasis on a promotional video for the Macau Conference Center project, which showed plans of ancillary developments such as hotels and museums next to the Conference Center's core meeting facilities.  *See* Tr. 3934-3935, GX 908F.  However, the same video shows that the meeting facilities take a substantial portion of the land for the project.  And, it would make little sense to build a conference center without convenient options for housing, dining, parks and cultural activities to support it.  The premise that those ancillary facilities are proof of some ambition for personal gain by Mr. Ng is false.  Rather, they reflect a desire that the Macau Conference Center have the facilities needed to actually support the kind of beneficial activities for which it was intended.  Who would bear the cost of those facilities, who would own them, and whether they would ultimately be profitable, are all questions that were years away from being answered.  Mr. Ng's willingness to support the project in the face of that uncertainty speaks directly to his patriotic and philanthropic motives.  In fact, Mr. Ng's company was doing well in the relevant period of 2012-2015,[66] and there would have been no need for him to undertake any project involving such high risk and uncertainty if his only goal was to make money.  Indeed, the government—during the two years preceding the trial, throughout the trial, and to

---

[65]    In *Takai*, the defendants paid bribes to an Immigration and Naturalization Service officer "to help three members of their immigrant community obtain green cards," and the government had no evidence that the defendants received any pecuniary gain.  941 F.2d at 738.  In *Cunningham*, the defendant was found guilty of bank fraud, misapplication of funds, making false entries, and making false statements, but the appellate court upheld the downward departure because the defendant "did not receive any kickbacks or other personal profit for his illegal conduct."  985 F.2d 575, at *3.

[66]    *See* Exhibit 45 (Support Letter from Wu Yaonian).

this day—has not produced or identified any revenue forecast or other analysis that shows Mr. Ng would have made any profit from the Macau Conference Center project. There is no such forecast or analysis, and no evidence that Mr. Ng ever commissioned or conducted any such profitability study. That silence speaks volumes about the lack of any financial motive here.

Supporting the Macau Conference Center was consistent with Mr. Ng's long history of supporting charitable endeavors and public projects—whether it was a stone bridge in his home village, a new wing for a local hospital, a new school, or any other philanthropic project. The full record provides every reason to believe that Mr. Ng's primary motivation was to foster economic development and cooperation in the developing world in a way that also promoted China's central place in the region, rather than any personal gain. On that point, it is reasonable to infer that Mr. Ng had good reason to believe that the local authorities in Macau and China were in favor of the project and gave it at least informal preliminary support; otherwise, it would have made no sense for him to have pursued it. As the trial evidence demonstrated, the entire venture required that massive amounts of land be reclaimed from the sea. This could not happen without government approval and assistance. The record therefore supports the conclusion that Mr. Ng acted with the belief that the Macau Conference Center would be welcomed by the governments of China and Macau, further confirming his patriotic and philanthropic motivations.

Lastly, any harm suffered by the United Nations was substantially caused by Ashe and Lorenzo, independent of the conduct for which Mr. Ng was convicted. The government does not dispute that the Macau Conference Center would have been provided to the United Nations to use for free, and there is no evidence in the record indicating otherwise. Nor does the government suggest that Mr. Ng ever intended to obtain United Nations funding for the construction of the conference center. The United Nations therefore did not suffer any financial harm caused by Mr. Ng.

To the extent the United Nations suffered a loss of public confidence or harm to its reputation as a result of the conduct in this case, that harm was proximately caused by the actions of Ashe and Lorenzo, which went far beyond anything involving Mr. Ng. As the PSR acknowledges, and as the Court is aware from hearing Heidi Piao's and Shiwei Yan's allocutions, beginning in approximately 2012, Piao and Yan arranged for more than $800,000 in bribe payments to Ashe in exchange for official actions by Ashe and one or more other Antiguan officials to benefit several Chinese businessmen. Ashe and Lorenzo had also established a separate organization (IOSSC), unbeknownst to Mr. Ng, through which Ashe and Lorenzo received various payments.

