UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA                      :

   -v.-                                                    :        S5 15 Cr. 706 (VSB)

NG LAP SENG,                                         :
  a/k/a "David Ng,"
  a/k/a "Wu Liseng,"                              :
  a/k/a "Boss Wu,"
                                  :
              Defendant.
                                  :
-------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                                  GEOFFREY S. BERMAN
                                  United States Attorney
                                  Southern District of New York

                                  SANDRA MOSER
                                  Acting Chief, Fraud Section
                                  Criminal Division

Daniel C.  Richenthal
Janis M. Echenberg
Douglas S. Zolkind
Assistant United States Attorneys

David A. Last
Trial Attorney
- Of Counsel -

## **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.      The Defendant's Offense Conduct.......................................................... 3

    B.      The Advisory Guidelines Range ............................................................ 4

    1.      The Probation Office's Calculation ....................................................... 4

    2.      The Defendant's Challenges To The Guidelines Calculation............................ 6

    C.      The Probation Office's Recommendation ............................................. 14

DISCUSSION .................................................................................................................. 15

    I.      A Substantial Term Of Imprisonment—Exceeding The 72 Months Recommended By The Probation Office—Is Warranted ........................................... 15

    II.      The Defendant's Request For A Sentence of Time Served Is Without Merit ...... 21

    III.      The Court Should Impose A $2 Million Fine ....................................... 29

    IV.      The Court Should Order Forfeiture Of The Defendant's Manhattan Apartment . 31

    V.      The Court Should Order Restitution To The UN................................... 32

    VI.      If Sentenced To A Term Of Imprisonment, The Defendant Should Be Remanded ................................................................................................ 32

CONCLUSION................................................................................................................ 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                           :          S5 15 Cr. 706 (VSB)

NG LAP SENG,                                :
  a/k/a "David Ng,"
  a/k/a "Wu Liseng,"                            :
  a/k/a "Boss Wu,"

                                 :

                Defendant.

                                 :
------------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Ng Lap Seng is scheduled to be sentenced on Friday, May 11, 2018, at 10:30

a.m.  The Government respectfully submits this memorandum in connection with that sentencing

and in response to the defendant's sentencing memorandum dated March 2, 2018 ("Def. Mem.").

## PRELIMINARY STATEMENT

The defendant, a sophisticated, international businessman, repeatedly used his wealth and

power to seek to corrupt decision-making at the United Nations ("UN").  That was a choice.  It

warrants substantial and meaningful punishment.

The defendant could have sought to persuade the UN and the UN Development

Programme ("UNDP") to support his latest project—a massive real estate development on a

manmade island off the coast of Macau, China, including a conference center, luxury hotel,

residential apartments, and a high-end shopping mall with brands such as Gucci, to be built by

the defendant's company—on its purported merits.  But the merits of such a project are, at the

very least, highly debatable.  Building luxury hotels, apartments, and retail outlets may be

profitable, but UNDP's mission is the eradication of poverty and the reduction of inequality

through sustainable, environmentally responsible development.  However, whether the UN or UNDP would have approved of and supported the defendant's project, or a portion thereof, on the merits is a question to which one cannot know the answer.  Because instead of seeking approval and support on the merits, the defendant cheated.  Hiding behind and misusing a non-governmental organization that he founded and funded allegedly to help developing nations rather than himself, the defendant orchestrated and led a scheme to pay bribes to two senior UN ambassadors, one of whom was the elected leader of the UN General Assembly.  He paid those bribes for years.  He paid those bribes in multiple ways.  And he kept doing so until he was caught, and then claimed that he was an innocent philanthropist, whose arrest was both political and wrongful.  It was neither.

The defendant's United States Sentencing Guidelines ("Guidelines") range reflects his extensive, deliberate, and exceedingly serious criminal conduct.  For what he did, the defendant faces an advisory Guidelines range of 235 to 293 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR"), in which the Probation Office recommends a sentence of 72 months' imprisonment and a $1 million fine.  Although the Government agrees with the Probation Office that a sentence within the advisory Guidelines range of 235 to 293 months' imprisonment is unwarranted in light of all of the facts and circumstances of this case, and also agrees with the Probation Office that a substantial prison term is required, the Government submits that, to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, that term should exceed 72 months.

## BACKGROUND

**A.     The Defendant's Offense Conduct**

As described in greater detail in the PSR, in Complaint 15 Mag. 3562, and in Superseding

Indictment S5 15 Cr. 706 (VSB) (the "Superseding Indictment")—and as overwhelmingly

proven at trial—for years, the defendant engaged in a massive, international bribery and money

laundering scheme in which he paid more than $1 million in bribes, in various forms, to two

senior UN ambassadors, the late John W. Ashe, who was Permanent Representative of Antigua

and Barbuda to the UN and the President of the UN General Assembly for the General

Assembly's 68th session, and Francis Lorenzo, who was a Deputy Ambassador of the

Dominican Republic to the UN.  (PSR ¶¶ 20-29, 32-63, 100-02, 40.)[1]

The defendant did not just engage in this scheme, but orchestrated and led it.  (*See, e.g.*,

Trial Transcript ("Tr.") 973, 982-83, 1008-10, 1060, 1091-92; Government Trial Exhibit ("GX")

50, 58, 88, 103, 116, 199.[2])  Indeed, as the Court is aware, the defendant threatened to cut off

payments to Lorenzo unless Lorenzo succeeded in obtaining the UN's approval for the

defendant's project.  (*See* Tr. 1228-30; GX 131.)  In short, it was the defendant's decision to start

paying bribes, it was the defendant (and his family, who were and are involved in the business

(*see, e.g.*, PSR ¶¶ 138, 151, 155-56; GX 912C, 955, 1352, 1352-TX, S-13, S-17)) who stood to

benefit from paying bribes, and it was the defendant who could have stopped paying bribes—and

did not.

---

[1]     Because the Court presided over the lengthy trial, the Government will not describe all
aspects of the scheme herein or cite all relevant evidence herein.

[2]     All trial exhibits cited herein are enclosed as Exhibits A through D and have been
redacted pursuant to the Southern District's ECF Privacy Policy.

Moreover, the defendant's bribery and money laundering scheme was anything but fleeting, straightforward, or easy to detect.  On the contrary, among other things, the defendant (a) paid bribes in multiple ways over an extended period of time, including to Ashe's wife as a purported "consultant," when in fact it was a no-show job (PSR ¶¶ 34, 38, 43-44; GX 13, 14, 941, 945, 1501, 1502), and (b) funneled and laundered bribe payments to and through both South-South News (referred to in the Superseding Indictment as "NGO-1") (PSR ¶¶ 27, 32, 35-36, 38-39, 42, 44, 48), and Terra Trading (referred to in the Superseding Indictment as the "Dominican Company"), the latter pursuant to multiple sham contracts (PSR ¶ 48; *see also, e.g.*, GX 172, 914, 918, S-4).  In short, the defendant's scheme was lengthy, sophisticated, and engineered to make detection difficult.

**B.     The Advisory Guidelines Range**

**1.     The Probation Office's Calculation**

The Government agrees with the Probation Office's calculation of the defendant's advisory Guidelines range, which is:

- Pursuant to U.S.S.G. § 3D1.2(d), all counts are grouped.

- Pursuant to U.S.S.G. § 3D1.3(b), the offense guideline that produces the highest offense level shall be used.  In this case, that offense guideline is U.S.S.G. § 2S1.1, which applies to Counts Five and Six, conspiracy to commit money laundering and money laundering, respectively.

- Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is that for the offenses underlying those counts, because the defendant committed the underlying offenses.  In this case, those offenses are conspiracy to commit bribery and to pay illegal gratuities, bribery and the payment of illegal gratuities, conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), and violating the FCPA.  Those offenses are all governed by U.S.S.G. § 2C1.1.

- Pursuant to U.S.S.G. § 2C1.1(a)(2), the base offense level for those offenses is 12.

- Pursuant to U.S.S.G. § 2C1.1(b)(1), this base offense level is increased by 2 levels, because the offenses involved more than one bribe.

4

- Pursuant to U.S.S.G. § 2C1.1(b)(2), this base offense level is increased by the number of levels from the table in § 2B1.1, because the value of the payments, the benefit received or to be received in return for the payments, and/or the value of anything obtained or to be obtained by the public official or others acting with the public official exceeded $6,500.

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because the value of the payments exceeded $550,000, but did not exceed $1,500,000, the base offense level is increased by 14 levels.

- Pursuant to U.S.S.G. § 2C1.1(b)(3), the base offense level is increased by 4 levels, because the offenses involved an elected public official and/or a public official in a high-level decision-making or sensitive position.

- Pursuant to U.S.S.G. § 2S1.1(b)(2)(B), the base offense level is increased by 2 levels, because the defendant was convicted under 18 U.S.C. § 1956.

- Pursuant to U.S.S.G. § 3B1.1(a), the offense level is increased by 4 levels, because the defendant was an organizer or leader of the criminal activity, which involved five or more participants and/or was otherwise extensive.

(PSR ¶¶ 111-18.)

In accordance with the above, the total offense level is 38.  (PSR ¶ 123.)  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶ 129.)  Based upon these calculations, the defendant's advisory Guidelines range is 235-293 months' imprisonment. (PSR ¶ 163.)  Pursuant to U.S.S.G. § 5G1.1(a), for each of Counts One through Four, because the statutorily authorized maximum sentence is less than the minimum of the applicable Guidelines range, the statutorily authorized maximum sentence is the Guidelines sentence.  (*Id.*) The Guidelines sentence per count is: Count One, 60 months; Count Two, 120 months; Count Three, 60 months; Count Four, 60 months; Count Five, 235-240 months; and Count Six, 235-240 months.  (*See* PSR p. 44.)

2.      **The Defendant's Challenges To The Guidelines Calculation**

The defendant challenges the Probation Office's calculation on multiple grounds.  (Def.

Mem. 32-39.)  These challenges are legally and factually baseless.[3]

*First*, the defendant claims that the "PSR's determination that the offense involved bribes

that totaled more than $550,000 but less than $1.5 million is unsupported."  (*Id.* 32.)  That range

is amply supported by the record of the defendant's approximately five-week trial.  There is no

requirement that the Probation Office describe the record in detail in order to reject the

defendant's claim.  Nor need the Court.  *See, e.g.*, *United States v. Guang*, 511 F.3d 110, 122 (2d

Cir. 2007) (affirming Guidelines findings where district court had presided over trial); *cf., e.g.*,

*United States v. Ware*, No. 04 Cr. 1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14,

2009) (denying motion for "all information used in the PSR to calculate the applicable loss

amount," rejecting objection to the loss amount, and explaining that the "Court presided over a

lengthy trial involving the facts [the defendant] now disputes").

Notably, the defendant's position appears to be not that the evidence shows that only a

subset of the monies he paid to Ashe and Lorenzo were bribes, but that there were *no* bribes.  He

asks this Court to find that no increase in the base offense level is warranted.  (*See* Def. Mem.

39.)  He asks this Court, in short, effectively to declare that he is innocent.  But this Court

---

[3]      Before the Probation Office issued the final PSR, the defendant challenged an additional
part of its Guidelines calculation, contending that he was entitled to a three-level reduction for
acceptance of responsibility.  (PSR p. 42.)  The defendant now appears to have abandoned that
contention, which was contrary to law.  *See, e.g.*, *United States v. Marinello*, 839 F.3d 209, 226-
27 (2d Cir. 2016) (defendant not entitled to acceptance of responsibility where he "proceeded to
trial on the theory that he lacked the requisite *mens rea*," which is "an issue of factual guilt");
*United States v. Elia*, 374 F. App'x 184, 186 (2d Cir. 2010) ("Because [the defendant] vigorously
challenged his factual guilt as to all charges against him, the defendant clearly fails to qualify for
an adjustment for acceptance of responsibility.").

already denied the defendant's initial and post-verdict motions for acquittal, and rightly so.  As the jury concluded, the defendant is not innocent.

Nor, as the defendant offers in the alternative, does the evidence show that he paid only approximately $30,000 in bribes (*id.*).  On the contrary, during the five-week trial, the Government presented overwhelming evidence, in various forms, including the testimony of Lorenzo, bank and other financial records, and emails, demonstrating that the defendant paid Lorenzo and Ashe more than $1,000,000 in bribes, including tens of thousands of dollars paid to Ashe's wife for a no-show job; $200,000 paid to a bank account that Ashe controlled; and hundreds of thousands of dollars paid to Lorenzo in various ways, including via Terra Trading, an offshore entity controlled in part by Lorenzo's brother.  Indeed, the wires to Terra Trading directly from the defendant or Sun Kian Ip Group—*i.e.*, those payments that were not from South-South News, but instead pursuant to sham contracts, and were self-evidently distinct from Lorenzo's "salary of $20,000 per month for his work at South-South News" (*id.* 33)—*alone* totaled $350,000.  All of these payments were described in detail on summary charts that were introduced into evidence, marked as GX 1501 and GX 1502, as were the records underlying those charts, and overwhelming evidence supporting the jury's findings of guilt on every count.

The defendant's contention that the Court should reject the evidence accepted by the jury—particularly when both the issues of whether a bribe was paid and the amount of the bribe must only be found by a preponderance of the evidence, *see, e.g.*, *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016)—is meritless.  The defendant was free to argue at trial, and did, that he "considered th[e] payments [to Terra Trading] perfectly legitimate" (Def. Mem. 33), that "he had no reason to believe" that the $200,000 wired to Ashe was a bribe (*id.* 34), and that there is purportedly insufficient evidence that payments to Ashe's wife were "intended as bribes" (*id.*

35).  He is not entitled to have the Court agree with him, particularly when he cites little or

nothing in support these conclusory assertions.[4]

Indeed, certain of the defendant's conclusory assertions are squarely irreconcilable with

the jury's verdict (*e.g.*, the "government has failed to prove by a preponderance of the evidence

that any specific payment constituted an actual or intended bribe" (*id.* 32)), many the Court

already rejected in denying the defendant's initial and post-verdict motions for acquittal, and all

are refuted by evidence that the defendant ignores.  To summarize only a subset of what he

ignores:

- Lorenzo testified that the reason he took actions in his official capacity to get the UN to approve and endorse the defendant's real estate project, referred to as the Macau Conference Center, was because the defendant was paying him.  (*See, e.g.*, Tr. 644-45 (Q. "Mr. Lorenzo, you testified . . . that you were working to get the UN's approval, is that right?"  A. "That's correct, yes."  Q. "Why did you do that?"  A. "Because that was the request that was made by Ng."  Q. "Why did you do what Ng requested you to do?"  A. "Because I was getting paid.").)

