

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 27, 2018

**BY ECF**

The Honorable Vernon S. Broderick
United States District Judge
Thurgood Marshall United States Courthouse, Room 415
40 Foley Square
New York, New York 10007

    Re:     *United States v. Ng Lap Seng*,
                S5 15 Cr. 706 (VSB)

Dear Judge Broderick:

    The Government respectfully writes in the above-captioned matter in response to the affidavit of Joel A. Sickler ("Sickler Aff."), which the defendant enclosed with his letter of April 19, 2018 (Docket Entry No. 752 ("Def. Ltr.")). This affidavit is flawed in multiple ways, and should be given little, if any, weight by the Court.

    *First*, it is apparent that the affidavit is anything but a dispassionate "assess[ment]" (Sickler Aff. ¶ 1) and presentation of objective "information" (Def. Ltr. 1). It is a piece of advocacy—indeed, strident advocacy—by a consultant retained by the defendant. Contrary to the impression that Mr. Sickler appears to give, "Justice Advocacy Group, LLC" is not a mere "consortium of criminal justice professionals" (Sickler Aff. ¶ 1). It is a private consulting firm, which markets its services to the defense bar. To be sure, there is nothing improper with a defendant retaining a consultant for this purpose. Many wealthy defendants have. *See, e.g.*, *Prison consultants help inmates get good digs*, Associated Press, July 28, 2009; Alex Kuczynski, *For the Elite, Easing the Way To Prison*, N.Y. Times, Dec. 9, 2001. But there should no mistaking the affidavit for anything other than what it is.

    Indeed, the affidavit is not just a piece of paid advocacy, but is one that (a) largely ignores the factors set forth in 18 U.S.C. § 3553(a); (b) ranges beyond Mr. Sickler's area of purported expertise; (c) appears to be animated by a view that prison should rarely, if ever, be the punishment for white-collar offenders; and (d) self-evidently is designed to echo the same arguments pressed by the defendant's sizable team of lawyers, including arguments that have nothing do with the length of the sentence to be imposed and cannot reasonably be made by someone who appears

Honorable Vernon S. Broderick
United States District Judge
April 27, 2018
Page 2

never to have met the defendant.[1]  (*See, e.g.*, Sickler Aff. ¶ 16 (expressing concern about the defendant's alleged "personal level of vulnerability"); ¶ 27 (asserting that remand would be "difficult emotionally" for the defendant); ¶ 28 (stating that "*we* note that Mr. Ng has been out on bond since he [sic] October 26, 2015 and has followed all the rules" (emphasis added)); ¶ 40 (concluding that the defendant "will be an isolated, lonely man in prison"); ¶ 34 (stating as fact that the "BOP's philosophy" causes it to operate "warehouse prisons").)[2]

As Judge Kaplan explained at a sentencing in April 2016 in which the defendant submitted an affidavit from Mr. Sickler:

> Just so that the record is clear. I don't put much weight on Mr. Sickler's affidavit. He has no particular medical or professional expertise. A lot of what's in here is based on hearsay of uncertain provenance and reliability. It's a piece of advocacy. It could just as easily have been written by [defense counsel] . . . .

*United States v. DeLuca*, 14 Cr. 782 (LAK), Docket Entry No. 132, at 33; *see also id.* 29 (Judge Kaplan, responding to the Government noting that Mr. Sickler asserted what the Federal Bureau of Prisons ("BOP") definitively would do: "There are lots of problems with that affidavit.").

*Second*, and in any event, the affidavit's conclusory assertions do not withstand examination. The principal contention of the affidavit is that the defendant should not be sent to prison (or should be sentenced to a far lower prison term than would otherwise be warranted) because, as a non-citizen, he purportedly (a) "will be designated to a private, contract prison" rather than a BOP, i.e., non-private, facility, and (b) "will" not in any circumstance be designated to serve his sentence in a minimum security facility. (Sickler Aff. ¶ 6.) Mr. Sickler's blanket assertions that the defendant "will" be so designated—much less that such a designation, were it to occur, would be caused solely by the defendant's immigration status—should be rejected. As the Court knows, designation rests on a post-sentencing analysis of factors that are case-specific, defendant-specific, time-specific, and institution-specific, as the very BOP Program Statement upon which Mr. Sickler purportedly relies makes crystal clear. *See* BOP Program Statement 5100.08 ("Program Statement"), Chapter 1, pp. 1-2 (listing eleven non-exhaustive factors), *available at* https://www.bop.gov/policy/progstat/5100_008.pdf. Mr. Sickler's suggestion that one merely

