I5BJNG1                          Sentence

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                         15 Cr. 706 VSB

 5    LAP SENG NG,

 6              Defendant.

 7    ------------------------------x

 8

 9                                         May 11, 2018
                                           10:30 a.m.
10

11

12    Before:

13                    HON. VERNON S. BRODERICK,

14                                         District Judge

15

16                         APPEARANCES

17

18    GEOFFREY S. BERMAN,
           United States Attorney for the
19         Southern District of New York
      JANIS ECHENBERG,
20    DOUGLAS ZOLKIND,
      DANIEL CHARLES RICHENTHAL,
21         Assistant United States Attorneys

22

23

24

25
```

I5BJNG1                          Sentence

                        APPEARANCES (Continued)


KIRLAND & ELLIS, LLP,
      Attorneys for defendant Ng
BY:   ANDREW M. GENSER, Esq.
      CHENG ZHANG, Esq.
      ERIN MURPHY, Esq.
                    Of counsel




Also Present:
      DAVID A. LAST, DOJ, CRIMINAL DIV., FRAUD SECTION
      JEAN YAP, CANTONESE INTERPRETER
      KWOK KEI NG, CANTONESE INTERPRETER
      FRANCISCO OLIVERO, Observer, Interpreter's Office

1                    (In open court)

2                    (Case called)

3                    THE COURT:  Thank you.  You may be seated.

4              So we're here today for sentencing.  Mr. Ng, can you

5      hear and understanding the interpreter?

6                    THE DEFENDANT:  Yes, yes.

7                    THE COURT:  If at any point in time you have

8      difficulty hearing or if you don't understand something I say,

9      or if you want to speak with your attorneys, just let me know

10     and we'll stop the proceedings and I'll allow you to do that,

11     okay?  Also the interpreters have to speak up so the Court

12     Reporter can hear.

13                   THE INTERPRETER:  He did say okay in English.

14                   THE COURT:  Thank you.  So as an initial matter, I

15     want to review for the parties the materials I've received and

16     reviewed in connection with today's sentencing.

17             Specifically, I have received the presentence

18     investigation report which was initially prepared on October

19     27th, 2017 and revised on February 26th, 2018, which includes a

20     recommendation.

21             I also have received the defendant's sentencing

22     submission which is dated March 2nd, 2018, which has

23     approximately 60 attachments that include letters from Mr. Ng's

24     family members, friends throughout his life, business

25     colleagues, employees, former employees, recipients of

1   charitable gifts, various photographs, a list of Mr. Ng's

2   charitable donations totaling approximately I think $22 million

3   over the course of several years, and Defense Exhibit 60, which

4   is a letter from Nu Beng Cao.

5           I also have a letter which I believe -- I think I

6   circulated to the parties yesterday from Lin Chu Sung, Lin Chu

7   Sung who is a friend of over 40 years.  That letter has

8   approximately 19 attachments, the majority of which appear to

9   be in different language.  However, there are portions of those

10  attachments that where there is a translation that appears in

11  those documents.

12          There are various articles, I think some official

13  documents, but things of that nature.  I also have a letter

14  from Dr. Steven Weiss, which is dated October 27th, 2017, who

15  is another acquaintance and friend of Mr. Ng's.

16          I have the defendant's supplemental letter, dated

17  April 19th, which objects to the government's forfeiture

18  request.  I think that may be resolved, but we'll talk about

19  later.  It objects to the government's request for remand and

20  reserving the right to seek bail pending appeal and objecting

21  to various arguments and factual assertions made by the

22  government in sentencing submission and, finally, in

23  principally attaching the affidavit of Joel Ziegler, who is an

24  expert, who proffers to be an expert in prison conditions and

25  designations.

I5BJNG1                            Sentence

1            I also have the government's sentencing submission

2    which is dated March 30th, 2018, which includes various

3    attachments.  Those are certain of government exhibits that

4    were presented to the jury during the trial and were admitted

5    in evidence during the trial as well as I think at least two

6    summary exhibits.  I also have the government's April 27th,

7    2018 supplemental letter addressing the affidavit of Joel

8    Ziegler.

9            In addition, I've got various documents relating to,

10   first, immigration, I think documents that support and relate

11   to a proposed order relating to a judicial order of removal,

12   and I also have a restitution order as well as I believe a

13   forfeiture-related order that the parties have agreed to.

14           I think I was recently handed certain of those

15   documents which have been executed.  So have the parties

16   received each of the submissions and have they been filed on

17   ECF?  Let me hear from the government?

18           MS. ECHENBERG:  Yes, your Honor, we received all of

19   those documents that you referenced, some of which we have

20   provided to the court.  I would note that the two letters that

21   your Honor circulated by email, I don't believe those have been

22   filed on Pacer, so I don't know if the court will do that or

23   you like us to do that.

24           THE COURT:  We were going to.  I asked my Deputy Clerk

25   to hold off until we had this proceeding to make sure there

1    wasn't anything in there that either party thought should be

2    redacted, but my Deputy Clerk will take care of filing that if

3    there is no objection, filing those two documents.

4         MS. ECHENBERG:  Yes, there is nothing the government

5    is aware that needs to be redacted.

6         We'll hear from the defense on the removal order,

7    forfeiture order and the restitution order.  Those were all

8    provided in draft to the court, and we have now, as you noted,

9    provided copies that the parties have signed the forfeiture

10   order, a copy of the removal order that the defense has signed,

11   and then just a clean copy of the restitution order for the

12   court's signature.  None of those have been filed on Pacer.  We

13   thought they would be filed by the court after they were

14   executed.

15        THE COURT:  That's correct.  We'll take care of once

16   they're executed, having those filed on the docket.  Thank you.

17        Mr. Genser, first with regard to all of those

18   documents, have you received each of those documents and if you

19   could just let me know whether there is an objection to the

20   filing of the two letters that I forwarded to the parties

21   yesterday?

22        MR. GENSER:  Yes, we have received all of those

23   documents, your Honor, and we have no objection to the filing

24   of the two letters that went directly to the court.

25        THE COURT:  Okay.  We'll take care of them.  My Deputy

1   Clerk will take care of filing those two letters as well as the

2   attachments to the one letter that I mentioned.  Mr. Genser,

3   have you received and read the presentence -- let me ask.

4   Sorry.  Are there any other submissions that I should have in

5   connection with today's sentencing?

6           MS. ECHENBERG:  Nothing the government is aware of.

7           THE COURT:  Mr. Genser?

8           MR. GENSER:  I am not sure if your Honor referenced

9   it, but there was an email from the court to the government

10  Thursday evening, 5:09 pm.  That probably ought to be noted,

11  but we have received a copy of it as well.

12          THE COURT:  I apologize.  I did receive an email in

13  response to my order I think of May 9th, asking certain

14  questions, asking about certain documents.  The government

15  provided responses to certain of those questions, and we'll go

16  over their responses in a moment.

17          MS. ECHENBERG:  What we had noted in the email, we

18  tended to make the same representations on the record, so we

19  can do that, but we have no objection to the email being filed

20  on Pacer if your Honor thinks it is probably --

21          THE COURT:  We'll probably do both.  We'll file the

22  email with the attachments on the docket and we'll discuss

23  later on my order and the responses.

24          Some of the responses, just to give you a sense of how

25  I intend to handle it, I will ask you specifically about before

1   I ask for your comments related to sentencing.  Others I will

2   just say you can refer those as you make your specific comments

3   to me with regard to sentencing here.

4           So, Mr. Genser, have you read the presentence report

5   and discussed it with Mr. Ng?

6           MR. GENSER:  Yes, your Honor, we have.

7           THE COURT:  Mr. Ng, have you read the presentence

8   report or has it been read to you?

9           THE DEFENDANT:  Yes.

10          THE COURT:  Have you discussed it with your attorneys?

11          THE DEFENDANT:  Discussed.

12          THE COURT:  Have you had an opportunity to go over any

13  errors in the report with them or anything else that you feel

14  should be taken up with me?

15          THE DEFENDANT:  Yes, all of them with my attorney.

16          THE COURT:  Mr. Genser, I note in the defense

17  submission you've objected to the PSR, to the extent that it

18  relies on the complaint filed in this action and also more

19  generally I think to the facts that characterize the payments

20  to Ambassador Ashe and Mr. Lorenzo as bribes, essentially

21  challenging, at least in part challenging and preserving the

22  argument that Mr. Ng is innocent.

23          So let me ask this.  And, in addition, raises the

24  issue of the PSR's reference to certain other defendants who

25  were involved in other aspects of their deals with Mr. Ashe and

1    Mr. Lorenzo, specifically defendants Peow and Yan.

2            While I don't believe there is any objection -- well,

3    I will find out from the government.  With regard to those

4    references where Mr. Ng was not involved, obviously I am not

5    specifically relying on those in connection with determining

6    what an appropriate sentence is here today, and I take the

7    Probation Department was merely providing the total picture of

8    this entire case which included those defendants.

9            So putting to the side for the moment the objections,

10   specific objections to the guideline calculation, I guess the

11   question I have is are there -- and also the, in essence, the

12   overall objection to facts that are characterized, the payments

13   as bribes and things that would be characterized as going to

14   the jury's determination of guilt, do you have any specific

15   objections to the specific paragraphs?

16           In other words, are there inaccuracies in those

17   paragraphs?  I think certain of them you pointed out, which is

18   one the defense position wasn't that certain funds of the

19   $200,000 were utilized to pay for travel expenses.  You

20   indicated that that was not part of your argument.  Are there

21   objections to specific paragraphs that we should deal with

22   today and I should resolve so that where everyone is in

23   agreement with regard to the allegations in the presentence

24   report?

25           MR. GENSER:  Yes.  Thank your Honor.  We noted a few

I5BJNG1                          Sentence

in our sentencing submission, one of which your Honor just

referred to.  The other one was to Paragraph 48 of the PSR.  It

is referenced on Page 34 of our memorandum, Footnote 50, and it

is just related to the characterization of our position on the

payments to Terra Trading.

          THE INTERPRETER:  Counsel, the interpreter requests

counsel repeats the last sentence.

          MR. GENSER:  It relates to the characterization of the

defense position about the payments to Terra Trading, and so

that is noted in our submission.

          The report, the presentence report, states that

defense counsel contends that Terra Trading payments were not

monthly, but irregular since some of the payments were for

legitimate purposes.  What we noted in our submission is that

that's not correct.  Our position was that all of those

payments, from Mr. Ng's perspective, were legitimate and were

for the purpose of lobbying in and other legitimate activities

like brochures to build support for the center.  That was the

only other clarification that I don't think your Honor had

mentioned.

          In addition, there is one other, not a matter or

thing, a small inaccuracy on Page 41.  In the addendum to the

presentence report there is a suggestion I think towards the

bottom of the page that Cao Yanchia, otherwise known as Forest

Cao, was a witness who testified at Mr. Ng's trial.  As the

I5BJNG1                          Sentence

1    court knows, that is not accurate.

2              THE COURT:  Sorry.  Where exactly is that?

3              MR. GENSER:  It is the second to last sentence on Page

4    41.

5              THE COURT:  Who testified, yes.  So I would

6    characterize at least the last one as factual inaccuracy.  I

7    will either make a notation on the presentence report itself or

8    more likely indicate in the judgment that that is inaccurate.

9              With regard to the representations of defense counsel,

10   I think the record is clear what the defense position is.  I

11   won't make those changes to the presentence report, but I

12   recognize both of those changes, that the defense's position is

13   other than what is stated in the presentence report.  Again

14   those are arguments and not factual assertions, although

15   they're based on factual assertions.

16             Is there anything else?

17             MR. GENSER:  Just two other items, your Honor.

18             THE COURT:  Yes.

19             MR. GENSER:  One I am not sure if it is intended to be

20   a factual assertion or not.  It is part of the presentence

21   report recommendation on Page 45.  There is an assertion, I can

22   help your Honor find it, there is an assertion Mr. Ng

23   rationalized his conduct as somewhat commonplace at the UN.  I

24   am not sure if that was intended as a factual assertion or more

25   supposition or explanation of the Probation Office's reasoning.

I5BJNG1                          Sentence

1          To the extent it is suggested as a factual assertion,

2     we object to that.  We don't think there is any evidence that

3     Mr. Ng has ever taken the position that his conduct was bribery

4     or that he's rationalized it in a particular way.  We just note

5     that as an objection to the extent it is considered a factual

6     assertion.

7          THE COURT:  Okay.  Also just so the record is clear,

8     my understanding is that Mr. Ng did not have substantive

9     conversations in his presentence investigation interview

10    related to the charges in this case.

11         MR. GENSER:  That's correct, your Honor.  We were

12    present for that.

13         The other final point is more a matter of form.  While

14    we're very appreciative the Probation Office recognized a

15    downward variance is warranted, we do object to the sentencing

16    recommendation of 72 months as being too harsh in light of the

17    circumstances, and we'll discuss this.

18         THE COURT:  Yes, yes, and I recognize that, okay?

19    Thank you.  Ms. Echenberg, does the government have any

20    objections to the report?

21         MS. ECHENBERG:  Nothing more than the back-and-forth

22    that we already had with Probation which is noted in the

23    report.

24         THE COURT:  Thank you.  So as an initial matter, I

25    find there is nothing improper about the Probation Department

I5BJNG1                          Sentence

1    relying on the criminal complaint filed in this action, among

2    other things, as support for the offense conduct section.  I

3    presided over the trial in this matter and I am completely

4    familiar with the facts of this case as well as the exhibits

5    that were offered and admitted in evidence.

6           The issue is whether or not the information in the

7    presentence report is accurate, and so we've discussed those

8    that the defense believes are inaccurate and I'll make the

9    appropriate notations in the judgment to deal with that.

10          So with that in mind, I adopt the factual findings in

11   the report.  Obviously, I think I made this clear, but to the

12   extent I did not, to the extent the arguments made by the

13   defense implicate the facts, obviously you preserved your

14   arguments with regard to those in connection with your

15   sentencing submission.

16          Now, however, just to be clear, and I may discuss this

17   a little bit later on as I discuss some of the submissions that

18   I have received in this case for sentencing.  I adhere to my

19   findings with regard to the defendant's post-verdict motions

20   for acquittal and my ruling earlier this week with regard to

21   the defendant's motion for a new trial, although I recognize

22   that there are obviously going to be various issues or may be

23   various issues raised in this case on appeal, based upon my

24   presiding over Mr. Ng's trial and the jury reached a reasonable

25   and just verdict based upon the evidence presented.

1            Now, the presentence report will be made part of the

2      record in this matter and placed under seal.  If an appeal is

3      taken, counsel on the appeal may have access to the sealed

4      report without further application to me or one of my

5      colleagues.

6            Now, Mr. Ng, the law requires as part of determining

7      what an appropriate sentence is for you that I reference a set

8      of rules known as the sentencing guidelines.  The guidelines

9      are a set of rules that are published by the Sentencing

10     Commission, and they're designed to assist judges like myself

11     when we impose sentences on people convicted of crimes.

12            Now, although at a certain point in time the

13     guidelines were mandatory, which would have meant I would have

14     been required to follow them in almost every instance, however,

15     they're no longer binding.  I am still, however, required to

16     consider them as one factor, among others, in determining what

17     an appropriate sentence is for you.

18            In a sense, the guidelines are a starting point for my

19     making that determination.  So my first task is to determine

20     what the sentencing range is under the guidelines, but before I

21     outline my calculations and finalize them with regard to the

22     guideline range, I'd like to discuss the various objections

23     that have been made to the guideline calculation by the

24     defense.

25            Now, specifically by my estimation, the defense

I5BJNG1                        Sentence

1   objects in several ways to the calculation:

2          First, to the value that is placed on the bribes, the

3   enhancement for there being multiple bribes, the enhancement

4   because the offense involved an elected public official or any

5   public official in high level decision-making or a sensitive

6   position, and to the role adjustment.

7          Let me ask Mr. Genser, are those the specific

8   guideline calculation objections?  Have I left anything out is

9   my question?

10          MR. GENSER:  I think you have got them all, your

11   Honor.

12          THE COURT:  Let's discuss each in turn.

13          So, Mr. Genser, do you have anything to add to the

14   defense submission concerning the value of the bribes?

15          MR. GENSER:  No, your Honor.  We stated our position

16   fully in our papers.

17          THE COURT:  Does the government have anything to add

18   to its submission with regard to the value of the bribes?

19          MS. ECHENBERG:  Your Honor, I will just briefly

20   address it.

21          THE COURT:  Sure.

22          MS. ECHENBERG:  I think the important thing to keep in

23   mind with regard to the bribe amount is that there are a number

24   of different ways to calculate it in which the bribe amount is

25   easily above the 550,000.  So we have broken it into four

1    different categories, and I'll just briefly cover those

2    categories.

3            The first is the evidence of the payments from Mr. Ng

4    directly to Mr. Lorenzo through Terra Trading, and that total

5    is $350,000, and there was ample -- the number I have.  Do you

6    have a different number?

7            THE COURT:  No.  In Government Exhibit 1501 and 1502?

8            MS. ECHENBERG:  I am talking about the wires that

9    went -- there are other payments to Terra Trading, and that

10   might be why your Honor is focused on that makes the number

11   higher, but the wires that came directly from either Mr. Ng or

12   his company.  I can give you the dates on those, your Honor.

13   Those are on February 5th, 2013, May 19th, 2014, September

14   23rd, 2014, and February 18th, 2015.

15           THE COURT:  So you're excluding the March 24 and March

16   26th of 2014?

17           MS. ECHENBERG:  We are not, to be clear, we are not

18   excluding it.  Let me start with the payments to Mr. Lorenzo

19   that were purportedly for his work at --

20           THE COURT:  Yes.

21           MS. ECHENBERG:  Mr. Leung's testimony that at least

22   part of what he was paid for, was to promote the UN support for

23   the Macau Center.  We argue at least a portion of those

24   payments were bribe payments, but even if you were to set those

25   aside, there are three additional categories that we think are

I5BJNG1                          Sentence

1   very clearly bribe payments.

2           So you have the South South News payments, right, and

3   those came in a number of forms.  Those were paid to Mr. Leung

4   to pay his rent.  Those were paid to Mr. Leung through his

5   brothers and sisters, and in some in instances those were paid

6   through Terra Trading.  That is one category.

7           The second category is the agreement that Mr. Leung

8   and Mr. Ng make that Mr. Ng will pay even more money, $30,000 a

9   month on top of that South News salary for Mr. Leung's even

10  more specific focus on the UN center.  That is the categories I

11  am talking about now that is over $300,000 of additional

12  payments.  So you have that category.

13          There was ample evidence of Mr. Leung's testimony, the

14  sham contract, the timing of those payments which I can review,

15  but I think your Honor knows the facts well that that shows

16  were clearly bribe payments.  You have the no-show job, which

17  we think is another category we believe is clearly bribe

18  payments.  That is another $327,000.  Then you have the

19  $200,000 payment to --

20          THE COURT:  I am sorry.  Are you saying that Ms.