A thorough review of Ashe's conduct while serving as the President of the United Nations General Assembly has revealed that Ashe received $1.3 million from member states in voluntary contributions to bank accounts that he designated. *See* OIOS Report ¶¶17, 19, 25. According to the PSR, Ashe then took funds from these accounts for his personal use. PSR ¶57. These findings show that Ashe's corruption went far beyond the events involving Mr. Ng, supporting the view that Mr. Ng believed he was making legitimate donations, and not committing bribery, when he provided funds to accounts designated by Ashe—just like the scores of other donors, sovereign states included, who were misled by Ashe and who were never charged. Put simply, the extensive corruption at the United Nations had nothing to do with Mr. Ng, and began long before he had any involvement in supporting the Macau Conference Center.

Both the OIOS Report and a Task Force Report issued by the United Nations (DX 1004) further acknowledge that the United Nations lacked internal control over the PGA, in particular its fundraising activities. *See* DX 1004 ¶4 ("This lack of transparency, together with the absence of an effective system of checks and balances (which are customarily found elsewhere in the Organization), impacts on the nature and level of accountability of the President and the

Office and presents a risk to the Organization."); OIOS Report ¶19 ("OPGA is an independent office of the legislature, it was up to that office to decide the level of resources that needed to be mobilized through voluntary contributions during the tenure of each PGA.").

In sum, this case is an atypical one. Mr. Ng's actions were not motivated by pecuniary gain, and did not proximately cause any harm suffered by the United Nations (which mainly resulted from Ashe's and Lorenzo's extensive corruption and the lack of internal United Nations controls). A downward variance is therefore warranted. *See, e.g., United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (affirming downward variance based on "finding that [a defendant's] crime '[di]d not pose the same danger to the community as many other crimes'" (internal quotation marks omitted) (second alteration in original)).

### C.    Loss Calculation

A downward variance is particularly warranted in this case because the Guideline calculation is significantly driven by the loss table, which is unnecessarily punitive and does not further the legitimate goals of sentencing.[67]

There is a growing consensus among district courts that rigid application of the §2B1.1 loss table in white-collar cases is neither just nor effective. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.) ("What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (describing the amount of loss as a "relatively weak indicator of the moral seriousness of the offense or the

---

[67]    Moreover, a sentence driven by a judicially-determined loss calculation may present serious Fifth and Sixth Amendment issues. *See, e.g., Gall v. United States*, 552 U.S. 38, 60 (2007) (Scalia, J., concurring) ("The door . . . remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury."); *Rita v. United States*, 551 U.S. 338, 375 (2007) (Scalia, J., concurring) (explaining that the Court's opinion "does not rule out as-applied Sixth Amendment challenges to sentences that would not have been upheld as reasonable on the facts encompassed by the jury verdict or guilty plea").

need for deterrence"). Indeed, as one district court in this Circuit explained in imposing a 24-month sentence despite a Guideline range of 108 to 135 months that was driven primarily by an 18-level loss enhancement, the fact that loss "is easily quantifiable . . . shouldn't overwhelm or cause [a court] to ignore other important but less quantifiable characteristics." Tr. at 136, *United States v. Litvak*, No. 3:13-cr-00019-JCH (D. Conn. July 23, 2014), Doc. No. 273. As such, even if the Court adopts the loss calculation proposed by the PSR or the government, it should resist dogmatic application of the Guidelines, and instead impose a sentence that properly accounts for the factors that must be considered under 18 U.S.C. §3553. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.").

### D. Deterrence, Respect for the Law, and Just Punishment

#### 1. Deterrence and Respect for the Law

The Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct." 18 U.S.C. §3553(a)(2)(B). The sentence also must promote respect for the law, and provide just punishment. *Id.* §3553(a)(2)(A), (B). Under the circumstances presented here, it is not necessary to imprison Mr. Ng to accomplish these goals. Many courts have recognized that the collateral consequences of a trial and conviction—especially in a highly publicized case like this one—can serve as a powerful deterrent to potential criminals. *See, e.g., United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (holding that §3553 "does not require the goal of general deterrence be met through a period of incarceration" and upholding district court's determination that probation and restitution provided adequate deterrence, despite Guideline range of 27-33 months' imprisonment).