- Lorenzo testified that he first began receiving monthly payments of $20,000 from the defendant, via South-South News, in or about July 2010.  (Tr. 796.)  At that time, Lorenzo was not focused on taking actions at the UN in his official capacity for the defendant.  However, this changed in or about October 2010, after Lorenzo attended a meeting in Macau with the defendant.  (Tr. 798-99.)  At that meeting, the defendant spoke in detail "about having this convention and meeting center that he wanted to build" and "also, at that time, he . . . highlighted the importance of having something official from the UN."  (Tr. 812.)  The defendant told Lorenzo "that he wanted to have an official document from the United Nations" endorsing the Macau Conference Center.  (Tr. 652.)  At this meeting, Lorenzo and the defendant discussed plans to host various meetings with the goal of obtaining this official document (which was also referred to as an "outcome document," as it would purportedly describe the outcome of the meetings).  (Tr. 812-18.)  When asked why he thereafter took actions to obtain the official UN document, Lorenzo answered, "I was getting paid every month."  (Tr. 819; *see also* Tr. 1104 (same).)

---

[4]     Nor is the defendant entitled to have the $200,000 bribe he paid to Ashe omitted from consideration on the ground that this payment could not have constituted a bribe as a matter of law (Def. Mem. 34 n.52).  The defendant's legal theory is wrong, as the Court recognized in denying his motion for acquittal at the close of the Government's case in chief, and denying it again after the verdict.  But even if this bribe were omitted—and there is no basis to do so—the total bribery amount would still exceed $550,000.

- Lorenzo's testimony on this point remained consistent on cross-examination.  He explained that certain of the money he received from the defendant was for two purposes: to help run South-South News, and to take actions in his official capacity as an ambassador to get the UN to support formally the Macau Conference Center.  (Tr. 1487-89.)  He explained that when he first began to get paid, he thought that South-South News "was a good idea" (Tr. 1492), "but then things changed" (Tr. 1493).  He knew that "[i]t was not right" to accept money from the defendant in exchange for taking actions in his capacity as an ambassador to influence the official actions of Ashe and the UN.  (Tr. 1521-22.)

- Lorenzo also testified that—as emails, financial records, the timing of payments, and documents in co-defendant Jeff C. Yin's possession when he was arrested made crystal clear—when the defendant offered to make additional $30,000 payments to Lorenzo, through Terra Trading, Lorenzo understood that those payments were intended to obtain the UN's approval and endorsement of the Macau Conference Center.  In exchange for these extra payments, the defendant wanted Lorenzo to "finalize the documents from the General Assembly, and he wanted [Lorenzo] to get letters of support and . . . continue bringing these to the UN agencies and the ambassadors."  (Tr. 966.)  In particular, with respect to the official UN document, the defendant wanted the name of his company, Sun Kian Ip Group, inserted into the document; and with respect to the "letters of support," he wanted documentation from the UN Office for South-South Cooperation (*i.e.*, the "South-South Unit") endorsing the Macau Conference Center project.  (Tr. 966-67.)  The defendant himself (through his assistant and translator, Yin) referred to this official document as an "approval document" because he "wanted to have . . . the full approval of the UN."  (Tr. 984.)  The purpose of these $30,000 payments was to supplement the existing monthly $20,000 payments to ensure that Lorenzo took actions to obtain the UN's formal support for the Macau Conference Center.  (Tr. 967-68.)  Lorenzo testified repeatedly that this work was separate and distinct from his work for South-South News. (*See, e.g.*, Tr. 972.)

- The evidence also showed that the defendant's payments to Ashe—namely, the monthly payments to his wife for a no-show job, and the $200,000 wire to Ashe's account—were also intended to influence Ashe in his official capacity to obtain the UN's formal support for the Macau Conference Center.  (*See, e.g.*, Tr. 1043 (the revised official UN document, which added an explicit reference to the Sun Kian Ip Group, was signed by Ashe at the same time as when Ashe's wife was being paid and the defendant was promising to make a financial contribution to Ashe, neither of which was disclosed to the UN by Ashe or Lorenzo); Tr. 1247-48 (Ashe's approval was necessary for the defendant to obtain the support he wanted from the South-South Unit).)

- For instance, during Ashe's March 2014 trip to Macau, the defendant said to Ashe, "I want your support in developing this center," and Ashe said to the defendant that he "wanted to have [the defendant's] support and commit to the promise that [the defendant] made in the past to support [Ashe's] presidency," to which the defendant responded, "I will, I will."  (Tr. 1292-93.)  And just a few months later, when Ashe repeated his request for a purported contribution, Lorenzo advised the defendant to make the payment because

"we need[ed] John [Ashe] to continue supporting us on the pro bono agreement [*i.e.*, the contract with the UN that the defendant wanted]," and the defendant agreed to make a payment of $200,000. (Tr. 1309-11.) Testimony concerning the purpose of this payment—that it was intended to influence Ashe to support the Macau Conference Center in his official capacity—was extensively corroborated by various documents, including, among other things, (i) a contemporaneous email in which Lorenzo told Yin to ensure the money was wired quickly because he was "working with [Ashe] to get the things we need," referring specifically to the Pro Bono Agreement (Tr. 1312), and (ii) a contemporaneous letter from the director of the South-South Unit providing assurance that the Pro Bono Agreement would be forthcoming now that it had "the support of the president of the General Assembly," that is, Ashe (Tr. 1314-16).

- The evidence also established that the defendant was not only aware of the payments to Ashe's wife for a no-show job, but also that he directed such payments to continue. Lorenzo testified about a meeting with the defendant in January 2014 in New York, at which the defendant spoke generally about reducing the number of South-South News consultants. (Tr. 1258.) Lorenzo told the defendant, "[W]e should continue having Anilla because she's John [Ashe's] wife and we needed John to continue his support on the expo and the letters that we were needing." (*Id.*) Lorenzo testified that it was the defendant's decision thereafter to keep Ashe's wife on the payroll, and this testimony was corroborated by, among other things, an internal spreadsheet, which listed Ashe's wife's position at South-South News—in Chinese (*i.e.*, because the record was for the defendant's use)—as "Antigua ambassador's wife, the wife of president of the UN General Assembly." (GX 1314, 1314-TX; Tr. 1262, 3280; *see also, e.g.*, Tr. 3232 (Wendy Zhu, the bookkeeper for South-South News, never saw Ashe's wife in the office, Ashe's wife did not have a desk, and Ashe's wife did not have a phone number); Tr. 3329 (Zhu was instructed to stop paying Ashe's wife a few months after Ashe ceased serving as an ambassador).)

In sum, there is more than ample support for a finding, well beyond a preponderance of the evidence, that the defendant agreed to and did pay bribes to both Lorenzo and Ashe in excess—indeed, well in excess—of $550,000.

*Second*, the defendant claims that the enhancement for multiple bribes does not apply. (Def. Mem. 35-36.) But as discussed above, the evidence overwhelmingly demonstrated (and certainly demonstrated by a preponderance of the evidence) that the defendant agreed to and did

bribe multiple officials, over multiple years, in multiple forms.  The "offense[s]" of which he was convicted plainly "involved more than one bribe," U.S.S.G. § 2C1.1(b)(1).