---

[1]  On April 20, 2018, the day after the defendant filed the affidavit, his counsel sought authorization from the Government for Mr. Sickler to visit the defendant for the first time, which authorization the Government provided. (*See* Docket Entry Nos. 753, 754.)

[2]  Unsurprisingly, much of Mr. Sickler's affidavit matches what he has filed in advance of sentencing in other white-collar cases. *See, e.g.*, *United States v. Zaman*, 13 Cr. 908 (AJN) (S.D.N.Y.), Docket Entry No. 251-1, at ¶ 9 (expressing concern about the defendant's alleged "personal level of vulnerability"); *see also United States v. Shkreli*, 15 Cr. 637 (KAM) (E.D.N.Y.), Docket Entry No. 538-1, Exhibit 50. The defendant in *Zaman* was sentenced to 88 months' imprisonment and the defendant in *Shkreli* was sentenced to 84 months' imprisonment.

needs to engage in a simple, mathematical exercise to know definitively, in advance, the precise type and security level of a facility to which a defendant "will" be designated (Sickler Aff. ¶ 6) is false. Nor is his "estimated" calculation (*id.* ¶ 6 n.2) necessarily correct, and even if it were, it is not dispositive. Mr. Sickler ignores, among other things, that given the nature of the defendant's offenses (bribery), his role in those offenses (the leader), and his use of electronic communications in those offenses, he may be subject to what the BOP refers to as a public safety factor ("PSF") or management variable ("MGTV") that would render him presumptively ineligible for a minimum security facility even were he a citizen. Mr. Sickler also ignores, on the contrary, that given, among other things, the defendant's age, health conditions, language, non-violent offenses, and that he was lawfully in the United States at the time he was arrested, the BOP might determine to place him in a minimum security facility notwithstanding his present immigration status. *See* Program Statement, Chapter 1, p. 2 ("The application of a PSF or MGTV could effect placement at either a higher or lower level institution than the specified point total indicates."); *see also id.* Chapter 2, p. 3 ("A Management Variable (MGTVs) reflects and supports the professional judgment of Bureau staff to ensure the inmate's placement in the most appropriate level institution. A Management Variable(s) is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's security score—a score which may not completely/accurately reflect his or her security needs.").

Indeed, one would expect the defendant to advocate forcefully within the BOP administrative system for such a placement, and to contest his designation if he did not receive it. Mr. Sickler markets precisely such services. *See* http://justiceadvocacygroupllc.com/our-services/federal-confinement-advocacy/ (last visited Apr. 26, 2018) (explaining that the firm provides "advocacy services," including "[a]ssisting a client in obtaining designation to the facility of choice," and "[d]uring their time in custody, we act as the client's advocate, addressing a myriad of issues that arise during confinement (e.g., medical, disciplinary, programming, communication, transfer, furlough, re-entry)."). To be sure, there is no guarantee that the defendant will receive a designation to the type and security level facility of his choice, and immigration status is one factor, among others, that may affect an inmate's designation. But Mr. Sickler's definitive assertions as to both what the defendant's designation "will" be and why he "will" be so designated (Sickler Aff. ¶ 6) should be rejected.