21  Cherian was paid $327,000?

22          MS. ECHENBERG:  Yes, and that is reflected on

23  Government Exhibit 1502.  Then we have $200,000 to the Ashe PGA

24  account.

25          THE COURT:  I thought the consulting payments were

I5BJNG1                    Sentence

1  32,500 or something like that.

2          MS. ECHENBERG:  Let me just look at the exhibit.

3          (Pause)

4          MS. ECHENBERG:  I apologize.  I was conflating two

5  things.  The $325,000 is Ms. Cherian's salary and the $200,000

6  payment to the Ashe PGA.  That together is well over the

7  550,000 number that we need to meet, again not even including

8  the South South News salary which we think at least in part

9  there was testimony that that was at least in part a bribe.

10  There was also testimony about another $20,000 cash payment.

11  So we think it is easily above the $550,000, and the Probation

12  Department agrees with that analysis.

13          THE COURT:  All right.  Mr. Genser, would you like to

14  respond in any way?

15          MR. GENSER:  Yes, your Honor.  We don't want to

16  relitigate the issues here.  Your Honor presided over the

17  trial.  Obviously, we have made arguments.  Arguments were made

18  at trial none of those payments have been established to be

19  bribes.

20          Just with respect to briefly the argument that the

21  Terra Trading contract was a sham contract, I would like to

22  remind the court that the testimony was that Leung forged the

23  name on the contract.  It was Mr. Ng's desire to have a

24  contract.  Leung forged a name on the contract because he

25  didn't want to be bound by it.  So the question it raises is if

1    Mr. Ng wanted to have a contract to make sure that Leung was

2    going to have something he would be bound by and have to honor,

3    why would he also want it to be a sham contract?

4         There was no testimony Mr. Ng knew the contract that

5    Mr. Leung thought it was false.  I also note there was evidence

6    at trial that the significant amount of those monies that went

7    to Terra Trading were used to pay for things like brochures and

8    marketing materials developed by Christian Batres to showcase

9    the idea of the Macau Conference Center.  That is all part of

10   why we argue that the evidence doesn't establish that Mr. Ng

11   intended those to be contract payments.

12        THE COURT:  Let me ask this, which relates to I guess

13   a little bit a question I had asked in my order.  As a legal

14   matter, does it, in other words, does the law require that

15   payments that are bribes or that are argued to be bribes, that

16   they go to pay someone's personal expenses or go to pay some,

17   for some other illicit activity, or is it really whether or not

18   the payments themselves are in relation for, in this case,

19   whether you say official acts or for actions taken the person,

20   the bribed recipient is my question.

21        I understand the factual argument and the argument

22   that with regard to the payments, the argument that Mr. Ng had

23   that perception and that is what it was going to be used for.

24   I am talking about as a legal matter.

25        Whoever wants to --

1          MR. GENSER:  I am happy for the government address it

2     and we are happy to respond.

3          MS. ECHENBERG:  Your Honor, I think we have addressed

4     this in our submission, but the critical issue is whether the

5     payments are designed to influence the official, and we think

6     the timing here makes that so clear.

7          For example, there is a $60,000 payment to Terra

8     Trading on February 5th, 2013, and then Leung springs into

9     action, begins his discussions about revising the UN document

10    to include the Sun Kian improved almost immediately after these

11    discussions, and there are multiple examples of that set forth

12    at trial.

13         THE COURT:  Mr. Genser.

14         MR. GENSER:  Yes, your Honor.  I think this point is

15    more applicable to the question of the $200,000 payment to the

16    PGA account, which I think the trial record is clear there is a

17    lot of evidence that the way that was presented to Mr. Ng at

18    least was it was to help pay for a UN sponsored concert where

19    the original backer had backed out of it, and Mr. Ashe was

20    requesting a donation so the concert could go forward.

21         The concert did go forward and Mr. Leung testified

22    that he attended the concert.  The precise question the court

23    is asking, can that legally, is it our position legally that

24    can't be a bribe because it went to a PGA account as opposed to

25    someone personal?

1          I think we do have an argument, and it is rooted in

2     the statutory language.  Section 666, which is the bribery

3     statute, applies to a bribe offered or paid to any person, and

4     the FCPA, that is Section 666 (a)(2), the FCPA applies only to

5     a bribe offered or paid to an official, foreign official,

6     political party official thereof, candidate, any person conduit

7     for the foregoing, and I can provide the statutory cite, the

8     FCPA statute, your Honor.

9          A donation to the office of the PGA is none of the

10    foregoing, and so we think basically under the plain language

11    of the statute, that payment can't qualify as a bribe.  It is

12    just to a recipient who is recognized as being capable of a

13    bribe recipient under the statute.

14         Our second argument is the one your Honor referenced

15    is that it goes to the intent.  To give a donation to a UN

16    office for a UN purpose speaks to the intent of Mr. Ng, which

17    was to do just what it was, just make a donation to help out

18    with the concert, and that was his intention.

19         THE COURT:  Okay.  All right.  Thank you.

20         Now, I find there is ample evidence in the record,

21    including the testimony of Mr. Leung, the bank and other

22    financial records and emails to support the bribe payments to

23    Ashe and Leung from defendant Ng and affiliated entities,

24    between 550,000 and $1.5 million, warranting the 14 level

25    increase.  Those payments are summarized, as I think the

I5BJNG1                          Sentence

1    government pointed out, in Government Exhibits 1501 and 1502.

2          Those bribes include, by way of example, the following

3    payments there are certain wire transfers and I think my

4    addition is a little different.  If you look at the items that

5    are denominated wires from either Mr. Ng or the Sun Kian Group,

6    I calculated it a little more than what the government came

7    out.  I calculated it as 370,000, but whether it is 370 or 350,

8    the records will bear that out.

9          In addition, those are the records I think that I had

10   for Mr. Ng, and again there is a reason why I became a lawyer

11   and not a scientist, I don't do math, but there is also a wire

12   from Sun Kian Group $90,000 February 18th of 2015.

13         Then there is also the purported consulting payments

14   to John Ashe's wife which the defense had calculated as

15   approximately $32,500.00.  I find there is more than ample

16   evidence presented during the trial that defendant Ng was aware

17   of these payments, including in documents and conversations,

18   and that these payments were not for consulting services

19   provided by Mr. Ashe's wife.

20         Now, with regard to the $200,000 payment to the bank

21   account or one of the bank accounts of John Ashe as President

22   of the General Assembly, or at least I think that may be the

23   notation, that may be the account name, I'm not entirely sure.

24   In any event, there was evidence in the record that Ashe

25   expressly said that he would not go to Macau and that Ng

1    requested that the trip be an official visit, and there was

2    some testimony I think during the trial what that meant.

3         In any event, Ashe traveled to Macau with his chief

4    along with other UN officials, including Leung, in March of

5    2015 and that was before the $200,000 was wired to one of

6    Ashe's accounts.

7         There is also evidence that this money was not only to

8    encourage or to get Mr. Ashe to travel to Macau for the

9    official visit, but was also used to compensate Ashe for

10   officials action, and again this is an inference from the

11   evidence that could be drawn from actions, official actions

12   already taken, like the official UN document and the revised UN

13   document, and to get Ashe to take other official actions on

14   behalf of Mr. Ng.

15        For example, on May 22nd, 2014, Leung sent an email to

16   Jeff Yin stating, "Jeff, see the bank account of the PGA

17   office.  Try to send the wire as soon as possible, and when you

18   send it, let me know so that I can advise him.  There are a lot

19   of things that we need to be done" -- excuse me -- "there are a

20   lot of things that need to be done.  He want to know when Ng

21   will come here.  I am working to get things we need."

22        Now, those things, and again either directly or

23   indirectly, the inference can be drawn that needed to be done

24   included, among other things, applying for Mr. Ashe to a

25   certain extent Mr. Leung to apply pressure or influence on

I5BJNG1                          Sentence

1   Yiping Zhou, and obtaining a pro bono agreement, among other

2   things.

3          On June 1st of 2014, the $200,000 was wired by South

4   South News to one of Mr. Ashe's PGA accounts.  The evidence

5   presented at trial was sufficient to establish certainly by a

6   preponderance that the $200,000 was, indeed, a bribe.

7          It is also a fair inference that after the October

8   2010 discussion that Leung testified he had with defendant Ng

9   about building a conference and meeting center in Macau and

10  need to obtain an official document from the UN, that Leung's

11  job certainly, in his mind -- and I think the facts bear this

12  out -- changed and he took actions in his capacity as an

13  ambassador to the UN to obtain the official documents because

14  he was being paid.

15         I think that is what he indicated.  Therefore, from

16  that point on, at least a portion or all of it, I don't know as

17  a legal matter, when there is a change here, whether or not

18  there is a division; in other words, whether you would only

19  include a portion of the 20,000 or all of the 20,000.

20         What is clear is that Mr. Leung didn't decline to do

21  this as part of his job, and by "job," I mean actually

22  exercising his powers as an ambassador to ensure that official

23  actions were taken in connection with that.  So I find

24  certainly at least a portion of that 20,000, if not all of it,

25  could be from that point on, that October 2010 time period, be

1    considered a bribe to be used to influence both ambassador and

2    PGA President Ashe as well as other members of the UN regarding

3    the Macau Center and including to obtain official documents and

4    other things in connection with that.

5            However, even using the late 2012 date that the

6    defense argues was the first point at which Mr. Ng became

7    interested in pursuing a UN conference center in Macau, the

8    $20,000 a month payments to Mr. Leung, at least by my

9    calculation, would amount to somewhere in excess of $400,000

10   from that point forward to the conclusion, to the arrest of

11   Mr. Ng.

12           So I find there is more than ample evidence that

13   proves by a preponderance of the evidence that the value of the

14   bribes was at least $550,000, but less than $1.5 million, okay?

15           Let's next discuss the enhancement for multiple

16   bribes.  Mr. Genser, do you have anything to add with regard to

17   the arguments that are made in your papers with regard to that

18   issue?

19           MR. GENSER:  We don't, your Honor.

20           THE COURT:  Does the government wish to be heard with

21   regard to that issue?

22           MS. ECHENBERG:  No, your Honor.

23           THE COURT:  All right.  I find that the evidence is

24   more than sufficient to establish by a preponderance of the

25   evidence that there was more than one bribe here.  As an

1    initial matter, and as the government points out, there were at

2    least the evidence shows two recipients of the bribes that the

3    jury could have found, Mr. Ashe and Mr. Leung.

4          That in and of itself means there are multiple bribe

5    payments and separate bribe payments.  I'm not necessarily, in

6    making my comments, although I don't know whether as a legal

7    matter the payments that went as consulting payments to

8    Ambassador Ashe's wife, I don't know as a legal matter that

9    would count as payments to Mr. Ashe or whether as a legal

10   matter you could still under the guidelines count that as a

11   separate bribe.

12         In any event, I think based upon the separate payments

13   to Mr. Ashe and Mr. Leung, I find that the enhancement is

14   appropriate.  In addition, there were multiple payments over

15   the years of the existence of the scheme, and they were done at

16   certain periods of time, and certain times they were done to,

17   in essence, spur activity, get activity done.

18         In fact, at least on one or more occasion the payments

19   were withheld so that to encourage, entice or what have you Mr.

20   Leung specifically to take action.  In addition, I think it is

21   a fair inference from the evidence that certain payments were

22   made to Mr. Ashe to actually get him to make those payments,

23   and there were exchanges of emails from Mr. Ashe indicating

24   prior conversations with the defendant concerning promises to

25   support the PGA.  I find that those payments also could be

1    considered separate payments.  So I think the enhancement is

2    entirely appropriate here.

3           Let's discuss the enhancement because the offense

4    involved an elected public official or any public official in

5    high, a high decision-making or sensitive position.  Mr.

6    Genser, do you have anything to add to your papers with regard

7    to that issue?

8           MR. GENSER:  We do not, your Honor.

9           THE COURT:  Does the government have anything to add?

10           MS. ECHENBERG:  No, your Honor.

11           THE COURT:  So with regard to here, too, with regard

12    to this enhancement, I find that the evidence was sufficient to

13    establish by a preponderance of the evidence that the offense

14    did involve an elected official, public official or public

15    official in a high decision-making, sensitive position.  As an

16    initial matter, the application notes to this section of the

17    guidelines containing the definition of public official states

18    that public official shall be construed broadly.

19           Second, according to the application notes, the

20    definition of public official includes, among other things, "an

21    individual who:  One, is in a position of public trust with

22    official responsibility for carrying out a government program

23    or policy; two, acts under color of law or official right; or,

24    three, participates so substantially in government operations

25    as to possess de facto authority to make governmental

1    officials.

2          Then it is in parens, "e.g., which may include a

3    leader of a state or local political party who acts in the

4    manner described in this subdivision."

5          I think that the description there both taken together

6    are illustrative and not necessarily exclusive, but I also

7    point to the Second Circuit's decision in United States versus

8    Bahel, B A H E L, which indicated that the UN is a public

9    international organization, and 2C1.1 specifically was meant to

10   cover employees of the United Nations.

11         In that case, the Second Circuit also stated, "it is

12   difficult to imagine how the defendant there, Bahel, could not

13   be considered a high-ranking UN official since he was chief of

14   the commodity procurement section within the United Nations

15   procurement division.  While this position may not have been

16   the same as that of a representative of a member state, in

17   other words, I would say an ambassador, it is far from being a

18   baggage porter to which Bahel now seeks to compare himself."

19         Now, the court goes on to state the guidelines

20   expressly refer to the sentencing of individuals at public

21   international organizations as appropriately considered in the

22   context of Part C.  Again it goes on to state that Bahel's

23   position at the UN could also be referenced with his title,

24   which it describes as closer to that of a foreign diplomat,

25   political party official or tribal leader, all of which the

1    court found in that case were covered expressly by the

2    guideline.

3           The court in Bahel also noted that Section 2C1.1 also

4    applies to offenses under the Foreign Corrupt Practices Act,

5    which generally involve the payment to public officials,

6    candidates or public office or agent or intermediator with an

7    intent to influence an official act or decision of a foreign

8    government or political party.

9           So based upon my review of 2C1.1, the holding in Bahel

10   and the application notes and commentary of that section of the

11   guidelines, both Ashe, as the elected president of the PGA and

12   ambassador, and Leung as an ambassador, both qualify as public

13   officials under 2C1.1, in that they are either elected public

14   officials or public officials in a high level decision-making

15   or sensitive position within the meaning of the guidelines.

16          Now let's now discuss the role enhancement for Mr. Ng

17   as an organizer or leader of the criminal activity that

18   involved five or more participants or was otherwise extensive.

19          Mr. Genser, do you have anything to add with regard to

20   that?

21          MR. GENSER:  No, your Honor.  We rely on our papers.

22          THE COURT:  Does the government have anything to add?

23          MS. ECHENBERG:  No, your Honor.

24          THE COURT:  Now, here I find that the evidence was

25   more than sufficient to establish by a preponderance of the

evidence that defendant Ng was an organizer or leader of

criminal activity that involved five or more participants or

was otherwise extensive.

First, as the government and Probation Department

state, there are at least five participants in the criminal

activity here.  You have the defendant, you have Ashe, Leung,

Yin and Forest Cao.

Now, I know the defense points out that Forest Cao and

Mr. Ng pursued, had different interests at a certain point in

time.  However, I believe that the government is correct, based

upon the testimony during the trial, that before Mr. Cao and

Mr. Ng had a falling out, the evidence supports a finding that

Mr. Cao started out working with Mr. Ng.  Therefore, Mr. Cao

was clearly a participant within a meaning of the guidelines.

In fact, I think, to the extent -- and I believe this

is the case -- he was or could be described as a

co-conspirator, who I would continue to be co-conspirator under

the law because I don't believe there was any evidence he, in

fact, withdrew from in a legal sense.  I believe the evidence

supports a finding that there are five or more participants.

However, in addition, I also find that the evidence supports

that Mr. Ng was a leader of criminal activity that was

otherwise extensive within the meaning of the guidelines.

The application notes for Section 3B1.2 provide that,

"in assessing whether an organization is otherwise extensive,

I5BJNG1                          Sentence

all persons involved during the course of the entire offense

are to be considered.  Thus, a fraud that involved only three

participants, but used the unknowing services of many

outsiders, could be considered extensive."

       Now, here the criminal activity involved the unknown

services of numerous outsiders.  By "outsiders," I mean -- and

the guidelines are consistent with this -- individuals who are

not participants, in other words, not considered participants

in the criminal activity.  So here those included employees of

South South News, people employed by the UN OSSC and the United

Nations itself who provided unknowing assistance to the

criminal activity related to the Macau, the development of the

Macau Conference Center.  Therefore, the application of a

four-level enhancement to the defendant's role as an

organizer-leader of criminal activity that involved five or

more participants or was otherwise extensive I find to be

warranted.  So in light of these findings, I reject the

guideline calculation contained on Page 39 of the defense

submission.

       Are there any other objections to the guideline

calculations contained in the presentence report, Mr. Genser?

       MR. GENSER:  No, your Honor.

       THE COURT:  From the government?

       MS. ECHENBERG:  No, your Honor.

       THE COURT:  All right.  So the defense objections are

1     obviously preserved with regard to any appeal in this matter.

2           Now I will down to the business of calculating Mr.

3     Ng's guideline range using the November 1st, 2016 guideline

4     manual.  I do so in the following manner.  The counts of

5     conviction are grouped together pursuant to 3D1.2 (d) since the

6     offense level is determined largely on the basis of the total

7     value of the funds laundering during the offense.

8           Pursuant to 3D1.3 (b), since the counts involved

9     offenses of the same general type to which different guidelines

10    apply, the offense guideline that produces the highest offense

11    level is applied.  The guideline for Counts 5 and 6 under

12    Section 2S1.1 is applied here and since they produce the

13    highest level.  The base offense level is determined with

14    reference to Section 2S1.1, which applies to a violation of

15    Title 18, United States Code, Section 1956 (h).

16          The offense level calculated from the underlying

17    offenses is utilized since the defendant committed the

18    underlying offenses, and the offense level for these offenses

19    can be determined, and this is again pursuant to 2S1.1(a)(1),

20    so the most appropriate guideline for the calculation for the

21    underlying offenses is 2C1.1.

22          Since Mr. Ng was not a public official pursuant to

23    2C1.1(a)(2), the base offense level is 12.  Since the offense

24    involved more than one bribe, as I mentioned before and as I

25    found, a two-level increase is warranted.  Since the bribes

1    totaled more than $550,000, but not more than $1.5 million, a

2    14 level increase is warranted.  Since the offense level

3    involved an elected public official or any public official in a

4    high level, decision-making or sensitive position, a four level

5    increase is also warranted.  Also since Mr. Ng was convicted