56

In white collar cases in particular, sentencing courts have recognized the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514. Research on deterrence and criminal sentencing proves that, particularly for white collar criminals, "informal sanctions (such as social censure, shame, and loss of respect)" are "equally important in producing the deterrent outcome." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007). There is no empirical evidence that lengthy sentences provide any additional deterrent effect. *See id*. (no evidence supporting "the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"). Studies of white collar offenders from before the enactment of the Sentencing Guidelines show no difference in recidivism patterns between offenders who received jail time and those sentenced to probation. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). Rather than longer sentences, it appears to be the criminal process itself—charge, trial, conviction, and sentencing—that has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence. *Id.*; *see also* John Braithwaite, *Crime, Shame and Reintegration* 69 (1989) ("It would seem that sanctions imposed by relatives, friends or a personally relevant collectivity have more effect on criminal behavior than sanctions imposed by a remote legal authority.").

In this case, Mr. Ng's experience of being arrested, detained, tried, and convicted, along with the extensive negative media coverage in the United States, mainland China, and Macau, and the detriment that his home incarceration has brought to his business, all serve as powerful deterrents. Every indication shows that the government message to end corruption in the United Nations has already been heard loud and clear. For example, the United Nations itself

has conducted a thorough investigation of the Office of the President of the General Assembly, and has initiated measures to improve internal control over the funding of that office. *See* OIOS Report Annex 1. The news of Mr. Ng's conviction has run in major newspapers around the world, including the Wall Street Journal,[68] Financial Times,[69] Southern China Morning Post,[70] and the Macau Daily Times,[71] the major newspaper in Macau. That publicity undoubtedly sent signals to businessmen and professionals around the world to adjust their behavior. Deterrence and respect for the law have already been achieved without imposing a sentence of imprisonment.

### 2.    Just Punishment

Mr. Ng has already suffered significant punishment even before being sentenced, and a sentence without incarceration would be a just punishment. First, the extensive media coverage has caused Mr. Ng, his wife, and their children significant emotional burdens, as they struggle to endure the public shame and humiliation caused by this criminal prosecution. *See, e.g.*, *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (granting downward variance based in part on "incalculable damage" defendant suffered from "tremendous media coverage of his case," including that defendant "was unflatteringly portrayed as the face of public corruption"), *aff'd*, 523 F.3d 1258 (10th Cir. 2008).

---

[68]   Rebecca D. O'Brien and Nicole Hong, *Macau Developer Found Guilty in U.N. Bribery Case*, Wall Street Journal (Jul. 27, 2017), https://www.wsj.com/articles/macau-developer-found-guilty-in-u-n-bribery-case-1501195859.

[69]   Tom Hancock, *Chinese billionaire Ng Lap Seng convicted in UN bribery case*, Financial Times (Jul. 28, 2017), https://www.ft.com/content/31037500-7340-11e7-aca6-c6bd07df1a3c.

[70]   *Macau billionaire Ng Lap-seng is convicted of bribery and laundering in UN corruption case*, South China Morning Post (Jul. 28, 2017), http://www.scmp.com/news/china/society/article/2104421/macau-billionaire-ng-lap-seng-convicted-us-jury-un-bribery-case.

[71]   *Ng Lap Seng Convicted in United Nations Bribery Case*, Macau Daily Times (Jul. 31, 2017), https://macaudailytimes.com.mo/ng-lap-seng-convicted-united-nations-bribery-case.html.

Mr. Ng's business operation has also suffered from the case. Because of the tremendous media coverage, the harm to Mr. Ng's reputation caused by the arrest and conviction is unfathomable. That reputational injury is obviously detrimental to his business, which is built on trust and confidence. *See supra* p.14.

The burden of running the family business is now on Alex Ng, but he is having difficulties due to his lack of experience. Without Mr. Ng's leadership, many key executives who worked at his companies have resigned from their positions.[72] Many significant company projects have been disrupted or put on hold.[73] As Alex Ng, Mr. Ng's son who is currently running the family business, explained regarding one key project that has been disrupted: "At present, the Company has invested years of profits and cashes available into [the] Hengqin project, which ties the fates of over 300 colleagues and whole famil[ies] closely with the project, so we cannot afford any mishap. I sincerely hope that my father could return home as soon as possible because his confinement has driven me and the company to near-collapse." Exhibit 19 (Support Letter from Alex Ng).