The defendant correctly notes that the pertinent Guideline commentary states: "Related payments 'that, in essence, constitute a single incident of bribery' or extortion (e.g., a number of installment payments for a single action) 'are to be treated as a single bribe' or extortion."  (Def. Mem 35 (quoting U.S.S.G. § 2C1.1 cmt. n.2).)  However, this commentary does not apply here for multiple reasons.  The defendant bribed *multiple people*.  He bribed those people in *multiple ways*.  And he bribed (or paid an illegal gratuity to) those persons over *multiple years* as *multiple steps* were taken towards achieving his goal.  Contrary to the defendant's assertion, that he had an ultimate goal—"obtaining Formal UN support for the Macau Conference Center" (Def. Mem. 35 (internal quotation marks omitted))—does not mean that his bribes to multiple people in multiple forms over multiple years as multiple steps were taken towards his goal should be deemed for Guidelines purposes to be the same as a single bribe.  *See United States v. Soumano*, 318 F.3d 135, 137-38 (2d Cir. 2003) (per curiam) ("multiple payments meant to influence more than one action should not be merged together for purposes of § 2C1.1 merely because they share a single overall goal or are part of a larger conspiracy" (internal quotation marks omitted)); *United States v. Arshad*, 239 F.3d 276, 282 (2d Cir. 2001) (affirming enhancement and discussing relevant factors, including "whether the method for making each payment remains the same—whether, for example, the payments involve the same payor and payee in each instance, and whether payments are made in the same form and by the same means").

*Third*, the defendant claims that the enhancement for bribing an elected official or one in a high-level decision-making or sensitive position does not apply.  (Def. Mem. 36-37.)  Like his other Guidelines objections, this claim is meritless.  There is no dispute that Ashe was elected the

President of the UN General Assembly.  The defendant offers no authority for the proposition that because, in his view, the ultimate formal election itself was not "contested," it does not count (*id.* 37).[5]  Under the plain language of the enhancement, if "the offense involved an elected public official," U.S.S.G. § 2C1.1(b)(3), it applies.  The enhancement says nothing about the degree to which a particular election is "contested."

In any event, Ashe was in a "high-level decision-making or sensitive position," which is sufficient even assuming, contrary to fact, that he was not elected.  *See* U.S.S.G. § 2C1.1(b)(3) (enhancement applies if "the offense involved an elected public official *or* any public official in a high-level decision-making or sensitive position" (emphasis added)).  As the evidence at trial demonstrated, the role of the President of the General Assembly ("PGA") is not purely "ceremonial" (Def. Mem. 37).  On the contrary, among other things, the PGA directs the discussion within and assists in setting the agenda for the General Assembly (Tr. 212-13), and conducts negotiations or otherwise carries out mandates of the General Assembly, including through appointments (Tr. 213-15), consistent with his role as the "highest elected officer at the United Nations" (Tr. 247), who "chair[s] the meetings of the General Assembly" and is empowered to "submit resolutions or do any other actions on behalf of the whole composition of the General Assembly" (Tr. 248).  (*See also, e.g.*, Tr. 3052 (The PGA is "[a]t the top" of the hierarchy of ambassadors and staff at the UN.); Tr. 3053 (The PGA has a "cabinet" of selected individuals "to provide technical and substantive advice during the[] presidency.").)  The Guidelines provide that someone occupies the requisite high-level position if he or she has

---

[5]     The defendant's argument also ignores that the President of the General Assembly rotates by region and various candidates from that region may vie for support.  (*See* Tr. 209-12, 701-02, 3051.)  Thus, saying that the ultimate formal election is not "contested" is akin to saying that a state race for the Assembly is not "contested" because although several people ran in a party's primary or sought the endorsement of the party, only one person ran in the general election.

"substantial influence over the decision-making process." U.S.S.G. § 2C1.1 cmt. n.4(A). That perfectly describes Ashe—and why the defendant sought to and did bribe him.

*Finally*, the defendant claims that he does not warrant a role enhancement of any kind. (Def. Mem. 37-38.) This claim is frivolous. There is no way to read the extensive record at trial, including emails, the testimony of multiple witnesses, letters signed by the defendant, and financial records, without concluding, under any standard, that the defendant was the leader and/or organizer of the activity for which he was convicted. The defendant does not appear to disagree. Instead, he asserts: "To be sure, the evidence at trial made clear that [the defendant] was a leader of *legitimate* efforts to develop a permanent UN-sponsored conference center in Macau; but the government certainly has not shown that he was the leader of the alleged *criminal* scheme to obtain that center through bribery." (*Id.* 38 (emphases in original).) This assertion is nonsensical. The jury unanimously found that the "efforts" that the defendant led were criminal. Contrary to the defendant's assertion (*see id.*), whether the individuals whom the defendant bribed may also have committed crimes, both by accepting the defendant's bribes and by taking other actions, is irrelevant. As the Probation Office explains:

> Contrary to defense counsel's position, there is no arguing [but] that Ng was the leader and organizer of the bribery scheme. Regardless of co-defendants John Ashe and Francis Lorenzo's other alleged criminal conduct, it was the defendant's vision to develop and build an international conference center in Macau with the resources readily available to him through his real-estate empire. However, Ng chose to facilitate this vision through unlawful means, and in so doing, ensnared some of his employees who acted under his direction.

(PSR p. 45.) The evidence at trial more than amply supports this view. (*See, e.g.*, Tr. 973, 982-83, 1008-10, 1060, 1091-92, 1228-30; GX 50, 58, 88, 103, 116, 131, 172, 199.)

The defendant also asserts that, even if he warrants a role enhancement, it should be a two-level one, not a four-level one, because "the criminal activity here did not involve five or more participants and was not otherwise extensive." (Def. Mem. 37.)  This assertion is irreconcilable with the record.  As an initial matter, there were at least five participants in the criminal activity: the defendant, Ashe, Lorenzo, Yin, and Cao Yanxia, a/k/a "Forest Cao."  The defendant's sole argument to the contrary is to state, without elaboration, that Cao also "sought to promote his own competing UN center." (*Id.* 38.)  This argument ignores that, although the defendant and Cao ultimately had a falling out, they started by working together in the charged scheme.  Indeed, some of the earliest emails from the scheme reflect Cao referring to the defendant as "Boss," and noting that the defendant had approved of the payments to Lorenzo. (*See, e.g.*, GX 331, 365; Tr. 749-54.)  The defendant's argument is no more persuasive than an assertion by a heroin dealer that the person he directed to sell heroin later sold heroin on his own. And regardless of whether there were at least five participants in the criminal activity (although there were), it is sufficient for the organization or leadership enhancement that the criminal conduct was "otherwise extensive."  U.S.S.G. § 3B1.1(a).  It was here, lasting for years, and involving bribes to multiple people in multiple forms, multiple bank accounts, multiple entities, multiple sham contracts, the funneling of money through a non-governmental organization, and conduct across international borders.

## C.   The Probation Office's Recommendation

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's age and background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Office recommends a sentence of 72 months' imprisonment and a $1 million fine.  (PSR p. 45.)

## DISCUSSION

I.  **A Substantial Term Of Imprisonment—Exceeding The 72 Months Recommended By The Probation Office—Is Warranted**

Every one of the factors set forth in 18 U.S.C. § 3553(a) weighs in favor of a substantial term of imprisonment.

*First*, the nature and seriousness of the offenses warrants such a sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  In his submission, the defendant states that "the conduct here is unique in the annals of bribery or money-laundering cases."  (Def. Mem. 1.)  If that is so, it is not for the reasons given by the defendant.  The defendant sought to—and did—corrupt decision-making at senior levels of the United Nations.  He funneled bribes through a non-governmental organization purportedly founded to help developing nations.  And he did so for years.