And even were he otherwise correct about the defendant's initial designation, Mr. Sickler ignores that an initial designation is just that. As the Court knows, inmates not infrequently change facilities—and security levels—over the course of their prison terms, based on an ongoing defendant-specific and institution-specific assessment. *See* Program Statement, Chapter 6, p. 1 ("An inmate's first custody classification will be scored at the first program review following initial classification (approximately 7 months after arrival at an institution). Subsequent reviews will occur at least every 12 months, but may be conducted earlier in order to enable progress toward community activities. Custody classification will ordinarily occur every 12 months at a regularly scheduled program review."); *id.* Chapter 7, p. 3 ("When a decrease in the inmate's security level is indicated by the Custody Classification Form, transfer of the inmate to a lower security level institution should be considered."); Chapter 7, p. 8 ("The Warden of an institution with a satellite

camp may transfer an inmate from the main institution to the camp if the inmate is assigned an appropriate security and/or custody level.").[3]

*Third*, Mr. Sickler asserts that regardless of his medical conditions, the defendant "will not be designated to a BOP Medical Referral Center nor will he be housed at a Medical Care Level III facility." (Sickler Aff. ¶ 34.) Mr. Sickler offers nothing in support of this blanket assertion, which is contradicted both by letters from the BOP that the Government previously submitted to the Court (Docket Entry No. 746, Ex. E) and by the Program Statement (*see, e.g.*, Chapter 7, p. 5, ¶ 6).

Were there any remaining doubt on this or any other point, prior to filing this letter, the Government shared it with the BOP, which confirmed the discussion and analysis herein, including (a) that deportable aliens go through the same designation process as all other inmates; (b) there are deportable aliens in BOP, *i.e.*, non-contract, facilities; (c) an inmate's immigration status or deportability does not preclude placement in a facility otherwise warranted by current medical conditions or those that may develop during incarceration, including placement in a Medical Referral Center or higher care level facility, such as a Medical Care Level III facility; and (d) if an inmate is housed in a contract facility, and it is determined that the inmate requires a higher level of medical care than a contract facility provides, the inmate is transferred to an appropriate BOP facility for medical care.

*Finally*, Mr. Sickler asserts that this Court should consider the "disturbing" alleged fact that the defendant will "languish in a strange and dangerous place" as "bureaucratic paperwork" in the "formal ICE deportation process" is "half-heartedly shuffled" around. (Sickler Aff. ¶ 32.) This is "[a]ll very time consuming," states Mr. Sickler (*id.*), and may add "significantly" to the defendant's period in "custody beyond his actual sentence" (*id.* ¶ 42). Whatever the merits of this assertion in certain other cases, on the facts this case, this is hyperbole, at best. Mr. Sickler notably does not assert that the People's Republic of China—the defendant's "home country" (*id.* ¶ 32)—is one of the countries that typically takes material time to "process[]" the "paperwork" needed to receive back its citizens (*id.*), much less that it would not act promptly to process whatever paperwork is needed to welcome home a powerful and well-connected businessman who claims that his prosecution in the United States was both political and wrongful. Moreover, the defendant may waive the need for any "formal ICE deportation process" entirely. The Government previously informed the defendant that the Government would agree to the entry of a judicial order of removal in this case, which, if executed with the defendant's consent, would permit removal upon completion of the defendant's sentence, without further formal proceedings. Such an order would moot Mr. Sickler's professed concern that the defendant will spend material time in custody prior to deportation, because any otherwise-applicable proceedings will have been waived.

\* \* \*

---

[3] Although immaterial, Mr. Sickler also miscites the Program Statement, incorrectly stating that Code G, which is the code for Threat to Government Officials, is the code for Deportable Alien (Sickler Aff. ¶ 6 n.4), an error that appears to result from copying verbatim portions of his affidavit filed in *United States v. Shkreli*, 15 Cr. 637 (KAM) (E.D.N.Y.).

Honorable Vernon S. Broderick
United States District Judge
April 27, 2018
Page 5

      For the foregoing reasons, Mr. Sickler's affidavit should have little to no impact on the Court's sentencing determination.

                          Respectfully submitted,

                          GEOFFREY S. BERMAN
                          United States Attorney

By:    s/ Daniel C. Richenthal
        Daniel C. Richenthal
        Janis M. Echenberg
        Douglas S. Zolkind
        Assistant United States Attorneys
        (212) 637-2109/2597/2418

        SANDRA MOSER
        Acting Chief, Fraud Section
        Criminal Division

By:    s/ David A. Last
        David A. Last
        Trial Attorney
        (202) 616-5651

cc:    (by ECF)

      All Counsel of Record