6    under 18, United States Code, Section 1956, an additional

7    two-level increase is warranted.

8            Now, finally, because, as I found Mr. Ng was an

9    organizer, leader of criminal activity that involved five or

10   more participants or was otherwise extensive, a four level

11   increase is warranted.  The resulting adjusted offense level is

12   38.  Mr. Ng's criminal history category is I, resulting in a

13   guideline range of 235 to 293 months imprisonment.

14           Now, understanding there have been various objections,

15   do the parties agree that based upon the findings that I've

16   made, that Mr. Ng's guideline range is 235 to 293 months in

17   prison.  The government?

18           MS. ECHENBERG:  Yes, your Honor.

19           THE COURT:  The defense?

20           MR. GENSER:  Yes, your Honor.

21           THE COURT:  Based upon the parties' agreement, in

22   other words, of course, with noting the objections that have

23   already been interposed and my independent evaluation of the

24   sentencing guidelines, I accept the guideline calculation in

25   the presentence report.  I find that Mr. Ng's offense level is

1   38, Criminal History Category I, and the recommended sentence;

2   therefore, is 235 to 293 months imprisonment.  The supervised

3   release range is one to three years on each count, and the fine

4   range is $25,000 to $1 million.

5          Now, with regard to the applicability of any

6   departures, I note that in the defense submission there is a

7   request for a departure based at least upon Mr. Ng's age,

8   infirmities and status as a deportable alien.

9          I am to consider whether his age and status as an

10  alien warrants a departure.  Understand the case law applicable

11  under the Second Circuit, a departure under these grounds is

12  not warranted under the facts and circumstances here.

13         In addition, I have also considered whether any other,

14  there are any other appropriate bases for departure from the

15  advisory range within the guideline system, and while

16  recognizing I do have the authority to depart, I do not find

17  any grounds warranting a departure under the guidelines.

18         However, I find and I recognize that I do have the

19  authority to consider Mr. Ng's age, infirmities, status as a

20  deportable alien and any other factors contained in 18 United

21  States Code Section 3553 (a) as a basis for a variance here.

22         Mr. Genser, in your submission on behalf of Mr. Ng,

23  you requested a sentence of time-served.  The Probation

24  Department has indicated that a variance is appropriate here.

25  However, the Probation Department recommends a sentence of 72

1    months imprisonment.  The government also states a variance is

2    appropriate, in other words, but they recommend the sentence be

3    something that is greater than 72 months imprisonment.

4            Now, I do agree with the parties and the Probation

5    Department that a variance appears to be warranted in this

6    case, not the least of which I think it is fair to say that a

7    235 month sentence would effectively be the rest of Mr. Ng's

8    life, being that he is currently 69 years' old.

9            Now, the issue in the end is how much of a variance is

10   appropriate here.  Before I hear the parties, let's talk about

11   the questions that I raised in my May 9th order.  Now, I think

12   with regard to Item 1, I have the answer from the government

13   from their perspective concerning the pages of the presentence

14   report related to the donation issue, for lack of a better

15   term.  Mr. Genser, were there any pages of that report that the

16   defense feels I should reference, understanding that the

17   defense may take the argument that I shouldn't consider the

18   report in any way, shape or form?

19           MR. GENSER:  Yes, your Honor.  Thank you.

20           That is correct, our position is that the court should

21   afford that report no weight, in that it is not relevant to the

22   sentencing here.  If your Honor is going to consider it, we

23   would suggest that your Honor also consider the minority

24   report, noting that the Senate report that your Honor asked

25   about was a majority report.  It is a partisan report.

1            There was a minority report in Volume V, at Page 5273.

2     We'll note that on occasion it refers to Mr. Ng as Mr. Wu,

3     which is the Mandarin pronunciation, but the minority report

4     notes at that page that the evidence before the committee is

5     insufficient to establish the precise source of funds for many

6     of the 220,000 contributions related to the person who was

7     accused of making those contributions and that the committee

8     was also unable to obtain specific evidence on the role that

9     Mr. Ng may have played in particular contribution decisions.

10            THE COURT:  Okay.  I'll note for the record that what

11     I did was I went to the report on the internet, I searched for

12     S E N G throughout the report, both the majority report and the

13     minority report, and so I am going to consider both here.  I

14     think for me the critical issue is I guess in part I think

15     there is sufficient information in there that by a

16     preponderance of the evidence that I can appropriately consider

17     that.

18            It is not so much the precise nature of the funds,

19     whether it was 200,000 or a hundred thousand, you know, or the

20     like.  The fact that at the time that this all occurred, it

21     garnered substantial amount of press coverage and substantial

22     amount of activity by officials of this country, and while the

23     facts may be, the facts may be what they are, the issue in part

24     I'm considering is the impact the knowledge of that would have

25     on the defendant and his activities as it relates to the future

1       and specifically with regard to any issues relating to

2       deterrence, specific deterrence is here.

3               So I understand the arguments being made.  Let me ask

4       you, with regard to Item 2, the government directly in their

5       opposition memorandum in connection with the pretrial motions

6       in limine, I have reviewed that already.  The question I had,

7       was there any other information related to the representative

8       that the government would point me to?

9               I think based upon the email I received, I think the

10      answer to that is no, but let me hear from the government with

11      regard to that.

12              MS. ECHENBERG:  That's right, your Honor, there is not

13      another specific document.  To the extent we end up arguing

14      more about the facts, we may want to respond with additional

15      information, but there is nothing we would point the court to

16      at this time.

17              THE COURT:  Mr. Genser.

18              MR. GENSER:  Yes, your Honor.  We have one document

19      that we would like to submit if the court is going to consider

20      that uncharged conduct or that set of conduct.  It is something

21      that was produced to us in discovery by the government.  It has

22      a Bates stamp on it 000302503.  It is not redacted right now,

23      and I know we haven't been identifying some of the participants

24      in this set of conduct, so perhaps after this hearing we can

25      deal with whether it gets filed in a redacted form.

1            It is some emails that we think made clear that the

2       defendant was a benefactor to the family of the representative

3       who were in dire financial straights following the

4       representative's conviction and that he was basically helping

5       them financially so they could stay in their home.  That is

6       reflected in this set of emails.

7            THE COURT:  All right.  If there is a request to

8       redact the specific names that are mentioned in there -- why

9       don't you hand it up.  Had you provided a copy of that to the

10      government?

11           MR. GENSER:  Yes.

12           MS. ECHENBERG:  Yes.

13           THE COURT:  I ask the parties to meet-and-confer with

14      regard to that.  With regard to this issue, it is a work in

15      progress.  I haven't made an ultimate decision.  I am likely to

16      reference it, the issues.

17           I think in looking at this, it does appear that

18      certain of the names, I would agree, probably should be

19      redacted.  I will leave it to the parties to meet-and-confer

20      about that and present me with a redacted form, and then I'll

21      rule on whether or not I believe the redactions are appropriate

22      because I do believe it should be made part of the record.

23           Now, with regard to Item 3, I will ask the parties in

24      your comments to me to address those.  Similarly, I ask with

25      regard to Item 4 for you to do the same.

1           With regard to Item 10, I don't know whether there was

2     evidence -- excuse me -- Item 5 -- I don't know whether there

3     was evidence in the record concerning the reference in

4     Paragraph 58 of the presentence report concerning the travel

5     expenses or not, but let me first hear from the government

6     whether or not there was evidence in the record as to who or

7     what entity paid for those travel expenses.

8           MS. ECHENBERG:  It is our understanding that the trip

9     that Ambassador Ashe took was the trip he took to Macau, was

10    tacked onto a trip that was already planned to a different

11    location, to India, and that either the United Nations or the

12    Indian government was paying for that trip and he just rerouted

13    his return through Hong Kong.

14          Once he got to Hong Kong with his delegation, we

15    understand Mr. Ng paid for a ferry to Macau and for the

16    accommodations in Macau.  I believe that was reflected in Mr.

17    Leung's testimony, possibly in Frances Fuller's testimony to

18    some extent, and certainly reflected in the 3500 material as

19    well.

20          THE COURT:  Mr. Genser, is that something you take

21    issue with, what the government has just said?

22          MR. GENSER:  Not as far as it goes.  Obviously to

23    legal conclusions and inferences to be drawn, we preserve all

24    of our objections.

25          THE COURT:  Of course.  Okay.

1    With regard to Item 6 in my order, I asked the parties

2    to address that in their comments to me.  I believe that Item 7

3    has been addressed by the government, providing me Government

4    Exhibit 968.  Does the defense agree that was the brochure or

5    something?  I may be inaccurately describing it, but it is

6    Government Exhibit 968?

7         MR. GENSER:  We don't have an issue with that, your

8    Honor.

9         THE COURT:  Now, with regard to Item 8, I believe that

10   the proposed consent preliminary order of forfeiture money

11   judgment resolves that, those questions that I had there.  Do

12   the parties agree with regard to that?

13        MS. ECHENBERG:  Yes, your Honor.

14        MR. GENSER:  Yes, your Honor.

15        THE COURT:  Okay.  Now I'll hear from the parties.

16        Does the government wish to be heard to sentencing?

17        MS. ECHENBERG:  We do, your Honor.

18        THE COURT:  All right.  Go ahead.

19        MS. ECHENBERG:  After presiding over this month-long

20   trial, your Honor, and as you demonstrated during the

21   proceedings thus far, your Honor is extremely familiar with the

22   facts of this case.

23        This defendant is an exceptionally wealthy and

24   powerful man, and he committed an extensive and a serious

25   crime.  For many years the defendant made hundreds of thousands

of dollars of payments, and your Honor has already ruled that
that number is well above $550,000.  He made those payments to
two United Nations ambassadors.  He made those payments in ways
that were hard to trace, and he made those payments in an
effort to obtain the United Nations approval for a permanent
United Nations center in Macau that would be the anchor for the
defendant's own massive real estate development project.

        What the defendant did, he essentially bought the
ability to act as a member state within the United Nations,
something that is not available on the open market and it is
precisely the type of unfair advantage that the bribery and the
FCPA statutes are designed to prevent.

        It is also the type of inequality that is in conflict
with the basic principles of the United Nations.  The defendant
engaged in conduct that not only gave him a significant unfair
advantage, it caused serious reputational harm and serious
financial harm to the United Nations, and that is not in
dispute.

        Your Honor has already ruled in a prior sentencing in
this case that those consequences came to the United Nations,
and the defense has acknowledged in connection with the
restitution order, there were hundreds of thousands of dollars
at least of damage to the United States nations.  It is the
government's position that there should be a significant
incarceratory sentence, as least as high as the probation

1   officer has argued, 17 months.

2              THE COURT:  72?

3              MS. ECHENBERG:  72 months.

4              MR. GENSER:  We'll take the 17.

5              THE COURT:  I figured, yes.

6              MS. ECHENBERG:  My words cut off, your Honor, but 72

7   months is absolutely what I was referring to.

8              I want to address, and I don't know if I will have the

9   opportunity to respond when the defense finishes, so I'll

10  address now a few of the arguments, I expect, unless your Honor

11  is going to give us the opportunity?

12             THE COURT:  No.  I think I would allow within reason

13  the ability for the parties to respond to each other's

14  arguments.  It is up to you, Ms. Echenberg.  You can address

15  them, and if there are issues, points you want to make later

16  on, you can do that.

17             MS. ECHENBERG:  I'll address them briefly.

18             First, this is not an aberration for this defendant.

19  I think your Honor honed in on exactly what is important about

20  the conduct that was addressed in the 1990's in the Senate

21  report.  The defendant was approached by investigators.  The

22  conduct was widely reported.  The defendant was on notice since

23  the 1990's that engaging in financial transactions,

24  particularly transactions that go through other people and that

25  are shaded in different ways, is conduct that is criminal in

I5BJNG1                        Sentence

1    the United States, it is conduct that is closely watched in the

2    United States.  The defendant was on notice about that behavior

3    decades ago.

4            With regard to the conduct that involves the

5    representative, first I would note the email that has been

6    passed up deals with a time period when that individual was no

7    longer in public office, so we don't think that email is

8    particularly relevant, but that conduct occurred after the

9    conduct in the 1990's and the conduct occurred in a secretive

10   manner.  In the 3500 material -- and there would have been

11   testimony had this been admitted at trial -- the defendant at

12   least in one instance directed his assistant to provide money

13   to the representative in a bag under a table in ways that

14   demonstrate that the defendant understood that this was

15   improper conduct.

16           THE COURT:  Just so that I understand --

17           MS. ECHENBERG:  Yes.

18           THE COURT:  -- your proffer of that evidence, was that

19   prior to -- that was while the representative was still a

20   representative.  Is that correct?

21           MS. ECHENBERG:  That's correct, your Honor.  The

22   payments were designed to have access to other public

23   officials.

24           THE COURT:  Okay.

25           MS. ECHENBERG:  So this conduct is not an aberration,

I5BJNG1                         Sentence

and for that reason it should be significantly punished.  The

defense spends a significant part of their submission focusing

on the defendant's philanthropic efforts.

          First, as we noted in our submission, while it is an

impressive amount of money, no doubt, the defendant himself has

acknowledged that he is a billionaire, he is worth $1.8

billion, so the amount that he gave to philanthropic causes is

not extraordinary in the way that the guidelines references

should be a reason for a significant reduction in sentence, the

kind that the defense is asking for.

          In any event, the government is not arguing for a

guideline sentence here, nor is Probation.  The government and

Probation are taking account of those philanthropic efforts and

the defendant's health conditions, which is another issue that

the defense addresses.  Those health conditions are not

extraordinary, either.  They are health conditions that the

Bureau of Prisons twice, in letters that we have submitted to

your Honor, says that they can accommodate and they accommodate

for many other prisoners.

          The defense also addresses business and family

consequences, and while those consequences may be unfortunate

for the defendant and his family, those are risks and the

expected consequence of engaging in white-collar crime such as

this.  Again, I would come back to the fact that the defendant

himself says he is worth $1.8 billion.  So this is not a

situation where anyone is going to be in poverty or in any sort
of dire straights.

          None of those reasons gives the court a reason to do
anything but give the defendant a significant incarceratory
sentence here.  I would note one other thing.  It is not
something the defense has argued yet, but I expect they may
argue.  The defendant's home detention during these proceedings
should not be a factor in your Honor's consideration of the
sentence.  The home detention did what it was designed to do.
It kept the defendant returning to court for these proceedings
leading up to sentencing just like any other defendant who is
on bail.

          I would refer the court to the PSR that describes the
defendant's home detention.  He lives in a 24-hour concierge
building.  He lives in an apartment that is, in fact, two
apartments, combining a very large apartment, four bedrooms,
three and a half bathrooms, a large living room, a large
kitchen, which is well furnished and well maintained.  That is
Probation's description.

          He has a cook, a masseuse that constantly come by that
visit him from all over the world, and that increases with
frequency for holidays and special occasions and he is frankly
living a lavish lifestyle.  He himself told the Probation
Department that his monthly expenses are over $20,000 a month.
So there is nothing about what the defendant has experienced

1   thus far that is punishing or is anything like an incarceratory

2   sentence.

3           We have submitted the orders for forfeiture and

4   restitution, and I would also just reiterate our argument in

5   the sentencing submission for a significant fine of $2 million.

6           THE COURT:  All right.  Mr. Genser, do you wish to be

7   heard.

8           MR. GENSER:  Yes, your Honor.

9           THE COURT:  Okay.

10          MR. GENSER:  I have comments that will address the

11  3553 sentencing factors, but before I address that, your Honor,

12  I wanted to briefly respond on the sort of I guess we call it

13  the three uncharged conduct areas without using the names of

14  the other folks that are involved.

15          So our argument, your Honor, is that those should be

16  afforded no weight.  They're not relevant to sentencing.

17  They're certainly not aggravating factors, not just because it

18  is hearsay and hasn't been presented in any kind of

19  comprehensive way, but because there is no allegation and

20  certainly no proof that any of that relates to bribery.

21          With respect to the Senate report, what I wanted to

22  say about that, your Honor, is the business associate involved

23  in that case was a business associate of Mr. Ng's.  They were

24  looking to set up a business.  Mr. Ng was looking to set up

25  business relationships in the U.S. and between the U.S. and

1   China, and he was in business with that person, and that is why

2   there were funds wired into accounts of trading companies.

3   That individual invited Mr. Ng to come to political events, and

4   Mr. Ng took advantage of those invitations.

5          There is nothing, certainly nothing except a few

6   instances of what I would qualify as double hearsay to suggest

7   that Mr. Ng had any knowledge of any campaign finance

8   violations, and what I'll note is that the individual involved

9   pleaded guilty, and it is our understanding he was actually a

10  cooperating witness and received a 5K letter from the

11  government.

12         I know this just from Google searching, and I have an

13  article from a CNN news article, November 1st, 1999 I can hand

14  up to your Honor that reports that.

15         THE COURT:  That is okay.  I am familiar with it,

16  which will be no surprise to my law clerk, I had Googled that

17  to determine what sentence that individual had received and

18  became aware of it at least in the media he was reported as

19  being a cooperator.  Let me ask this, though.

20         I understand the hearsay argument, but I can rely on

21  hearsay?

22         THE INTERPRETER:  The interpreter cannot hear your

23  microphone.

24         THE COURT:  Okay.  Sorry.

25         Let me just start again.  With regard to hearsay, I

I5BJNG1                         Sentence

1    can rely on hearsay and, in fact, I dare say many of the --

2    well, I think all of the -- well, many of the exhibits to the

3    defense submission are, in fact, hearsay, some double hearsay.

4    So just to get the legal point out of the way, I can rely on

5    hearsay evidence in connection with sentencing.

6              Do you agree with that?

7              MR. GENSER:  I do, your Honor.  I am talking the

8    weight should the court ascribe to it.  As additional

9    background, there was no allegation of any bribery at all in

10   any aspect of that Senate report.  It was a campaign violation

11   issue with respect to the business associate.

12             I'll also note, your Honor, that Mr. Ng was never

13   charged with anything related to that.  I know that there was

14   something in the PSR that suggested that witnesses had fled,

15   and Mr. Ng didn't give an interview when he was approached in

16   China relating to that, but I will proffer to the court that

17   Mr. Ng recalls actually meeting with investigators in I believe

18   1997 in his attorney's office in China, Mr. Valente, and

19   answering questions about it, and to his understanding, it was

20   cleared up.

21             So our position is if this has any relevance, its

22   relevance to knowledge that there are campaign finance laws

23   that prohibit foreign donations, it doesn't speak to what the