Finally, Mr. Ng has suffered from the confinement and home detention he has endured for the last two years. Mr. Ng was arrested on September 19, 2015, was released on bail on October 26, 2015, and has since remained in home detention. During the month he was in confinement, he lost more than 15 pounds. According to Janet Ng, who visited Mr. Ng after he was detained for three weeks, Mr. Ng "looked gaunt and dark, and languish[ed]." Exhibit 20 (Support Letter from Janet Ng). Since his release on bail, Mr. Ng's apartment has in effect become a cage, where he is generally isolated from his family, friends, and community. Anyone from Macau who wishes to visit him has to travel by plane for more than 19 hours,

---

[72] Exhibit 49 (Support Letter from Zheng Xiuli).

[73] *See, e.g.*, Exhibit 45 (Support Letter from Wu Yaonian).

which makes it difficult for his wife, his elderly siblings, or his grandchildren to visit him.[74] Candice Tse, Mr. Ng's goddaughter who took care of him in New York, could easily observe how Mr. Ng suffered from his separation from his family: "Now [Mr. Ng] desired nothing but to stay together with his family.  Sometimes I saw that he was desperate, frustrated and stressful due to the case, when he sees his grandchildren coming, to give him a hug and a kiss.  He would suddenly be released.  He knew that his grandchildren couldn't stay for a long time, every time he has to say goodbye to them with tears that cannot be seen by others."  Exhibit 32 (Support Letter from Tse Sum Ping (Candice).

### E. Need to Protect the Public from Further Crimes

The Court's sentence also must "protect the public from further crimes of the defendant."  18 U.S.C. §3553(a)(2)(C).  There is no need to imprison Mr. Ng to accomplish that goal because there is no risk that he will commit crimes in the future.

Mr. Ng's advanced age indicates that recidivism is highly unlikely.  "This court and others have previously declined to impose Guidelines sentences on defendants who . . . were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants."  *United States v. Hernandez*, No. 03-cr-1257-RWS, 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005); *United States v. Carmona-Rodriguez*, No. 04-cr-667-RWS, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (same); *United States v. Nellum*, No. 2:04-cr-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) ("The positive correlation between age and recidivism is impossible to deny.").  Mr. Ng is 69 years old, in seriously ill health, and his risk of recidivism is zero.[75]

---

[74] *See, e.g.,* Exhibit 40 (Support Letter from Wu Li'e) ("I have six stents in my heart, so I could not fly to America to visit him.").

[75] The Sentencing Commission's study also shows that as a married man, Mr. Ng's likelihood of recidivism is substantially lower than it would be for most defendants.  *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (2004).

Furthermore, Mr. Ng has no criminal record of any kind. Courts have recognized that first-time offenders like Mr. Ng pose little to no risk of recidivism. *See United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) ("There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I."). These courts have, in turn, appropriately imposed variant sentences on defendants with no criminal history. *See, e.g.*, *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (reasoning that because "Criminal History I did not fully account for [the defendant's] complete lack of criminal history, considering it as a mitigating factor was not redundant or improper").

Lastly, Mr. Ng is a citizen of China and resident of Macau. His visa to visit the United States has been cancelled, and it is unlikely that another visa would be approved given his conviction. *See* 8 U.S.C. §1182(a)(2). The past two years have also taught Mr. Ng an expensive lesson. As Candice Tse observes: "In the past couple of months, I stayed with Mr. Ng in [the] US, taking care of his daily life. I saw his changes in character. He is more careful, and would consult and listen more before making any decisions. He learned a big lesson in this case and in these 2 years." There is virtually zero risk that Mr. Ng will recidivate, and so a term of incarceration is not necessary to "protect the public from further crimes" by Mr. Ng. 18 U.S.C. §3553(a)(2)(C). Consideration of this factor militates in favor of a downward variance.

### F.    Need to Avoid Unwarranted Disparity

18 U.S.C. §3553(a)(6) instructs the Court to impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." The 72-month sentence recommended by the PSR would create just such a disparity—and the Guideline range of 235 to 293 months would create an almost unthinkable one. Indeed, the offense level of 38 calculated by the PSR is the same level that would apply

if Mr. Ng had committed second-degree murder (U.S.S.G. §2A1.2) or criminal sexual abuse by force or threat (U.S.S.G. §2A3.1). Mr. Ng's conduct certainly cannot be said to rise to the heinous level of those offenses, and he should not be sentenced as if it did.