As the Government has explained in prior written submissions and at prior sentencings in this case, what the defendant agreed to do and repeatedly did undermines the foundational principle that public officials should act solely in the interest of the public good, not their financial interest.  It undermines the corollary principle that if what the defendant terms an "idea" is to gain the support of others (*id.* 2), it should do so because it is worth supporting, not because a wealthy businessman paid bribes.  It discourages honest citizens who would seek out public service from doing so, because it creates the appearance that money, above all, drives outcomes.  And it taints those officials who serve the public with integrity, and those non-governmental organizations that are committed to their mission.  When the defendant funneled bribes through South-South News, he tainted its work and betrayed those employees who genuinely wanted to make a difference in the lives of people from developing nations.  When the defendant paid Ashe and Lorenzo hundreds of thousands of dollars in bribes each in return for advancing the defendant's business interests, the defendant undermined the trust that the citizens

15

of Antigua and Barbuda and the Dominican Republic placed in their officials—trust that they would pursue the interests of their countries, not prioritize the interests of a foreign businessman who could afford to pay bribes.  And when the defendant paid those bribes to achieve formal support at the UN for his real estate project, he undermined the similar trust that member countries, employees, and citizens have in the UN.  (PSR ¶¶ 105-06.)  It is difficult to quantify the damage that the defendant did.  But the damage caused by corruption is real.  The defendant's sentence must account for it.

In his submission, the defendant ignores that damage.  Instead, he suggests that there was none, or if there was, it was caused by others, and that in any event, it was outweighed by the alleged good that he sought.  The defendant asserts, without hesitation, that the project for which he paid bribes "would benefit the United Nations and the economies of Macau, China and the South-South nations, it was consistent with the stated missions and goals of the United Nations, and it was supported by many of its member states."  (Def. Mem. 2.)  The defendant offers nothing in support of this assertion.  Nor does the defendant offer anything in support of his related assertion that he "merely sought support for a project that the United Nations would have supported in any event," other than falsely suggesting, as he did at trial, that what he sought was a "centre[] of excellence" (*id.* 51 (internal quotation marks omitted)), which the evidence showed was an entirely different thing (*see, e.g.*, Tr. 1938-39, 2154-55, 2404-05, 2747-48).

The truth, as the record at trial, common sense, and publicly available information demonstrates, is that the defendant's grandiose, self-interested assertions are just that.  There may have been many competing ideas as to how to "improve the lives of perhaps millions of people" who live in poverty (Def. Mem. 2) when the defendant started to pay bribes.  Building a luxury hotel, luxury apartments, and luxury stores in a hard-to-reach city was not, to the

Government's knowledge, one of them, particularly when doing so involved creating artificial islands, a high-end marina, and a heliport—the money for which was to go not to the poor, but to the defendant's for-profit company, benefitting both him and his family.  There can be no question that, if the defendant had wanted, he could have set up a foundation or other non-profit entity to seek funding for and build a conference center for the public.  (*See, e.g.*, GX 1602.)  But that was not what the defendant wanted.  He wanted his for-profit company to develop a massive, high-end real estate project, to which a conference center would lend prestige and attention.  "[C]ommercial advantage" was not entirely unimportant (Def. Mem. 50).  It was part of the plan.  (*See, e.g.*, GX 908-F, at 1:40-10:02.)

Excerpting a Government trial exhibit, the defendant states that his "primary motivation" was to "'to provide pro bono support to 133 countries, and to establish a never ending World Expo in China to serve the South-South countries.'" (Def. Mem. 51 (quoting GX 1321-TX) (internal quotation marks omitted; capitalization in original).)  But in context, the excerpted sentence demonstrates that the defendant supported selling the UN on that concept as part of his larger project, which would include, among other things, "office facilities, residential apartments, community, arts and cultural arenas."  (GX 1321-TX.)  *That* was the defendant's "idea" (Def. Mem. 2), not simply, without more, a "conference center" (*id.* 50), much less one without a "commercial" aspect (*id.* 51).  Indeed, the defendant's own promotional materials indicated that the conference center would be a small percentage of the overall project.  (*See* GX 968, at 19; GX 908-F, at 4:09; Tr. 1126-29, 2875-76.)  The rest of the project would contain facilities and amenities designed for the rich.  (*See, e.g.*, GX 968; 908-F, at 1:40-10:02.)  And rather than bring Ashe, Lorenzo, and others from the UN to where he hoped the conference center would be, or to any other project that might assist the poor, he repeatedly took them to another private, for-profit,

luxury project developed by his company, Star River-Windsor Arch, with marble floors, gold statues, and a clubhouse with a cigar lounge and wine storage.  (*See, e.g.*, Tr. 1280-87, 1355-56; GX 991, at 15, 29, 35, 36, 42, 44, 53; GX 908-F, at 12:20-14:30; GX 1144-47, 1154, 1351, 1351-TX, 1352, 1352-TX.)  In subsequent promotional materials, there were photographs highlighting Ashe's visit to Star River-Windsor Arch and emphasizing that the luxury residential development would have an "Ambassador Club."  (Tr. 1296.)  That speaks volumes about the defendant's focus.

The defendant attempts to avoid the obvious inference from his own promotional materials and his own repeated actions by asserting, without citation to the record, that "it would make little sense to build a conference center without convenient options for housing, dining, parks and cultural activities to support it" (Def. Mem. 52).  Perhaps so, but it is apparent that the defendant did not intend merely to build a "convenient option[]" for "dining" by conference attendees, such as a cafeteria, or temporary "housing" for representatives of developing countries.  He intended to build and market high-end apartments, a luxury hotel, and a luxury shopping center, to complement his existing luxury residential development.

To be sure, there is evidence indicating that, as the defendant states, he may also have had "patriotic" and/or "philanthropic" motivations (*id.* 2, 52, 53) and believed that his new project "would be welcomed by the governments of China and Macau" (*id.* 53).  It is appropriate that the Court consider this evidence, which the Government does not challenge.  But the Court must equally consider the full nature of the defendant's project, the full scope of his actions, and his self-evident profit motive and focus.  The story of what the defendant did, and why he did it, is not that the defendant had an "idea" for a purely "philanthropic project" without any regard for "personal gain" (*id.*).  The story is not as simple, or as pretty.

18

Moreover, contrary to the central thrust of the defendant's submission, even if the defendant were purely motivated by a desire to leave his mark on China generally or Macau specifically—a desire to leave a "legacy" (PSR ¶ 63)—his conduct is still worthy of and demands substantial punishment.  Plenty of businesspeople have their own ideas about how to help their own country or city or to advance their own vision of what the world needs.  Those ideas can and should be debated on the merits, not decided by who can afford bribes.  The defendant knew that—and he paid bribes anyway.  His sentence should reflect that choice.

As the UN General Assembly explained in 2003:

> Corruption is an insidious plague that has a wide range of corrosive effects on societies.  It undermines democracy and the rule of law, leads to violations of human rights, distorts markets, erodes the quality of life and allows organized crime, terrorism and other threats to human security to flourish.

> This evil phenomenon is found in all countries—big and small, rich and poor—but it is in the developing world that its effects are most destructive.  Corruption hurts the poor disproportionately by diverting funds intended for development, undermining a Government's ability to provide basic services, feeding inequality and injustice and discouraging foreign aid and investment.  Corruption is a key element in economic underperformance and a major obstacle to poverty alleviation and development.

UN Convention Against Corruption, Forward, *available at* https://www.unodc.org/documents/treaties/UNCAC/Publications/Convention/08-50026_E.pdf.

*Second*, the history and characteristics of the defendant, the circumstances of the offenses, and the need for the sentence imposed to promote respect for the law warrant a substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant did not commit bribery or money laundering hesitantly, fleetingly, or on a small scale.  He did so for years, in substantial amounts, and without any apparent hesitation.  And as discussed previously in this

case and below, this was not the defendant's only brush with the law or only time he chose to use his massive wealth to gain access to and influence officials.