24   allegation in this case is, which is bribery.  Our position is

25   Mr. Ng wasn't involved, didn't have any knowledge of campaign

1      violations in that case, and it shouldn't be given any weight

2      with respect to this sentencing.

3              With respect to the representative, I think we have

4      made our point there.  There is again no allegation of bribery.

5      There is an allegation of some gifts and support to the

6      representative, as the government just said, for access, to

7      meet other people.  The fact is that Mr. Ng became a benefactor

8      to the representative's family.  That representative was

9      convicted, he was in terrible financial situation, and he

10     essentially implored Mr. Ng to help him support his family

11     after-the-fact, and Mr. Ng did.  He took the representative's

12     children as his own godchildren, and that is reflected in the

13     letter.

14              So the government says that's somehow an aggravating

15     factor, the court can further look at it as further evidence of

16     Mr. Ng's general approach being charitable and trying to help

17     out friends in need.

18              With respect to the UN official and the $25,000, that

19     was a loan.  The person requested a loan to help out with

20     graduate school.  Mr. Ng agreed to give the loan.  The 3500

21     material reflects that.  There was expectation it would be

22     repaid within four or five years, and there is really nothing

23     more to that.  I don't think any of that should be given any

24     weight or factor in.  None of it speaks to a pattern or a

25     history of attempting to bribe.  It is quite the opposite.  If

1    anything, it is a pattern or history of thinking that certainly

2    it is okay to have relationships with people, certainly okay to

3    help people financially and try and network and establish

4    himself and get contacts through those relationships.

5           So with that, I would like to now address the

6    sentencing factors and I have comments that may take a little

7    while.  So we thank the court in advance for your patience.

8           THE COURT:  Why don't we take a brief break since in

9    your comments you have indicated will take a little bit of

10   time, and the government I may have response to that.  Let's

11   take a break now and come back in about five minutes.  It is

12   about noon, so we'll come back somewhere between 12:05 and

13   12:10.  Say 12:10 because there are a lot of folks here.

14          (Recess)

15          THE COURT:  You may be seated.  Mr. Genser, you may

16   proceed.

17          MR. GENSER:  Thank you, your Honor.

18          Your Honor, Mr. Ng is 69-year-old man with some

19   significant health issues.  He has a history of strokes,

20   coronary artery disease, diabetes, high blood pressure,

21   hypertension, gall bladder issues.  In 10 years, he will be 80

22   years' old, just about 80 years' old, and he looks all right

23   today, but we don't know what kind of shape he will be in in 10

24   years, and I think it is fair to say that these next 10 years

25   will be perhaps the only 10 good years that he has left.

1          The government is asking the court to sentence him to

2     in excess of six years in jail, an amount that could well turn

3     out to be a life sentence for him depending on what that is.

4     His native language is Cantonese.  He doesn't speak any

5     English.  He can't stomach western food.  When he was

6     incarcerated at the beginning of this case for 30 days in a

7     maximum security facility or equivalent, he lost 15 pounds.

8          Jail is going to be very, very hard on him if your

9     Honor sentences him to jail because of his age, his health

10    issues, his language, he will be isolated and vulnerable in a

11    way that most defendants are not.

12         He has, as I mentioned, already spent 30 days in jail

13    and he spent the last two and a half years locked in an

14    apartment.  It's a perfectly fine apartment, but he has been

15    locked in a apartment.  He has not had his freedom for the past

16    two and a half years.  He indicated a waiver of deportation,

17    meaning upon release from jail, as soon as the ICE agency gets

18    around to it, he will immediately go into their custody.  As

19    soon as they get around to it, he will be deported to China.

20    He will be barred from reentry for 10 years.  He will never

21    come back to the United States, your Honor.

22         We ask the court to impose a sentence of time-served,

23    let him go back him to his friends and family, many of whom

24    have flown here from China and are in the courtroom here today

25    to be with him and show their support for him and for the

court.

As the court knows, Section 3553 sets forth various
factors that the court shall consider in determining a
particular sentence, and the overall goal is to impose a
sentence that is sufficient but not greater than necessary to
comply with the purposes in Paragraph 2 of that section.  What
I would like to do is just highlight some of the factors.  I
won't address all of them.  We addressed them in our papers,
and I know your Honor has read them carefully.

First I would like to talk about the factors in
Subsection (A)(1), that direct the court to consider the nature
and circumstance of the offense and the history and
characteristics of the defendant.

I am going to talk about the second part of that and
come back to the first part of that later.  I'll talk about his
history because his personal background and his history has
shaped him into the person he is today.

Notwithstanding the conduct in this case for which the
jury convicted him, the person that he is is a person who has
demonstrated extraordinary kindness and compassion to everyone
around him at every stage in his life.  That is informed by the
history and that is what shaped him.

Mr. Ng has led a remarkable life.  He is probably one
of the most remarkable people I've ever met and perhaps that
many of us in this room has ever met or will ever meet.  He

1  came from literally nothing.  He has lived through unimaginable

2  poverty.  He has lived through hardship and tragedy, and he has

3  persevered to become an extraordinarily successful businessman

4  almost through sheer force of his will.

5          His life story is just simply amazing.  He grew up in

6  extreme poverty in a turbulent, violent time in the aftermath

7  of the Communist revolution in China.  His family was run out

8  of his village and exiled by the Communist Party.  They

9  wandered while he was a young boy from village to village,

10  essentially close to starvation, scrounging for food.

11          His mother was so desperate that when he was a young

12  boy, she tried to drown herself and the surviving children that

13  she had because several of his siblings he never met, they

14  perished before he was born, she tried to commit suicide by

15  drowning them all in a pond, but they were saved by villagers.

16  He survived.  He persevered.  He quit school after elementary

17  school to go to work to help his family.

18          He did various odd jobs.  He wound up working

19  construction, building what we could call them houses but

20  they're more like brick shacks by hand.  He made the equivalent

21  of $3.50 a week, most of which he gave to his mother to help

22  support the family.  He was so poor when he got married, he was

23  wearing borrowed clothes.  He didn't have a pair of shoes.  He

24  built his own house out of abandon bricks.  The house didn't

25  have door or window, didn't have running water, didn't have

1    electricity.

2            In 1978, but he was determined to improve his

3    situation.  In 1978, he moved to Macau with the equivalent of

4    $13.00 in his pocket, and he would turn that $13.00 into a

5    billion dollar real estate business.  He started out by selling

6    excess inventory on the streets of Macau, inventory of clothes

7    and fabrics.  He was just one of thousands of migrants trying

8    to scrape a living together.

9            He rented a factory.  He lived and slept there with

10   his wife and his children.  He hired people from his village

11   who had also emigrated to Macau to help sell clothes on the

12   street.  His strength and his enterprising spirit allowed him

13   to become a successful entrepreneur.  He became a successful

14   fabric seller in Macau, did well for a while, but that business

15   went under in the wake of Tiananmen Square protest and impact

16   that had on economy.  That also depressed real estate values in

17   Macau, he had the foresight and gusto to invest in real estate

18   when values were very depressed, and he did that and that paid

19   off.

20           In 1993, based on some reforms, real estate values

21   soared and he became wealthy for the first time, really

22   wealthy.  That success was short-lived.  As the court knows

23   from our submissions, in 1998 his second son, his beloved

24   second son, Bin Yan, who was 19 years' old and studying in

25   Canada, was killed in a tragic car accident.  That was

1   devastating to Mr. Ng and his family, obviously.

2          In the years after his son's death, Mr. Ng suffered

3   two strokes, was hospitalized.  His business suffered as well

4   and there was the SARS epidemic in 2003, which again depressed

5   the real estate market, and Mr. Ng's real estate business which

6   was overextended collapsed.  He essentially lost everything,

7   was heavily in debt, chased by creditors, but he survived,

8   persevered again, never gave up.

9          He consoled his wife, supported his family, he worked

10  hard to keep current on his loan payments, and he doubled-down

11  on real estate, taking another chance that it would come back,

12  and it paid off again and he became wealthy again.

13         I dwell on this because it has shaped him.  These

14  experiences have shaped him.  They made him who he is.  He was

15  born a peasant.  He is a pesant in his heart.  He is intimately

16  familiar with poverty, with pain and suffering, and he has

17  never forgotten where he came from, and that's why, as you see

18  in the letters of support and the people who are here who have

19  written to the court, he has lived a life of such extraordinary

20  compassion and generosity, and that goes to his good character,

21  which is obviously a factor that is highly relevant under the

22  3553 analysis under Subsection (a)(1).

23         I can talk about the tens of millions of dollars he

24  has given to charities, to build roads, hospitals, schools to

25  support youth in Macau.  His assistance to the elderly in the

1    Village that he came from, that is laid out in our papers and

2    it speaks to his generous spirit.

3          We're not talking just about the amount; we are

4    talking about the quality of his charity, and that is what I

5    think is more revealing than the amount of money he has given.

6    What I would like to focus on is the way in which Mr. Ng has

7    given of himself, the way he has cared for and treated his

8    family and his employees, his fellow villagers and his

9    countrymen over the years whether he was poor or rich.  That's

10   why we're asking for a variance, and there are lots of cases

11   that we cite in our papers that support a variance for all of

12   those grounds.

13         I want to touch on a few.  There are a lots of

14   examples, countless examples of his generosity and compassion

15   and good character in our papers.  Just a few examples.

16   Exhibit 45 to our submission is a letter from Mr. Ng's cousin,

17   Wu Yan, I hope I am pronouncing that correctly, he was Mr. Ng's

18   younger cousin, and he describes an incident when they were

19   working in construction when Mr. Ng, before he became

20   successful in Macau, Mr. Ng came across an old man in a nearby

21   village basically senile, living in the street all alone, the

22   kind of person who everyday scores of other people would just

23   walk by, but Mr. Ng didn't.  He took pity on him and he took

24   him to get some clothes, took him to get some food.  He found

25   him a place to live.  He followed up with him.  He tried to get

I5BJNG1                        Sentence

him into a nursing home.  He just did that out of the kindness

of his heart before he was a wealthy man.

         Wu Yan describes how in the 1970's in their village

Mr. Ng did a number of things on his own, had an enterprising

spirit to try to improve things for the villagers.  He had the

idea to go and get young saplings and transplant them into the

village so there would be trees growing there, and he organized

the villagers to do that.  He organized them to rebuild a

bridge that was falling apart and was unsafe for children and

older people to cross the river.  He organized the villagers to

dig fresh water wells, and they worked together digging the

wells with their bare hands.

         He tells how when he was working in the factory,

living in the factory in Macau selling clothes, Mr. Ng would

let Mr. Yo Yan sleep on the only comforable table in the

factory while Mr. Ng himself slept on the floor because he was

his younger cousin and how when he was sick, Mr. Ng would brew

Chinese herbal medicine for him and stay with him and care for

him.  That is his nature.  That is who he is.  These are a few

of examples of scores of examples in the letters.

         There are so many stories of Mr. Ng not only giving

financial help to his employees and villagers when they were

sick and faced debilitating medical bills, but it is not just

the financial help, but it is his readiness to help even the

lowliest employee and the way he would get personally involved

1   to help arrange for medical care.  It wasn't somebody who was

2   just writing a check.

3          Exhibit 2, your Honor, in our submission is a letter

4   from Chin Chin Yo, a fellow from Mr. Ng's home village of Ju

5   Jang in China, and he described in how 2007 Mr. Ng learned how

6   he suffered a stroke and helped him find treatment in various

7   hospitals, followed up and got physical therapy so he could

8   recover.  He helped him make appointments and, yes, he paid for

9   his medical care, gave him thousands of dollars to help him pay

10  for his medical care.  He also came to visit for him and check

11  up on him and he encouraged him to carry on.

12         Exhibit 12 is another example of that from Young Hu,

13  another fellow villager.  He helped her and followed up with

14  her when her husband was sick with cancer.  In 2007 when she

15  fell ill, he followed up again.  Just a few examples, your

16  Honor.

17         He has been good to his employees.  He is a kind and

18  compassionate boss.  He cares about his employees, and that

19  comes through.  Exhibit 15, your Honor, Liang Segwan wrote a

20  letter in support.  She worked in Mr. Ng's company doing HR for

21  23 years.  When she was 37 years' old, she became pregnant and

22  she had a high-risk pregnancy.  Mr. Ng approved her to have

23  extra leave.  He gave her extra months' pay that wasn't

24  required by law.  He followed up with her to make sure she was

25  getting enough nutrition for herself and the baby, and not only

1   that, he held her job open for a year until she was ready to

2   come back and when she was healthy and ready to come back to

3   work.

4           More recently with South South News, after Mr. Ng was

5   incarcerated in this case, he continued to fund the operations

6   of South South News so that the employees weren't abruptly cut

7   off and finding themselves suddenly unemployed.

8           There is another story, example from the letters I

9   think is worth dwelling on for a moment.  Exhibit 35 from the

10  gentleman named Wu San Hu who worked with Mr. Ng's masseuse in

11  China.  He tells a story, an incident of whether Mr. Ng was in

12  a restaurant and private room in a meeting and Mr. Wu San who

13  fell ill, who fainted and he went down on the floor and called

14  out for help.  The waiter came over, immediately ran into the

15  private room to get Mr. Ng.

16          Mr. Ng was in the middle of a business meeting comes

17  running out, goes right to him, gives him his medicine, Chinese

18  herbal medicine that he keeps for his own heart issues,

19  administers those, rubbing his forehead, directing people to

20  call for an ambulance, staying with him and caring for him.  Of

21  course, he offered to pay for his medical costs.  He recovered,

22  thankfully.

23          But this one is interesting in particular because it

24  is very similar to what the court learned about last year at

25  the post-conviction bail hearing when the court learned Mr. Ng

I5BJNG1                        Sentence

 1  came to the aid of John Prindle, one of the guards from

 2  Guidepost who was guarding Mr. Ng when he was in the gym in his

 3  building and Mr. Prindle suffered a heart attack.  Mr. Ng

 4  immediately came to his aid, and he did the same thing, he

 5  stayed with him, he tried to let the guards know that he had

 6  medicine in his apartment that could help.  He tried to help

 7  with CPR.  This wasn't even a thought of trying to take

 8  advantage of the situation to escape.  This was his instinct

 9  because that is who he is.

10        It is not something that he did for show or for

11  recognition or for some advantage.  He did it because that was

12  the right thing to do and he cares about the people around him.

13  He never even mentioned that incident to his lawyers.  We

14  learned about it, as your Honor knows, from the Guidepost cards

15  long after the fact.

16        That just speaks to his character.  Whatever led to

17  the conviction, he is a good and caring man.  He also has a

18  quality of forgiveness when he is wronged, and I think I'll

19  dwell on that briefly.  Exhibit 8, shows his big heartedness

20  and his readiness to forgive and forget.  There is a letter

21  from a gentleman named Quan Mu Sen, who describes an incident

22  when Mr. Ng was defrauded in a business deal out of two million

23  I guess Chinese dollars, Chinese currency, and the perpetrator

24  was arrested and the money was repaid.  Mr. Ng, out of pity,

25  even though he was the victim of the fraud, wrote a letter

1   seeking leniency to the court just out of pity for the man.

2           Exhibit 43 is a letter from Wu Quan Non, nephew of

3   Mr. Ng.  He tells of a story that is also revealing of his

4   character and his spirit when Mr. Ng was back in the Village

5   and he was giving always to help elderly in the Village.  He

6   came upon a man 80 years' old, and the man started crying and

7   asked him why, and he said well, I am the one of the people who

8   denounced your family as landlords when you were a little boy,

9   and now you're giving me money to help support me in my old

10  age, I feel so guilty about this.  Mr. Ng's response was don't

11  worry about it, brother, it is all past.  That speaks to the

12  quality of the person he is, your Honor.

13          With respect to his giving and comparable giving, the

14  government suggested that in light of his net assets, it

15  shouldn't count, but I think it should count, your Honor.  I

16  don't think we measure charity based on your illiquid assets

17  and real estate investments that may or may not be realized

18  over time.  We measure it by the quality of the giving.  I

19  think that is what we are talking about here.

20          One example, Exhibit 18, was a letter from a gentleman

21  named Sang Hung Mu of the Maging Foundation, and he tells about

22  in 2005 Mr. Ng heard about Maging Foundation, and he didn't

23  just write a check to go support the foundation, it supports

24  education and development of underprivileged children in rural

25  parts of China, the particular Uyghur Tribe, which is not a

1    particularly popular group of people in China.

2              Mr. Ng and his wife traveled to this remote area to

3    see the conditions that the children lived in, to visit them,

4    to pay home visits, and Mr. Ng began by sponsoring five ethnic

5    Uyghur girls, maybe it is Uyghur, I may be mispronouncing it,

6    and he met those girls, he stayed in touch with them over the

7    years.  He expanded to his foundation to include thousands and

8    thousands, support for thousands and thousands of

9    underprivileged children in rural China.

10             In 2014, he traveled to a ceremony when those five

11   girls that he essentially adopted as his godchildren graduated

12   junior high school to be with them, and there is a photograph

13   of that ceremony in Exhibit 54 of our submission.  You can see

14   in the photograph the bond that he has with them and the

15   emotion that is between them at that ceremony.  That is what

16   goes to his spirit and his kindness, your Honor.

17             He is also an extraordinarily dedicated family man,

18   and I take issue with the government's argument that there is

19   nothing extraordinary or warranting a variance based on his

20   dedication to his family.  There are lots of cases that we

21   cited that show that that is warranted.

22             This is obviously a characteristic that is relevant in

23   the 3553 analysis.  Your Honor has received letters from

24   Mr. Ng's wife of 40 years, his son Alex, his daughter Janet,

25   his daughter-in-law.  They're all here in the courtroom today,

1    your Honor.  You have received letters from his older brothers

2    and sister, and what comes through from these letters is the

3    love, the reverence, the feeling of closeness that Mr. Ng's

4    family has, the way that he is involved as a compassionate

5    father.  He is still close with his older siblings.  He pays

6    for all their medical care.

7            He is the patriarch of a large extended family and he

8    doesn't just provide financial support, he provides guidance,

9    he provides encouragement and emotional support for scores of

10   family members.  I just want to talk about a few examples, your

11   Honor.  There is a lot of discussion of that in the papers.

12           I want to highlight two things.  A letter from

13   Mr. Ng's goddaughter, Doris, who is here in the court today.

14   Her mother was a nanny for Mr. Ng's children for many years,

15   and Mr. Ng adopted her as a goddaughter.  She described how

16   when she was younger, she had some health problems and she was

17   essentially ostracized in school.  She was very depressed as a

18   younger child and she was doing poorly in school.

19           Mr. Ng spent time with her and he has talked to her

20   and he encouraged her and he taught her how to persevere and

21   overcome challenges, and she describes in her letter how she

22   went on to graduate actually in the top of her class in her

23   high school class of 200 students and get a scholarship to the

24   University of Macau, and she credits Mr. Ng.

25           Exhibit 30 is a letter from Crystal's son, Mr. Ng's