As explained above, Mr. Ng's conduct is not in the "heartland" of criminal bribery because the goal of his alleged bribery was not personal pecuniary gain but rather to build a meeting facility for the United Nations to use for free. *See supra* p. 49. There are few if any cases where defendants have been convicted under similar circumstances, and these rare facts themselves justify a downward variance. In all events, even in cases where the offense of conviction falls in the heartland of bribery, federal courts have consistently imposed sentences lower than the 235 to 293 months in prison that the PSR calculated as the Guideline range here. *See, e.g.*, *United States v. Loman*, 597 F. App'x 518 (10th Cir. 2015) (unpublished) (30-month sentence after Guideline range was 121-151 months in case involving over $800,000 in bribes).

Public officials convicted of corruption, on whom the Guidelines impose an additional two-level upward adjustment, often receive sentences below the Guideline range in their cases (and well below the sentence suggested in this case). For instance:

- Governor of Virginia Robert "Bob" McDonnell, age 61, received a 24-month sentence, although his PSR offense level was 32 and his Guideline range was 121 to 151 months. *See* Tr. at 178, *United States v. McDonnell*, No. 3:13-cr-00012-JRS (E.D. Va. Jan. 6, 2015), Doc. No. 604. Mr. McDonnell was convicted on 11 counts, including honest services mail and wire fraud, Hobbs Act extortion, and conspiracy to commit those offenses. *United States v. McDonnell*, 792 F.3d 478, 486 (4th Cir. 2015). During a five-week jury trial, the evidence revealed that Mr. McDonnell was "lavished" by the alleged bribe-payer with "shopping sprees, money, loans, golf outings, and vacations." *Id.* at 519. (Governor McDonnell's conviction was later overturned by the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016).)

- New York State Assemblyman Eric Stevenson, age 58, who was convicted by a jury on four counts of honest services wire fraud, bribery, conspiracy to commit bribery, and Hobbs Act extortion, received a sentence of 36 months although the applicable Guideline range was 51 to 63 months. *See* Judgment, *United States v. Stevenson*, No. 1:13-cr-00161-LAP (S.D.N.Y. May 23, 2014), Doc. No. 133. Assemblyman Stevenson inserted language into proposed Assembly legislation based "nearly word for word" on language the bribe-payers had asked for. *See* Gov't Sentencing Br. at 3, *United States v. Stevenson*, No. 13-cr-00161-LAP (S.D.N.Y. May 15, 2014), Doc. No. 130.

- U.S. Representative Richard Renzi received a 36-month prison sentence, despite the government's request for a 108- to 144-month sentence, after being convicted of supporting federal land exchange legislation in exchange for personal benefits. Judgment, *United States v. Renzi*, 4:08-CR-00212 (D. Ariz. Oct. 28, 2013).

- New York State Senate Majority Leader Joseph Bruno, age 81, received a 24-month sentence when the applicable Guideline range was 97 to 121 months. His misconduct allegedly included taking various acts in exchange for $280,000 in bribes. He was convicted of two counts of honest services mail fraud. *See* Amended Judgment, *United States v. Bruno*, No. 1:09-cr-00029-GLS (N.D.N.Y. June 1, 2010), Doc. No. 304. (Senator Bruno's conviction was later reversed, after which he was acquitted upon retrial.)

Lastly, in this case, Shiwei Yan pleaded guilty to paying more than $800,000 in bribes to John Ashe to obtain official actions to benefit several Chinese businessmen, and received sentence of 20 months even though the applicable Guideline range was 70 to 87 months. *See* Doc. No. 255 at 7, 65. In imposing that sentence, the Court considered among other things the fact that Yan "at various points in time exhibited a selfless aspect" to her personality and character. Mr. Ng's lifelong devotion to charity and public works has been extraordinary, and deserves similar if not more favorable consideration. Imposing a lengthy sentence on Mr. Ng will create unwarranted disparity even between defendants in this very case.

## **CONCLUSION**

For the foregoing reasons, and because the Sentencing Guidelines fail to account for Mr. Ng's long history of charitable works and the unique nature of this case, we respectfully request that the Court impose a sentence of time served and allow Mr. Ng to return to his family in China.

Dated: March 2, 2018
     New York, NY

          Respectfully Submitted,

          KIRKLAND & ELLIS LLP

By:   <u>/s/ Andrew M. Genser</u>
          Andrew M. Genser
          Chang Liu
          Kirkland & Ellis LLP
          601 Lexington Avenue
          New York, NY 10022

          *Attorneys for Defendant Ng Lap Seng*