*Finally*, the need for general deterrence strongly weighs in favor of a substantial sentence. *See* 18 U.S.C. § 3553(a)(2)(B). As the Government has previously discussed in this case, it is particularly challenging to investigate and prosecute successfully international bribery schemes, especially where, as here, the scheme involves individuals in multiple foreign countries, individuals at the UN, multiple bank accounts, multiple foreign and domestic entities, and multiple sham contracts. This means that when such a scheme is uncovered, and individuals are successfully prosecuted and convicted, substantial sentences are warranted. *See, e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

The defendant's suggestion that he need not be sentenced to any prison time whatsoever to achieve robust general deterrence (*see* Def. Mem. 56-58)—notwithstanding how difficult it is to detect and prosecute successfully cases such as this—flies in the face of case law, logic, and human experience. And the defendant's related assertion, that "[t]here is no empirical evidence that lengthy sentences provide any additional deterrent effect" (*id.* 57), is incorrect. At least one study (post-dating those cited by the defendant) indicates that there are indeed deterrent effects

of increased sentences.  *See* Drago Francesco, Roberto Galbiati & Pietro Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Pol. Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence.").  Moreover, the approach for which the defendant advocates would lead to similarly short or non-existent custodial sentences in all corruption cases, regardless of their size, scope, or complexity, which would frustrate proportionality, a paramount goal of sentencing.  *See United States v. Booker*, 543 U.S. 220, 264 (2005).  Indeed, the approach for which the defendant advocates would lead to the perverse result that sentences in the largest and most complex cases would be the *lowest*, because those are precisely the cases most likely to receive "publicity" (Def. Mem. 58).  The defendant does not deserve a lower sentence because what he did has garnered media attention.  If anything, the media attention in this case militates in favor of a more significant sentence, because "businessmen and professionals around the world" are watching (*id.*) and should be deterred from engaging in similar conduct.

## II.     The Defendant's Request For A Sentence of Time Served Is Without Merit

In his submission, the defendant requests time served, which would effectively be a sentence of 37 days' imprisonment, 98% lower than what the Probation Office recommends, and far less than any defendant in this case, or any remotely comparable case, has received.  The defendant does not deserve such a shockingly low sentence.  The defendant presses six principal arguments.  Whatever their merits, they do not warrant the extraordinary sentence that he seeks.

*First*, the defendant suggests that the conduct for which he stands to be sentenced was "an aberration" and asserts that he "has consistently demonstrated the highest moral standards." (Def. Mem. 41.)  However, as described in greater detail in the Government's Opposition to the Defendant's Motion *in Limine*, dated May 8, 2017 (Docket Entry No. 463), the conduct of which

21

the defendant was convicted was not the only time when he sought to use his wealth to gain access to or influence or reward officials.  On the contrary, in connection with the UN Office for South-South Cooperation ("UNOSSC") holding a forum in Macau in August 2015, at which the defendant continued to press his goal of obtaining formal UN support for his project (PSR ¶ 62; GX 142, 977, 318, 319), the defendant provided approximately $25,000—characterized as a loan, but with no interest rate or other terms—to a senior UNOSSC official.  The defendant initially offered this money in cash, but when the official declined it, the defendant wired money from China to Yin's personal bank account in the United States, and Yin then provided the official with a check in Yin's name.  (Docket Entry No. 263, at 24-25.)

In addition, during the same time period as certain events in this case, the defendant offered cash and other things of value to a then-member of the United States House of Representatives (the "Representative").[6]  After the Representative left Congress, the defendant provided cash to the Representative's wife, and also paid the Representative's wife by wire, purportedly as part of a consultancy agreement.  The Representative and Yin regularly emailed about payments to the Representative's wife, and what the Representative might be able to do for the defendant.  In one of these exchanges, Yin sent the Representative a link to a press release of UNOSSC concerning the forum it held in Macau in August 2015.  (*Id.* at 5-6.)

And years earlier, the defendant was identified as having illicitly routed money from bank accounts in China to bank accounts in the United States, which money was used by a business associate (who was subsequently convicted of violating federal campaign finance laws)

---

[6]     The Government does not identify the Representative by name herein.  All discovery on this issue has been provided to the defendant pursuant to a protective order issued by this Court.

to make illegal donations to a major political party, in part to secure financing for a real estate project of the defendant. (*Id.* at 12-13; PSR ¶¶ 124-25.)

Irrespective of whether the foregoing—much of which, including the payments to the senior UNOSSC official and the Representative, the defendant did not dispute in pretrial litigation (*see* Docket Entry No. 545, at 67-68, 78-79, 124)—was criminal, it may be considered by the Court. *See, e.g.*, *United States v. Reese*, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal"). And it strongly suggests that caution is warranted before accepting the defendant's assertion that his criminal conduct was entirely "aberrational" (Def. Mem. 42). In any event, given the length, complexity, and deliberate and repeated nature of the defendant's criminal conduct, a substantial term of imprisonment is warranted regardless of what else he has done or not done.

*Second*, the defendant states that he has "donated more than $20 million to various organizations" since 1993. (*Id.* 24 (citing Defense Sentencing Exhibit 59).) As an initial matter, there is reason to doubt the defendant's blanket assertion that all of the payments he lists were "charitable" (*id.*). At least one was made through the Chinese People's Political Consultative Conference, an official political advisory body of which the defendant was a member. Others were made to unions in the defendant's industry or to support tourism to the defendant's city, in which he is a real estate owner and developer. Still others appear to have been made to be private companies. In any event, assuming *arguendo* that all of the defendant's listed donations were purely charitable, he has donated approximately 1% of his net worth over an approximately 25-year period. The law accords with common sense: Charitable work warrants a downward departure only where it is "present to an exceptional degree or in some other way makes the case

different from the ordinary case where [charitable work] is present," *United States v. Canova*, 412 F.3d 331, 358 (2d Cir. 2005), and "more is expected of high-level business executives who enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities," *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (internal quotation marks omitted). *Cf., e.g.*, *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman").

The defendant's donation of approximately 1% of his net worth does not warrant a lower sentence, particularly when the wealth that permitted the defendant to make donations is what he used to commit his crimes. *See United States v. McHan*, 920 F.2d 244, 247 (4th Cir. 1990) ("[T]o allow any affluent offender to point to the good his money has performed . . . suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory[.]"). Indeed, the defendant paid more in bribes in this case than many of the donations that he invokes to seek to avoid punishment for his bribes.

*Third*, the defendant asserts that he "suffers from poor health." (Def. Mem. 25.) The Government takes seriously a claim by any defendant that he or she suffers from health problems. However, the defendant conflates medical events that he experienced more than a decade ago, and has recovered from, with present, manageable medical conditions (PSR ¶ 144), which are materially indistinguishable from that of the typical, older offender. And although the defendant's health conditions are real, his assertion that he is "elderly and infirm" (Def. Mem. 43) is in tension, to say the least, with (a) his appearance in court, (b) his appearance in his post-arrest interview and in photos and videos taken during the scheme (*e.g.*, Defense Trial Exhibit

24

1804), (c) his frequent international travel prior to his arrest, and (d) his active involvement in complex business affairs (which has continued since his arrest).  In any event, and most importantly, the Federal Bureau of Prisons has reviewed all medical records provided by the defendant and has concluded that it can properly treat his medical conditions.  (*See* Exhibit E.)  Those conditions do not warrant a sentence of time served.