1    daughter-in-law, and she tells an extraordinary story.  When

2    she first got married to Alex, Mr. Ng's son, and moved to

3    Macau, she was out of place and she wasn't happy living in

4    Macau.  Mr. Ng traveled 5,000 miles to the other side of China

5    to speak with her parents about the situation, and he convinced

6    her parents to actually uproot themselves and come to Macau to

7    be with her so that the family would be happy and she would be

8    happy, and they did that, they came.

9         It was okay.  She still wasn't making an adjustment

10   well, so Mr. Ng flew all the way back to her village, 5,000

11   miles, and spoke to aunts and uncles and cousins and friends,

12   and he convinced them all to come to Macau and he made

13   arrangements for housing.  He helped them with jobs, helped

14   them with school so that his family and his extended family

15   would have a happy life.  That is dedication to a family.  That

16   is a family man, your Honor.

17        I have to say I've seen this myself.  I have been to

18   the apartment many times over the past year.  We had lunch

19   there many times.  Mr. Ng greets you with a smile no matter how

20   dire the situation or how bad the news.  He is always humble.

21   He serves the food himself.  He goes around, and his biggest

22   concern is to make sure everyone has enough on their plate, and

23   when his grandchildren are allowed to come visit, he is so

24   happy to see them.  You can see it on his face.  He is really

25   involved with his family.  They're very close.

I5BJNG1                          Sentence

1          Another sentencing factor that I think your Honor can
2    consider is the impact of a jail sentence on Mr. Ng's
3    employees.  Because Mr. Ng is not only the beloved patriarch of
4    a large extended family, but he is essential to the continued
5    success of a business that employs several hundred people in
6    China.  They need his involvement and his support.  It is
7    difficult to quantify it, but imprisonment would result in
8    significant collateral damage to numerous innocent employees.

9          Over the past couple of years while he has been on
10   home detention, she has been constantly on the phone trying to
11   kind of stabilize things in the business in the wake of this
12   case and the charges.  The letters that have been submitted to
13   the court talk about the enormous debt and enormous pressure
14   the business is under.  The letters make clear Mr. Ng's
15   children are working to try to help run the business, but they
16   need his help to manage things.

17         If he is incarcerated, he won't be able to be on the
18   phone as he has been, and it is reasonable to expect that the
19   business is going to suffer and may not survive.  Certainly
20   many of his projects employing hundreds of people in China may
21   not be able to go forward.  We have cited a number of cases
22   that recognize that that is a valid consideration and a grounds
23   for a variance.

24         So I would now like to turn to the first part of 3553
25   (a)(1), the nature and circumstances of the offense.  I am not

I5BJNG1                          Sentence

1    going to relitigate the facts.  Your Honor has presided over

2    the trial and made rulings related to factual issues, but I

3    have one observation that I think is important to highlight and

4    I think that it is important.

5           There is absolutely no dispute in the case that the

6    evidence shows that certainly at least part of Mr. Ng's

7    motivation, and we would argue the majority of his motivation,

8    if not all of it, was to do something really good in this case,

9    that he genuinely believed in the Macau Conference Center

10   project, it would be a great thing for Macau, China and South

11   South Nations.

12          I would draw the court's attention to the fact on Page

13   18 of the government's submission, the government agrees that

14   to be sure, there is evidence, "there is evidence indicating

15   that, as the defense states, he may also have had patriotic

16   and/or philanthropic motivations for pursuing the project."

17          Of course, the government also argues that Mr. Ng had

18   a profit motive and it wasn't all pretty and they've made that

19   argument.  We responded to it in our papers.  I won't belabor

20   that point, but I think we should pause for a moment and

21   recognize that even that concession is remarkable coming from

22   the government in a criminal case.

23          I am not familiar with another criminal case where at

24   least part of the motive was patriotic and philanthropic, to do

25   something potentially wonderful on a grand scale that could

1   potentially help millions of people in the developed world, and

2   that is relevant and there is lots of evidence in the case of

3   Mr. Ng speaking about it, speaking about his vision, sharing

4   his vision and trying to present his vision on the merits to

5   different constituents.

6          Another factor that I want to address is obviously a

7   set of factors in Paragraph (a)(2) of 3553, and that is the

8   seriousness of the offense, promotion of respect for the law

9   and just punishment.  These are very weighty and important

10  factors and we do not trivialize them.  The government won its

11  conviction here, and this is going to the need for the sentence

12  to reflect promotion of respect for the law.

13         The government has won a conviction here.  They laid

14  out the alleged misconduct at the trial.  The United Nations

15  has issued task force reports.  There was corruption at the

16  United Nations going that started before anything involved

17  Mr. Ng and went far beyond anything involving Mr. Ng, and the

18  government's prosecution has had salutary impact on that.  The

19  United Nations has investigated it.  Presumably they're

20  updating their rules and regulations to tighten up the rules

21  around support and financial support and donations, and the

22  government has struck a real blow against corruption at the

23  United Nations in this case.

24         In terms of reflecting the seriousness of the offense

25  and just punishment, we do ask the court to consider that by

I5BJNG1                         Sentence

1    virtue of Mr. Ng's status as a deportable alien, he will suffer

2    in jail far more than a typical defendant in a similar case.

3    In all likelihood -- and we have had a series of dueling

4    letters with the government, but I don't think there is a real

5    debate at least in all likelihood, he is not going to be

6    sentenced to a camp if he is sentenced to a jail.

7         He will be in a low security prison, which sounds a

8    lot better than it is, and even more likely he will be sent to

9    a private contract facility which the government uses for

10   deportable aliens, where the conditions are going to be crowded

11   and far more dangerous than they would be if he were sent to a

12   camp.

13        The likelihood of his being assaulted is going to be

14   much higher there.  He will be particularly vulnerable because

15   of his age, his health and very significantly, your Honor, his

16   inability to speak or understand English.  Even the Probation

17   Department notes that as a result of that, Mr. Ng is likely to

18   experience a sense of isolation in prison.  He won't be

19   eligible for early release.  That's 10 percent of any sentence

20   up to six months.

21        And then he's already consented to deportation.  The

22   impact of that is that he won't be brought before an

23   immigration judge, but he will be sent, if he is sent to jail

24   at the close of the sentence, he will be sent immediately to

25   ICE custody and he could languish there for an indeterminate

I5BJNG1                         Sentence

1   amount of time before he is deported back to China.  I don't

2   know how long that could last.  It could be a matter of days,

3   it could be weeks and months.

4             THE COURT:  Mr. Genser, I am not sure if I understood

5   exactly.  Are you saying that because of Mr. Ng's status, he is

6   not eligible to get credit for good behavior, is that what

7   you're saying?

8             MR. GENSER:  It is early release.

9             THE COURT:  To a halfway house?

10            MR. GENSER:  Halfway house, and that credit which is

11  10 percent up to six months, that is laid out in Mr. Ziegler's

12  affidavit.

13            THE COURT:  All right.

14            MR. GENSER:  Considering what is sufficient but no

15  greater than necessary to constitute a just punishment, we do

16  ask the court to consider the punishment that Mr. Ng has

17  already suffered in this case.  He has spent a month in what

18  was effectively a maximum security prison, I am not sure if it

19  was MDC or MCC or some combination thereof.  He was in jail for

20  30 days.  He didn't do well there, your Honor.  The letters

21  describe the impact on him.  He was gaunt, he lost 15 pounds,

22  doesn't eat western food.

23            Then for the past two and a half, almost three years,

24  his life has been in limbo.  He has exercised his right to go

25  to trial, but the impact of this case is that his life has been

I5BJNG1                           Sentence

in limbo.  He has been in an apartment.  Certainly that is

better than jail, but he hasn't been a free man.  He has again

under lock and key in an apartment for two and a half, almost

three years already.  That is something.  It is not nothing.

        He has had to live with the anxiety and expense of

this case.  His reputation has been shredded.  His business has

been knocked back on its heels.  He is struggling to survive.

He will be a felon for the rest of his life.  He is going to be

paying a fine, we're fairly confident it will be at least a

million dollars.  He has agreed not to contest forfeiture of

over $300,000.  He has agreed to settle forfeiture allegations

for one and a half million dollars, your Honor.  He has paid

millions of dollars in attorney's fees.

        The question is how much punishment is enough?  How

much more punishment is needed in this case?  That brings us to

Section 3553 (a)(2)(B) and (C), the need for deterrence and

protection of the public.

        These factors, your Honor, I note that Mr. Ng has

agreed to waive deportation proceedings and consent to

deportation.  He will never come back to America again.  He

will never do business here again.  There is literally no

chance that he will be a recidivist.  Deterrence has been

accomplished, both specific and general.  There is no danger of

further crimes by Mr. Ng.  The case has received wide

publicity.  The government has emphatically made its point.

1          To wind up, the punishment Mr. Ng has suffered

2     already, as I mentioned, the question is what further

3     punishment is really necessary to do justice in this case.  If

4     the court believes that the offense conduct itself, the

5     mitigating facts and with the mitigating motives that I've

6     described warrants a sentence greater than time-served, our

7     question is isn't that outweighed by Mr. Ng's history and good

8     character, the life of compassion he led, the kindness of

9     generosity he has shown throughout his life, his close family

10    ties, the support that he has given to his employees, the need

11    that his business has for him, and the way that he'll uniquely

12    suffer if he is sent to jail?

13         So for all of those reasons, your Honor, we do ask for

14    leniency and we do ask for a sentence of time-served.  If your

15    Honor cannot see to give him a sentence of time-served, we ask

16    for a very low sentence in jail, to let Mr. Ng go back to his

17    family and go back to China where he belongs.  Thank you.

18         THE COURT:  Mr. Genser, actually I have one question

19    to follow up on your comments.

20         I've sentenced two other defendants in this case, both

21    of whom were sentenced to jail time, both of whom I think would

22    be characterized as less involved in the underlying criminal

23    conduct.  So why in terms of sentencing disparities, why would

24    it be appropriate or what is your argument with why it would be

25    appropriate here that Mr. Ng receive a non-incarceratory

1    sentence in light of that?

2            MR. GENSER:  Your Honor, obviously the need to avoid

3    disparate sentences is one of the sentencing factors, and we

4    are certainly aware that Mr. Yin was sentenced to seven months

5    and Sheri Yan was sentenced to 20 months, and we understand

6    that the court would view Mr. Ng as more culpable.

7            Our argument, your Honor, there are differences that

8    are personal to Mr. Ng that relate to the factors that I've

9    laid out, your Honor.  They're not almost 70 years' old.  For

10   example, Mr. Yin is a young man.  He speaks English, a U.S.

11   Citizen.  What he did was essentially separate and apart with

12   anything to do with Mr. Ng with his tax evasion.

13           Ordinarily absent all the extraordinary circumstances

14   we have outlined, a sentence greater than those sentences might

15   well be warranted, your Honor, but our argument is that these

16   factors are unique to Mr. Ng.  Neither of those people have had

17   the history, lived the life that he has lived, have shown the

18   compassion and had support of family and charities, the

19   kindness to employees, supporting the businesses, have so many

20   people depending on them.  Neither of them would face the same

21   issues that Mr. Ng would face in jail, and I will note that

22   with respect to Ms. Yan, she was convicted on her own plea for

23   $800,000 of bribes for specific quid pro quo with no

24   philanthropic or patriotic motive at all.  She got 20 months,

25   your Honor.

1           I understand the government will argue that the crime

2     here, the alleged crime for which he was convicted is more

3     extensive and that his involvement was more serious, but it is

4     different.  It was for fundamentally a philanthropic endeavor,

5     and the dollars involved are not so different, your Honor.

6           Mr. Ng, certainly I know at that sentencing your Honor

7     commented there was evidence Ms. Yan, there was evidence she

8     was a good person.  If there is evidence she was a good person,

9     your Honor, there is a mountain of evidence that speaks to the

10    quality of the person Mr. Ng is.  Those factors I think would

11    compensate for what we would agree would be circumstances where

12    you would ordinarily look to a sentence that would be somewhat

13    greater than the sentence of those two individuals.

14           THE COURT:  Thank you.

15           Ms. Echenberg, do you have anything to add?

16           MS. ECHENBERG:  Yes, your Honor.

17           THE COURT:  Yes.

18           MS. ECHENBERG:  The defendant before you today, your

19    Honor, is an exceptionally rich and powerful man.  He has used

20    that wealth to pay multiple people over time, not just the

21    conduct in this case, the other conduct that we have previously

22    discussed.  He has used that wealth to direct it at people who

23    had the ability to influence his business.  That is exactly

24    what he did here.

25           What he was motivated by was not fundamentally a

I5BJNG1                          Sentence

philanthropic endeavor.  The evidence at trial was clear.  Your

Honor may remember the video that we played a substantial

portion of during closing argument.  It talked about a

development that had luxury hotels, luxury stores, a helipad.

We are talking about a massive real estate development that the

defendant and his family stood to gain tremendously from.  So

that is the motivation here, and that should not be lost.

        The conduct here is incredibly serious.  The United

Nations is one of the premier international institutions.  The

defendant corrupted it.  That's what he was convicted of doing.

He led that crime.

        The defense has talked about the conditions in jail

and the designations.  We addressed that in our papers.  We

disagree, we believe, based on our conversations with the

Bureau of Prisons and what is represented in their materials,

that the defendant will have the ability and he has excellent

representation to advocate for him to be in the most

appropriate location for him.

        I want to bring the court back to the guidelines here,

which is 235 to 293 months.  Your Honor has ruled that is the

appropriate guidelines, and the Probation Department

specifically took account of all of the factors that the

defense has talked about, the defendant's history, his

philanthropic efforts, and with all of that in mind, the

Probation Department recommends a significant sentence of 72

1    months.

2              A time-served sentence here would be a terrible

3    message to send for a case like this.  As your Honor knows,

4    international bribery in FCPA cases are incredibly hard to

5    investigate and to prosecute.  The records are abroad, the

6    individuals are abroad.  These cases are so difficult to

7    investigate that the Department of Justice has instituted a

8    special policy for corporations that cooperate in these

9    investigations, to give them significant leniency.  That is how

10   difficult these cases are.

11             So people are watching this case.  People are watching

12   what your Honor is going to do, and general deterrence is

13   critical here.  The defense has asserted our prosecution struck

14   a real blow to corruption at the United Nations.  There have

15   been changes.  The United Nations certainly took account of our

16   case and the press has also been following the case.

17             A significant sentence for this rich and powerful

18   defendant, that is what is going to strike a real blow to

19   corruption not only at the United Nations but in our major

20   institutions and organizations frankly across the world.  Your

21   Honor, it is critical that this defendant receive a significant

22   incarceratory sentence.

23             THE COURT:  Thank you.

24             MR. GENSER:  Your Honor, if I may respond just

25   briefly?

1          THE COURT:  Yes, briefly.

2          MR. GENSER:  Your Honor, there are a number of cases

3   involving allegations of serious conduct that we have cited in

4   our papers where, based on factors similar to what are present

5   here, courts have varied very, very substantially from very

6   high guideline ranges, and it is not necessary, your Honor, to

7   put Mr. Ng in a United States jail, at taxpayer expense, a

8   69-year-old man who speaks no English, for the world to get the

9   message the government wants to send.

10          There are very, very unique factors here that would

11   justify the sentence we are asking for and would in no way

12   dilute the need to promote respect for the law and general

13   deterrence.  That is all we have to say.  The last thing is

14   Mr. Ng obviously will have something to say to address the

15   court, and we ask your Honor to consider that as well.

16          THE COURT:  Absolutely.

17          MS. ECHENBERG:  I forgot to answer one of your Honor's

18   questions about ICE custody.

19          THE COURT:  Yes.

20          MS. ECHENBERG:  If this is to factor in your decision

21   at all, we understand from a representation from ICE that if

22   your Honor signs the removal order, the defendant at the

23   conclusion of any sentence would spend up to two weeks in

24   custody.  It will be very brief, and then he would be deported.

25          THE COURT:  Thank you.  Mr. Ng, do you wish to be

I5BJNG1                          Sentence

1     heard?

2                  THE DEFENDANT:  Yes.

3                  THE COURT:  I don't know the interpreter's name.  Are

4     you going to be doing the translation?

5                  THE INTERPRETER:  Yes, your Honor.

6                  THE COURT:  You may proceed.

7                  THE DEFENDANT:  Your Honor, I would like to first

8     thank the court for allowing me to stay out on bail during this

9     case.  Even though the past few years have been very difficult

10    for me, it is better than being in jail.  At the same time, I

11    would like to thank the court and the government for allowing

12    my family and friends to come visit.

13                 Your Honor, I want to apologize to the court for all

14    the trouble my actions have caused.  I alone am responsible for

15    my actions.  Looking back, I am filled with regret how I went

16    to about trying to support the Macau Conference Center.

17                 Your Honor, I really believed that the Macau

18    Conference Center it would do great things for Macau in the

19    South South Nations.  Your Honor, I would ask for your mercy

20    not only for myself, but more importantly, for my family.

21                 My wife is this year over 66 years' old.  Since my

22    youngest son passed away when he was 19 years' old, my wife's

23    health has been deteriorating.  In the past 40 years, even

24    though I was penniless, my wife never abandoned me through

25    thick and thin and kept me a companion.  Now that she is in her

1   twilight years, she needs my companionship.

2          I very much hope I can continue my responsibilities to

3   her as a husband.  It seems that since I have been arrested,

4   especially after my conviction, my creditors have been pushing

5   me for repayment.  Interest has been piling up, the bank has

6   closed my account, the previous business partners are shunning

7   us.  The business that I built over in the past decades is

8   facing great difficulties.

9          Since I have been allowed to stay out on bail, every

10  day I spent a few hours every day to try to stabilize the

11  business.  If I go to jail, my children will bear my

12  responsibilities.  Even though they are very talented, but

13  since I have been sheltered, I have always sheltered them in

14  the -- I have been protecting them and not to let them handle

15  these responsibilities, I am very afraid that they will not be

16  able to handle it and to bear these responsibilities, that the

17  business would not survive.

18         There are many employees who have been working for me

19  and my company for decades because they trust me.  I am also

20  very afraid for the future, your Honor.  I have eight

21  granddaughters and grandsons.  I miss them dearly.  I very much

22  want to go back to them, to greet them, to tell them stories,

23  to play with them.  I am very sorry for the pain and suffering

24  I have caused my family, my friends and employees.  I swear

25  that I will never repeat my mistakes again.

1         Your Honor, I sincerely wish that you could show

2   leniency on me.  My only wish is that I can return to my family

3   as soon as possible instead of having my family to bring me

4   home in ashes.

5         Thank you, your Honor.  Thank everybody.

6         THE COURT:  All right.  Thank you, Mr. Ng.