*Fourth*, the defendant asserts that his "business has suffered immeasurably in his absence."  (Def. Mem. 27.)  The defendant offers nothing in support of this assertion other than his say-so and that of his family.  And given the defendant's continued involvement in "the family business" (*id.* 48), including through numerous phone calls and in-person meetings, there is very strong reason to doubt that it is the defendant's physical "absence," rather than the fact of conviction for serious crimes, that has materially hurt that business.  (*See id.* 28 ("many of [the defendant's] loans are secured through his personal relations and reputation"); *id.* 59 ("[The harm to [the defendant's] reputation caused by the arrest and conviction is unfathomable.  That reputational injury is obviously detrimental to his business, which is built on trust and confidence.").)  But even if his physical absence has hurt his business, that is not a basis for a lower sentence.  Rather, just as a defendant's commission of crimes may separate him or her from family and friends, it may separate him or her from business life.  *See, e.g.*, *United States v. Sharapan*, 13 F.3d 781, 785 (3d Cir. 1994) (there is "nothing extraordinary in the fact that the imprisonment of [a business's] principal for mail fraud and filing false corporate tax returns may cause harm to the business and its employees"); *United States v. Rutana*, 932 F.2d 1155, 1158 (6th Cir. 1991) ("[E]ven assuming that [the defendant's] imprisonment would lead to the failure of his business and the loss of his employees' jobs, this fact does not distinguish [him] from other similar offenders.").  The defendant took that risk when he chose to advance his business

through bribes.  And while those family members involved in the business may have had to liquidate certain unidentified "assets" to satisfy certain unidentified loans (Def. Mem. 28), the business remains in operation and the defendant's family remains wealthy beyond most people's wildest dreams.  Plainly, this is not a case where the defendant's family will fall into poverty—or anything remotely close—if he is incarcerated.  Nor is this a case in which the defendant is supporting young children.  (*Cf. id.* 47 (comparing this case to ones in which defendants received lower sentences based on their ongoing support of young children).)

*Fifth*, the defendant argues that, whatever the impact on his family business, the emotional impact on his family warrants a sentence of time served.  (*Id.* 46-47.)  It does not.  As an initial matter, the defendant has taken advantage of his vast wealth, and release pending trial and sentencing in a multi-million dollar, 4 bedroom, 3.5 bathroom apartment, to receive daily visits from family, friends, or business associates—many of whom stay for weeks or months in the defendant's apartment with him, along with his live-in housekeeper (PSR ¶ 140), or stay in nearby hotels.  The defendant also continues to receive frequent visits from his masseuse.  The Government has no doubt that the defendant's family and friends would prefer for him to be in Macau, and New York is far from Macau.  But the picture painted by the defendant—that his spacious apartment is akin to a "cage," and that he been "generally isolated from his family, friends and community" (Def. Mem. 59)—is misleading at best.

In any event, as the Government has explained in connection with prior sentencings, and as the Court has recognized at those sentencings, the argument that the defendant asks this Court to accept could be made in virtually every case.  It is not unique to the defendant, and is at odds with Section 3553(a), which focuses the Court's attention in imposing sentence on the defendant and his offenses, not the impact of incarceration on the defendant's family.  *See, e.g.*, *United*

*States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."); *United States v. Zadora*, 93 F. App'x 305, 306-07 (2d Cir. 2004) (same); *see also Koon v. United States*, 518 U.S. 81, 95 (1996) ("the defendant's family ties and responsibilities" are a "discouraged" basis for a departure (citing U.S.S.G. § 5H1.6)).  There is nothing about the defendant's family circumstances such that he is entitled to the extraordinary sentence that he seeks.  On the contrary, the defendant's family has far more resources at their disposal, which may be used to visit the defendant wherever he is located, than the average family facing the incarceration of a family member.

*Finally*, the defendant argues that the need to "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), warrants a sentence of time served in this case.  (Def. Mem. 61-63.)  However, every case cited by the defendant (*id.* 62-63) involved a prison term—and none was remotely close to 37 days.  The defendant also omits the numerous corruption cases in which defendants received terms above those in the few cases that the defendant chooses to cite, which appear to have been selected by him not because they are anything like this case, but simply because they happen to involve sentences lower than that recommended by the Probation Office in this case.

To choose just two examples of corruption cases omitted by the defendant:

- In *United States v. William Boyland, Jr.*, No. 11 Cr. 850 (E.D.N.Y.), the defendant, a former New York State Assemblyman, was sentenced to 168 months' imprisonment, following conviction at trial. As in this case, the applicable Guidelines range was 235 to 293 months' imprisonment.

- In *United States v. Wilkes*, No. 07 Cr. 330 (S.D. Cal.), the defendant was sentenced to 144 months' imprisonment, following conviction at trial in connection with a scheme to bribe a United States Representative. Similar to the defendant's corruption of two senior UN ambassadors through bribes in multiple forms over time, Wilkes paid bribes in various forms over time. Also similar to the defendant, Wilkes was convicted of money laundering in connection with his bribery scheme.

The defendant also omits all FCPA cases or cases involving the UN. To choose a handful of examples:

- In *United States v. Joel Esquenzi, et al.*, No. 09 Cr. 21010 (S.D. Fla.), the former president and vice-president of a private telecommunications company were sentenced after trial to terms of imprisonment of 180 months and 84 months, respectively, for their roles in an FCPA bribery and money laundering conspiracy. The case involved a scheme in which the private telecommunications company paid approximately $890,000 to shell companies used to pay bribes to Haitian officials.

- In *United States v. Jumet*, No. 09 Cr. 397 (E.D. Va.), the defendant was sentenced, after pleading guilty, to 87 months' imprisonment for paying approximately $200,000 in bribes to Panamanian government officials to secure contracts.

- In *United States v. Mahmoud Thiam*, No. 17 Cr. 47 (S.D.N.Y.), Judge Cote sentenced the defendant, a former Minister of Mines and Geology of the Republic of Guinea, to 84 months' imprisonment, after he was convicted at trial of laundering bribes paid to him by executives of a Chinese conglomerate.

- In *United States v. Bahel*, No. 06 Cr. 918 (S.D.N.Y.), the defendant, a senior employee at the UN, was sentenced to 97 months' imprisonment after conviction at trial of honest services fraud and accepting bribes.

The defendant's list of cases, in short, is arbitrary. It says nothing about what sentence to impose this in case. The defendant no more deserves a more lenient sentence because one was imposed in certain cases than he deserves a more substantial sentence because one was imposed in certain other cases.

28

Nor, contrary to the defendant's suggestion (Def. Mem. 63), does he deserve the extraordinary sentence that he seeks because former co-defendant Shiwei Yan was sentenced to 20 months' imprisonment (a sentence that is more than sixteen times what the defendant seeks). The defendant does not attempt to compare his conduct to that of Yan, and even a cursory comparison demonstrates why he warrants a higher sentence. Yan, whose advisory Guidelines range was 70-87 months, not the 235-293 months faced by the defendant, pleaded guilty to bribing one ambassador between in or about Spring 2012 and in or about December 2014. The defendant was convicted at trial of agreeing to bribe and bribing two ambassadors, in multiple ways, for a far longer period, conduct that he executed in large part by directing the actions of others, and that involved, among other things, multiple sham contracts, multiple entities and bank accounts, and a no-show job. The defendant was also convicted of agreeing to commit and committing money laundering. And even if the Court were to conclude that the defendant should receive a sentence that is the same proportion below his advisory Guidelines range as Yan's sentence was below her advisory Guidelines range, that sentence would exceed 65 months' imprisonment, not the 37 days sought by the defendant.