7         Let me ask, is there any reason why sentence should

8   not be imposed at this time?

9         MS. ECHENBERG:  No, your Honor.

10         MR. GENSER:  No, your Honor.

11         THE COURT:  As I've stated, and the parties agree,

12   obviously with conditions with the objections have been made,

13   the defendant's guideline range is 235 to 293 months

14   imprisonment.  Under the Supreme Court's decision in Booker and

15   its progeny, the guideline is just one factor that I must

16   consider in deciding an appropriate sentence here.

17         I am also required to consider the other factors set

18   forth in 18, United States Code, Section 3553 (a), and the

19   parties have addressed those issues both in their submissions

20   as well as here today in court.  So I am going to consider all

21   of those factors, and those factors include, but are not

22   limited to, the nature and circumstances of the offense and the

23   personal history and characteristics of the defendant since

24   each defendant must be considered individually.

25         I am also required to consider the need for the

sentence imposed to reflect the seriousness of the offense,

promote respect for the law, provide just punishment for the

offense, and afford adequate deterrence to criminal conduct and

avoid unwarranted sentencing disparities among other things.

First I am going to address Mr. Ng's history and

characteristics, and obviously there has been a lot said today

here as well as a lot of information contained in the

submission.  Now, I accept Mr. Ng overcame poverty and at time

there was depressive conduct directed towards himself and his

family by the government in China at the time when he was a

child.

I also note that there were various deprivations his

family faced, and some could be characterized as serious

deprivations while he was growing up that left his family in at

times despair and resulted also in poor health to his family

members as well as the death of some of his siblings who were

older than Mr. Ng.  So I will consider that background and

Mr. Ng's apparent resiliency and the success he has had as a

person as part of my determination of what an appropriate

sentence is for Mr. Ng.

Now there are numerous letters from friends and family

members, former employees, current employees, business

associates, just to name a few categories that paint a picture

of Mr. Ng as a devoted family man as well as someone who is

philanthropic and also personally generous with his time as

1    well as his finances.  Those are documented in letter, and Mr.

2    Genser pointed out some specific examples here today in court.

3    Those letters describe various, as I mentioned, various acts of

4    kindness for individuals who are in need of medical care, to

5    citizens and folks from Mr. Ng's home town, to the citizens of

6    Macau, including children as well as the elderly.

7           So I'll consider the views that have been expressed by

8    your friends and family members and others in connection with

9    your sentence, concerning your character which I, outside of

10   the presentation of evidence here in court, I have to rely on

11   the parties to provide that information.  As I indicated, I'll

12   consider that information in connection with determining what

13   an appropriate sentence is here today.

14          Now, as I mentioned, in the letters they do mention

15   the charitable contributions you have made over the years, and

16   I will consider your philanthropic over the years and again not

17   necessarily as a percentage of your overall wealth, although I

18   do acknowledge the point the government makes with regard to

19   your overall wealth and percent as being a percentage of your

20   donations more generally really to reflect on your overall

21   character as a person.

22          However, to the extent that certain of the letters

23   written on your behalf take issue with your prosecution as

24   misguided or driven by some political motivations or some other

25   rationale other than enforcement of the law, just to be clear,

1    I reject those views.  As I mentioned earlier in my comments, I

2    believe the jury's verdict was reasonable, a reasonable and

3    just outcome based on the evidence that was presented and

4    admitted, and I have ruled as such in connection with the

5    post-trial motions.

6            In addition, I am going to consider what was presented

7    to me pretrial as 404 (b) evidence related to the political

8    contributions and your interactions with the representative as

9    well as the loan.  However, the $25,000 loan I think is less of

10   an issue for me.  So to that extent, I give that really a very

11   little weight, if not no weight.

12           I find that the evidence presented with regard to that

13   and the proffers made with regard to that of your past actions,

14   I think that they're sufficient for me to consider here in

15   terms of sentences and in terms of your sentence and what an

16   appropriate sentence is.

17           In particular, as I mentioned earlier, with regard to

18   the issue of specific deterrence as well as general deterrence,

19   although I believe the allegations related to the campaign

20   contributions, and again I understand the back-and-forth that

21   is contained in the reports concerning what access the members

22   of Congress had to witnesses and other things in connection

23   with that.  It is not so much the specifics again, as I

24   mentioned earlier, of the actions and the amounts involved as

25   it is a reflection and is probative on your apparent

1   willingness to utilize your money at various stages, putting

2   aside what the underlying motivation is, but utilize your money

3   to accomplish ends that you believed, you believed in; in other

4   words, that included skating close to the line between legal

5   and illegal conduct.

6        Certainly the awareness that that sort of activity, in

7   other words, by that sort of activity, I mean utilizing your

8   money in that way, and I'll use this term, probably not the

9   correct term, really throwing your money around in that way

10  caused the authorities to focus on those activities.

11       And yet despite those indications, more so with the

12  contributions, you chose to proceed the way you did in this

13  matter, by again utilizing money and paying folks, ambassadors

14  and the president of the PGA rather than seeking some other

15  alternative means of pressing something, and I accept your

16  counsel's representation that is something that you believed in

17  and that is being the Macau Conference Center.  The ends don't

18  justify the means, and that is what the law is designed to make

19  sure that folks don't follow that adage in their conduct.

20       So I'll consider that information that was

21  characterized as 404 (b) in that context, as sort of a

22  reflection on what your state of mind was and also in an effort

23  to make a determination, which is not an easy one to do

24  concerning recidivism, provide punishment as well as the

25  deterrent effect in connection with sentencing.

1              Now, I also accept that a sentence of incarceration

2     will have an impact on your family and your business.  However,

3     in just about every sentence that I impose and quite frankly

4     that are imposed by my colleagues here in this courthouse,

5     there is an impact on family members.  It is tragic and

6     oftentimes obviously innocent bystanders to the conduct of a

7     loved one.  So that impact I think, although I will consider, I

8     think it is of substantially less weight than some of the other

9     things I've mentioned here in part because unlike -- and again

10    it is admirable that you were able to work and develop the

11    business that you have, but many of the defendants I have who

12    come before me have nothing or really next to nothing.

13             They may have young children, as young as two or even

14    younger, and the consequence of them going to jail is that

15    their loved ones really have to be able to find a way to

16    literally put food on the table, and it is a tragic consequence

17    of criminal conduct that there are others involved here.  As I

18    mentioned, I will consider it, although I don't give it as much

19    weight as I do some of the other factors I will also.

20             I will also take into effect again, as I mentioned

21    earlier, your age and the various infirmities you have in

22    making a determination of what an appropriate sentence is.  As

23    I noted earlier, obviously, a sentence that is certainly in the

24    guideline range and actually even far below that would

25    effectively mean that you would spend the rest of your life in

1      prison.

2            I also recognize that you won't receive the same level

3      of health care as you would if you were not incarcerated, but

4      again I don't give that a substantial amount of weight.  I

5      recognize the conditions that you've had and the history, but I

6      don't ascribe to the views that Mr Ziegler has said.  I do

7      believe that the Bureau of Prisons will be able to address your

8      health issues during any period of incarceration.

9            Now, with regard to Mr. Ziegler's views about your

10     designation to a low security versus a minimum security

11     facility, I find that certain of his assertions in his

12     affidavit certainly have some basis in history that Mr Ziegler

13     has indicated that he has.  However, I would describe that more

14     as what is really is a term, for lack of a better one, I will

15     say knowledgeable speculation.

16           Until the Bureau of Prisons does their calculation,

17     while we can assume where Mr. Ng might fall in terms of a

18     designation, there are a whole number of other factors that it

19     didn't appear as if Mr Ziegler had considered, including the

20     possibility of a recommendation by me concerning a facility as

21     well as other things that the Bureau of Prisons takes into

22     account with regard to what level of security a defendant

23     should be placed.

24           I find that the conditions of confinement are not so

25     onerous in a low security facility to warrant substantial

1    weight here, although I do recognize that they will be more

2    onerous and in particular in Mr. Ng's case because of the fact

3    he does not speak English.  However, I do note, and

4    historically there have been many defendants who are considered

5    white collar defendants who are in low security facilities and

6    come close in connection with the sentencing, I came across an

7    individual who was sentenced recently by one of my colleagues

8    in the Eastern District, and my understanding, again from press

9    reports, is that he is currently housed in a low security

10   facility, and that is Mr. Scorelli, who was recently convicted

11   in the Eastern District.  I believe he is housed in -- I don't

12   remember, it might be Fort Dix, but I am not entirely sure.

13          So there is precedent for white collar defendants to

14   be in a low security facility.  I will consider it, but as I

15   mentioned, I won't give it a substantial amount of weight in

16   what an appropriate sentence is for you.

17          Next I'll turn to the circumstances and nature of the

18   events.  There is no question that you have been convicted of

19   serious offenses.  Your activities were not isolated incident,

20   but instead occurred over a number of years.  In other words,

21   you had more than ample opportunity to rethink your approach as

22   to how you would accomplish your end goal of having a

23   conference center built in Macau.

24          However, at least based upon the evidence presented at

25   trial, not only did you not change your mind with regard to how

1   you'd proceed, the evidence would suggest that you became, as

2   that possibility became closer, you became more aggressive as

3   time went on, pushing either directly or indirectly through

4   Jeff Yin or Leung and Ashe to complete certain tasks and take

5   certain actions in their capacity as ambassadors in Mr. Yin's

6   case as one of your employees, with regard to Mr. Ashe as

7   President of the PGA, as well as the actions and influence the

8   actions of others within the United Nations.  As I mentioned,

9   in your actions here, you were undaunted in particular by the

10  investigation that ensued in connection with the donations

11  issue that I mentioned earlier.

12         Now, the offense here also was not something that

13  could be described as sophisticated.  It at times involved

14  shell companies, what was portrayed, and the jury found there

15  was sufficient evidence, fake contracts and the funneling of

16  money internationally, all of which, whether intentionally and

17  I think the evidence, it could be inferred that that was

18  intentional, but even not, it certainly made the detection of

19  that activity and the bribery scheme more difficult.

20         The parties have also mentioned, and as I mentioned in

21  a prior sentence in this case, there is no question that there

22  has been damage to the United Nations as an institution.

23  Obviously, there is restitution here and I credit the defendant

24  for agreeing to that restitution amount to the United Nations,

25  but that is a matter of the money that was expended.

1          The UN's reputation was certainly tarnished by your

2     actions and the actions of others, in particular Mr. Ashe and

3     Mr. Leung, but by rigging the system, you deprived the members

4     of the United Nations of considering the merits or folly of

5     having a permanent conference center in Macau or anywhere else

6     in the world.  In other words, it rigged the system in such a

7     way that it didn't allow for legitimate debate concerning what

8     the pros and cons would be for having such a conference center

9     at all or for the location of such a conference center.

10         In addition, although the likelihood of recidivism of

11    someone your age is statistically very, very low, the fact you

12    committed the instant offense when you were already in your

13    mid-60's also somewhat defies the statistics.  So although I

14    recognize the statistical aspect of it, there are other things

15    that impact my consideration, including your past issue with

16    the political contributions which I think impact my

17    consideration of the deterrent effect going forward.

18         Now, I also think that general deterrence in this case

19    does deserve real consideration.  I understand, and I hear

20    arguments all the time, that is there really such thing as

21    general deterrence.  I think in this case in particular,

22    because of the fact it involved the United Nations, because of

23    the fact it involves yourself, someone of prominence in terms

24    of your stature as a businessperson in your own country, but

25    also recognized here in the United States, I do think general

1    deterrence is an issue that I will consider here in connection

2    with what an appropriate sentence is.

3            In at least in part, it might give, I would hope, give

4    pause to individuals whether they're in like circumstances of

5    yourself or not, will give them pause to any consideration they

6    have about doing, corrupting institutions like the United

7    Nations to achieve their personal goals and whims in connection

8    whatever activities that they might have and beyond the public

9    embarrassment or inconvenience of having a criminal case filed

10   against them.

11           In addition, I do think it is also important to send a

12   message to those at the United Nations itself and other

13   institutions in this country that perverting the

14   decision-making or attempting to pervert decision-making

15   through bribes will not be tolerated and that there are

16   consequences to those actions.

17           So, Mr. Ng, with that, if you could please rise for

18   the imposition of sentence.  It is the judgment of the Court

19   you be committed to the custody of the Bureau of Prisons for a

20   period of 48 months.  I will impose a period of supervised

21   release, although I believe that in all likelihood you -- you

22   may be seated -- you are going to be deported, but I would

23   impose a period of supervised release of three years.  You will

24   be subject to the mandatory conditions of supervision set forth

25   on Page 46 and 47 of your presentence report, the standard and

1   special conditions set forth on Pages 47 and 48 of the

2   presentence report.

3          I am going to impose a million dollars in fines, and I

4   will also sign the restitution order and the forfeiture order

5   that has been presented to me for my signature.  I will also

6   execute the judicial order of removal.  That has also been

7   presented to me.  You're also required to pay a special

8   assessment on each count of $100.00, for a total of $600.00.

9          Now, I am not, although I recognize the government

10  requested that you be remanded immediately, I am not going to

11  remand you today.  I am going to allow you to voluntarily

12  surrender to the Marshal Service.

13         I find that the sentence is sufficient but not greater

14  than necessary to comply with the purposes of sentencing set

15  forth in 18 United States Code Section 3553 (a).  Do either

16  counsel know of any legal reason why this sentence should not

17  be imposed as stated?

18         MS. ECHENBERG:  No, your Honor.  I would just ask that

19  you state the forfeiture and the restitution amounts on the

20  record that you intend to impose.

21         THE COURT:  State the amount?

22         MS. ECHENBERG:  On the record.

23         THE COURT:  I believe the forfeiture amount is $1.5

24  million and the restitution amount is $329,707.20, payable to

25  the United Nations.

1          MS. ECHENBERG:  Thank your Honor.  You're imposing

2     both of those?

3          THE COURT:  Correct.  In fact, just so the record is

4     clear, I have the restitution order here and I am signing it

5     right now.  I also have the consent preliminary order of

6     forfeiture that has been signed by the parties.  I am signing

7     that now.  Lastly, I have the judicial removal along with the

8     accompanying supporting documents which I have just signed.

9          Mr. Genser do you know of any legal reason why the

10    sentence should not be imposed as stated?

11         MR. GENSER:  No, your Honor.  We would ask that -- and

12    we appreciate that your Honor's permitting Mr. Ng to surrender

13    voluntarily -- we ask that your Honor set that date to be no

14    sooner than 60 days from today.

15         THE COURT:  I will do that.  Ms. Williams.

16         THE CLERK:  July 10th.

17         THE COURT:  July 10th.  With regard to where, I am

18    going to, and again I will hear the parties on this, but I

19    intend to have Mr. Ng surrender here in this district.

20         I think I am going to continue all of the bail

21    conditions as mentioned right now until the surrender date, and

22    I think the logistics of -- and again I don't know where Mr. Ng

23    will be designated, but the logistics of actually getting

24    Mr. Ng, if it is, as I understood, might be in California or

25    out West would be I think significant.

I5BJNG1                        Sentence

1          MR. GENSER:  On that, your Honor, I think we would ask

2     that your Honor permit Mr. Ng to surrender directly to the

3     facility.  I think it is laid out in Mr. Ziegler's affidavit.

4     The transportation process to the facility in custody is

5     particularly onerous and can last several weeks.  It is very

6     difficult to get medical attention, and we can certainly

7     arrange with Guidepost to have him delivered under guard to

8     whatever facility the court designates.

9          THE COURT:  This is what I would suggest.  I think the

10    designated facility will be decided in advance.  We'll have

11    time.  So I want you to speak with Guidepost, speak with the

12    government, and present to me whatever the plan would be for

13    that transportation so that I can make the ultimate decision

14    about that.

15         Look, it is conceivable, and I understand -- let me

16    ask Mr. Genser, is there a specific request that Mr. Ng be

17    housed in a low security facility in the western region of the

18    Bureau of Prisons' system?

19         MR. GENSER:  Your Honor, we would ask he be

20    designated, and court strongly recommend to the BOP, he be

21    designated to LSCI Allenwood in White Dear, Pennsylvania.

22         THE COURT:  I'll make the recommendation of Allenwood

23    or another low -- well, I will make the recommendation of

24    Allenwood and would be willing to make a recommendation, if not

25    Allenwood, somewhere on the East Coast if that is what you

1    would request.

2                MR. GENSER:  Yes, we would request and that and we

3    would propose we can actually provide specific language that we

4    would be requesting to be included in the judgment with respect

5    to the recommendation for designation.

6                THE COURT:  Okay.  The only thing, I ask you share

7    that language with the government and hopefully there is

8    agreement with regard to that.

9                MR. GENSER:  Yes.

10               THE COURT:  Okay.

11               MS. ECHENBERG:  Your Honor, so it is currently our

12   position that the defendant should surrender here as your Honor

13   had initially ordered.  We'll, of course, look at whatever the

14   defense submits and take it up with your Honor, but that is our

15   position.

16               THE COURT:  Just to be clear, my concern with the

17   logistics is just that.  I understand the Guidepost would

18   probably be willing to do it.  The issue for me is there now

19   has been a sentence that has been imposed.  It is a sentence of

20   incarceration for a period of time that is not insubstantial.

21   So I think that there are differences between the pretrial

22   release and now, so I would want to, to the extent I would

23   change my view about that, I need to see what the plan would

24   be, and the parties should meet-and-confer about that and

25   present it to me in advance of, hopefully well in advance of

1   the 60 days we have indicated for surrender.

2                MR. GENSER:  Your Honor, can we have a few days after

3   today to confer with the government about those issues and

4   present the court with a hopefully agreed-upon plan and some

5   language for the designation?

6                THE COURT:  Absolutely.  Do you want to make it three

7   weeks to do that, two weeks?

8                THE COURT:  My Deputy Clerk, who I take counsel from

9   in just about all matters, said next Friday, if that is