## III.    The Court Should Impose A $2 Million Fine

Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a). Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his or her dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a). The Guidelines

provide that a court "shall impose a fine in all cases, except where the defendant establishes that

he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a).

In determining the size of any fine, the sentencing court shall consider:

> (1) the need for the combined sentence to reflect the seriousness of
> the offense (including the harm or loss to the victim and the gain to
> the defendant), to promote respect for the law, to provide just
> punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the
> fine (including the ability to pay over a period of time) in light of
> his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his
> dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is
> obligated to make;
> (5) any collateral consequences of conviction, including civil
> obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar
> offense;
> (7) the expected costs to the government of any term of probation,
> or term of imprisonment and term of supervised release imposed;
> and
> (8) any other pertinent equitable considerations.

*Id.* § 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be

sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  *Id.*

The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States v.*

*Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010); *United States v. Salameh*, 261 F.3d 271, 276

(2d Cir. 2001).

Here, the Probation Office recommends a fine of $1 million (PSR p. 44), the top of the

advisory Guidelines fine range (PSR ¶ 173).  In his submission, the defendant states that he does

not challenge such a fine.  (Def. Mem. 49.)  The Court should accordingly impose a fine of at

least $1 million.  In the light of the defendant's net worth of at least $1.8 billion (PSR ¶ 154),

however, and all of the facts and circumstances of this case, the Government submits that a

substantially higher fine, of $2 million, is warranted.[7]  If any case warranted such a fine, this one does.

## IV.    The Court Should Order Forfeiture Of The Defendant's Manhattan Apartment

As charged, the defendant's conviction on Counts Five and Six of the Superseding Indictment, conspiracy to commit money laundering and money laundering, respectively, requires forfeiture, pursuant to 18 U.S.C. § 982(a)(1), of any property, real or personal, involved in the offenses alleged in Counts Five and Six, and any property traceable to such property. (Superseding Indictment ¶ 39.)  As proven at trial, one of ways in which the defendant agreed to bribe and reward Lorenzo was to permit him to live, rent-free, in the defendant's Manhattan apartment, which he purchased in Summer 2015, with Lorenzo's assistance, using funds wired from China.  (*See* GX 272, 905, 941, S-4; Tr. 1367-69, 1383-87.)  Accordingly, the Court should order forfeiture of the defendant's Manhattan apartment.[8]

---

[7]      The Probation Office incorrectly states that the maximum fine for each of Counts Three and Four is $100,000, because that is the amount set forth in the FCPA.  (PSR ¶ 171.)  However, under 18 U.S.C. § 3571(e), the fine set forth in the FCPA is not the statutory maximum because it does not "by specific reference, exempt[] the offense from the applicability of the fine" set forth in Section 3571 itself, which, for a felony, is "not more than $250,000," *id.* 3571(a)(3). Accordingly, the aggregate numerically-specified maximum fine for all counts is $2 million.  In any event, the statutory maximum for each of Counts Five and Six is $500,000 or "twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater."  *Id.* § 1956(a)(2).  Accordingly, even if the Court were to conclude that the statutory maximum for each of Counts Three and Four is only $100,000 (and it is not), the Court has authority to impose a fine of $2 million provided that either Count Five or Count Six or both involved at least $650,000, which they did.

[8]      The Government will submit additional evidence upon request, although it believes that the evidence already in the record is sufficient.  *See* Fed. R. Crim. Pro. 32.2(b)(1)(B) ("The court's determination may be based on evidence already in the record, . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.").  The Government also reserves the right to seek a money judgment and/or to seek to forfeit other property.  The parties are conferring regarding a potential agreement on forfeiture.

## V.    The Court Should Order Restitution To The UN

Before the Probation Office issued the final PSR, the defendant objected to being ordered

to pay restitution to the UN for legal expenses incurred in connection with the investigation and

prosecution of this case, on the ground that such expenses purportedly "had no connection" to

him.  (PSR p. 40.)  The Probation Office rejected that objection, and recommends that the

defendant be ordered to pay $302,977.20 in restitution (PSR p. 44) under the Victim and Witness

Protection Act (18 U.S.C. § 3663), representing the UN's external legal fees.  (PSR ¶ 104.)  In

his submission, the defendant states that he does not challenge such restitution.  (Def. Mem. 49.)

The Court should accordingly order it as part of the defendant's sentence.  *See, e.g.*, *United

States v. Bahel*, 662 F.3d 610, 648 (2d Cir. 2011) (affirming restitution to UN for legal fees).

## VI.    If Sentenced To A Term Of Imprisonment, The Defendant Should Be Remanded

The law provides that a court "shall order that a person who has been found guilty of an

offense and sentenced to a term of imprisonment" be detained pending appeal, unless the court

finds "by clear and convincing evidence that the person is not likely to flee or pose a danger to

any other person or the community if released," and "that the appeal is not for the purpose of

delay and raises a substantial question of law or fact likely to result in—(i) reversal, (ii) an order

for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced

sentence to a term of imprisonment less than the total of the time already served plus the

expected duration of the appeal process."  18 U.S.C. § 3143(b).

This statute reflects Congress's judgment that "'once a person has been convicted and

sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even

to permit it in the absence of exceptional circumstances.'"  *United States v. Miller*, 753 F.2d 19,

22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).  In short, there

is a "presumption in favor of detention." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). The defendant must "rebut that presumption with clear and convincing evidence." *Id*.

A "substantial question" is "a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (internal quotation marks omitted). "If a court does find that a question raised on appeal is 'substantial,' it must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *Id.* (quoting *Miller*, 753 F.2d at 23). With respect to these issues, too, "the burden of persuasion rests on the defendant." *Id*. The Second Circuit gives great deference to bail decisions, and will reverse only if "'on the entire evidence," it is "'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (internal quotation marks omitted).

For the reasons set forth in the Government's letter dated August 4, 2017 (Docket Entry No. 614), the defendant cannot meet his burden to demonstrate by "clear and convincing evidence" that, during the pendency of an appeal, he will not flee. That is particularly true if the defendant knows that, if his appeal is rejected—on even a single count—he faces certain prison. It is even more true if the defendant is sentenced to a substantial prison term. That is a very different posture from hoping, following a conviction, for a sentence with little to no prison. But even if the defendant could meet that burden, he must also demonstrate that there exists "a substantial question of law or fact" that is "likely to result" in a reversal or a new trial. That is a burden that he did not have between conviction and sentencing. *Compare* 18 U.S.C. § 3143(a)(1), *with* 18 U.S.C. § 3143(b). If he is sentenced to prison, he must meet both of these burdens. He has not and cannot.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial term of imprisonment exceeding 72 months and impose a $2 million fine, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.  The Government also respectfully requests that the Court order forfeiture of the defendant's Manhattan apartment and restitution to the UN and, if the defendant is sentenced to a term of imprisonment, order him remanded.

Dated: New York, New York
        March 30, 2018

                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              United States Attorney

                    By:    s/ Daniel C. Richenthal
                           Daniel C.  Richenthal
                           Janis M. Echenberg
                           Douglas S. Zolkind
                           Assistant United States Attorneys
                           (212) 637-2109/2597/2418

                           SANDRA MOSER
                           Acting Chief, Fraud Section
                           Criminal Division

                    By:    s/ David A. Last
                           David A. Last
                           Trial Attorney
                           (202) 616-5651