10   sufficient.  I think in part, let me just be clear.

11               I think the reason is for the judgment, so that we can

12   have put in the judgment whatever both the language that the

13   parties would suggest and anything else because in order to

14   start the ball rolling, the judgment needs to be issued.

15               MR. GENSER:  That is fine with us.

16               MS. ECHENBERG:  One other matter with regard to the

17   sentence.

18               THE COURT:  Yes.

19               MS. ECHENBERG:  If your Honor could just make clear

20   that sentence applies concurrently to all of the counts.

21               THE COURT:  I am sorry.  Yes, the sentence of 48

22   months is on each count, to be assessed concurrently on that.

23   I apologize.  I should have made that clear.

24               I think overall that is a sentence, again it is a

25   substantial variance from the guidelines and a variance from

1   where Probation came out.  So even if I had ruled on certainly

2   with regard to many of the issues, I still think that is an

3   overall appropriate sentence in this case.

4            MR. GENSER:  Your Honor, will the defendant, would the

5   court recommend the defendant receive credit for the 30 days he

6   spent in jail already?

7            THE COURT:  He should automatically receive that under

8   the way that they calculate, but to the extent I need to

9   recommend that, I would do that, yes, since it is the same

10  offense.  Is there anything else?

11           MS. ECHENBERG:  Just that your Honor advise the

12  defendant of his right to appeal.  We would make a motion to

13  dismiss the counts in the underlying indictments.

14           THE COURT:  Mr. Ng, you have the right to appeal your

15  conviction and sentence.  The notice of appeal must be filed

16  within 14 days of the judgment of conviction.  If you're not

17  able to pay the cost of an appeal, you may apply for leave to

18  appeal in forma pauperis.  If you request, the Clerk of the

19  Court will file and prepare a notice of appeal on your own

20  behalf.

21           Now, Mr. Ng, I know it is not the sentence that your

22  attorneys had asked for, but I hope that when you are released

23  from custody, you go home and spend time, and I should have

24  mentioned that it is clear that your family, there are at least

25  26 members, friends and family that are here if not more of you

I5BJNG1                          Sentence

1    and it is clear that they support you.  I suggest that you make

2    use of that support while you're incarcerated and once you're

3    released.  Is admirable they have stood by you and I believe

4    that they will continue to stand by you.

5              I will dismiss the open counts in the underlying

6    indictments.  Is there anything else?

7              MR. GENSER:  Yes, your Honor.  We would actually make

8    an application for bail pending appeal.  We intend, obviously,

9    to appeal the conviction and possibly the sentence, and we

10   would make an application orally for bail pending appeal.

11             We're prepared to address that today, although given

12   that your Honor has granted Mr. Ng some time and ability to

13   voluntarily surrender, it is possible we could come back

14   another day to argue that.  We are prepared to argue that

15   today.  I am prepared to argue the risk of flight issues, and

16   my colleague, Ms. Murphy, is here, an appellate specialist, is

17   prepared to outline the second prong of that, which is the

18   likelihood of substantial success and substantial questions on

19   appeal.

20             THE COURT:  I guess the question I have, since we do

21   have some time, I am willing to allow limited submissions if

22   you like.  The government has in their briefs to me, in their

23   sentencing submission did address the issue.  I note in the

24   defense submission not in a substantive way, with regard to

25   case law or we can address it now.

I5BHNG2

1          MR. GENSER:  We would be happy to address it.

2          (Off-the-record discussion)

3          THE COURT:  I do lose track of time.  Well, should we

4     come back after a brief break to allow people to have lunch and

5     then continue this argument?

6          MR. GENSER:  It is fine with me, your Honor.  The only

7     constraint that I have, I have an arraignment in front of Judge

8     Failla at 3:00 p.m.

9          THE COURT:  Well, why don't we take half an hour and

10    then come back.  Does that work for the government?

11         MS. ECHENBERG:  Yes, your Honor.

12         MR. GENSER:  That would be fine.

13         THE COURT:  So it is now 1:40.  We are going to come

14    back in half an hour.

15         (Luncheon recess)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2          2:10 p.m.

3          (In open court)

4          THE COURT:  Mr. Genser, are you ready to proceed?

5          MR. GENSER:  Yes, your Honor.

6          THE COURT:  OK.

7          MR. GENSER:  Actually, if I may just have one moment.

8          THE COURT:  Oh, sure, go ahead.

9          MR. GENSER:  Your Honor, we have an application for

10   bail pending appeal.  Obviously, the burden has shifted.  We

11   have the burden to prove by clear and convincing evidence that

12   Mr. Ng will not be a danger to the community or a risk of

13   flight, and there's also the second part of the issue of

14   substantial questions on appeal which my colleague, Erin

15   Murphy, will address.

16          Your Honor, I would suggest there's no question here

17   of danger to the community.  That's never been an issue in the

18   case.

19          With respect to risk of flight, I think that the fact

20   that Mr. Ng is here today is all the evidence that your Honor

21   needs to support our burden.  Mr. Ng was convicted.  He's

22   complied with his bail conditions in every respect.  Guidepost

23   has confirmed to us and to the government that Mr. Ng has

24   complied.  They feel confident they can assure his continued

25   compliance.

I5BHNG2

1          Your Honor, Mr. Ng has understood that today could be

2     a day when he would be sentenced to a sentence of perhaps 72

3     months, which is what the probation department recommended, or

4     perhaps substantially more than that, which is what the

5     government sought.  And he also understood, as the government

6     had informed us long ago, that they were going to seek his

7     immediate remand today, and he's here.  That ought to be enough

8     to demonstrate to the Court that he has no intention to attempt

9     to flee and that, even if he did, the conditions that the Court

10    has set very carefully, which are very stringent, are more than

11    adequate to assure his appearance.

12          And unless the Court has questions about that, I think

13    that really the risk of flight should be an easy issue for the

14    Court to resolve in our favor.

15          THE COURT:  OK.  But would you agree with me that

16    before today, everything was a possibility.  It's now assured

17    that Mr. Ng is facing jail time.  Putting aside whether it

18    tips, entirely tips, the balance, that actually militates, that

19    actually cuts against, in other words, that's another factor

20    that I need to weigh in addition to what I've weighed before,

21    which I did for purposes of bail.  That is a change in the

22    circumstances here.  It was a possibility; it's a reality now.

23    Obviously, not only do people have hope, but, obviously, there

24    were a lot of things that militated towards that hope,

25    including the probation department granting a substantial

I5BHNG2

1    variance.

2            The government -- how often do you see that, right,

3    where there's a variance that the government thinks is

4    appropriate?  So the issue is what he's now facing, it's a

5    reality and not a possibility.  So doesn't that factor weigh on

6    the side of flight?

7            MR. GENSER:  Your Honor --

8            THE COURT:  Or possibility of flight, I should say.

9            MR. GENSER:  I think it certainly weighs, but I think

10   the question is how much weight?  And I think, number one, yes,

11   there was hope that he would get a sentence of time served, but

12   Mr. Ng understood that it was a hope and that the greater, much

13   greater, likelihood was that there would be a jail sentence

14   perhaps as high as 72 months or higher.  And Mr. Ng is resigned

15   and -- Mr. Ng stood up and I think he made a very moving and

16   important statement to the Court that the Court can also

17   consider and should consider.  I think it's evident that Mr. Ng

18   has resigned himself to accepting whatever the Court has

19   imposed and that he has to serve, not from a legal perspective,

20   we intend to challenge it, but that he's not going to try and

21   deal with the situation by essentially committing a crime and

22   somehow trying to flee out of his apartment, and that's

23   evident.  Nothing about the sentence that was imposed is going

24   to create such an incentive to flee that it materially changes

25   the calculation or the risk of flight.

1    I think the other thing that we can point to are the

2    conditions.  I think the government during their comments noted

3    that the confinement to the apartment is doing what it was

4    intended to do, and it's going to continue to do what it was

5    intended to do.  There's no way he could escape if he wanted to

6    escape.  There's no realistic possibility of it.  And there's

7    no reason to think that he has any intention to make any effort

8    to do that.

9    I think, your Honor, you have a two-year track record,

10   six months of which have been after the conviction when the

11   guidelines were 25 years.  I don't know if I did the math

12   right, but something in that range, and all before the

13   probation report came out, before we knew there was going to be

14   the potential of at least an agreement from probation and then

15   potentially from the government that there should be some

16   variance.  You know, the risk was something much higher than

17   that based on the guidelines.

18   So for all those reasons, I think your Honor has ample

19   evidence to conclude that Mr. Ng is not a flight risk under the

20   conditions that your Honor has set.

21   THE COURT:  OK.  Thank you.

22   Ms. Murphy.

23   MS. MURPHY:  Thank you, your Honor.

24   If I could start with just the standard that we're

25   dealing with here in terms of the substantial question.  The

I5BHNG2

1    question for the Court is whether our appeal will present a

2    substantial question of law or fact that's likely to result in

3    reversal or a new trial.  The Second Circuit has made clear

4    that doesn't mean we have to demonstrate to you we're likely to

5    prevail.  Likely refers to if we prevail on our substantial

6    question, are we likely to obtain the relief of reversal or new

7    trial?  The substantial question test asks only whether you

8    have a close question, one in which the Second Circuit very

9    well could come out the other way.

10           Now, this is a prosecution that's really

11   extraordinarily unusual in several respects.  We have a foreign

12   national accused of bribing foreign officials in their capacity

13   as U.N. ambassadors.  So, unsurprisingly, we have some really

14   novel legal issues here that haven't come up in other cases

15   before in the Second Circuit.  I know your Honor is familiar

16   with some of the legal issues here.  They've been briefed and

17   argued in the pretrial proceedings, so I won't belabor them to

18   too much detail, but if I could just go through the two -- two

19   of the principal ones.

20           THE COURT:  Give me one moment, Ms. Murphy.

21           Sorry about that.  Go ahead.

22           MS. MURPHY:  No problem.

23           So the first substantial question on appeal is whether

24   the United Nations --

25           (Pause)

I5BHNG2

1        THE COURT:  Go ahead.

2        MS. MURPHY:  No problem.  The first substantial

3    question is whether the United Nations qualifies as an

4    organization for purposes of Section 666.  I'm sure the

5    government will tell you that the Second Circuit already

6    resolved this question in the *Bahel* case, but that case just

7    didn't concern the meaning of the term "organization" under the

8    statute.  And there's strong arguments that the textual matter,

9    as a legislative history matter, in terms of canons of

10   interpretation that organization really means private

11   organization in this statute, not public.

12       THE COURT:  Let me ask is this:  Because there are six

13   counts here --

14       MS. MURPHY:  Sure.

15       THE COURT:  -- at least by my estimation, the proof

16   that would be required for any of the six counts is essentially

17   the same.  In other words, is there case law relating to --

18   would you have to run the table?  In other words, it's

19   conceivable that the Second Circuit might agree with you about

20   whether it's 666, or whatever, but not necessarily on all of

21   the other counts, one or more of the other counts.  Does that

22   result in a new trial?

23       MS. MURPHY:  Well, so we believe that -- the two

24   principal issues that I would bring up today are 666 and the

25   *McDonnell* official acts issue.  And I think that if we were to

I5BHNG2

1    prevail on both of those issues, it would impact every count in

2    the case, because if the court -- if the Second Circuit were to

3    conclude that there was an official acts problem with both the

4    FCPA and the 666 charges, that would impact every count in the

5    case because the first four counts depend on both -- on one or

6    both of 666 and the FCPA.  And then Counts Five and Six, the

7    jury was instructed that they could rely on 666, the FCPA, or

8    the foreign law allegations.

9            THE COURT:  What about the foreign law, though?  How

10   does *McDonnell* implicate the foreign law determination for

11   purposes of, I think it's, money laundering?

12           MS. MURPHY:  Sure.  The problem, the reason we'd be

13   likely to get a new trial on that is because the jury wasn't

14   asked which theory it relied upon for its money laundering

15   convictions.  Under the Second Circuit and clear Supreme Court

16   case law, if you can't tell which theory the jury relied on

17   that, if they were instructed on multiple theories and you

18   can't tell which one it is, then you have to have a new trial.

19   And I don't really see how, on this record, you could argue

20   that anybody knows to a certainty that the jury relied on the

21   foreign law charges instead of these two substantive charges

22   where it had already found convictions.

23           THE COURT:  Was there a request for a verdict sheet

24   with regard to that?  Was there a request at trial?  I don't

25   remember there being one, not that that means that you're not

I5BHNG2

1    correct on the law.  I'm just wondering.  I just don't

2    remember.

3             MS. MURPHY:  I have to say I don't know offhand

4    whether there was a request to do it separately, but it does

5    happen quite often that you don't have a request to separate it

6    out, and the relief when you have a situation where the jury

7    got separate theories and you can't tell which one they relied

8    on is it has to be a new trial.

9             THE COURT:  All right.  I'm sorry I interrupted you.

10            MS. MURPHY:  Sure.  No problem.

11            In terms of 666, we think there's strong arguments

12   there that it's a private organization.  I think there's a

13   textual argument on that, and the Second Circuit didn't have to

14   confront that argument in *Bahel* because it was focused on a

15   different part of the text.  Here, we have a statute that

16   separately applies to organizations and government agencies.

17   You wouldn't really need that separate piece if organizations

18   were really such a broad term that it encompassed everything.

19   You have a statute that says on its face what kind of

20   governmental entities it was to apply to, and they're all

21   notably domestic: state, local, and tribal.  They don't include

22   foreign governments and they don't include international

23   governments, which actually is a notable contrast to the FCPA

24   which actually specifically defines a foreign official to

25   include a public international organization.

I5BHNG2

1          So on the face of the statute there are indications

2     that it wasn't intended to reach public quasi-sovereign

3     international organizations like the United Nations, and the

4     legislative history of the statute actually says that it was

5     supposed to reach private organizations and state and local

6     government agencies.

7          So particularly when you take all of that in

8     combination with the canon of interpretation that says statutes

9     shouldn't be read to create unreasonable interference with the

10    sovereignty of foreign nations, which particularly as to 666

11    this would since 666 applies to both the payor and the

12    recipient, we believe it's at least a close question on which

13    the Second Circuit could very well come out the other way on

14    whether the 666 charges belonged in this case at all, which

15    would impact several of the counts in the case.

16          THE COURT:  OK.

17          MS. MURPHY:  We also believe there are substantial

18    questions here about the application of *McDonnell* and the

19    official acts doctrine that it sets forth as to both of the

20    statutes in this case.  We have two statutes that were

21    patterned after Section 201, which is the very statute that the

22    Supreme Court was interpreting in the *McDonnell* case.  And we

23    have two statutes that raise all the same constitutional

24    concerns as Section 201 and kind of the entire array of federal

25    bribery and corruption statutes because you have serious

I5BHNG2

1    vagueness concerns in terms of fair notice and arbitrary

2    enforcement if these statutes are read exceptionally broadly.

3    You have First Amendment concerns if they're read exceptionally

4    broadly, and you can have both interference with state

5    sovereignty as to 666 and interference with foreign sovereignty

6    as to both statutes in reading them in this manner.

7            Now, obviously, the text of these statutes is not

8    identical to Section 201, and in particular, the FCPA does have

9    that broader language that refers to securing an improper

10   advantage.  But, if anything, the sheer breadth of that

11   language, just read in isolation, kind of makes the

12   constitutional terms all the stronger.

13           THE COURT:  But here, right, at least there was an

14   attempt to address *McDonnell* in the jury charge and the jury

15   instructions.  Why isn't that sufficient?

16           MS. MURPHY:  Sure.

17           THE COURT:  So not unlike, again, different sort of

18   statutes, but not unlike the trial which was just recently

19   resolved, the Silver trial, or the Skelos trial which is going

20   to come up, which the Second Circuit reversed and set a new

21   trial, they didn't say you're out of the box.  In other words,

22   they basically said you can go for a new trial.

23           So why wouldn't the jury instructions be enough here

24   with regard to these statutes that we're considering?

25           MS. MURPHY:  So, first, there wasn't an official acts

I5BHNG2

1    instruction on the FCPA charges at all, so that's an

2    independent problem.

3           As to 666, there was an instruction and we appreciate

4    that your Honor gave an instruction, but we don't believe that

5    the instruction that was given was sufficient to do what

6    McDonnell needs a jury to do, which is understand, really, the

7    distinction between actions taken in official capacity and

8    actions that qualify as the kind of official acts McDonnell had

9    in question.

10          The couple things -- one of them, these are ways in

11   which the instruction differentiated from the one that we had

12   requested.  I mean, in one respect, we requested instructions

13   that would have clearly delineated what we see as the two

14   distinct requirements of McDonnell.  The first is that you need

15   a specific and focused matter, something that is or could be

16   pending before the, here, United Nations; and the second would

17   then be that you need the official actor decision on that

18   specific matter.  The instruction the jury got instead kind of

19   blended the two concepts together, and basically ended up

20   saying what you need is something that's specific and focused

21   on a matter.  I think that doesn't really delineate those two

22   prongs in the way that McDonnell requires.

23          The other thing the instruction didn't do, and I think

24   if you look back at McDonnell and what the court was talking

25   about and was concerned there with, is there is a notion that

I5BHNG2

the instructions have to be tailored to the things that are

being argued in the particular case.  Here, our instruction

would have told the jury that meeting with someone,

participating in the meeting is not an official act, which is

really an important distinction in this case given that the

government repeatedly argued and invited the jury to conclude

that this trip to Macau was an official act just because it was

taken in official capacity.  We don't believe that that's the

kind of official act that qualifies under *McDonnell*.  And the

instruction, by not specifically telling the jury that, didn't

really tailor to the facts of this case what was and wasn't an

official act.

        Here, I think it's compounded by the fact that the

government did repeatedly -- basically tried this case for

official acts.  We think at least three of those are not

official acts within the meaning of *McDonnell*.  So you have a

real problem with the government really inviting the jury

explicitly to treat things as official acts that are not

official acts and that the instruction doesn't make

sufficiently clear to the jury are not official agents.

        So I think with all of that, I don't mean to suggest

that we don't also have an argument about the sufficiency of

the evidence and other arguments in the case, but given that

particular problem with this issue, which is one that the

Second Circuit hasn't confronted in the FCPA context, this is a

I5BHNG2

1  substantial question on which the Second Circuit clearly could

2  come out in our favor.  And if they did, given that the

3  official acts aspects of the case impacts both 666 and the FCPA

4  charges, which themselves impact every count in the case, we'd

5  be likely to obtain a new trial if we prevailed on these

6  arguments.

7            THE COURT:  OK.  Thank you.

8            For the government.

9            MR. ZOLKIND:  Thank you, your Honor.

10           Your Honor, it has been nearly a year since the

11  defendant was convicted by a unanimous jury of serious

12  corruption and money laundering crimes, crimes that dated back

13  to at least 2010 and crimes which the Court has now determined

14  warrant a significant term of imprisonment.

15           Your Honor, the defendant faces at this point a much

16  steeper burden in terms of his argument to be kept out on bail

17  than he faced at any previous point in this case, and it cannot

18  meet that burden.  He can't meet either prong of it.  As I will

19  discuss, the defendant should be detained at this point.

20           Your Honor, first, with respect to the standard, I

21  think, just to be clear, the defendant has the burden of

22  showing both by clear and convincing evidence that he is not

23  likely to flee and, in addition, that there are substantial

24  issues that, if resolved in his favor on appeal, are likely to

25  lead to a reversal of his conviction or a new trial.

I5BHNG2

1          I'll address that in a moment, but I think, to get

2     right to the heart of one of the Court's questions, the

3     government's view is that he does need to sweep the deck, so to

4     speak.  He needs to win on every single count, essentially, in

5     order to get a new trial or reversal because the Court imposed

6     the same term of imprisonment concurrently as to each count.

7          Let me address the risk of flight first.  Just

8     briefly, we've argued this in front of the Court many times,

9     but the Court has previously found repeatedly that the

10    defendant does pose a significant risk of flight.  I think it's

11    important just to recall that the Court has made that finding

12    and for good reason, and the Court has imposed truly

13    extraordinary bail conditions to address that risk of flight,

14    but the risk of flight has always been there.  The defendant

15    now knows to a certainty that he is facing a serious term of

16    imprisonment, 48 months of imprisonment.  And he's argued

17    repeatedly, he's argued today, that jail is going to be very

18    difficult for him.  He's repeatedly let the Court know the

19    extent to which he is fearful of going to jail in this country.

20         So his incentive to flee, which has always been there,

21    is greater now than it has ever been before, and the Court

22    alluded to that.  I think there's really no dispute about that,

23    no serious dispute, that the incentive has gotten much greater

24    in light of today's sentencing.

25         In prior applications for bail, the defense has argued

I5BHNG2

1    that the defendant wasn't motivated to flee because he believed

2    that he'd be acquitted at trial, and then after he was

3    convicted, the argument was that he believed strongly in his

4    arguments for a non-incarceratory sentence.  Those arguments

5    don't apply at this point.

6         He has new motivations.  We don't know whether there's

7    ever been an attempt to flee before.  We have no indication

8    that there is, but that's not to say that in light of the

9    change of circumstances, there wouldn't be a new motivation.

10   So I don't think that the past is necessarily a guide in light

11   of the changed circumstances.

12        So then, obviously, he has an argument about his

13   belief in his likelihood of success on appeal.  Our view is

14   that the likelihood of success on appeal is very low.  And let

15   me turn to that now.

16        So, again, and the Court pointed this out, it's

17   critical to keep in mind that this is not a case in which the

18   defendant was convicted of just Section 666 and a conspiracy to

19   violate 666, where if the defense can persuade the appeals

20   court that there was a problem with the 666 counts, the whole

21   thing is getting reversed.  Here, the defendant's convictions

22   stands on multiple, independent different pegs.  He was

23   convicted not just of 666 but also of two different FCPA

24   substantive counts and money laundering counts which were

25   predicated both on the 666, the FCPA, and Antiguan and

I5BHNG2

1    Dominican law, which have their own unique elements.

2              So to win, to get his convictions reversed or get a

3    new trial, the defendant has to do more than overturn his

4    Section 666 conviction, which we don't think there's a

5    likelihood of that happening in any event; he has to do that

6    for each of those counts.

7              Let me turn to the specific arguments that were just

8    raised.  So, first of all, the argument with respect to whether

9    the United Nations is an organization.  The first thing to say

10   about that is that argument applies only to Section 666.  So

11   even if that argument were adopted by the circuit, that would

12   have no bearing whatsoever on his FCPA convictions, on his

13   conspiracy conviction.  And I should note there was a special

14   verdict form for the conspiracy charge, and so the jury

15   indicated that that conviction was predicated on each of the

16   underlying counts.  So that's the first thing to say about --

17   regardless of what the circuit says about whether or not the

18   U.N. is an organization, that only impacts Section 666.

19             On the merits of that argument, as the Court knows,

20   this was the subject of extensive briefing in the motion to

21   dismiss.  The Court read all the precedents and arguments that

22   the defense advanced and rejected that argument.  We think it

23   did so for exactly the right reasons, most notably because the

24   Second Circuit has already addressed this issue in the *Bahel*

25   case.  So I think another panel of the circuit would be very

I5BHNG2

1    hard pressed to reevaluate that issue in light of *Bahel*.  It

2    would really require the circuit to sit *en banc*.  I think

3    that's not at all likely to happen.

4           With respect to the argument about whether Congress

5    intended Section 666 to apply to an organization like the

6    United Nations, cases again and again have talked about the

7    purpose of Section 666, which is to safeguard federal money.

8    The purpose of Section 666 is to ensure that federal money that

9    is going to organizations is not squandered through corruption.

10   The federal government spends, as the Court knows, hundreds of

11   millions of dollars every single year on the United Nations.

12   So using that statute to enable the federal government to

13   enforce -- to ensure that U.S. money is not going to fund an

14   organization that is afflicted with bribery and corruption is

15   exactly in line with what Congress intended Section 666 to be

16   about.

17          I don't think the fact that it applies to an

18   organization like the U.N. but not to foreign governments is at

19   all strange.  There is the FCPA which applies outside the

20   United States to foreign officials, and there's Section 666

21   that applies to state and local governments and to federally

22   funded organizations.  I'm not at all conceding that Section

23   666 wouldn't have some potential application outside the United

24   States.  That wasn't presented in this case.  Here, the U.N. is

25   headquartered right here in New York.  This was not an

I5BHNG2

extraterritorial application of Section 666, and they're not
arguing that; that wasn't the argument that was just raised.

        So for all those reasons, I don't think that is
remotely a substantial issue that's likely to result in a
reversal or a new trial.

        With respect to the second and last issue that the
defense raised, *McDonnell*, there's several reasons why
*McDonnell* does not at all raise an issue that's likely to lead
to a reversal or new trial.

        Number 1, as the Court again alluded to, the Court
instructed the jury on *McDonnell* with respect to Section 666,
and that wasn't because the government necessarily concedes
that the Court had to do so, but we requested that instruction
in an abundance of caution.  And, in fact, the Court gave, I
think, a broader, more robust instruction than the government
had even proposed.  So I think the Court did, in fact, adopt
much of what the defense was requesting with respect to a
*McDonnell* instruction.  So with respect to 666, they were
instructed on *McDonnell*.

        With respect to the FCPA, there is no court that has
found that *McDonnell* applies to the FCPA.  So for the defense
to argue that that is a substantial issue that's likely to lead
to reversal or a new trial, what they're saying is that this is
going to be the first case that leads to a court deciding that
*McDonnell* applies to the FCPA.  There are very good reasons why

1   the Court, this Court, addressed that issue and held to the

2   contrary.  And specifically, it's because, among other things,

3   the FCPA is explicitly much broader than Section 201 or Section

4   666, and it applies, by its own terms, to corrupt payments that

5   are designed to obtain an unfair business advantage.  There's

6   no way to read that language as requiring proof of an official

7   act.

8           So that's the FCPA.  And then, of course, there's even

9   less reason to think that *McDonnell* would apply to Antiguan or

10  Dominican law.

11          Just another point that gets, I think, less to the

12  sort of legal issue and more to a factual sufficiency,

13  evidentiary sufficiency argument that was alluded to by the

14  defense.  They claim that the government proved or attempted to

15  prove four official acts.  I understand why they're making that

16  argument and why they articulated it that way to the circuit.

17  It's easier to point at the four actions that the government

18  talked about, but the government did not in its pretrial

19  briefing or at trial ever confine itself to those four specific

20  acts.  We focused on those four acts and argued that they were

21  important evidence of the scheme and of the crime, but the

22  official act that the government has always been most focused

23  on, both in its legal arguments to the Court and in its

24  arguments to the jury, was the defendant's agreement with

25  Ambassador Ashe and Ambassador Lorenzo to establish a formal

I5BHNG2

U.N. center in Macau.  That was the subject of the agreement;
that was the official act, at the end of the day, that was the
subject of the corrupt agreement.

So whether or not a particular U.N. document or the
revision to that U.N. document was an official act, regardless
of whether a particular contract was an official act, and
certainly regardless of whether a trip to Macau was an official
act, the government's going to argue about particular official
acts, but even if the circuit doesn't agree, there's really no
way to dispute that an agreement to establish an official U.N.
center in Macau was an agreement to obtain official action.
That was the subject.  And so, again, I don't think arguments
about the four actions that did take place before the
defendant's plan was disrupted and he was arrested at all raise
a substantial issue that could potentially lead to a reversal
or a new trial, let alone likely to do so.

Unless the Court has any questions, I'll sit down.

THE COURT:  OK.  Thank you.

Mr. Genser.

MR. GENSER:  Yes, if I can just respond a little bit
on risk of flight.

THE COURT:  Yes.

MR. GENSER:  Your Honor, at every point when there's
been a bail determination, the government has stood up and told
the Court the parade of horribles and the enormous incentives

I5BHNG2

that Mr. Ng has to flee and how the conditions, the very strict

conditions that the Court has set, aren't going to be

sufficient.  Every time the government's been wrong, and

they're wrong again.

I want to also point out that earlier the Court asked,

well, does the certainty of the sentence that the Court has

imposed make the risk of flight more acute?  And I think I

agree that it could in some respects, but in another respect,

it doesn't.  It's at least a wash, or maybe it even reduces the

incentive to flee because you're taking the uncertainty, which

includes a very, very high end range of potentially more than

25 years in jail that the defendant faced, that the government

argued created an enormous incentive to flee, and you are

replacing that with the certainty of, relative to that level, a

much more moderate amount.

So from that perspective, in some ways it actually

reduces the incentive to flee because the real concern is that

Mr. Ng was going to spend the rest of his life in jail, and

we're very grateful that, based upon the sentence that your

Honor imposed, he's likely not to spend the rest of his life in

jail.  So I would just point that out as well.  I don't think

that the risk of flight is a serious issue.

The other point I want to make is that the strength of

the appellate prong of this discussion and the faith that

Mr. Ng has in those arguments and in the appellate team that

I5BHNG2

1   he's assembled, very able team, including Ms. Murphy and also

2   Paul Clement, former Solicitor General of the United States,

3   lots of appellate experience.

4           THE COURT:  Some would say able is probably putting it

5   mildly.

6           MR. GENSER:  I'm trying to be modest about my partner

7   who I think is terrific.

8           But I think the point is, your Honor, that Mr. Ng now

9   has something else to hope for, something that he believes in,

10   and he believes in his chances on appeal as Ms. Murphy

11   outlined.  And he's committed to that.  He's committed to

12   pursuing that, and I think that factors in and reflects back on

13   the question of risk of flight.

14           So I think when you considered all that together,

15   there's no material increased incentive.  And to the extent

16   there was, your Honor's seen he has no -- he's expressed his

17   feelings about the case, and your Honor can tell he's resigned

18   to seeing this through, complying with the Court's rulings.

19   And the whole concept of risk of flight is not what should hold

20   up granting bail pending appeal.

21           Thank you.

22           THE COURT:  OK.  Thank you.

23           Ms. Murphy?

24           MS. MURPHY:  So first on 666, we acknowledge 666 is

25   not going to knock out every charge in this case, but our

I5BHNG2

argument on 666 is very important because it does matter for

several of the counts in this case.  So if the Second Circuit

agrees with us that it shouldn't have been in this case, that

will be critical to conspiracy, to 666, and also to the money

laundering charges.

As for the *Bahel* decision, the Court just did not

address the question of organization there.  The notion that

the court would need to go *en banc* to answer a question that

*Bahel* just wasn't confronted with and it doesn't address at all

is simply not correct.  The court can't kind of *sub silentio*

have interpreted statutory language that nobody put at issue in

the *Bahel* case.  And given that we believe there's textual

arguments here about reading organization narrowly and not just

arguments generally about how to read statutes as a general

matter, this is just clearly an open question on which *Bahel* is

relevant but is not conclusive.

The government also notes that applying 666 to the

United Nations would achieve the government's interests.  Well,

that can be said of applying any number of federal criminal

statutes in kind of what is essentially a sort of

extraterritorial context that involves foreign nationals and

foreign officials.  That's precisely why there's a canon of

interpretation that the courts are not supposed to read

statutes to create undue interference with foreign nations

unless the statute makes clear that that was Congress' intent.

I5BHNG2

1    And this statute just does not make that clear at all.  I think

2    it is notable that in comparing that to the FCPA, you can see

3    in the FCPA when Congress wants to reach a foreign

4    international organization, it knows how to do so and says so

5    on the face of the statute.

6            If I could just make a couple quick points about

7    *McDonnell*.  The government notes that the Second Circuit would

8    be the first court to hold that *McDonnell* applies to the FCPA.

9    They'd be the first court to rule on that issue that we're

10   aware of.  We're talking about a two-year-old decision and a

11   statute on which cases are rarely brought to trial and there

12   are very few appeals.  While there are a few cases that have

13   mentioned the issue, we're not aware of any court that has

14   actually confronted the question squarely and resolved the

15   question of whether the FCPA is impacted by the *McDonnell*

16   decision.  That alone cuts in favor of treating that as a

17   substantial question since the Second Circuit has also said

18   part of the consideration in the substantial question analysis

19   is whether you're dealing with a novel question, which that

20   question really is here.

21           The one other point that I would make on *McDonnell* is

22   while the government has an argument that maybe there is one

23   official act here, and I don't mean to concede that there is,

24   but that doesn't really get them all the way home since we are

25   entitled to bail if we're likely to get a new trial.  And I

I5BHNG2

1   don't think there's any dispute, I don't even hear the

2   government disputing that they relied on many official acts

3   here, four in particular and perhaps some others, and we

4   believe that they invited the jury to convict on things that

5   they classified as official acts that we believe, as a matter

6   of law, are not official acts.

7          So absent an instruction that made crystal clear to

8   the jury that they could not do that, we believe we have a

9   substantial question about whether the FCPA charges can stand

10   and the 666 charges, since both of them rely on the official

11   acts.  And as I noted at the beginning, without those two

12   pieces, there has to be a new trial.

13          THE COURT:  OK.  Thank you.

14          I've considered the arguments of the parties, and I

15   looked and, as counsel knows, I have given a substantial amount

16   of time to the issue of bail here.  I do think that the

17   sentence, certainty of the sentence of 48 months is something

18   that does weigh, tilt, on balance, because I think if it wasn't

19   clear from the amount of time I spent on it that it was a very

20   close call for me in making the determination that bail --

21   there could be conditions that would satisfy that.  I think, on

22   balance now, that I find that the defense has not met its

23   burden with regard to clear and convincing evidence that there

24   isn't a risk of flight here.

25          Again, these are close calls.  And I would say that

I5BHNG2

1    when I made the decision with regard to granting bail, there

2    were arguments -- I don't know whether they were explicitly

3    articulated here.  I think they may have been -- that the

4    methodology that I was using, in other words, the fact that

5    Mr. Ng was a person of means and could actually accomplish a

6    lot of the things that were requested in the bail package

7    itself would be something that wouldn't be -- again, I think it

8    is appropriately considered under the Bail Reform Act; some of

9    my colleagues have disagreed about that.  That's the only point

10   I would make on that.

11          Now, with regard to the issue that the appeal is going

12   to raise substantial questions of law or fact likely to result

13   in either reversal or new trial and otherwise, I think, as I

14   mentioned and as my questions may have indicated, there are six

15   counts here.  With regard to the *McDonnell* issue, as I was at

16   the time, I was convinced that the jury instruction that I

17   utilized was sufficient to address the concerns relating to

18   that.

19          With regard to the 666, while I do agree that *Bahel*

20   isn't on point, and I think I've discussed this in the past, it

21   is a reference point for me both in terms of 666 and statutes

22   like 666, but also with regard to, as I mentioned earlier in

23   the sentencing, with regard to the considerations relating to

24   the application, and this is a guideline issue, of 2C1.1 to

25   organizations like the United Nations.

I5BHNG2

1          So I think, everything considered with regard to that,

2     I find that there isn't clear and convincing evidence that

3     there's a likelihood to be reversal and a new trial here.

4          Putting that aside, and I understand that the FCPA,

5     that no one has addressed the issue of the FCPA and how that

6     relates to it, in other words, the defense doesn't have in its

7     quiver of arguments that there are cases that basically

8     indicate that, in fact -- that would support the argument that

9     if there's clear and convincing evidence, that it should be

10    applied.  Again, in connection with the decision with regard to

11    how to construct the jury charge, I think we spent, I think,

12    the better part of a day, if not more, on the jury charge

13    issues.  I'm not saying that it's necessarily the amount of

14    time we spent on it, but there was a substantial amount of time

15    I spent both discussing with the parties the FCPA and the

16    implications of *McDonnell* as well as thinking about it on my

17    own.

18          Again, I think, on balance, I don't find that there's

19    clear and convincing evidence that there's likely to be a

20    reversal there and a new trial on that.

21          I understand the argument with regard to the money

22    laundering counts, obviously, as it relates to the relationship

23    between the unlawful activity alleged, both 666 and otherwise,

24    but I don't see that there is a likelihood, again, with regard

25    to the bribery -- excuse me, the money laundering charge as it

I5BHNG2

1    relates to violation of foreign law that there is, again, clear

2    and convincing evidence that that count will be reversed

3    because, although I recognize there is some connection, I don't

4    believe that it is such that that count will be reversed.

5          Just more globally, I think I may have alluded to this

6    in my questioning, the proof, at least in my mind, the proof

7    that the government would have put forward with regard to all

8    of the counts, I think, would be, if not identical,

9    substantially -- not materially different with regard to any of

10   the six counts in light of what the other -- in light of the

11   underlying facts here and the charges.

12         So, on that basis, I would deny defendant bail pending

13   appeal.

14         Is there anything else that we need to deal with?

15         MR. ZOLKIND:  Not from the government, your Honor.

16         THE COURT:  All right.  From the defense?

17         MR. GENSER:  No, your Honor.

18         THE COURT:  All right.  Thank you very much.

19         It was a very good argument, and we'll stand

20   adjourned.

21         (Adjourned)

22

23

24

25