```
I5BJNG1                         Sentence
```

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                v.                            15 Cr. 706 VSB

 5    LAP SENG NG,

 6                    Defendant.

 7    ------------------------------x

 8

 9                                           May 11, 2018
                                             10:30 a.m.
10

11

12    Before:

13                        HON. VERNON S. BRODERICK,

14                                           District Judge

15

16                              APPEARANCES

17

18    GEOFFREY S. BERMAN,
              United States Attorney for the
19            Southern District of New York
      JANIS ECHENBERG,
20    DOUGLAS ZOLKIND,
      DANIEL CHARLES RICHENTHAL,
21            Assistant United States Attorneys

22

23

24

25

I5BJNG1                           Sentence

APPEARANCES (Continued)


KIRLAND & ELLIS, LLP,
      Attorneys for defendant Ng
BY:   ANDREW M. GENSER, Esq.
      CHENG ZHANG, Esq.
      ERIN MURPHY, Esq.
                  Of counsel




Also Present:
      DAVID A. LAST, DOJ, CRIMINAL DIV., FRAUD SECTION
      JEAN YAP, CANTONESE INTERPRETER
      KWOK KEI NG, CANTONESE INTERPRETER
      FRANCISCO OLIVERO, Observer, Interpreter's Office

I5BJNG1                          Sentence

1            (In open court)

2            (Case called)

3            THE COURT:  Thank you.  You may be seated.

4            So we're here today for sentencing.  Mr. Ng, can you

5    hear and understanding the interpreter?

6            THE DEFENDANT:  Yes, yes.

7            THE COURT:  If at any point in time you have

8    difficulty hearing or if you don't understand something I say,

9    or if you want to speak with your attorneys, just let me know

10   and we'll stop the proceedings and I'll allow you to do that,

11   okay?  Also the interpreters have to speak up so the Court

12   Reporter can hear.

13           THE INTERPRETER:  He did say okay in English.

14           THE COURT:  Thank you.  So as an initial matter, I

15   want to review for the parties the materials I've received and

16   reviewed in connection with today's sentencing.

17           Specifically, I have received the presentence

18   investigation report which was initially prepared on October

19   27th, 2017 and revised on February 26th, 2018, which includes a

20   recommendation.

21           I also have received the defendant's sentencing

22   submission which is dated March 2nd, 2018, which has

23   approximately 60 attachments that include letters from Mr. Ng's

24   family members, friends throughout his life, business

25   colleagues, employees, former employees, recipients of

I5BJNG1                          Sentence

1    charitable gifts, various photographs, a list of Mr. Ng's

2    charitable donations totaling approximately I think $22 million

3    over the course of several years, and Defense Exhibit 60, which

4    is a letter from Nu Beng Cao.

5          I also have a letter which I believe -- I think I

6    circulated to the parties yesterday from Lin Chu Sung, Lin Chu

7    Sung who is a friend of over 40 years.  That letter has

8    approximately 19 attachments, the majority of which appear to

9    be in different language.  However, there are portions of those

10   attachments that where there is a translation that appears in

11   those documents.

12         There are various articles, I think some official

13   documents, but things of that nature.  I also have a letter

14   from Dr. Steven Weiss, which is dated October 27th, 2017, who

15   is another acquaintance and friend of Mr. Ng's.

16         I have the defendant's supplemental letter, dated

17   April 19th, which objects to the government's forfeiture

18   request.  I think that may be resolved, but we'll talk about

19   later.  It objects to the government's request for remand and

20   reserving the right to seek bail pending appeal and objecting

21   to various arguments and factual assertions made by the

22   government in sentencing submission and, finally, in

23   principally attaching the affidavit of Joel Ziegler, who is an

24   expert, who proffers to be an expert in prison conditions and

25   designations.

I5BJNG1                        Sentence

1          I also have the government's sentencing submission

2     which is dated March 30th, 2018, which includes various

3     attachments.  Those are certain of government exhibits that

4     were presented to the jury during the trial and were admitted

5     in evidence during the trial as well as I think at least two

6     summary exhibits.  I also have the government's April 27th,

7     2018 supplemental letter addressing the affidavit of Joel

8     Ziegler.

9          In addition, I've got various documents relating to,

10    first, immigration, I think documents that support and relate

11    to a proposed order relating to a judicial order of removal,

12    and I also have a restitution order as well as I believe a

13    forfeiture-related order that the parties have agreed to.

14         I think I was recently handed certain of those

15    documents which have been executed.  So have the parties

16    received each of the submissions and have they been filed on

17    ECF?  Let me hear from the government?

18         MS. ECHENBERG:  Yes, your Honor, we received all of

19    those documents that you referenced, some of which we have

20    provided to the court.  I would note that the two letters that

21    your Honor circulated by email, I don't believe those have been

22    filed on Pacer, so I don't know if the court will do that or

23    you like us to do that.

24         THE COURT:  We were going to.  I asked my Deputy Clerk

25    to hold off until we had this proceeding to make sure there

1   wasn't anything in there that either party thought should be

2   redacted, but my Deputy Clerk will take care of filing that if

3   there is no objection, filing those two documents.

4           MS. ECHENBERG:  Yes, there is nothing the government

5   is aware that needs to be redacted.

6           We'll hear from the defense on the removal order,

7   forfeiture order and the restitution order.  Those were all

8   provided in draft to the court, and we have now, as you noted,

9   provided copies that the parties have signed the forfeiture

10  order, a copy of the removal order that the defense has signed,

11  and then just a clean copy of the restitution order for the

12  court's signature.  None of those have been filed on Pacer.  We

13  thought they would be filed by the court after they were

14  executed.

15          THE COURT:  That's correct.  We'll take care of once

16  they're executed, having those filed on the docket.  Thank you.

17          Mr. Genser, first with regard to all of those

18  documents, have you received each of those documents and if you

19  could just let me know whether there is an objection to the

20  filing of the two letters that I forwarded to the parties

21  yesterday?

22          MR. GENSER:  Yes, we have received all of those

23  documents, your Honor, and we have no objection to the filing

24  of the two letters that went directly to the court.

25          THE COURT:  Okay.  We'll take care of them.  My Deputy

I5BJNG1                          Sentence

1    Clerk will take care of filing those two letters as well as the

2    attachments to the one letter that I mentioned.  Mr. Genser,

3    have you received and read the presentence -- let me ask.

4    Sorry.  Are there any other submissions that I should have in

5    connection with today's sentencing?

6          MS. ECHENBERG:  Nothing the government is aware of.

7          THE COURT:  Mr. Genser?

8          MR. GENSER:  I am not sure if your Honor referenced

9    it, but there was an email from the court to the government

10   Thursday evening, 5:09 pm.  That probably ought to be noted,

11   but we have received a copy of it as well.

12         THE COURT:  I apologize.  I did receive an email in

13   response to my order I think of May 9th, asking certain

14   questions, asking about certain documents.  The government

15   provided responses to certain of those questions, and we'll go

16   over their responses in a moment.

17         MS. ECHENBERG:  What we had noted in the email, we

18   tended to make the same representations on the record, so we

19   can do that, but we have no objection to the email being filed

20   on Pacer if your Honor thinks it is probably --

21         THE COURT:  We'll probably do both.  We'll file the

22   email with the attachments on the docket and we'll discuss

23   later on my order and the responses.

24         Some of the responses, just to give you a sense of how

25   I intend to handle it, I will ask you specifically about before

```
 1   I ask for your comments related to sentencing.  Others I will
 2   just say you can refer those as you make your specific comments
 3   to me with regard to sentencing here.
 4           So, Mr. Genser, have you read the presentence report
 5   and discussed it with Mr. Ng?
 6           MR. GENSER:  Yes, your Honor, we have.
 7           THE COURT:  Mr. Ng, have you read the presentence
 8   report or has it been read to you?
 9           THE DEFENDANT:  Yes.
10           THE COURT:  Have you discussed it with your attorneys?
11           THE DEFENDANT:  Discussed.
12           THE COURT:  Have you had an opportunity to go over any
13   errors in the report with them or anything else that you feel
14   should be taken up with me?
15           THE DEFENDANT:  Yes, all of them with my attorney.
16           THE COURT:  Mr. Genser, I note in the defense
17   submission you've objected to the PSR, to the extent that it
18   relies on the complaint filed in this action and also more
19   generally I think to the facts that characterize the payments
20   to Ambassador Ashe and Mr. Lorenzo as bribes, essentially
21   challenging, at least in part challenging and preserving the
22   argument that Mr. Ng is innocent.
23           So let me ask this.  And, in addition, raises the
24   issue of the PSR's reference to certain other defendants who
25   were involved in other aspects of their deals with Mr. Ashe and
```

1    Mr. Lorenzo, specifically defendants Peow and Yan.

2             While I don't believe there is any objection -- well,

3    I will find out from the government.  With regard to those

4    references where Mr. Ng was not involved, obviously I am not

5    specifically relying on those in connection with determining

6    what an appropriate sentence is here today, and I take the

7    Probation Department was merely providing the total picture of

8    this entire case which included those defendants.

9             So putting to the side for the moment the objections,

10   specific objections to the guideline calculation, I guess the

11   question I have is are there -- and also the, in essence, the

12   overall objection to facts that are characterized, the payments

13   as bribes and things that would be characterized as going to

14   the jury's determination of guilt, do you have any specific

15   objections to the specific paragraphs?

16            In other words, are there inaccuracies in those

17   paragraphs?  I think certain of them you pointed out, which is

18   one the defense position wasn't that certain funds of the

19   $200,000 were utilized to pay for travel expenses.  You

20   indicated that that was not part of your argument.  Are there

21   objections to specific paragraphs that we should deal with

22   today and I should resolve so that where everyone is in

23   agreement with regard to the allegations in the presentence

24   report?

25            MR. GENSER:  Yes.  Thank your Honor.  We noted a few

I5BJNG1                          Sentence

1    in our sentencing submission, one of which your Honor just

2    referred to.  The other one was to Paragraph 48 of the PSR.  It

3    is referenced on Page 34 of our memorandum, Footnote 50, and it

4    is just related to the characterization of our position on the

5    payments to Terra Trading.

6              THE INTERPRETER:  Counsel, the interpreter requests

7    counsel repeats the last sentence.

8              MR. GENSER:  It relates to the characterization of the

9    defense position about the payments to Terra Trading, and so

10   that is noted in our submission.

11             The report, the presentence report, states that

12   defense counsel contends that Terra Trading payments were not

13   monthly, but irregular since some of the payments were for

14   legitimate purposes.  What we noted in our submission is that

15   that's not correct.  Our position was that all of those

16   payments, from Mr. Ng's perspective, were legitimate and were

17   for the purpose of lobbying in and other legitimate activities

18   like brochures to build support for the center.  That was the

19   only other clarification that I don't think your Honor had

20   mentioned.

21             In addition, there is one other, not a matter or

22   thing, a small inaccuracy on Page 41.  In the addendum to the

23   presentence report there is a suggestion I think towards the

24   bottom of the page that Cao Yanchia, otherwise known as Forest

25   Cao, was a witness who testified at Mr. Ng's trial.  As the

I5BJNG1                          Sentence

1    court knows, that is not accurate.

2              THE COURT:  Sorry.  Where exactly is that?

3              MR. GENSER:  It is the second to last sentence on Page

4    41.

5              THE COURT:  Who testified, yes.  So I would

6    characterize at least the last one as factual inaccuracy.  I

7    will either make a notation on the presentence report itself or

8    more likely indicate in the judgment that that is inaccurate.

9              With regard to the representations of defense counsel,

10   I think the record is clear what the defense position is.  I

11   won't make those changes to the presentence report, but I

12   recognize both of those changes, that the defense's position is

13   other than what is stated in the presentence report.  Again

14   those are arguments and not factual assertions, although

15   they're based on factual assertions.

16             Is there anything else?

17             MR. GENSER:  Just two other items, your Honor.

18             THE COURT:  Yes.

19             MR. GENSER:  One I am not sure if it is intended to be

20   a factual assertion or not.  It is part of the presentence

21   report recommendation on Page 45.  There is an assertion, I can

22   help your Honor find it, there is an assertion Mr. Ng

23   rationalized his conduct as somewhat commonplace at the UN.  I

24   am not sure if that was intended as a factual assertion or more

25   supposition or explanation of the Probation Office's reasoning.

1          To the extent it is suggested as a factual assertion,

2     we object to that.  We don't think there is any evidence that

3     Mr. Ng has ever taken the position that his conduct was bribery

4     or that he's rationalized it in a particular way.  We just note

5     that as an objection to the extent it is considered a factual

6     assertion.

7          THE COURT:  Okay.  Also just so the record is clear,

8     my understanding is that Mr. Ng did not have substantive

9     conversations in his presentence investigation interview

10    related to the charges in this case.

11         MR. GENSER:  That's correct, your Honor.  We were

12    present for that.

13         The other final point is more a matter of form.  While

14    we're very appreciative the Probation Office recognized a

15    downward variance is warranted, we do object to the sentencing

16    recommendation of 72 months as being too harsh in light of the

17    circumstances, and we'll discuss this.

18         THE COURT:  Yes, yes, and I recognize that, okay?

19    Thank you.  Ms. Echenberg, does the government have any

20    objections to the report?

21         MS. ECHENBERG:  Nothing more than the back-and-forth

22    that we already had with Probation which is noted in the

23    report.

24         THE COURT:  Thank you.  So as an initial matter, I

25    find there is nothing improper about the Probation Department

I5BJNG1                          Sentence

1    relying on the criminal complaint filed in this action, among

2    other things, as support for the offense conduct section.  I

3    presided over the trial in this matter and I am completely

4    familiar with the facts of this case as well as the exhibits

5    that were offered and admitted in evidence.

6            The issue is whether or not the information in the

7    presentence report is accurate, and so we've discussed those

8    that the defense believes are inaccurate and I'll make the

9    appropriate notations in the judgment to deal with that.

10           So with that in mind, I adopt the factual findings in

11   the report.  Obviously, I think I made this clear, but to the

12   extent I did not, to the extent the arguments made by the

13   defense implicate the facts, obviously you preserved your

14   arguments with regard to those in connection with your

15   sentencing submission.

16           Now, however, just to be clear, and I may discuss this

17   a little bit later on as I discuss some of the submissions that

18   I have received in this case for sentencing.  I adhere to my

19   findings with regard to the defendant's post-verdict motions

20   for acquittal and my ruling earlier this week with regard to

21   the defendant's motion for a new trial, although I recognize

22   that there are obviously going to be various issues or may be

23   various issues raised in this case on appeal, based upon my

24   presiding over Mr. Ng's trial and the jury reached a reasonable

25   and just verdict based upon the evidence presented.

1          Now, the presentence report will be made part of the

2     record in this matter and placed under seal.  If an appeal is

3     taken, counsel on the appeal may have access to the sealed

4     report without further application to me or one of my

5     colleagues.

6          Now, Mr. Ng, the law requires as part of determining

7     what an appropriate sentence is for you that I reference a set

8     of rules known as the sentencing guidelines.  The guidelines

9     are a set of rules that are published by the Sentencing

10     Commission, and they're designed to assist judges like myself

11     when we impose sentences on people convicted of crimes.

12          Now, although at a certain point in time the

13     guidelines were mandatory, which would have meant I would have

14     been required to follow them in almost every instance, however,

15     they're no longer binding.  I am still, however, required to

16     consider them as one factor, among others, in determining what

17     an appropriate sentence is for you.

18          In a sense, the guidelines are a starting point for my

19     making that determination.  So my first task is to determine

20     what the sentencing range is under the guidelines, but before I

21     outline my calculations and finalize them with regard to the

22     guideline range, I'd like to discuss the various objections

23     that have been made to the guideline calculation by the

24     defense.

25          Now, specifically by my estimation, the defense

I5BJNG1                          Sentence

objects in several ways to the calculation:

First, to the value that is placed on the bribes, the
enhancement for there being multiple bribes, the enhancement
because the offense involved an elected public official or any
public official in high level decision-making or a sensitive
position, and to the role adjustment.

Let me ask Mr. Genser, are those the specific
guideline calculation objections?  Have I left anything out is
my question?

MR. GENSER:  I think you have got them all, your
Honor.

THE COURT:  Let's discuss each in turn.

So, Mr. Genser, do you have anything to add to the
defense submission concerning the value of the bribes?

MR. GENSER:  No, your Honor.  We stated our position
fully in our papers.

THE COURT:  Does the government have anything to add
to its submission with regard to the value of the bribes?

MS. ECHENBERG:  Your Honor, I will just briefly
address it.

THE COURT:  Sure.

MS. ECHENBERG:  I think the important thing to keep in
mind with regard to the bribe amount is that there are a number
of different ways to calculate it in which the bribe amount is
easily above the 550,000.  So we have broken it into four

I5BJNG1                          Sentence

different categories, and I'll just briefly cover those

categories.

          The first is the evidence of the payments from Mr. Ng

directly to Mr. Lorenzo through Terra Trading, and that total

is $350,000, and there was ample -- the number I have.  Do you

have a different number?

          THE COURT:  No.  In Government Exhibit 1501 and 1502?

          MS. ECHENBERG:  I am talking about the wires that

went -- there are other payments to Terra Trading, and that

might be why your Honor is focused on that makes the number

higher, but the wires that came directly from either Mr. Ng or

his company.  I can give you the dates on those, your Honor.

Those are on February 5th, 2013, May 19th, 2014, September

23rd, 2014, and February 18th, 2015.

          THE COURT:  So you're excluding the March 24 and March

26th of 2014?

          MS. ECHENBERG:  We are not, to be clear, we are not

excluding it.  Let me start with the payments to Mr. Lorenzo

that were purportedly for his work at --

          THE COURT:  Yes.

          MS. ECHENBERG:  Mr. Lorenzo's testimony that at least

part of what he was paid for, was to promote the UN support for

the Macau Center.  We argue at least a portion of those

payments were bribe payments, but even if you were to set those

aside, there are three additional categories that we think are

1    very clearly bribe payments.

2              So you have the South South News payments, right, and

3    those came in a number of forms.  Those were paid to Mr.

4    Lorenzo to pay his rent.  Those were paid to Mr. Lorenzo

5    through his brothers and sisters, and in some in instances

6    those were paid through Terra Trading.  That is one category.

7              The second category is the agreement that Mr. Lorenzo

8    and Mr. Ng make that Mr. Ng will pay even more money, $30,000 a

9    month on top of that South News salary for Mr. Lorenzo's even

10   more specific focus on the UN center.  That is the categories I

11   am talking about now that is over $300,000 of additional

12   payments.  So you have that category.

13             There was ample evidence of Mr. Lorenzo's testimony,

14   the sham contract, the timing of those payments which I can

15   review, but I think your Honor knows the facts well that that

16   shows were clearly bribe payments.  You have the no-show job,

17   which we think is another category we believe is clearly bribe

18   payments.  That is another $327,000.  Then you have the

19   $200,000 payment to --

20             THE COURT:  I am sorry.  Are you saying that Ms.

21   Cherian was paid $327,000?

22             MS. ECHENBERG:  Yes, and that is reflected on

23   Government Exhibit 1502.  Then we have $200,000 to the Ashe PGA

24   account.

25             THE COURT:  I thought the consulting payments were

I5BJNG1                         Sentence

1   32,500 or something like that.

2               MS. ECHENBERG:  Let me just look at the exhibit.

3               (Pause)

4               MS. ECHENBERG:  I apologize.  I was conflating two

5   things.  The $325,000 is Ms. Cherian's salary and the $200,000

6   payment to the Ashe PGA.  That together is well over the

7   550,000 number that we need to meet, again not even including

8   the South South News salary which we think at least in part

9   there was testimony that that was at least in part a bribe.

10  There was also testimony about another $20,000 cash payment.

11  So we think it is easily above the $550,000, and the Probation

12  Department agrees with that analysis.

13              THE COURT:  All right.  Mr. Genser, would you like to

14  respond in any way?

15              MR. GENSER:  Yes, your Honor.  We don't want to

16  relitigate the issues here.  Your Honor presided over the

17  trial.  Obviously, we have made arguments.  Arguments were made

18  at trial none of those payments have been established to be

19  bribes.

20              Just with respect to briefly the argument that the

21  Terra Trading contract was a sham contract, I would like to

22  remind the court that the testimony was that Lorenzo forged the

23  name on the contract.  It was Mr. Ng's desire to have a

24  contract.  Lorenzo forged a name on the contract because he

25  didn't want to be bound by it.  So the question it raises is if

I5BJNG1                           Sentence

1    Mr. Ng wanted to have a contract to make sure that Lorenzo was

2    going to have something he would be bound by and have to honor,

3    why would he also want it to be a sham contract?

4           There was no testimony Mr. Ng knew the contract that

5    Mr. Lorenzo thought it was false.  I also note there was

6    evidence at trial that the significant amount of those monies

7    that went to Terra Trading were used to pay for things like

8    brochures and marketing materials developed by Christian Batres

9    to showcase the idea of the Macau Conference Center.  That is

10   all part of why we argue that the evidence doesn't establish

11   that Mr. Ng intended those to be contract payments.

12          THE COURT:  Let me ask this, which relates to I guess

13   a little bit a question I had asked in my order.  As a legal

14   matter, does it, in other words, does the law require that

15   payments that are bribes or that are argued to be bribes, that

16   they go to pay someone's personal expenses or go to pay some,

17   for some other illicit activity, or is it really whether or not

18   the payments themselves are in relation for, in this case,

19   whether you say official acts or for actions taken the person,

20   the bribed recipient is my question.

21          I understand the factual argument and the argument

22   that with regard to the payments, the argument that Mr. Ng had

23   that perception and that is what it was going to be used for.

24   I am talking about as a legal matter.

25          Whoever wants to --

1          MR. GENSER:  I am happy for the government address it

2     and we are happy to respond.

3          MS. ECHENBERG:  Your Honor, I think we have addressed

4     this in our submission, but the critical issue is whether the

5     payments are designed to influence the official, and we think

6     the timing here makes that so clear.

7          For example, there is a $60,000 payment to Terra

8     Trading on February 5th, 2013, and then Lorenzo springs into

9     action, begins his discussions about revising the UN document

10    to include the Sun Kian improved almost immediately after these

11    discussions, and there are multiple examples of that set forth

12    at trial.

13          THE COURT:  Mr. Genser.

14          MR. GENSER:  Yes, your Honor.  I think this point is

15    more applicable to the question of the $200,000 payment to the

16    PGA account, which I think the trial record is clear there is a

17    lot of evidence that the way that was presented to Mr. Ng at

18    least was it was to help pay for a UN sponsored concert where

19    the original backer had backed out of it, and Mr. Ashe was

20    requesting a donation so the concert could go forward.

21          The concert did go forward and Mr. Lorenzo testified

22    that he attended the concert.  The precise question the court

23    is asking, can that legally, is it our position legally that

24    can't be a bribe because it went to a PGA account as opposed to

25    someone personal?

I5BJNG1                          Sentence

1           I think we do have an argument, and it is rooted in

2      the statutory language.  Section 666, which is the bribery

3      statute, applies to a bribe offered or paid to any person, and

4      the FCPA, that is Section 666 (a)(2), the FCPA applies only to

5      a bribe offered or paid to an official, foreign official,

6      political party official thereof, candidate, any person conduit

7      for the foregoing, and I can provide the statutory cite, the

8      FCPA statute, your Honor.

9           A donation to the office of the PGA is none of the

10     foregoing, and so we think basically under the plain language

11     of the statute, that payment can't qualify as a bribe.  It is

12     just to a recipient who is recognized as being capable of a

13     bribe recipient under the statute.

14          Our second argument is the one your Honor referenced

15     is that it goes to the intent.  To give a donation to a UN

16     office for a UN purpose speaks to the intent of Mr. Ng, which

17     was to do just what it was, just make a donation to help out

18     with the concert, and that was his intention.

19          THE COURT:  Okay.  All right.  Thank you.

20          Now, I find there is ample evidence in the record,

21     including the testimony of Mr. Lorenzo, the bank and other

22     financial records and emails to support the bribe payments to

23     Ashe and Lorenzo from defendant Ng and affiliated entities,

24     between 550,000 and $1.5 million, warranting the 14 level

25     increase.  Those payments are summarized, as I think the

I5BJNG1                          Sentence

1    government pointed out, in Government Exhibits 1501 and 1502.

2            Those bribes include, by way of example, the following

3    payments there are certain wire transfers and I think my

4    addition is a little different.  If you look at the items that

5    are denominated wires from either Mr. Ng or the Sun Kian Group,

6    I calculated it a little more than what the government came

7    out.  I calculated it as 370,000, but whether it is 370 or 350,

8    the records will bear that out.

9            In addition, those are the records I think that I had

10   for Mr. Ng, and again there is a reason why I became a lawyer

11   and not a scientist, I don't do math, but there is also a wire

12   from Sun Kian Group $90,000 February 18th of 2015.

13           Then there is also the purported consulting payments

14   to John Ashe's wife which the defense had calculated as

15   approximately $32,500.00.  I find there is more than ample

16   evidence presented during the trial that defendant Ng was aware

17   of these payments, including in documents and conversations,

18   and that these payments were not for consulting services

19   provided by Mr. Ashe's wife.

20           Now, with regard to the $200,000 payment to the bank

21   account or one of the bank accounts of John Ashe as President

22   of the General Assembly, or at least I think that may be the

23   notation, that may be the account name, I'm not entirely sure.

24   In any event, there was evidence in the record that Ashe

25   expressly said that he would not go to Macau and that Ng

1    requested that the trip be an official visit, and there was

2    some testimony I think during the trial what that meant.

3          In any event, Ashe traveled to Macau with his chief

4    along with other UN officials, including Lorenzo, in March of

5    2015 and that was before the $200,000 was wired to one of

6    Ashe's accounts.

7          There is also evidence that this money was not only to

8    encourage or to get Mr. Ashe to travel to Macau for the

9    official visit, but was also used to compensate Ashe for

10   officials action, and again this is an inference from the

11   evidence that could be drawn from actions, official actions

12   already taken, like the official UN document and the revised UN

13   document, and to get Ashe to take other official actions on

14   behalf of Mr. Ng.

15         For example, on May 22nd, 2014, Lorenzo sent an email

16   to Jeff Yin stating, "Jeff, see the bank account of the PGA

17   office.  Try to send the wire as soon as possible, and when you

18   send it, let me know so that I can advise him.  There are a lot

19   of things that we need to be done" -- excuse me -- "there are a

20   lot of things that need to be done.  He want to know when Ng

21   will come here.  I am working to get things we need."

22         Now, those things, and again either directly or

23   indirectly, the inference can be drawn that needed to be done

24   included, among other things, applying for Mr. Ashe to a

25   certain extent Mr. Lorenzo to apply pressure or influence on

I5BJNG1                          Sentence

1   Yiping Zhou, and obtaining a pro bono agreement, among other

2   things.

3           On June 1st of 2014, the $200,000 was wired by South

4   South News to one of Mr. Ashe's PGA accounts.  The evidence

5   presented at trial was sufficient to establish certainly by a

6   preponderance that the $200,000 was, indeed, a bribe.

7           It is also a fair inference that after the October

8   2010 discussion that Lorenzo testified he had with defendant Ng

9   about building a conference and meeting center in Macau and

10  need to obtain an official document from the UN, that Lorenzo's

11  job certainly, in his mind -- and I think the facts bear this

12  out -- changed and he took actions in his capacity as an

13  ambassador to the UN to obtain the official documents because

14  he was being paid.

15          I think that is what he indicated.  Therefore, from

16  that point on, at least a portion or all of it, I don't know as

17  a legal matter, when there is a change here, whether or not

18  there is a division; in other words, whether you would only

19  include a portion of the 20,000 or all of the 20,000.

20          What is clear is that Mr. Lorenzo didn't decline to do

21  this as part of his job, and by "job," I mean actually

22  exercising his powers as an ambassador to ensure that official

23  actions were taken in connection with that.  So I find

24  certainly at least a portion of that 20,000, if not all of it,

25  could be from that point on, that October 2010 time period, be

I5BJNG1                              Sentence

1      considered a bribe to be used to influence both ambassador and

2      PGA President Ashe as well as other members of the UN regarding

3      the Macau Center and including to obtain official documents and

4      other things in connection with that.

5              However, even using the late 2012 date that the

6      defense argues was the first point at which Mr. Ng became

7      interested in pursuing a UN conference center in Macau, the

8      $20,000 a month payments to Mr. Lorenzo, at least by my

9      calculation, would amount to somewhere in excess of $400,000

10     from that point forward to the conclusion, to the arrest of

11     Mr. Ng.

12             So I find there is more than ample evidence that

13     proves by a preponderance of the evidence that the value of the

14     bribes was at least $550,000, but less than $1.5 million, okay?

15             Let's next discuss the enhancement for multiple

16     bribes.  Mr. Genser, do you have anything to add with regard to

17     the arguments that are made in your papers with regard to that

18     issue?

19             MR. GENSER:  We don't, your Honor.

20             THE COURT:  Does the government wish to be heard with

21     regard to that issue?

22             MS. ECHENBERG:  No, your Honor.

23             THE COURT:  All right.  I find that the evidence is

24     more than sufficient to establish by a preponderance of the

25     evidence that there was more than one bribe here.  As an

initial matter, and as the government points out, there were at least the evidence shows two recipients of the bribes that the jury could have found, Mr. Ashe and Mr. Lorenzo.

That in and of itself means there are multiple bribe payments and separate bribe payments.  I'm not necessarily, in making my comments, although I don't know whether as a legal matter the payments that went as consulting payments to Ambassador Ashe's wife, I don't know as a legal matter that would count as payments to Mr. Ashe or whether as a legal matter you could still under the guidelines count that as a separate bribe.

In any event, I think based upon the separate payments to Mr. Ashe and Mr. Lorenzo, I find that the enhancement is appropriate.  In addition, there were multiple payments over the years of the existence of the scheme, and they were done at certain periods of time, and certain times they were done to, in essence, spur activity, get activity done.

In fact, at least on one or more occasion the payments were withheld so that to encourage, entice or what have you Mr. Lorenzo specifically to take action.  In addition, I think it is a fair inference from the evidence that certain payments were made to Mr. Ashe to actually get him to make those payments, and there were exchanges of emails from Mr. Ashe indicating prior conversations with the defendant concerning promises to support the PGA.  I find that those payments also

I5BJNG1                         Sentence

1    could be considered separate payments.  So I think the

2    enhancement is entirely appropriate here.

3            Let's discuss the enhancement because the offense

4    involved an elected public official or any public official in

5    high, a high decision-making or sensitive position.  Mr.

6    Genser, do you have anything to add to your papers with regard

7    to that issue?

8            MR. GENSER:  We do not, your Honor.

9            THE COURT:  Does the government have anything to add?

10           MS. ECHENBERG:  No, your Honor.

11           THE COURT:  So with regard to here, too, with regard

12   to this enhancement, I find that the evidence was sufficient to

13   establish by a preponderance of the evidence that the offense

14   did involve an elected official, public official or public

15   official in a high decision-making, sensitive position.  As an

16   initial matter, the application notes to this section of the

17   guidelines containing the definition of public official states

18   that public official shall be construed broadly.

19           Second, according to the application notes, the

20   definition of public official includes, among other things, "an

21   individual who:  One, is in a position of public trust with

22   official responsibility for carrying out a government program

23   or policy; two, acts under color of law or official right; or,

24   three, participates so substantially in government operations

25   as to possess de facto authority to make governmental

I5BJNG1                          Sentence

1    officials.

2          Then it is in parens, "e.g., which may include a

3    leader of a state or local political party who acts in the

4    manner described in this subdivision."

5          I think that the description there both taken together

6    are illustrative and not necessarily exclusive, but I also

7    point to the Second Circuit's decision in United States versus

8    Bahel, B A H E L, which indicated that the UN is a public

9    international organization, and 2C1.1 specifically was meant to

10   cover employees of the United Nations.

11         In that case, the Second Circuit also stated, "it is

12   difficult to imagine how the defendant there, Bahel, could not

13   be considered a high-ranking UN official since he was chief of

14   the commodity procurement section within the United Nations

15   procurement division.  While this position may not have been

16   the same as that of a representative of a member state, in

17   other words, I would say an ambassador, it is far from being a

18   baggage porter to which Bahel now seeks to compare himself."

19         Now, the court goes on to state the guidelines

20   expressly refer to the sentencing of individuals at public

21   international organizations as appropriately considered in the

22   context of Part C.  Again it goes on to state that Bahel's

23   position at the UN could also be referenced with his title,

24   which it describes as closer to that of a foreign diplomat,

25   political party official or tribal leader, all of which the

I5BJNG1                          Sentence

1    court found in that case were covered expressly by the

2    guideline.

3            The court in Bahel also noted that Section 2C1.1 also

4    applies to offenses under the Foreign Corrupt Practices Act,

5    which generally involve the payment to public officials,

6    candidates or public office or agent or intermediator with an

7    intent to influence an official act or decision of a foreign

8    government or political party.

9            So based upon my review of 2C1.1, the holding in Bahel

10   and the application notes and commentary of that section of the

11   guidelines, both Ashe, as the elected president of the PGA and

12   ambassador, and Lorenzo as an ambassador, both qualify as

13   public officials under 2C1.1, in that they are either elected

14   public officials or public officials in a high level

15   decision-making or sensitive position within the meaning of the

16   guidelines.

17           Now let's now discuss the role enhancement for Mr. Ng

18   as an organizer or leader of the criminal activity that

19   involved five or more participants or was otherwise extensive.

20           Mr. Genser, do you have anything to add with regard to

21   that?

22           MR. GENSER:  No, your Honor.  We rely on our papers.

23           THE COURT:  Does the government have anything to add?

24           MS. ECHENBERG:  No, your Honor.

25           THE COURT:  Now, here I find that the evidence was

1    more than sufficient to establish by a preponderance of the

2    evidence that defendant Ng was an organizer or leader of

3    criminal activity that involved five or more participants or

4    was otherwise extensive.

5           First, as the government and Probation Department

6    state, there are at least five participants in the criminal

7    activity here.  You have the defendant, you have Ashe, Lorenzo,

8    Yin and Forest Cao.

9           Now, I know the defense points out that Forest Cao and

10   Mr. Ng pursued, had different interests at a certain point in

11   time.  However, I believe that the government is correct, based

12   upon the testimony during the trial, that before Mr. Cao and

13   Mr. Ng had a falling out, the evidence supports a finding that

14   Mr. Cao started out working with Mr. Ng.  Therefore, Mr. Cao

15   was clearly a participant within a meaning of the guidelines.

16          In fact, I think, to the extent -- and I believe this

17   is the case -- he was or could be described as a

18   co-conspirator, who I would continue to be co-conspirator under

19   the law because I don't believe there was any evidence he, in

20   fact, withdrew from in a legal sense.  I believe the evidence

21   supports a finding that there are five or more participants.

22   However, in addition, I also find that the evidence supports

23   that Mr. Ng was a leader of criminal activity that was

24   otherwise extensive within the meaning of the guidelines.

25          The application notes for Section 3B1.2 provide that,

I5BJNG1                        Sentence

"in assessing whether an organization is otherwise extensive,

all persons involved during the course of the entire offense

are to be considered.  Thus, a fraud that involved only three

participants, but used the unknowing services of many

outsiders, could be considered extensive."

          Now, here the criminal activity involved the unknown

services of numerous outsiders.  By "outsiders," I mean -- and

the guidelines are consistent with this -- individuals who are

not participants, in other words, not considered participants

in the criminal activity.  So here those included employees of

South South News, people employed by the UN OSSC and the United

Nations itself who provided unknowing assistance to the

criminal activity related to the Macau, the development of the

Macau Conference Center.  Therefore, the application of a

four-level enhancement to the defendant's role as an

organizer-leader of criminal activity that involved five or

more participants or was otherwise extensive I find to be

warranted.  So in light of these findings, I reject the

guideline calculation contained on Page 39 of the defense

submission.

          Are there any other objections to the guideline

calculations contained in the presentence report, Mr. Genser?

          MR. GENSER:  No, your Honor.

          THE COURT:  From the government?

          MS. ECHENBERG:  No, your Honor.

I5BJNG1                        Sentence

1          THE COURT:  All right.  So the defense objections are

2     obviously preserved with regard to any appeal in this matter.

3          Now I will down to the business of calculating Mr.

4     Ng's guideline range using the November 1st, 2016 guideline

5     manual.  I do so in the following manner.  The counts of

6     conviction are grouped together pursuant to 3D1.2 (d) since the

7     offense level is determined largely on the basis of the total

8     value of the funds laundering during the offense.

9          Pursuant to 3D1.3 (b), since the counts involved

10    offenses of the same general type to which different guidelines

11    apply, the offense guideline that produces the highest offense

12    level is applied.  The guideline for Counts 5 and 6 under

13    Section 2S1.1 is applied here and since they produce the

14    highest level.  The base offense level is determined with

15    reference to Section 2S1.1, which applies to a violation of

16    Title 18, United States Code, Section 1956 (h).

17         The offense level calculated from the underlying

18    offenses is utilized since the defendant committed the

19    underlying offenses, and the offense level for these offenses

20    can be determined, and this is again pursuant to 2S1.1(a)(1),

21    so the most appropriate guideline for the calculation for the

22    underlying offenses is 2C1.1.

23         Since Mr. Ng was not a public official pursuant to

24    2C1.1(a)(2), the base offense level is 12.  Since the offense

25    involved more than one bribe, as I mentioned before and as I

1    found, a two-level increase is warranted.  Since the bribes

2    totaled more than $550,000, but not more than $1.5 million, a

3    14 level increase is warranted.  Since the offense level

4    involved an elected public official or any public official in a

5    high level, decision-making or sensitive position, a four level

6    increase is also warranted.  Also since Mr. Ng was convicted

7    under 18, United States Code, Section 1956, an additional

8    two-level increase is warranted.

9          Now, finally, because, as I found Mr. Ng was an

10   organizer, leader of criminal activity that involved five or

11   more participants or was otherwise extensive, a four level

12   increase is warranted.  The resulting adjusted offense level is

13   38.  Mr. Ng's criminal history category is I, resulting in a

14   guideline range of 235 to 293 months imprisonment.

15         Now, understanding there have been various objections,

16   do the parties agree that based upon the findings that I've

17   made, that Mr. Ng's guideline range is 235 to 293 months in

18   prison.  The government?

19         MS. ECHENBERG:  Yes, your Honor.

20         THE COURT:  The defense?

21         MR. GENSER:  Yes, your Honor.

22         THE COURT:  Based upon the parties' agreement, in

23   other words, of course, with noting the objections that have

24   already been interposed and my independent evaluation of the

25   sentencing guidelines, I accept the guideline calculation in

I5BJNG1                          Sentence

1      the presentence report.  I find that Mr. Ng's offense level is

2      38, Criminal History Category I, and the recommended sentence;

3      therefore, is 235 to 293 months imprisonment.  The supervised

4      release range is one to three years on each count, and the fine

5      range is $25,000 to $1 million.

6              Now, with regard to the applicability of any

7      departures, I note that in the defense submission there is a

8      request for a departure based at least upon Mr. Ng's age,

9      infirmities and status as a deportable alien.

10             I am to consider whether his age and status as an

11     alien warrants a departure.  Understand the case law applicable

12     under the Second Circuit, a departure under these grounds is

13     not warranted under the facts and circumstances here.

14             In addition, I have also considered whether any other,

15     there are any other appropriate bases for departure from the

16     advisory range within the guideline system, and while

17     recognizing I do have the authority to depart, I do not find

18     any grounds warranting a departure under the guidelines.

19             However, I find and I recognize that I do have the

20     authority to consider Mr. Ng's age, infirmities, status as a

21     deportable alien and any other factors contained in 18 United

22     States Code Section 3553 (a) as a basis for a variance here.

23             Mr. Genser, in your submission on behalf of Mr. Ng,

24     you requested a sentence of time-served.  The Probation

25     Department has indicated that a variance is appropriate here.

I5BJNG1                      Sentence

1    However, the Probation Department recommends a sentence of 72

2    months imprisonment.  The government also states a variance is

3    appropriate, in other words, but they recommend the sentence be

4    something that is greater than 72 months imprisonment.

5          Now, I do agree with the parties and the Probation

6    Department that a variance appears to be warranted in this

7    case, not the least of which I think it is fair to say that a

8    235 month sentence would effectively be the rest of Mr. Ng's

9    life, being that he is currently 69 years' old.

10          Now, the issue in the end is how much of a variance is

11   appropriate here.  Before I hear the parties, let's talk about

12   the questions that I raised in my May 9th order.  Now, I think

13   with regard to Item 1, I have the answer from the government

14   from their perspective concerning the pages of the presentence

15   report related to the donation issue, for lack of a better

16   term.  Mr. Genser, were there any pages of that report that the

17   defense feels I should reference, understanding that the

18   defense may take the argument that I shouldn't consider the

19   report in any way, shape or form?

20          MR. GENSER:  Yes, your Honor.  Thank you.

21          That is correct, our position is that the court should

22   afford that report no weight, in that it is not relevant to the

23   sentencing here.  If your Honor is going to consider it, we

24   would suggest that your Honor also consider the minority

25   report, noting that the Senate report that your Honor asked

I5BJNG1                        Sentence

about was a majority report.  It is a partisan report.

There was a minority report in Volume V, at Page 5273.
We'll note that on occasion it refers to Mr. Ng as Mr. Wu,
which is the Mandarin pronunciation, but the minority report
notes at that page that the evidence before the committee is
insufficient to establish the precise source of funds for many
of the 220,000 contributions related to the person who was
accused of making those contributions and that the committee
was also unable to obtain specific evidence on the role that
Mr. Ng may have played in particular contribution decisions.

THE COURT:  Okay.  I'll note for the record that what
I did was I went to the report on the internet, I searched for
S E N G throughout the report, both the majority report and the
minority report, and so I am going to consider both here.  I
think for me the critical issue is I guess in part I think
there is sufficient information in there that by a
preponderance of the evidence that I can appropriately consider
that.

It is not so much the precise nature of the funds,
whether it was 200,000 or a hundred thousand, you know, or the
like.  The fact that at the time that this all occurred, it
garnered substantial amount of press coverage and substantial
amount of activity by officials of this country, and while the
facts may be, the facts may be what they are, the issue in part
I'm considering is the impact the knowledge of that would have

I5BJNG1                         Sentence

1    on the defendant and his activities as it relates to the future

2    and specifically with regard to any issues relating to

3    deterrence, specific deterrence is here.

4              So I understand the arguments being made.  Let me ask

5    you, with regard to Item 2, the government directly in their

6    opposition memorandum in connection with the pretrial motions

7    in limine, I have reviewed that already.  The question I had,

8    was there any other information related to the representative

9    that the government would point me to?

10             I think based upon the email I received, I think the

11   answer to that is no, but let me hear from the government with

12   regard to that.

13             MS. ECHENBERG:  That's right, your Honor, there is not

14   another specific document.  To the extent we end up arguing

15   more about the facts, we may want to respond with additional

16   information, but there is nothing we would point the court to

17   at this time.

18             THE COURT:  Mr. Genser.

19             MR. GENSER:  Yes, your Honor.  We have one document

20   that we would like to submit if the court is going to consider

21   that uncharged conduct or that set of conduct.  It is something

22   that was produced to us in discovery by the government.  It has

23   a Bates stamp on it 000302503.  It is not redacted right now,

24   and I know we haven't been identifying some of the participants

25   in this set of conduct, so perhaps after this hearing we can

I5BJNG1                          Sentence

deal with whether it gets filed in a redacted form.

It is some emails that we think made clear that the
defendant was a benefactor to the family of the representative
who were in dire financial straights following the
representative's conviction and that he was basically helping
them financially so they could stay in their home.  That is
reflected in this set of emails.

THE COURT:  All right.  If there is a request to
redact the specific names that are mentioned in there -- why
don't you hand it up.  Had you provided a copy of that to the
government?

MR. GENSER:  Yes.

MS. ECHENBERG:  Yes.

THE COURT:  I ask the parties to meet-and-confer with
regard to that.  With regard to this issue, it is a work in
progress.  I haven't made an ultimate decision.  I am likely to
reference it, the issues.

I think in looking at this, it does appear that
certain of the names, I would agree, probably should be
redacted.  I will leave it to the parties to meet-and-confer
about that and present me with a redacted form, and then I'll
rule on whether or not I believe the redactions are appropriate
because I do believe it should be made part of the record.

Now, with regard to Item 3, I will ask the parties in
your comments to me to address those.  Similarly, I ask with

I5BJNG1                        Sentence

1   regard to Item 4 for you to do the same.

2            With regard to Item 10, I don't know whether there was

3   evidence -- excuse me -- Item 5 -- I don't know whether there

4   was evidence in the record concerning the reference in

5   Paragraph 58 of the presentence report concerning the travel

6   expenses or not, but let me first hear from the government

7   whether or not there was evidence in the record as to who or

8   what entity paid for those travel expenses.

9            MS. ECHENBERG:  It is our understanding that the trip

10   that Ambassador Ashe took was the trip he took to Macau, was

11   tacked onto a trip that was already planned to a different

12   location, to India, and that either the United Nations or the

13   Indian government was paying for that trip and he just rerouted

14   his return through Hong Kong.

15            Once he got to Hong Kong with his delegation, we

16   understand Mr. Ng paid for a ferry to Macau and for the

17   accommodations in Macau.  I believe that was reflected in Mr.

18   Lorenzo's testimony, possibly in Frances Fuller's testimony to

19   some extent, and certainly reflected in the 3500 material as

20   well.

21            THE COURT:  Mr. Genser, is that something you take

22   issue with, what the government has just said?

23            MR. GENSER:  Not as far as it goes.  Obviously to

24   legal conclusions and inferences to be drawn, we preserve all

25   of our objections.

I5BJNG1                          Sentence

1           THE COURT:  Of course.  Okay.

2           With regard to Item 6 in my order, I asked the parties

3   to address that in their comments to me.  I believe that Item 7

4   has been addressed by the government, providing me Government

5   Exhibit 968.  Does the defense agree that was the brochure or

6   something?  I may be inaccurately describing it, but it is

7   Government Exhibit 968?

8           MR. GENSER:  We don't have an issue with that, your

9   Honor.

10          THE COURT:  Now, with regard to Item 8, I believe that

11  the proposed consent preliminary order of forfeiture money

12  judgment resolves that, those questions that I had there.  Do

13  the parties agree with regard to that?

14          MS. ECHENBERG:  Yes, your Honor.

15          MR. GENSER:  Yes, your Honor.

16          THE COURT:  Okay.  Now I'll hear from the parties.

17          Does the government wish to be heard to sentencing?

18          MS. ECHENBERG:  We do, your Honor.

19          THE COURT:  All right.  Go ahead.

20          MS. ECHENBERG:  After presiding over this month-long

21  trial, your Honor, and as you demonstrated during the

22  proceedings thus far, your Honor is extremely familiar with the

23  facts of this case.

24          This defendant is an exceptionally wealthy and

25  powerful man, and he committed an extensive and a serious

I5BJNG1                          Sentence

crime.  For many years the defendant made hundreds of thousands

of dollars of payments, and your Honor has already ruled that

that number is well above $550,000.  He made those payments to

two United Nations ambassadors.  He made those payments in ways

that were hard to trace, and he made those payments in an

effort to obtain the United Nations approval for a permanent

United Nations center in Macau that would be the anchor for the

defendant's own massive real estate development project.

          What the defendant did, he essentially bought the

ability to act as a member state within the United Nations,

something that is not available on the open market and it is

precisely the type of unfair advantage that the bribery and the

FCPA statutes are designed to prevent.

          It is also the type of inequality that is in conflict

with the basic principles of the United Nations.  The defendant

engaged in conduct that not only gave him a significant unfair

advantage, it caused serious reputational harm and serious

financial harm to the United Nations, and that is not in

dispute.

          Your Honor has already ruled in a prior sentencing in

this case that those consequences came to the United Nations,

and the defense has acknowledged in connection with the

restitution order, there were hundreds of thousands of dollars

at least of damage to the United States nations.  It is the

government's position that there should be a significant

I5BJNG1                         Sentence

incarceratory sentence, as least as high as the probation

officer has argued, 17 months.

THE COURT:  72?

MS. ECHENBERG:  72 months.

MR. GENSER:  We'll take the 17.

THE COURT:  I figured, yes.

MS. ECHENBERG:  My words cut off, your Honor, but 72

months is absolutely what I was referring to.

I want to address, and I don't know if I will have the

opportunity to respond when the defense finishes, so I'll

address now a few of the arguments, I expect, unless your Honor

is going to give us the opportunity?

THE COURT:  No.  I think I would allow within reason

the ability for the parties to respond to each other's

arguments.  It is up to you, Ms. Echenberg.  You can address

them, and if there are issues, points you want to make later

on, you can do that.

MS. ECHENBERG:  I'll address them briefly.

First, this is not an aberration for this defendant.

I think your Honor honed in on exactly what is important about

the conduct that was addressed in the 1990's in the Senate

report.  The defendant was approached by investigators.  The

conduct was widely reported.  The defendant was on notice since

the 1990's that engaging in financial transactions,

particularly transactions that go through other people and that

I5BJNG1                    Sentence

are shaded in different ways, is conduct that is criminal in

the United States, it is conduct that is closely watched in the

United States.  The defendant was on notice about that behavior

decades ago.

        With regard to the conduct that involves the

representative, first I would note the email that has been

passed up deals with a time period when that individual was no

longer in public office, so we don't think that email is

particularly relevant, but that conduct occurred after the

conduct in the 1990's and the conduct occurred in a secretive

manner.  In the 3500 material -- and there would have been

testimony had this been admitted at trial -- the defendant at

least in one instance directed his assistant to provide money

to the representative in a bag under a table in ways that

demonstrate that the defendant understood that this was

improper conduct.

        THE COURT:  Just so that I understand --

        MS. ECHENBERG:  Yes.

        THE COURT:  -- your proffer of that evidence, was that

prior to -- that was while the representative was still a

representative.  Is that correct?

        MS. ECHENBERG:  That's correct, your Honor.  The

payments were designed to have access to other public

officials.

        THE COURT:  Okay.

1          MS. ECHENBERG:  So this conduct is not an aberration,

2     and for that reason it should be significantly punished.  The

3     defense spends a significant part of their submission focusing

4     on the defendant's philanthropic efforts.

5          First, as we noted in our submission, while it is an

6     impressive amount of money, no doubt, the defendant himself has

7     acknowledged that he is a billionaire, he is worth $1.8

8     billion, so the amount that he gave to philanthropic causes is

9     not extraordinary in the way that the guidelines references

10    should be a reason for a significant reduction in sentence, the

11    kind that the defense is asking for.

12         In any event, the government is not arguing for a

13    guideline sentence here, nor is Probation.  The government and

14    Probation are taking account of those philanthropic efforts and

15    the defendant's health conditions, which is another issue that

16    the defense addresses.  Those health conditions are not

17    extraordinary, either.  They are health conditions that the

18    Bureau of Prisons twice, in letters that we have submitted to

19    your Honor, says that they can accommodate and they accommodate

20    for many other prisoners.

21         The defense also addresses business and family

22    consequences, and while those consequences may be unfortunate

23    for the defendant and his family, those are risks and the

24    expected consequence of engaging in white-collar crime such as

25    this.  Again, I would come back to the fact that the defendant

I5BJNG1                          Sentence

1   himself says he is worth $1.8 billion.  So this is not a

2   situation where anyone is going to be in poverty or in any sort

3   of dire straights.

4        None of those reasons gives the court a reason to do

5   anything but give the defendant a significant incarceratory

6   sentence here.  I would note one other thing.  It is not

7   something the defense has argued yet, but I expect they may

8   argue.  The defendant's home detention during these proceedings

9   should not be a factor in your Honor's consideration of the

10  sentence.  The home detention did what it was designed to do.

11  It kept the defendant returning to court for these proceedings

12  leading up to sentencing just like any other defendant who is

13  on bail.

14        I would refer the court to the PSR that describes the

15  defendant's home detention.  He lives in a 24-hour concierge

16  building.  He lives in an apartment that is, in fact, two

17  apartments, combining a very large apartment, four bedrooms,

18  three and a half bathrooms, a large living room, a large

19  kitchen, which is well furnished and well maintained.  That is

20  Probation's description.

21        He has a cook, a masseuse that constantly come by that

22  visit him from all over the world, and that increases with

23  frequency for holidays and special occasions and he is frankly

24  living a lavish lifestyle.  He himself told the Probation

25  Department that his monthly expenses are over $20,000 a month.

I5BJNG1                          Sentence

So there is nothing about what the defendant has experienced

thus far that is punishing or is anything like an incarceratory

sentence.

          We have submitted the orders for forfeiture and

restitution, and I would also just reiterate our argument in

the sentencing submission for a significant fine of $2 million.

          THE COURT:  All right.  Mr. Genser, do you wish to be

heard.

          MR. GENSER:  Yes, your Honor.

          THE COURT:  Okay.

          MR. GENSER:  I have comments that will address the

3553 sentencing factors, but before I address that, your Honor,

I wanted to briefly respond on the sort of I guess we call it

the three uncharged conduct areas without using the names of

the other folks that are involved.

          So our argument, your Honor, is that those should be

afforded no weight.  They're not relevant to sentencing.

They're certainly not aggravating factors, not just because it

is hearsay and hasn't been presented in any kind of

comprehensive way, but because there is no allegation and

certainly no proof that any of that relates to bribery.

          With respect to the Senate report, what I wanted to

say about that, your Honor, is the business associate involved

in that case was a business associate of Mr. Ng's.  They were

looking to set up a business.  Mr. Ng was looking to set up

I5BJNG1                          Sentence

1   business relationships in the U.S. and between the U.S. and

2   China, and he was in business with that person, and that is why

3   there were funds wired into accounts of trading companies.

4   That individual invited Mr. Ng to come to political events, and

5   Mr. Ng took advantage of those invitations.

6           There is nothing, certainly nothing except a few

7   instances of what I would qualify as double hearsay to suggest

8   that Mr. Ng had any knowledge of any campaign finance

9   violations, and what I'll note is that the individual involved

10  pleaded guilty, and it is our understanding he was actually a

11  cooperating witness and received a 5K letter from the

12  government.

13          I know this just from Google searching, and I have an

14  article from a CNN news article, November 1st, 1999 I can hand

15  up to your Honor that reports that.

16          THE COURT:  That is okay.  I am familiar with it,

17  which will be no surprise to my law clerk, I had Googled that

18  to determine what sentence that individual had received and

19  became aware of it at least in the media he was reported as

20  being a cooperator.  Let me ask this, though.

21          I understand the hearsay argument, but I can rely on

22  hearsay?

23          THE INTERPRETER:  The interpreter cannot hear your

24  microphone.

25          THE COURT:  Okay.  Sorry.

I5BJNG1                         Sentence

1              Let me just start again.  With regard to hearsay, I

2     can rely on hearsay and, in fact, I dare say many of the --

3     well, I think all of the -- well, many of the exhibits to the

4     defense submission are, in fact, hearsay, some double hearsay.

5     So just to get the legal point out of the way, I can rely on

6     hearsay evidence in connection with sentencing.

7              Do you agree with that?

8              MR. GENSER:  I do, your Honor.  I am talking the

9     weight should the court ascribe to it.  As additional

10    background, there was no allegation of any bribery at all in

11    any aspect of that Senate report.  It was a campaign violation

12    issue with respect to the business associate.

13             I'll also note, your Honor, that Mr. Ng was never

14    charged with anything related to that.  I know that there was

15    something in the PSR that suggested that witnesses had fled,

16    and Mr. Ng didn't give an interview when he was approached in

17    China relating to that, but I will proffer to the court that

18    Mr. Ng recalls actually meeting with investigators in I believe

19    1997 in his attorney's office in China, Mr. Valente, and

20    answering questions about it, and to his understanding, it was

21    cleared up.

22             So our position is if this has any relevance, its

23    relevance to knowledge that there are campaign finance laws

24    that prohibit foreign donations, it doesn't speak to what the

25    allegation in this case is, which is bribery.  Our position is

I5BJNG1                              Sentence

Mr. Ng wasn't involved, didn't have any knowledge of campaign
violations in that case, and it shouldn't be given any weight
with respect to this sentencing.

         With respect to the representative, I think we have
made our point there.  There is again no allegation of bribery.
There is an allegation of some gifts and support to the
representative, as the government just said, for access, to
meet other people.  The fact is that Mr. Ng became a benefactor
to the representative's family.  That representative was
convicted, he was in terrible financial situation, and he
essentially implored Mr. Ng to help him support his family
after-the-fact, and Mr. Ng did.  He took the representative's
children as his own godchildren, and that is reflected in the
letter.

         So the government says that's somehow an aggravating
factor, the court can further look at it as further evidence of
Mr. Ng's general approach being charitable and trying to help
out friends in need.

         With respect to the UN official and the $25,000, that
was a loan.  The person requested a loan to help out with
graduate school.  Mr. Ng agreed to give the loan.  The 3500
material reflects that.  There was expectation it would be
repaid within four or five years, and there is really nothing
more to that.  I don't think any of that should be given any
weight or factor in.  None of it speaks to a pattern or a

I5BJNG1                       Sentence

1    history of attempting to bribe.  It is quite the opposite.  If

2    anything, it is a pattern or history of thinking that certainly

3    it is okay to have relationships with people, certainly okay to

4    help people financially and try and network and establish

5    himself and get contacts through those relationships.

6            So with that, I would like to now address the

7    sentencing factors and I have comments that may take a little

8    while.  So we thank the court in advance for your patience.

9            THE COURT:  Why don't we take a brief break since in

10   your comments you have indicated will take a little bit of

11   time, and the government I may have response to that.  Let's

12   take a break now and come back in about five minutes.  It is

13   about noon, so we'll come back somewhere between 12:05 and

14   12:10.  Say 12:10 because there are a lot of folks here.

15           (Recess)

16           THE COURT:  You may be seated.  Mr. Genser, you may

17   proceed.

18           MR. GENSER:  Thank you, your Honor.

19           Your Honor, Mr. Ng is 69-year-old man with some

20   significant health issues.  He has a history of strokes,

21   coronary artery disease, diabetes, high blood pressure,

22   hypertension, gall bladder issues.  In 10 years, he will be 80

23   years' old, just about 80 years' old, and he looks all right

24   today, but we don't know what kind of shape he will be in in 10

25   years, and I think it is fair to say that these next 10 years

I5BJNG1                        Sentence

will be perhaps the only 10 good years that he has left.

          The government is asking the court to sentence him to

in excess of six years in jail, an amount that could well turn

out to be a life sentence for him depending on what that is.

His native language is Cantonese.  He doesn't speak any

English.  He can't stomach western food.  When he was

incarcerated at the beginning of this case for 30 days in a

maximum security facility or equivalent, he lost 15 pounds.

          Jail is going to be very, very hard on him if your

Honor sentences him to jail because of his age, his health

issues, his language, he will be isolated and vulnerable in a

way that most defendants are not.

          He has, as I mentioned, already spent 30 days in jail

and he spent the last two and a half years locked in an

apartment.  It's a perfectly fine apartment, but he has been

locked in a apartment.  He has not had his freedom for the past

two and a half years.  He indicated a waiver of deportation,

meaning upon release from jail, as soon as the ICE agency gets

around to it, he will immediately go into their custody.  As

soon as they get around to it, he will be deported to China.

He will be barred from reentry for 10 years.  He will never

come back to the United States, your Honor.

          We ask the court to impose a sentence of time-served,

let him go back him to his friends and family, many of whom

have flown here from China and are in the courtroom here today

I5BJNG1                          Sentence

1   to be with him and show their support for him and for the

2   court.

3               As the court knows, Section 3553 sets forth various

4   factors that the court shall consider in determining a

5   particular sentence, and the overall goal is to impose a

6   sentence that is sufficient but not greater than necessary to

7   comply with the purposes in Paragraph 2 of that section.  What

8   I would like to do is just highlight some of the factors.  I

9   won't address all of them.  We addressed them in our papers,

10  and I know your Honor has read them carefully.

11              First I would like to talk about the factors in

12  Subsection (A)(1), that direct the court to consider the nature

13  and circumstance of the offense and the history and

14  characteristics of the defendant.

15              I am going to talk about the second part of that and

16  come back to the first part of that later.  I'll talk about his

17  history because his personal background and his history has

18  shaped him into the person he is today.

19              Notwithstanding the conduct in this case for which the

20  jury convicted him, the person that he is is a person who has

21  demonstrated extraordinary kindness and compassion to everyone

22  around him at every stage in his life.  That is informed by the

23  history and that is what shaped him.

24              Mr. Ng has led a remarkable life.  He is probably one

25  of the most remarkable people I've ever met and perhaps that

I5BJNG1                          Sentence

many of us in this room has ever met or will ever meet.  He
came from literally nothing.  He has lived through unimaginable
poverty.  He has lived through hardship and tragedy, and he has
persevered to become an extraordinarily successful businessman
almost through sheer force of his will.

His life story is just simply amazing.  He grew up in
extreme poverty in a turbulent, violent time in the aftermath
of the Communist revolution in China.  His family was run out
of his village and exiled by the Communist Party.  They
wandered while he was a young boy from village to village,
essentially close to starvation, scrounging for food.

His mother was so desperate that when he was a young
boy, she tried to drown herself and the surviving children that
she had because several of his siblings he never met, they
perished before he was born, she tried to commit suicide by
drowning them all in a pond, but they were saved by villagers.
He survived.  He persevered.  He quit school after elementary
school to go to work to help his family.

He did various odd jobs.  He wound up working
construction, building what we could call them houses but
they're more like brick shacks by hand.  He made the equivalent
of $3.50 a week, most of which he gave to his mother to help
support the family.  He was so poor when he got married, he was
wearing borrowed clothes.  He didn't have a pair of shoes.  He
built his own house out of abandon bricks.  The house didn't

have door or window, didn't have running water, didn't have
electricity.

In 1978, but he was determined to improve his
situation.  In 1978, he moved to Macau with the equivalent of
$13.00 in his pocket, and he would turn that $13.00 into a
billion dollar real estate business.  He started out by selling
excess inventory on the streets of Macau, inventory of clothes
and fabrics.  He was just one of thousands of migrants trying
to scrape a living together.

He rented a factory.  He lived and slept there with
his wife and his children.  He hired people from his village
who had also emigrated to Macau to help sell clothes on the
street.  His strength and his enterprising spirit allowed him
to become a successful entrepreneur.  He became a successful
fabric seller in Macau, did well for a while, but that business
went under in the wake of Tiananmen Square protest and impact
that had on economy.  That also depressed real estate values in
Macau, he had the foresight and gusto to invest in real estate
when values were very depressed, and he did that and that paid
off.

In 1993, based on some reforms, real estate values
soared and he became wealthy for the first time, really
wealthy.  That success was short-lived.  As the court knows
from our submissions, in 1998 his second son, his beloved
second son, Bin Yan, who was 19 years' old and studying in

I5BJNG1                        Sentence

1   Canada, was killed in a tragic car accident.  That was

2   devastating to Mr. Ng and his family, obviously.

3              In the years after his son's death, Mr. Ng suffered

4   two strokes, was hospitalized.  His business suffered as well

5   and there was the SARS epidemic in 2003, which again depressed

6   the real estate market, and Mr. Ng's real estate business which

7   was overextended collapsed.  He essentially lost everything,

8   was heavily in debt, chased by creditors, but he survived,

9   persevered again, never gave up.

10             He consoled his wife, supported his family, he worked

11   hard to keep current on his loan payments, and he doubled-down

12   on real estate, taking another chance that it would come back,

13   and it paid off again and he became wealthy again.

14             I dwell on this because it has shaped him.  These

15   experiences have shaped him.  They made him who he is.  He was

16   born a peasant.  He is a pesant in his heart.  He is intimately

17   familiar with poverty, with pain and suffering, and he has

18   never forgotten where he came from, and that's why, as you see

19   in the letters of support and the people who are here who have

20   written to the court, he has lived a life of such extraordinary

21   compassion and generosity, and that goes to his good character,

22   which is obviously a factor that is highly relevant under the

23   3553 analysis under Subsection (a)(1).

24             I can talk about the tens of millions of dollars he

25   has given to charities, to build roads, hospitals, schools to

1    support youth in Macau.  His assistance to the elderly in the

2    Village that he came from, that is laid out in our papers and

3    it speaks to his generous spirit.

4            We're not talking just about the amount; we are

5    talking about the quality of his charity, and that is what I

6    think is more revealing than the amount of money he has given.

7    What I would like to focus on is the way in which Mr. Ng has

8    given of himself, the way he has cared for and treated his

9    family and his employees, his fellow villagers and his

10   countrymen over the years whether he was poor or rich.  That's

11   why we're asking for a variance, and there are lots of cases

12   that we cite in our papers that support a variance for all of

13   those grounds.

14           I want to touch on a few.  There are a lots of

15   examples, countless examples of his generosity and compassion

16   and good character in our papers.  Just a few examples.

17   Exhibit 45 to our submission is a letter from Mr. Ng's cousin,

18   Wu Yan, I hope I am pronouncing that correctly, he was Mr. Ng's

19   younger cousin, and he describes an incident when they were

20   working in construction when Mr. Ng, before he became

21   successful in Macau, Mr. Ng came across an old man in a nearby

22   village basically senile, living in the street all alone, the

23   kind of person who everyday scores of other people would just

24   walk by, but Mr. Ng didn't.  He took pity on him and he took

25   him to get some clothes, took him to get some food.  He found

him a place to live.  He followed up with him.  He tried to get

him into a nursing home.  He just did that out of the kindness

of his heart before he was a wealthy man.

          Wu Yan describes how in the 1970's in their village

Mr. Ng did a number of things on his own, had an enterprising

spirit to try to improve things for the villagers.  He had the

idea to go and get young saplings and transplant them into the

village so there would be trees growing there, and he organized

the villagers to do that.  He organized them to rebuild a

bridge that was falling apart and was unsafe for children and

older people to cross the river.  He organized the villagers to

dig fresh water wells, and they worked together digging the

wells with their bare hands.

          He tells how when he was working in the factory,

living in the factory in Macau selling clothes, Mr. Ng would

let Mr. Yo Yan sleep on the only comforable table in the

factory while Mr. Ng himself slept on the floor because he was

his younger cousin and how when he was sick, Mr. Ng would brew

Chinese herbal medicine for him and stay with him and care for

him.  That is his nature.  That is who he is.  These are a few

of examples of scores of examples in the letters.

          There are so many stories of Mr. Ng not only giving

financial help to his employees and villagers when they were

sick and faced debilitating medical bills, but it is not just

the financial help, but it is his readiness to help even the

lowliest employee and the way he would get personally involved
to help arrange for medical care.  It wasn't somebody who was
just writing a check.

          Exhibit 2, your Honor, in our submission is a letter
from Chin Chin Yo, a fellow from Mr. Ng's home village of Ju
Jang in China, and he described in how 2007 Mr. Ng learned how
he suffered a stroke and helped him find treatment in various
hospitals, followed up and got physical therapy so he could
recover.  He helped him make appointments and, yes, he paid for
his medical care, gave him thousands of dollars to help him pay
for his medical care.  He also came to visit for him and check
up on him and he encouraged him to carry on.

          Exhibit 12 is another example of that from Young Hu,
another fellow villager.  He helped her and followed up with
her when her husband was sick with cancer.  In 2007 when she
fell ill, he followed up again.  Just a few examples, your
Honor.

          He has been good to his employees.  He is a kind and
compassionate boss.  He cares about his employees, and that
comes through.  Exhibit 15, your Honor, Liang Segwan wrote a
letter in support.  She worked in Mr. Ng's company doing HR for
23 years.  When she was 37 years' old, she became pregnant and
she had a high-risk pregnancy.  Mr. Ng approved her to have
extra leave.  He gave her extra months' pay that wasn't
required by law.  He followed up with her to make sure she was

I5BJNG1                         Sentence

1    getting enough nutrition for herself and the baby, and not only

2    that, he held her job open for a year until she was ready to

3    come back and when she was healthy and ready to come back to

4    work.

5           More recently with South South News, after Mr. Ng was

6    incarcerated in this case, he continued to fund the operations

7    of South South News so that the employees weren't abruptly cut

8    off and finding themselves suddenly unemployed.

9           There is another story, example from the letters I

10   think is worth dwelling on for a moment.  Exhibit 35 from the

11   gentleman named Wu San Hu who worked with Mr. Ng's masseuse in

12   China.  He tells a story, an incident of whether Mr. Ng was in

13   a restaurant and private room in a meeting and Mr. Wu San who

14   fell ill, who fainted and he went down on the floor and called

15   out for help.  The waiter came over, immediately ran into the

16   private room to get Mr. Ng.

17          Mr. Ng was in the middle of a business meeting comes

18   running out, goes right to him, gives him his medicine, Chinese

19   herbal medicine that he keeps for his own heart issues,

20   administers those, rubbing his forehead, directing people to

21   call for an ambulance, staying with him and caring for him.  Of

22   course, he offered to pay for his medical costs.  He recovered,

23   thankfully.

24          But this one is interesting in particular because it

25   is very similar to what the court learned about last year at

I5BJNG1                              Sentence

1    the post-conviction bail hearing when the court learned Mr. Ng

2    came to the aid of John Prindle, one of the guards from

3    Guidepost who was guarding Mr. Ng when he was in the gym in his

4    building and Mr. Prindle suffered a heart attack.  Mr. Ng

5    immediately came to his aid, and he did the same thing, he

6    stayed with him, he tried to let the guards know that he had

7    medicine in his apartment that could help.  He tried to help

8    with CPR.  This wasn't even a thought of trying to take

9    advantage of the situation to escape.  This was his instinct

10   because that is who he is.

11           It is not something that he did for show or for

12   recognition or for some advantage.  He did it because that was

13   the right thing to do and he cares about the people around him.

14   He never even mentioned that incident to his lawyers.  We

15   learned about it, as your Honor knows, from the Guidepost cards

16   long after the fact.

17           That just speaks to his character.  Whatever led to

18   the conviction, he is a good and caring man.  He also has a

19   quality of forgiveness when he is wronged, and I think I'll

20   dwell on that briefly.  Exhibit 8, shows his big heartedness

21   and his readiness to forgive and forget.  There is a letter

22   from a gentleman named Quan Mu Sen, who describes an incident

23   when Mr. Ng was defrauded in a business deal out of two million

24   I guess Chinese dollars, Chinese currency, and the perpetrator

25   was arrested and the money was repaid.  Mr. Ng, out of pity,

I5BJNG1                        Sentence

1   even though he was the victim of the fraud, wrote a letter

2   seeking leniency to the court just out of pity for the man.

3           Exhibit 43 is a letter from Wu Quan Non, nephew of

4   Mr. Ng.  He tells of a story that is also revealing of his

5   character and his spirit when Mr. Ng was back in the Village

6   and he was giving always to help elderly in the Village.  He

7   came upon a man 80 years' old, and the man started crying and

8   asked him why, and he said well, I am the one of the people who

9   denounced your family as landlords when you were a little boy,

10  and now you're giving me money to help support me in my old

11  age, I feel so guilty about this.  Mr. Ng's response was don't

12  worry about it, brother, it is all past.  That speaks to the

13  quality of the person he is, your Honor.

14          With respect to his giving and comparable giving, the

15  government suggested that in light of his net assets, it

16  shouldn't count, but I think it should count, your Honor.  I

17  don't think we measure charity based on your illiquid assets

18  and real estate investments that may or may not be realized

19  over time.  We measure it by the quality of the giving.  I

20  think that is what we are talking about here.

21          One example, Exhibit 18, was a letter from a gentleman

22  named Sang Hung Mu of the Maging Foundation, and he tells about

23  in 2005 Mr. Ng heard about Maging Foundation, and he didn't

24  just write a check to go support the foundation, it supports

25  education and development of underprivileged children in rural

1   parts of China, the particular Uyghur Tribe, which is not a

2   particularly popular group of people in China.

3            Mr. Ng and his wife traveled to this remote area to

4   see the conditions that the children lived in, to visit them,

5   to pay home visits, and Mr. Ng began by sponsoring five ethnic

6   Uyghur girls, maybe it is Uyghur, I may be mispronouncing it,

7   and he met those girls, he stayed in touch with them over the

8   years.  He expanded to his foundation to include thousands and

9   thousands, support for thousands and thousands of

10  underprivileged children in rural China.

11           In 2014, he traveled to a ceremony when those five

12  girls that he essentially adopted as his godchildren graduated

13  junior high school to be with them, and there is a photograph

14  of that ceremony in Exhibit 54 of our submission.  You can see

15  in the photograph the bond that he has with them and the

16  emotion that is between them at that ceremony.  That is what

17  goes to his spirit and his kindness, your Honor.

18           He is also an extraordinarily dedicated family man,

19  and I take issue with the government's argument that there is

20  nothing extraordinary or warranting a variance based on his

21  dedication to his family.  There are lots of cases that we

22  cited that show that that is warranted.

23           This is obviously a characteristic that is relevant in

24  the 3553 analysis.  Your Honor has received letters from

25  Mr. Ng's wife of 40 years, his son Alex, his daughter Janet,

1   his daughter-in-law.  They're all here in the courtroom today,

2   your Honor.  You have received letters from his older brothers

3   and sister, and what comes through from these letters is the

4   love, the reverence, the feeling of closeness that Mr. Ng's

5   family has, the way that he is involved as a compassionate

6   father.  He is still close with his older siblings.  He pays

7   for all their medical care.

8        He is the patriarch of a large extended family and he

9   doesn't just provide financial support, he provides guidance,

10  he provides encouragement and emotional support for scores of

11  family members.  I just want to talk about a few examples, your

12  Honor.  There is a lot of discussion of that in the papers.

13       I want to highlight two things.  A letter from

14  Mr. Ng's goddaughter, Doris, who is here in the court today.

15  Her mother was a nanny for Mr. Ng's children for many years,

16  and Mr. Ng adopted her as a goddaughter.  She described how

17  when she was younger, she had some health problems and she was

18  essentially ostracized in school.  She was very depressed as a

19  younger child and she was doing poorly in school.

20       Mr. Ng spent time with her and he has talked to her

21  and he encouraged her and he taught her how to persevere and

22  overcome challenges, and she describes in her letter how she

23  went on to graduate actually in the top of her class in her

24  high school class of 200 students and get a scholarship to the

25  University of Macau, and she credits Mr. Ng.

I5BJNG1                      Sentence

1              Exhibit 30 is a letter from Crystal's son, Mr. Ng's

2      daughter-in-law, and she tells an extraordinary story.  When

3      she first got married to Alex, Mr. Ng's son, and moved to

4      Macau, she was out of place and she wasn't happy living in

5      Macau.  Mr. Ng traveled 5,000 miles to the other side of China

6      to speak with her parents about the situation, and he convinced

7      her parents to actually uproot themselves and come to Macau to

8      be with her so that the family would be happy and she would be

9      happy, and they did that, they came.

10             It was okay.  She still wasn't making an adjustment

11     well, so Mr. Ng flew all the way back to her village, 5,000

12     miles, and spoke to aunts and uncles and cousins and friends,

13     and he convinced them all to come to Macau and he made

14     arrangements for housing.  He helped them with jobs, helped

15     them with school so that his family and his extended family

16     would have a happy life.  That is dedication to a family.  That

17     is a family man, your Honor.

18             I have to say I've seen this myself.  I have been to

19     the apartment many times over the past year.  We had lunch

20     there many times.  Mr. Ng greets you with a smile no matter how

21     dire the situation or how bad the news.  He is always humble.

22     He serves the food himself.  He goes around, and his biggest

23     concern is to make sure everyone has enough on their plate, and

24     when his grandchildren are allowed to come visit, he is so

25     happy to see them.  You can see it on his face.  He is really

involved with his family.  They're very close.

Another sentencing factor that I think your Honor can consider is the impact of a jail sentence on Mr. Ng's employees.  Because Mr. Ng is not only the beloved patriarch of a large extended family, but he is essential to the continued success of a business that employs several hundred people in China.  They need his involvement and his support.  It is difficult to quantify it, but imprisonment would result in significant collateral damage to numerous innocent employees.

Over the past couple of years while he has been on home detention, she has been constantly on the phone trying to kind of stabilize things in the business in the wake of this case and the charges.  The letters that have been submitted to the court talk about the enormous debt and enormous pressure the business is under.  The letters make clear Mr. Ng's children are working to try to help run the business, but they need his help to manage things.

If he is incarcerated, he won't be able to be on the phone as he has been, and it is reasonable to expect that the business is going to suffer and may not survive.  Certainly many of his projects employing hundreds of people in China may not be able to go forward.  We have cited a number of cases that recognize that that is a valid consideration and a grounds for a variance.

So I would now like to turn to the first part of 3553

I5BJNG1                          Sentence

(a)(1), the nature and circumstances of the offense.  I am not going to relitigate the facts.  Your Honor has presided over the trial and made rulings related to factual issues, but I have one observation that I think is important to highlight and I think that it is important.

There is absolutely no dispute in the case that the evidence shows that certainly at least part of Mr. Ng's motivation, and we would argue the majority of his motivation, if not all of it, was to do something really good in this case, that he genuinely believed in the Macau Conference Center project, it would be a great thing for Macau, China and South South Nations.

I would draw the court's attention to the fact on Page 18 of the government's submission, the government agrees that to be sure, there is evidence, "there is evidence indicating that, as the defense states, he may also have had patriotic and/or philanthropic motivations for pursuing the project."

Of course, the government also argues that Mr. Ng had a profit motive and it wasn't all pretty and they've made that argument.  We responded to it in our papers.  I won't belabor that point, but I think we should pause for a moment and recognize that even that concession is remarkable coming from the government in a criminal case.

I am not familiar with another criminal case where at least part of the motive was patriotic and philanthropic, to do

I5BJNG1                         Sentence

1   something potentially wonderful on a grand scale that could

2   potentially help millions of people in the developed world, and

3   that is relevant and there is lots of evidence in the case of

4   Mr. Ng speaking about it, speaking about his vision, sharing

5   his vision and trying to present his vision on the merits to

6   different constituents.

7           Another factor that I want to address is obviously a

8   set of factors in Paragraph (a)(2) of 3553, and that is the

9   seriousness of the offense, promotion of respect for the law

10  and just punishment.  These are very weighty and important

11  factors and we do not trivialize them.  The government won its

12  conviction here, and this is going to the need for the sentence

13  to reflect promotion of respect for the law.

14          The government has won a conviction here.  They laid

15  out the alleged misconduct at the trial.  The United Nations

16  has issued task force reports.  There was corruption at the

17  United Nations going that started before anything involved

18  Mr. Ng and went far beyond anything involving Mr. Ng, and the

19  government's prosecution has had salutary impact on that.  The

20  United Nations has investigated it.  Presumably they're

21  updating their rules and regulations to tighten up the rules

22  around support and financial support and donations, and the

23  government has struck a real blow against corruption at the

24  United Nations in this case.

25          In terms of reflecting the seriousness of the offense

I5BJNG1                          Sentence

1    and just punishment, we do ask the court to consider that by

2    virtue of Mr. Ng's status as a deportable alien, he will suffer

3    in jail far more than a typical defendant in a similar case.

4    In all likelihood -- and we have had a series of dueling

5    letters with the government, but I don't think there is a real

6    debate at least in all likelihood, he is not going to be

7    sentenced to a camp if he is sentenced to a jail.

8         He will be in a low security prison, which sounds a

9    lot better than it is, and even more likely he will be sent to

10   a private contract facility which the government uses for

11   deportable aliens, where the conditions are going to be crowded

12   and far more dangerous than they would be if he were sent to a

13   camp.

14        The likelihood of his being assaulted is going to be

15   much higher there.  He will be particularly vulnerable because

16   of his age, his health and very significantly, your Honor, his

17   inability to speak or understand English.  Even the Probation

18   Department notes that as a result of that, Mr. Ng is likely to

19   experience a sense of isolation in prison.  He won't be

20   eligible for early release.  That's 10 percent of any sentence

21   up to six months.

22        And then he's already consented to deportation.  The

23   impact of that is that he won't be brought before an

24   immigration judge, but he will be sent, if he is sent to jail

25   at the close of the sentence, he will be sent immediately to

I5BJNG1                         Sentence

1   ICE custody and he could languish there for an indeterminate

2   amount of time before he is deported back to China.  I don't

3   know how long that could last.  It could be a matter of days,

4   it could be weeks and months.

5              THE COURT:  Mr. Genser, I am not sure if I understood

6   exactly.  Are you saying that because of Mr. Ng's status, he is

7   not eligible to get credit for good behavior, is that what

8   you're saying?

9              MR. GENSER:  It is early release.

10             THE COURT:  To a halfway house?

11             MR. GENSER:  Halfway house, and that credit which is

12  10 percent up to six months, that is laid out in Mr. Ziegler's

13  affidavit.

14             THE COURT:  All right.

15             MR. GENSER:  Considering what is sufficient but no

16  greater than necessary to constitute a just punishment, we do

17  ask the court to consider the punishment that Mr. Ng has

18  already suffered in this case.  He has spent a month in what

19  was effectively a maximum security prison, I am not sure if it

20  was MDC or MCC or some combination thereof.  He was in jail for

21  30 days.  He didn't do well there, your Honor.  The letters

22  describe the impact on him.  He was gaunt, he lost 15 pounds,

23  doesn't eat western food.

24             Then for the past two and a half, almost three years,

25  his life has been in limbo.  He has exercised his right to go

I5BJNG1                    Sentence

to trial, but the impact of this case is that his life has been
in limbo.  He has been in an apartment.  Certainly that is
better than jail, but he hasn't been a free man.  He has again
under lock and key in an apartment for two and a half, almost
three years already.  That is something.  It is not nothing.

     He has had to live with the anxiety and expense of
this case.  His reputation has been shredded.  His business has
been knocked back on its heels.  He is struggling to survive.
He will be a felon for the rest of his life.  He is going to be
paying a fine, we're fairly confident it will be at least a
million dollars.  He has agreed not to contest forfeiture of
over $300,000.  He has agreed to settle forfeiture allegations
for one and a half million dollars, your Honor.  He has paid
millions of dollars in attorney's fees.

     The question is how much punishment is enough?  How
much more punishment is needed in this case?  That brings us to
Section 3553 (a)(2)(B) and (C), the need for deterrence and
protection of the public.

     These factors, your Honor, I note that Mr. Ng has
agreed to waive deportation proceedings and consent to
deportation.  He will never come back to America again.  He
will never do business here again.  There is literally no
chance that he will be a recidivist.  Deterrence has been
accomplished, both specific and general.  There is no danger of
further crimes by Mr. Ng.  The case has received wide

1    publicity.  The government has emphatically made its point.

2              To wind up, the punishment Mr. Ng has suffered

3    already, as I mentioned, the question is what further

4    punishment is really necessary to do justice in this case.  If

5    the court believes that the offense conduct itself, the

6    mitigating facts and with the mitigating motives that I've

7    described warrants a sentence greater than time-served, our

8    question is isn't that outweighed by Mr. Ng's history and good

9    character, the life of compassion he led, the kindness of

10   generosity he has shown throughout his life, his close family

11   ties, the support that he has given to his employees, the need

12   that his business has for him, and the way that he'll uniquely

13   suffer if he is sent to jail?

14             So for all of those reasons, your Honor, we do ask for

15   leniency and we do ask for a sentence of time-served.  If your

16   Honor cannot see to give him a sentence of time-served, we ask

17   for a very low sentence in jail, to let Mr. Ng go back to his

18   family and go back to China where he belongs.  Thank you.

19             THE COURT:  Mr. Genser, actually I have one question

20   to follow up on your comments.

21             I've sentenced two other defendants in this case, both

22   of whom were sentenced to jail time, both of whom I think would

23   be characterized as less involved in the underlying criminal

24   conduct.  So why in terms of sentencing disparities, why would

25   it be appropriate or what is your argument with why it would be

1    appropriate here that Mr. Ng receive a non-incarceratory

2    sentence in light of that?

3         MR. GENSER:  Your Honor, obviously the need to avoid

4    disparate sentences is one of the sentencing factors, and we

5    are certainly aware that Mr. Yin was sentenced to seven months

6    and Sheri Yan was sentenced to 20 months, and we understand

7    that the court would view Mr. Ng as more culpable.

8         Our argument, your Honor, there are differences that

9    are personal to Mr. Ng that relate to the factors that I've

10   laid out, your Honor.  They're not almost 70 years' old.  For

11   example, Mr. Yin is a young man.  He speaks English, a U.S.

12   Citizen.  What he did was essentially separate and apart with

13   anything to do with Mr. Ng with his tax evasion.

14        Ordinarily absent all the extraordinary circumstances

15   we have outlined, a sentence greater than those sentences might

16   well be warranted, your Honor, but our argument is that these

17   factors are unique to Mr. Ng.  Neither of those people have had

18   the history, lived the life that he has lived, have shown the

19   compassion and had support of family and charities, the

20   kindness to employees, supporting the businesses, have so many

21   people depending on them.  Neither of them would face the same

22   issues that Mr. Ng would face in jail, and I will note that

23   with respect to Ms. Yan, she was convicted on her own plea for

24   $800,000 of bribes for specific quid pro quo with no

25   philanthropic or patriotic motive at all.  She got 20 months,

your Honor.

I understand the government will argue that the crime here, the alleged crime for which he was convicted is more extensive and that his involvement was more serious, but it is different.  It was for fundamentally a philanthropic endeavor, and the dollars involved are not so different, your Honor.

Mr. Ng, certainly I know at that sentencing your Honor commented there was evidence Ms. Yan, there was evidence she was a good person.  If there is evidence she was a good person, your Honor, there is a mountain of evidence that speaks to the quality of the person Mr. Ng is.  Those factors I think would compensate for what we would agree would be circumstances where you would ordinarily look to a sentence that would be somewhat greater than the sentence of those two individuals.

THE COURT:  Thank you.

Ms. Echenberg, do you have anything to add?

MS. ECHENBERG:  Yes, your Honor.

THE COURT:  Yes.

MS. ECHENBERG:  The defendant before you today, your Honor, is an exceptionally rich and powerful man.  He has used that wealth to pay multiple people over time, not just the conduct in this case, the other conduct that we have previously discussed.  He has used that wealth to direct it at people who had the ability to influence his business.  That is exactly what he did here.

1          What he was motivated by was not fundamentally a

2     philanthropic endeavor.  The evidence at trial was clear.  Your

3     Honor may remember the video that we played a substantial

4     portion of during closing argument.  It talked about a

5     development that had luxury hotels, luxury stores, a helipad.

6     We are talking about a massive real estate development that the

7     defendant and his family stood to gain tremendously from.  So

8     that is the motivation here, and that should not be lost.

9          The conduct here is incredibly serious.  The United

10    Nations is one of the premier international institutions.  The

11    defendant corrupted it.  That's what he was convicted of doing.

12    He led that crime.

13         The defense has talked about the conditions in jail

14    and the designations.  We addressed that in our papers.  We

15    disagree, we believe, based on our conversations with the

16    Bureau of Prisons and what is represented in their materials,

17    that the defendant will have the ability and he has excellent

18    representation to advocate for him to be in the most

19    appropriate location for him.

20         I want to bring the court back to the guidelines here,

21    which is 235 to 293 months.  Your Honor has ruled that is the

22    appropriate guidelines, and the Probation Department

23    specifically took account of all of the factors that the

24    defense has talked about, the defendant's history, his

25    philanthropic efforts, and with all of that in mind, the

I5BJNG1                        Sentence

Probation Department recommends a significant sentence of 72

months.

          A time-served sentence here would be a terrible

message to send for a case like this.  As your Honor knows,

international bribery in FCPA cases are incredibly hard to

investigate and to prosecute.  The records are abroad, the

individuals are abroad.  These cases are so difficult to

investigate that the Department of Justice has instituted a

special policy for corporations that cooperate in these

investigations, to give them significant leniency.  That is how

difficult these cases are.

          So people are watching this case.  People are watching

what your Honor is going to do, and general deterrence is

critical here.  The defense has asserted our prosecution struck

a real blow to corruption at the United Nations.  There have

been changes.  The United Nations certainly took account of our

case and the press has also been following the case.

          A significant sentence for this rich and powerful

defendant, that is what is going to strike a real blow to

corruption not only at the United Nations but in our major

institutions and organizations frankly across the world.  Your

Honor, it is critical that this defendant receive a significant

incarceratory sentence.

          THE COURT:  Thank you.

          MR. GENSER:  Your Honor, if I may respond just

1    briefly?

2              THE COURT:  Yes, briefly.

3              MR. GENSER:  Your Honor, there are a number of cases

4    involving allegations of serious conduct that we have cited in

5    our papers where, based on factors similar to what are present

6    here, courts have varied very, very substantially from very

7    high guideline ranges, and it is not necessary, your Honor, to

8    put Mr. Ng in a United States jail, at taxpayer expense, a

9    69-year-old man who speaks no English, for the world to get the

10   message the government wants to send.

11             There are very, very unique factors here that would

12   justify the sentence we are asking for and would in no way

13   dilute the need to promote respect for the law and general

14   deterrence.  That is all we have to say.  The last thing is

15   Mr. Ng obviously will have something to say to address the

16   court, and we ask your Honor to consider that as well.

17             THE COURT:  Absolutely.

18             MS. ECHENBERG:  I forgot to answer one of your Honor's

19   questions about ICE custody.

20             THE COURT:  Yes.

21             MS. ECHENBERG:  If this is to factor in your decision

22   at all, we understand from a representation from ICE that if

23   your Honor signs the removal order, the defendant at the

24   conclusion of any sentence would spend up to two weeks in

25   custody.  It will be very brief, and then he would be deported.

I5BJNG1                        Sentence

1          THE COURT:  Thank you.  Mr. Ng, do you wish to be

2    heard?

3          THE DEFENDANT:  Yes.

4          THE COURT:  I don't know the interpreter's name.  Are

5    you going to be doing the translation?

6          THE INTERPRETER:  Yes, your Honor.

7          THE COURT:  You may proceed.

8          THE DEFENDANT:  Your Honor, I would like to first

9    thank the court for allowing me to stay out on bail during this

10   case.  Even though the past few years have been very difficult

11   for me, it is better than being in jail.  At the same time, I

12   would like to thank the court and the government for allowing

13   my family and friends to come visit.

14         Your Honor, I want to apologize to the court for all

15   the trouble my actions have caused.  I alone am responsible for

16   my actions.  Looking back, I am filled with regret how I went

17   to about trying to support the Macau Conference Center.

18         Your Honor, I really believed that the Macau

19   Conference Center it would do great things for Macau in the

20   South South Nations.  Your Honor, I would ask for your mercy

21   not only for myself, but more importantly, for my family.

22         My wife is this year over 66 years' old.  Since my

23   youngest son passed away when he was 19 years' old, my wife's

24   health has been deteriorating.  In the past 40 years, even

25   though I was penniless, my wife never abandoned me through

thick and thin and kept me a companion.  Now that she is in her

twilight years, she needs my companionship.

        I very much hope I can continue my responsibilities to

her as a husband.  It seems that since I have been arrested,

especially after my conviction, my creditors have been pushing

me for repayment.  Interest has been piling up, the bank has

closed my account, the previous business partners are shunning

us.  The business that I built over in the past decades is

facing great difficulties.

        Since I have been allowed to stay out on bail, every

day I spent a few hours every day to try to stabilize the

business.  If I go to jail, my children will bear my

responsibilities.  Even though they are very talented, but

since I have been sheltered, I have always sheltered them in

the -- I have been protecting them and not to let them handle

these responsibilities, I am very afraid that they will not be

able to handle it and to bear these responsibilities, that the

business would not survive.

        There are many employees who have been working for me

and my company for decades because they trust me.  I am also

very afraid for the future, your Honor.  I have eight

granddaughters and grandsons.  I miss them dearly.  I very much

want to go back to them, to greet them, to tell them stories,

to play with them.  I am very sorry for the pain and suffering

I have caused my family, my friends and employees.  I swear

I5BJNG1                        Sentence

1    that I will never repeat my mistakes again.

2              Your Honor, I sincerely wish that you could show

3    leniency on me.  My only wish is that I can return to my family

4    as soon as possible instead of having my family to bring me

5    home in ashes.

6              Thank you, your Honor.  Thank everybody.

7              THE COURT:  All right.  Thank you, Mr. Ng.

8              Let me ask, is there any reason why sentence should

9    not be imposed at this time?

10             MS. ECHENBERG:  No, your Honor.

11             MR. GENSER:  No, your Honor.

12             THE COURT:  As I've stated, and the parties agree,

13   obviously with conditions with the objections have been made,

14   the defendant's guideline range is 235 to 293 months

15   imprisonment.  Under the Supreme Court's decision in Booker and

16   its progeny, the guideline is just one factor that I must

17   consider in deciding an appropriate sentence here.

18             I am also required to consider the other factors set

19   forth in 18, United States Code, Section 3553 (a), and the

20   parties have addressed those issues both in their submissions

21   as well as here today in court.  So I am going to consider all

22   of those factors, and those factors include, but are not

23   limited to, the nature and circumstances of the offense and the

24   personal history and characteristics of the defendant since

25   each defendant must be considered individually.

1            I am also required to consider the need for the

2    sentence imposed to reflect the seriousness of the offense,

3    promote respect for the law, provide just punishment for the

4    offense, and afford adequate deterrence to criminal conduct and

5    avoid unwarranted sentencing disparities among other things.

6            First I am going to address Mr. Ng's history and

7    characteristics, and obviously there has been a lot said today

8    here as well as a lot of information contained in the

9    submission.  Now, I accept Mr. Ng overcame poverty and at time

10   there was depressive conduct directed towards himself and his

11   family by the government in China at the time when he was a

12   child.

13           I also note that there were various deprivations his

14   family faced, and some could be characterized as serious

15   deprivations while he was growing up that left his family in at

16   times despair and resulted also in poor health to his family

17   members as well as the death of some of his siblings who were

18   older than Mr. Ng.  So I will consider that background and

19   Mr. Ng's apparent resiliency and the success he has had as a

20   person as part of my determination of what an appropriate

21   sentence is for Mr. Ng.

22           Now there are numerous letters from friends and family

23   members, former employees, current employees, business

24   associates, just to name a few categories that paint a picture

25   of Mr. Ng as a devoted family man as well as someone who is

I5BJNG1                              Sentence

1    philanthropic and also personally generous with his time as

2    well as his finances.  Those are documented in letter, and Mr.

3    Genser pointed out some specific examples here today in court.

4    Those letters describe various, as I mentioned, various acts of

5    kindness for individuals who are in need of medical care, to

6    citizens and folks from Mr. Ng's home town, to the citizens of

7    Macau, including children as well as the elderly.

8              So I'll consider the views that have been expressed by

9    your friends and family members and others in connection with

10   your sentence, concerning your character which I, outside of

11   the presentation of evidence here in court, I have to rely on

12   the parties to provide that information.  As I indicated, I'll

13   consider that information in connection with determining what

14   an appropriate sentence is here today.

15             Now, as I mentioned, in the letters they do mention

16   the charitable contributions you have made over the years, and

17   I will consider your philanthropic over the years and again not

18   necessarily as a percentage of your overall wealth, although I

19   do acknowledge the point the government makes with regard to

20   your overall wealth and percent as being a percentage of your

21   donations more generally really to reflect on your overall

22   character as a person.

23             However, to the extent that certain of the letters

24   written on your behalf take issue with your prosecution as

25   misguided or driven by some political motivations or some other

rationale other than enforcement of the law, just to be clear, I reject those views.  As I mentioned earlier in my comments, I believe the jury's verdict was reasonable, a reasonable and just outcome based on the evidence that was presented and admitted, and I have ruled as such in connection with the post-trial motions.

In addition, I am going to consider what was presented to me pretrial as 404 (b) evidence related to the political contributions and your interactions with the representative as well as the loan.  However, the $25,000 loan I think is less of an issue for me.  So to that extent, I give that really a very little weight, if not no weight.

I find that the evidence presented with regard to that and the proffers made with regard to that of your past actions, I think that they're sufficient for me to consider here in terms of sentences and in terms of your sentence and what an appropriate sentence is.

In particular, as I mentioned earlier, with regard to the issue of specific deterrence as well as general deterrence, although I believe the allegations related to the campaign contributions, and again I understand the back-and-forth that is contained in the reports concerning what access the members of Congress had to witnesses and other things in connection with that.  It is not so much the specifics again, as I mentioned earlier, of the actions and the amounts involved as

I5BJNG1                         Sentence

1    it is a reflection and is probative on your apparent

2    willingness to utilize your money at various stages, putting

3    aside what the underlying motivation is, but utilize your money

4    to accomplish ends that you believed, you believed in; in other

5    words, that included skating close to the line between legal

6    and illegal conduct.

7          Certainly the awareness that that sort of activity, in

8    other words, by that sort of activity, I mean utilizing your

9    money in that way, and I'll use this term, probably not the

10   correct term, really throwing your money around in that way

11   caused the authorities to focus on those activities.

12         And yet despite those indications, more so with the

13   contributions, you chose to proceed the way you did in this

14   matter, by again utilizing money and paying folks, ambassadors

15   and the president of the PGA rather than seeking some other

16   alternative means of pressing something, and I accept your

17   counsel's representation that is something that you believed in

18   and that is being the Macau Conference Center.  The ends don't

19   justify the means, and that is what the law is designed to make

20   sure that folks don't follow that adage in their conduct.

21         So I'll consider that information that was

22   characterized as 404 (b) in that context, as sort of a

23   reflection on what your state of mind was and also in an effort

24   to make a determination, which is not an easy one to do

25   concerning recidivism, provide punishment as well as the

deterrent effect in connection with sentencing.

Now, I also accept that a sentence of incarceration
will have an impact on your family and your business.  However,
in just about every sentence that I impose and quite frankly
that are imposed by my colleagues here in this courthouse,
there is an impact on family members.  It is tragic and
oftentimes obviously innocent bystanders to the conduct of a
loved one.  So that impact I think, although I will consider, I
think it is of substantially less weight than some of the other
things I've mentioned here in part because unlike -- and again
it is admirable that you were able to work and develop the
business that you have, but many of the defendants I have who
come before me have nothing or really next to nothing.

They may have young children, as young as two or even
younger, and the consequence of them going to jail is that
their loved ones really have to be able to find a way to
literally put food on the table, and it is a tragic consequence
of criminal conduct that there are others involved here.  As I
mentioned, I will consider it, although I don't give it as much
weight as I do some of the other factors I will also.

I will also take into effect again, as I mentioned
earlier, your age and the various infirmities you have in
making a determination of what an appropriate sentence is.  As
I noted earlier, obviously, a sentence that is certainly in the
guideline range and actually even far below that would

I5BJNG1                          Sentence

1    effectively mean that you would spend the rest of your life in

2    prison.

3            I also recognize that you won't receive the same level

4    of health care as you would if you were not incarcerated, but

5    again I don't give that a substantial amount of weight.  I

6    recognize the conditions that you've had and the history, but I

7    don't ascribe to the views that Mr Ziegler has said.  I do

8    believe that the Bureau of Prisons will be able to address your

9    health issues during any period of incarceration.

10           Now, with regard to Mr. Ziegler's views about your

11   designation to a low security versus a minimum security

12   facility, I find that certain of his assertions in his

13   affidavit certainly have some basis in history that Mr Ziegler

14   has indicated that he has.  However, I would describe that more

15   as what is really is a term, for lack of a better one, I will

16   say knowledgeable speculation.

17           Until the Bureau of Prisons does their calculation,

18   while we can assume where Mr. Ng might fall in terms of a

19   designation, there are a whole number of other factors that it

20   didn't appear as if Mr Ziegler had considered, including the

21   possibility of a recommendation by me concerning a facility as

22   well as other things that the Bureau of Prisons takes into

23   account with regard to what level of security a defendant

24   should be placed.

25           I find that the conditions of confinement are not so

I5BJNG1                          Sentence

onerous in a low security facility to warrant substantial

weight here, although I do recognize that they will be more

onerous and in particular in Mr. Ng's case because of the fact

he does not speak English.  However, I do note, and

historically there have been many defendants who are considered

white collar defendants who are in low security facilities and

come close in connection with the sentencing, I came across an

individual who was sentenced recently by one of my colleagues

in the Eastern District, and my understanding, again from press

reports, is that he is currently housed in a low security

facility, and that is Mr. Scorelli, who was recently convicted

in the Eastern District.  I believe he is housed in -- I don't

remember, it might be Fort Dix, but I am not entirely sure.

          So there is precedent for white collar defendants to

be in a low security facility.  I will consider it, but as I

mentioned, I won't give it a substantial amount of weight in

what an appropriate sentence is for you.

          Next I'll turn to the circumstances and nature of the

events.  There is no question that you have been convicted of

serious offenses.  Your activities were not isolated incident,

but instead occurred over a number of years.  In other words,

you had more than ample opportunity to rethink your approach as

to how you would accomplish your end goal of having a

conference center built in Macau.

          However, at least based upon the evidence presented at

I5BJNG1                          Sentence

1     trial, not only did you not change your mind with regard to how

2     you'd proceed, the evidence would suggest that you became, as

3     that possibility became closer, you became more aggressive as

4     time went on, pushing either directly or indirectly through

5     Jeff Yin or Lorenzo and Ashe to complete certain tasks and take

6     certain actions in their capacity as ambassadors in Mr. Yin's

7     case as one of your employees, with regard to Mr. Ashe as

8     President of the PGA, as well as the actions and influence the

9     actions of others within the United Nations.  As I mentioned,

10    in your actions here, you were undaunted in particular by the

11    investigation that ensued in connection with the donations

12    issue that I mentioned earlier.

13            Now, the offense here also was not something that

14    could be described as sophisticated.  It at times involved

15    shell companies, what was portrayed, and the jury found there

16    was sufficient evidence, fake contracts and the funneling of

17    money internationally, all of which, whether intentionally and

18    I think the evidence, it could be inferred that that was

19    intentional, but even not, it certainly made the detection of

20    that activity and the bribery scheme more difficult.

21            The parties have also mentioned, and as I mentioned in

22    a prior sentence in this case, there is no question that there

23    has been damage to the United Nations as an institution.

24    Obviously, there is restitution here and I credit the defendant

25    for agreeing to that restitution amount to the United Nations,

I5BJNG1                         Sentence

1   but that is a matter of the money that was expended.

2            The UN's reputation was certainly tarnished by your

3   actions and the actions of others, in particular Mr. Ashe and

4   Mr. Lorenzo, but by rigging the system, you deprived the

5   members of the United Nations of considering the merits or

6   folly of having a permanent conference center in Macau or

7   anywhere else in the world.  In other words, it rigged the

8   system in such a way that it didn't allow for legitimate debate

9   concerning what the pros and cons would be for having such a

10  conference center at all or for the location of such a

11  conference center.

12           In addition, although the likelihood of recidivism of

13  someone your age is statistically very, very low, the fact you

14  committed the instant offense when you were already in your

15  mid-60's also somewhat defies the statistics.  So although I

16  recognize the statistical aspect of it, there are other things

17  that impact my consideration, including your past issue with

18  the political contributions which I think impact my

19  consideration of the deterrent effect going forward.

20           Now, I also think that general deterrence in this case

21  does deserve real consideration.  I understand, and I hear

22  arguments all the time, that is there really such thing as

23  general deterrence.  I think in this case in particular,

24  because of the fact it involved the United Nations, because of

25  the fact it involves yourself, someone of prominence in terms

1    of your stature as a businessperson in your own country, but

2    also recognized here in the United States, I do think general

3    deterrence is an issue that I will consider here in connection

4    with what an appropriate sentence is.

5         In at least in part, it might give, I would hope, give

6    pause to individuals whether they're in like circumstances of

7    yourself or not, will give them pause to any consideration they

8    have about doing, corrupting institutions like the United

9    Nations to achieve their personal goals and whims in connection

10   whatever activities that they might have and beyond the public

11   embarrassment or inconvenience of having a criminal case filed

12   against them.

13        In addition, I do think it is also important to send a

14   message to those at the United Nations itself and other

15   institutions in this country that perverting the

16   decision-making or attempting to pervert decision-making

17   through bribes will not be tolerated and that there are

18   consequences to those actions.

19        So, Mr. Ng, with that, if you could please rise for

20   the imposition of sentence.  It is the judgment of the Court

21   you be committed to the custody of the Bureau of Prisons for a

22   period of 48 months.  I will impose a period of supervised

23   release, although I believe that in all likelihood you -- you

24   may be seated -- you are going to be deported, but I would

25   impose a period of supervised release of three years.  You will

I5BJNG1                          Sentence

1    be subject to the mandatory conditions of supervision set forth

2    on Page 46 and 47 of your presentence report, the standard and

3    special conditions set forth on Pages 47 and 48 of the

4    presentence report.

5              I am going to impose a million dollars in fines, and I

6    will also sign the restitution order and the forfeiture order

7    that has been presented to me for my signature.  I will also

8    execute the judicial order of removal.  That has also been

9    presented to me.  You're also required to pay a special

10   assessment on each count of $100.00, for a total of $600.00.

11             Now, I am not, although I recognize the government

12   requested that you be remanded immediately, I am not going to

13   remand you today.  I am going to allow you to voluntarily

14   surrender to the Marshal Service.

15             I find that the sentence is sufficient but not greater

16   than necessary to comply with the purposes of sentencing set

17   forth in 18 United States Code Section 3553 (a).  Do either

18   counsel know of any legal reason why this sentence should not

19   be imposed as stated?

20             MS. ECHENBERG:  No, your Honor.  I would just ask that

21   you state the forfeiture and the restitution amounts on the

22   record that you intend to impose.

23             THE COURT:  State the amount?

24             MS. ECHENBERG:  On the record.

25             THE COURT:  I believe the forfeiture amount is $1.5

I5BJNG1                        Sentence

million and the restitution amount is $329,707.20, payable to

the United Nations.

          MS. ECHENBERG:  Thank your Honor.  You're imposing

both of those?

          THE COURT:  Correct.  In fact, just so the record is

clear, I have the restitution order here and I am signing it

right now.  I also have the consent preliminary order of

forfeiture that has been signed by the parties.  I am signing

that now.  Lastly, I have the judicial removal along with the

accompanying supporting documents which I have just signed.

          Mr. Genser do you know of any legal reason why the

sentence should not be imposed as stated?

          MR. GENSER:  No, your Honor.  We would ask that -- and

we appreciate that your Honor's permitting Mr. Ng to surrender

voluntarily -- we ask that your Honor set that date to be no

sooner than 60 days from today.

          THE COURT:  I will do that.  Ms. Williams.

          THE CLERK:  July 10th.

          THE COURT:  July 10th.  With regard to where, I am

going to, and again I will hear the parties on this, but I

intend to have Mr. Ng surrender here in this district.

          I think I am going to continue all of the bail

conditions as mentioned right now until the surrender date, and

I think the logistics of -- and again I don't know where Mr. Ng

will be designated, but the logistics of actually getting

I5BJNG1                    Sentence

1    Mr. Ng, if it is, as I understood, might be in California or

2    out West would be I think significant.

3           MR. GENSER:  On that, your Honor, I think we would ask

4    that your Honor permit Mr. Ng to surrender directly to the

5    facility.  I think it is laid out in Mr. Ziegler's affidavit.

6    The transportation process to the facility in custody is

7    particularly onerous and can last several weeks.  It is very

8    difficult to get medical attention, and we can certainly

9    arrange with Guidepost to have him delivered under guard to

10   whatever facility the court designates.

11          THE COURT:  This is what I would suggest.  I think the

12   designated facility will be decided in advance.  We'll have

13   time.  So I want you to speak with Guidepost, speak with the

14   government, and present to me whatever the plan would be for

15   that transportation so that I can make the ultimate decision

16   about that.

17          Look, it is conceivable, and I understand -- let me

18   ask Mr. Genser, is there a specific request that Mr. Ng be

19   housed in a low security facility in the western region of the

20   Bureau of Prisons' system?

21          MR. GENSER:  Your Honor, we would ask he be

22   designated, and court strongly recommend to the BOP, he be

23   designated to LSCI Allenwood in White Dear, Pennsylvania.

24          THE COURT:  I'll make the recommendation of Allenwood

25   or another low -- well, I will make the recommendation of

```
 1    Allenwood and would be willing to make a recommendation, if not

 2    Allenwood, somewhere on the East Coast if that is what you

 3    would request.

 4             MR. GENSER:  Yes, we would request and that and we

 5    would propose we can actually provide specific language that we

 6    would be requesting to be included in the judgment with respect

 7    to the recommendation for designation.

 8             THE COURT:  Okay.  The only thing, I ask you share

 9    that language with the government and hopefully there is

10    agreement with regard to that.

11             MR. GENSER:  Yes.

12             THE COURT:  Okay.

13             MS. ECHENBERG:  Your Honor, so it is currently our

14    position that the defendant should surrender here as your Honor

15    had initially ordered.  We'll, of course, look at whatever the

16    defense submits and take it up with your Honor, but that is our

17    position.

18             THE COURT:  Just to be clear, my concern with the

19    logistics is just that.  I understand the Guidepost would

20    probably be willing to do it.  The issue for me is there now

21    has been a sentence that has been imposed.  It is a sentence of

22    incarceration for a period of time that is not insubstantial.

23    So I think that there are differences between the pretrial

24    release and now, so I would want to, to the extent I would

25    change my view about that, I need to see what the plan would
```

1   be, and the parties should meet-and-confer about that and

2   present it to me in advance of, hopefully well in advance of

3   the 60 days we have indicated for surrender.

4          MR. GENSER:  Your Honor, can we have a few days after

5   today to confer with the government about those issues and

6   present the court with a hopefully agreed-upon plan and some

7   language for the designation?

8          THE COURT:  Absolutely.  Do you want to make it three

9   weeks to do that, two weeks?

10          THE COURT:  My Deputy Clerk, who I take counsel from

11   in just about all matters, said next Friday, if that is

12   sufficient.  I think in part, let me just be clear.

13          I think the reason is for the judgment, so that we can

14   have put in the judgment whatever both the language that the

15   parties would suggest and anything else because in order to

16   start the ball rolling, the judgment needs to be issued.

17          MR. GENSER:  That is fine with us.

18          MS. ECHENBERG:  One other matter with regard to the

19   sentence.

20          THE COURT:  Yes.

21          MS. ECHENBERG:  If your Honor could just make clear

22   that sentence applies concurrently to all of the counts.

23          THE COURT:  I am sorry.  Yes, the sentence of 48

24   months is on each count, to be assessed concurrently on that.

25   I apologize.  I should have made that clear.

1          I think overall that is a sentence, again it is a

2    substantial variance from the guidelines and a variance from

3    where Probation came out.  So even if I had ruled on certainly

4    with regard to many of the issues, I still think that is an

5    overall appropriate sentence in this case.

6          MR. GENSER:  Your Honor, will the defendant, would the

7    court recommend the defendant receive credit for the 30 days he

8    spent in jail already?

9          THE COURT:  He should automatically receive that under

10   the way that they calculate, but to the extent I need to

11   recommend that, I would do that, yes, since it is the same

12   offense.  Is there anything else?

13         MS. ECHENBERG:  Just that your Honor advise the

14   defendant of his right to appeal.  We would make a motion to

15   dismiss the counts in the underlying indictments.

16         THE COURT:  Mr. Ng, you have the right to appeal your

17   conviction and sentence.  The notice of appeal must be filed

18   within 14 days of the judgment of conviction.  If you're not

19   able to pay the cost of an appeal, you may apply for leave to

20   appeal in forma pauperis.  If you request, the Clerk of the

21   Court will file and prepare a notice of appeal on your own

22   behalf.

23         Now, Mr. Ng, I know it is not the sentence that your

24   attorneys had asked for, but I hope that when you are released

25   from custody, you go home and spend time, and I should have

1    mentioned that it is clear that your family, there are at least

2    26 members, friends and family that are here if not more of you

3    and it is clear that they support you.  I suggest that you make

4    use of that support while you're incarcerated and once you're

5    released.  Is admirable they have stood by you and I believe

6    that they will continue to stand by you.

7              I will dismiss the open counts in the underlying

8    indictments.  Is there anything else?

9              MR. GENSER:  Yes, your Honor.  We would actually make

10   an application for bail pending appeal.  We intend, obviously,

11   to appeal the conviction and possibly the sentence, and we

12   would make an application orally for bail pending appeal.

13             We're prepared to address that today, although given

14   that your Honor has granted Mr. Ng some time and ability to

15   voluntarily surrender, it is possible we could come back

16   another day to argue that.  We are prepared to argue that

17   today.  I am prepared to argue the risk of flight issues, and

18   my colleague, Ms. Murphy, is here, an appellate specialist, is

19   prepared to outline the second prong of that, which is the

20   likelihood of substantial success and substantial questions on

21   appeal.

22             THE COURT:  I guess the question I have, since we do

23   have some time, I am willing to allow limited submissions if

24   you like.  The government has in their briefs to me, in their

25   sentencing submission did address the issue.  I note in the

I5BHNG2

1    defense submission not in a substantive way, with regard to

2    case law or we can address it now.

3            MR. GENSER:  We would be happy to address it.

4            (Off-the-record discussion)

5            THE COURT:  I do lose track of time.  Well, should we

6    come back after a brief break to allow people to have lunch and

7    then continue this argument?

8            MR. GENSER:  It is fine with me, your Honor.  The only

9    constraint that I have, I have an arraignment in front of Judge

10   Failla at 3:00 p.m.

11           THE COURT:  Well, why don't we take half an hour and

12   then come back.  Does that work for the government?

13           MS. ECHENBERG:  Yes, your Honor.

14           MR. GENSER:  That would be fine.

15           THE COURT:  So it is now 1:40.  We are going to come

16   back in half an hour.

17           (Luncheon recess)

18           (Continued on next page)

19

20

21

22

23

24

25

I5BHNG2

1          AFTERNOON SESSION

2          2:10 p.m.

3          (In open court)

4          THE COURT:  Mr. Genser, are you ready to proceed?

5          MR. GENSER:  Yes, your Honor.

6          THE COURT:  OK.

7          MR. GENSER:  Actually, if I may just have one moment.

8          THE COURT:  Oh, sure, go ahead.

9          MR. GENSER:  Your Honor, we have an application for

10    bail pending appeal.  Obviously, the burden has shifted.  We

11    have the burden to prove by clear and convincing evidence that

12    Mr. Ng will not be a danger to the community or a risk of

13    flight, and there's also the second part of the issue of

14    substantial questions on appeal which my colleague, Erin

15    Murphy, will address.

16          Your Honor, I would suggest there's no question here

17    of danger to the community.  That's never been an issue in the

18    case.

19          With respect to risk of flight, I think that the fact

20    that Mr. Ng is here today is all the evidence that your Honor

21    needs to support our burden.  Mr. Ng was convicted.  He's

22    complied with his bail conditions in every respect.  Guidepost

23    has confirmed to us and to the government that Mr. Ng has

24    complied.  They feel confident they can assure his continued

25    compliance.

I5BHNG2

1          Your Honor, Mr. Ng has understood that today could be

2     a day when he would be sentenced to a sentence of perhaps 72

3     months, which is what the probation department recommended, or

4     perhaps substantially more than that, which is what the

5     government sought.  And he also understood, as the government

6     had informed us long ago, that they were going to seek his

7     immediate remand today, and he's here.  That ought to be enough

8     to demonstrate to the Court that he has no intention to attempt

9     to flee and that, even if he did, the conditions that the Court

10    has set very carefully, which are very stringent, are more than

11    adequate to assure his appearance.

12         And unless the Court has questions about that, I think

13    that really the risk of flight should be an easy issue for the

14    Court to resolve in our favor.

15         THE COURT:  OK.  But would you agree with me that

16    before today, everything was a possibility.  It's now assured

17    that Mr. Ng is facing jail time.  Putting aside whether it

18    tips, entirely tips, the balance, that actually militates, that

19    actually cuts against, in other words, that's another factor

20    that I need to weigh in addition to what I've weighed before,

21    which I did for purposes of bail.  That is a change in the

22    circumstances here.  It was a possibility; it's a reality now.

23    Obviously, not only do people have hope, but, obviously, there

24    were a lot of things that militated towards that hope,

25    including the probation department granting a substantial

I5BHNG2

1    variance.

2          The government -- how often do you see that, right,

3    where there's a variance that the government thinks is

4    appropriate?  So the issue is what he's now facing, it's a

5    reality and not a possibility.  So doesn't that factor weigh on

6    the side of flight?

7          MR. GENSER:  Your Honor --

8          THE COURT:  Or possibility of flight, I should say.

9          MR. GENSER:  I think it certainly weighs, but I think

10   the question is how much weight?  And I think, number one, yes,

11   there was hope that he would get a sentence of time served, but

12   Mr. Ng understood that it was a hope and that the greater, much

13   greater, likelihood was that there would be a jail sentence

14   perhaps as high as 72 months or higher.  And Mr. Ng is resigned

15   and -- Mr. Ng stood up and I think he made a very moving and

16   important statement to the Court that the Court can also

17   consider and should consider.  I think it's evident that Mr. Ng

18   has resigned himself to accepting whatever the Court has

19   imposed and that he has to serve, not from a legal perspective,

20   we intend to challenge it, but that he's not going to try and

21   deal with the situation by essentially committing a crime and

22   somehow trying to flee out of his apartment, and that's

23   evident.  Nothing about the sentence that was imposed is going

24   to create such an incentive to flee that it materially changes

25   the calculation or the risk of flight.

1          I think the other thing that we can point to are the

2     conditions.  I think the government during their comments noted

3     that the confinement to the apartment is doing what it was

4     intended to do, and it's going to continue to do what it was

5     intended to do.  There's no way he could escape if he wanted to

6     escape.  There's no realistic possibility of it.  And there's

7     no reason to think that he has any intention to make any effort

8     to do that.

9          I think, your Honor, you have a two-year track record,

10    six months of which have been after the conviction when the

11    guidelines were 25 years.  I don't know if I did the math

12    right, but something in that range, and all before the

13    probation report came out, before we knew there was going to be

14    the potential of at least an agreement from probation and then

15    potentially from the government that there should be some

16    variance.  You know, the risk was something much higher than

17    that based on the guidelines.

18         So for all those reasons, I think your Honor has ample

19    evidence to conclude that Mr. Ng is not a flight risk under the

20    conditions that your Honor has set.

21         THE COURT:  OK.  Thank you.

22         Ms. Murphy.

23         MS. MURPHY:  Thank you, your Honor.

24         If I could start with just the standard that we're

25    dealing with here in terms of the substantial question.  The

I5BHNG2

```
 1   question for the Court is whether our appeal will present a
 2   substantial question of law or fact that's likely to result in
 3   reversal or a new trial.  The Second Circuit has made clear
 4   that doesn't mean we have to demonstrate to you we're likely to
 5   prevail.  Likely refers to if we prevail on our substantial
 6   question, are we likely to obtain the relief of reversal or new
 7   trial?  The substantial question test asks only whether you
 8   have a close question, one in which the Second Circuit very
 9   well could come out the other way.
10          Now, this is a prosecution that's really
11   extraordinarily unusual in several respects.  We have a foreign
12   national accused of bribing foreign officials in their capacity
13   as U.N. ambassadors.  So, unsurprisingly, we have some really
14   novel legal issues here that haven't come up in other cases
15   before in the Second Circuit.  I know your Honor is familiar
16   with some of the legal issues here.  They've been briefed and
17   argued in the pretrial proceedings, so I won't belabor them to
18   too much detail, but if I could just go through the two -- two
19   of the principal ones.
20          THE COURT:  Give me one moment, Ms. Murphy.
21          Sorry about that.  Go ahead.
22          MS. MURPHY:  No problem.
23          So the first substantial question on appeal is whether
24   the United Nations --
25          (Pause)
```

I5BHNG2

1          THE COURT:  Go ahead.

2          MS. MURPHY:  No problem.  The first substantial

3    question is whether the United Nations qualifies as an

4    organization for purposes of Section 666.  I'm sure the

5    government will tell you that the Second Circuit already

6    resolved this question in the *Bahel* case, but that case just

7    didn't concern the meaning of the term "organization" under the

8    statute.  And there's strong arguments that the textual matter,

9    as a legislative history matter, in terms of canons of

10   interpretation that organization really means private

11   organization in this statute, not public.

12         THE COURT:  Let me ask is this:  Because there are six

13   counts here --

14         MS. MURPHY:  Sure.

15         THE COURT:  -- at least by my estimation, the proof

16   that would be required for any of the six counts is essentially

17   the same.  In other words, is there case law relating to --

18   would you have to run the table?  In other words, it's

19   conceivable that the Second Circuit might agree with you about

20   whether it's 666, or whatever, but not necessarily on all of

21   the other counts, one or more of the other counts.  Does that

22   result in a new trial?

23         MS. MURPHY:  Well, so we believe that -- the two

24   principal issues that I would bring up today are 666 and the

25   *McDonnell* official acts issue.  And I think that if we were to

I5BHNG2

1    prevail on both of those issues, it would impact every count in

2    the case, because if the court -- if the Second Circuit were to

3    conclude that there was an official acts problem with both the

4    FCPA and the 666 charges, that would impact every count in the

5    case because the first four counts depend on both -- on one or

6    both of 666 and the FCPA.  And then Counts Five and Six, the

7    jury was instructed that they could rely on 666, the FCPA, or

8    the foreign law allegations.

9        THE COURT:  What about the foreign law, though?  How

10   does *McDonnell* implicate the foreign law determination for

11   purposes of, I think it's, money laundering?

12       MS. MURPHY:  Sure.  The problem, the reason we'd be

13   likely to get a new trial on that is because the jury wasn't

14   asked which theory it relied upon for its money laundering

15   convictions.  Under the Second Circuit and clear Supreme Court

16   case law, if you can't tell which theory the jury relied on

17   that, if they were instructed on multiple theories and you

18   can't tell which one it is, then you have to have a new trial.

19   And I don't really see how, on this record, you could argue

20   that anybody knows to a certainty that the jury relied on the

21   foreign law charges instead of these two substantive charges

22   where it had already found convictions.

23       THE COURT:  Was there a request for a verdict sheet

24   with regard to that?  Was there a request at trial?  I don't

25   remember there being one, not that that means that you're not

I5BHNG2

1    correct on the law.  I'm just wondering.  I just don't

2    remember.

3            MS. MURPHY:  I have to say I don't know offhand

4    whether there was a request to do it separately, but it does

5    happen quite often that you don't have a request to separate it

6    out, and the relief when you have a situation where the jury

7    got separate theories and you can't tell which one they relied

8    on is it has to be a new trial.

9            THE COURT:  All right.  I'm sorry I interrupted you.

10           MS. MURPHY:  Sure.  No problem.

11           In terms of 666, we think there's strong arguments

12   there that it's a private organization.  I think there's a

13   textual argument on that, and the Second Circuit didn't have to

14   confront that argument in *Bahel* because it was focused on a

15   different part of the text.  Here, we have a statute that

16   separately applies to organizations and government agencies.

17   You wouldn't really need that separate piece if organizations

18   were really such a broad term that it encompassed everything.

19   You have a statute that says on its face what kind of

20   governmental entities it was to apply to, and they're all

21   notably domestic: state, local, and tribal.  They don't include

22   foreign governments and they don't include international

23   governments, which actually is a notable contrast to the FCPA

24   which actually specifically defines a foreign official to

25   include a public international organization.

I5BHNG2

1          So on the face of the statute there are indications

2     that it wasn't intended to reach public quasi-sovereign

3     international organizations like the United Nations, and the

4     legislative history of the statute actually says that it was

5     supposed to reach private organizations and state and local

6     government agencies.

7          So particularly when you take all of that in

8     combination with the canon of interpretation that says statutes

9     shouldn't be read to create unreasonable interference with the

10    sovereignty of foreign nations, which particularly as to 666

11    this would since 666 applies to both the payor and the

12    recipient, we believe it's at least a close question on which

13    the Second Circuit could very well come out the other way on

14    whether the 666 charges belonged in this case at all, which

15    would impact several of the counts in the case.

16         THE COURT:  OK.

17         MS. MURPHY:  We also believe there are substantial

18    questions here about the application of *McDonnell* and the

19    official acts doctrine that it sets forth as to both of the

20    statutes in this case.  We have two statutes that were

21    patterned after Section 201, which is the very statute that the

22    Supreme Court was interpreting in the *McDonnell* case.  And we

23    have two statutes that raise all the same constitutional

24    concerns as Section 201 and kind of the entire array of federal

25    bribery and corruption statutes because you have serious

1    vagueness concerns in terms of fair notice and arbitrary

2    enforcement if these statutes are read exceptionally broadly.

3    You have First Amendment concerns if they're read exceptionally

4    broadly, and you can have both interference with state

5    sovereignty as to 666 and interference with foreign sovereignty

6    as to both statutes in reading them in this manner.

7            Now, obviously, the text of these statutes is not

8    identical to Section 201, and in particular, the FCPA does have

9    that broader language that refers to securing an improper

10   advantage.  But, if anything, the sheer breadth of that

11   language, just read in isolation, kind of makes the

12   constitutional terms all the stronger.

13           THE COURT:  But here, right, at least there was an

14   attempt to address *McDonnell* in the jury charge and the jury

15   instructions.  Why isn't that sufficient?

16           MS. MURPHY:  Sure.

17           THE COURT:  So not unlike, again, different sort of

18   statutes, but not unlike the trial which was just recently

19   resolved, the Silver trial, or the Skelos trial which is going

20   to come up, which the Second Circuit reversed and set a new

21   trial, they didn't say you're out of the box.  In other words,

22   they basically said you can go for a new trial.

23           So why wouldn't the jury instructions be enough here

24   with regard to these statutes that we're considering?

25           MS. MURPHY:  So, first, there wasn't an official acts

I5BHNG2

instruction on the FCPA charges at all, so that's an

independent problem.

As to 666, there was an instruction and we appreciate

that your Honor gave an instruction, but we don't believe that

the instruction that was given was sufficient to do what

*McDonnell* needs a jury to do, which is understand, really, the

distinction between actions taken in official capacity and

actions that qualify as the kind of official acts *McDonnell* had

in question.

The couple things -- one of them, these are ways in

which the instruction differentiated from the one that we had

requested. I mean, in one respect, we requested instructions

that would have clearly delineated what we see as the two

distinct requirements of *McDonnell*. The first is that you need

a specific and focused matter, something that is or could be

pending before the, here, United Nations; and the second would

then be that you need the official actor decision on that

specific matter. The instruction the jury got instead kind of

blended the two concepts together, and basically ended up

saying what you need is something that's specific and focused

on a matter. I think that doesn't really delineate those two

prongs in the way that *McDonnell* requires.

The other thing the instruction didn't do, and I think

if you look back at *McDonnell* and what the court was talking

about and was concerned there with, is there is a notion that

I5BHNG2

1    the instructions have to be tailored to the things that are

2    being argued in the particular case.  Here, our instruction

3    would have told the jury that meeting with someone,

4    participating in the meeting is not an official act, which is

5    really an important distinction in this case given that the

6    government repeatedly argued and invited the jury to conclude

7    that this trip to Macau was an official act just because it was

8    taken in official capacity.  We don't believe that that's the

9    kind of official act that qualifies under *McDonnell*.  And the

10   instruction, by not specifically telling the jury that, didn't

11   really tailor to the facts of this case what was and wasn't an

12   official act.

13          Here, I think it's compounded by the fact that the

14   government did repeatedly -- basically tried this case for

15   official acts.  We think at least three of those are not

16   official acts within the meaning of *McDonnell*.  So you have a

17   real problem with the government really inviting the jury

18   explicitly to treat things as official acts that are not

19   official acts and that the instruction doesn't make

20   sufficiently clear to the jury are not official agents.

21          So I think with all of that, I don't mean to suggest

22   that we don't also have an argument about the sufficiency of

23   the evidence and other arguments in the case, but given that

24   particular problem with this issue, which is one that the

25   Second Circuit hasn't confronted in the FCPA context, this is a

I5BHNG2

substantial question on which the Second Circuit clearly could

come out in our favor.  And if they did, given that the

official acts aspects of the case impacts both 666 and the FCPA

charges, which themselves impact every count in the case, we'd

be likely to obtain a new trial if we prevailed on these

arguments.

THE COURT:  OK.  Thank you.

For the government.

MR. ZOLKIND:  Thank you, your Honor.

Your Honor, it has been nearly a year since the

defendant was convicted by a unanimous jury of serious

corruption and money laundering crimes, crimes that dated back

to at least 2010 and crimes which the Court has now determined

warrant a significant term of imprisonment.

Your Honor, the defendant faces at this point a much

steeper burden in terms of his argument to be kept out on bail

than he faced at any previous point in this case, and it cannot

meet that burden.  He can't meet either prong of it.  As I will

discuss, the defendant should be detained at this point.

Your Honor, first, with respect to the standard, I

think, just to be clear, the defendant has the burden of

showing both by clear and convincing evidence that he is not

likely to flee and, in addition, that there are substantial

issues that, if resolved in his favor on appeal, are likely to

lead to a reversal of his conviction or a new trial.

I5BHNG2

1          I'll address that in a moment, but I think, to get

2     right to the heart of one of the Court's questions, the

3     government's view is that he does need to sweep the deck, so to

4     speak.  He needs to win on every single count, essentially, in

5     order to get a new trial or reversal because the Court imposed

6     the same term of imprisonment concurrently as to each count.

7          Let me address the risk of flight first.  Just

8     briefly, we've argued this in front of the Court many times,

9     but the Court has previously found repeatedly that the

10    defendant does pose a significant risk of flight.  I think it's

11    important just to recall that the Court has made that finding

12    and for good reason, and the Court has imposed truly

13    extraordinary bail conditions to address that risk of flight,

14    but the risk of flight has always been there.  The defendant

15    now knows to a certainty that he is facing a serious term of

16    imprisonment, 48 months of imprisonment.  And he's argued

17    repeatedly, he's argued today, that jail is going to be very

18    difficult for him.  He's repeatedly let the Court know the

19    extent to which he is fearful of going to jail in this country.

20         So his incentive to flee, which has always been there,

21    is greater now than it has ever been before, and the Court

22    alluded to that.  I think there's really no dispute about that,

23    no serious dispute, that the incentive has gotten much greater

24    in light of today's sentencing.

25         In prior applications for bail, the defense has argued

I5BHNG2

that the defendant wasn't motivated to flee because he believed

that he'd be acquitted at trial, and then after he was

convicted, the argument was that he believed strongly in his

arguments for a non-incarceratory sentence.  Those arguments

don't apply at this point.

He has new motivations.  We don't know whether there's

ever been an attempt to flee before.  We have no indication

that there is, but that's not to say that in light of the

change of circumstances, there wouldn't be a new motivation.

So I don't think that the past is necessarily a guide in light

of the changed circumstances.

So then, obviously, he has an argument about his

belief in his likelihood of success on appeal.  Our view is

that the likelihood of success on appeal is very low.  And let

me turn to that now.

So, again, and the Court pointed this out, it's

critical to keep in mind that this is not a case in which the

defendant was convicted of just Section 666 and a conspiracy to

violate 666, where if the defense can persuade the appeals

court that there was a problem with the 666 counts, the whole

thing is getting reversed.  Here, the defendant's convictions

stands on multiple, independent different pegs.  He was

convicted not just of 666 but also of two different FCPA

substantive counts and money laundering counts which were

predicated both on the 666, the FCPA, and Antiguan and

I5BHNG2

Dominican law, which have their own unique elements.

          So to win, to get his convictions reversed or get a
new trial, the defendant has to do more than overturn his
Section 666 conviction, which we don't think there's a
likelihood of that happening in any event; he has to do that
for each of those counts.

          Let me turn to the specific arguments that were just
raised.  So, first of all, the argument with respect to whether
the United Nations is an organization.  The first thing to say
about that is that argument applies only to Section 666.  So
even if that argument were adopted by the circuit, that would
have no bearing whatsoever on his FCPA convictions, on his
conspiracy conviction.  And I should note there was a special
verdict form for the conspiracy charge, and so the jury
indicated that that conviction was predicated on each of the
underlying counts.  So that's the first thing to say about --
regardless of what the circuit says about whether or not the
U.N. is an organization, that only impacts Section 666.

          On the merits of that argument, as the Court knows,
this was the subject of extensive briefing in the motion to
dismiss.  The Court read all the precedents and arguments that
the defense advanced and rejected that argument.  We think it
did so for exactly the right reasons, most notably because the
Second Circuit has already addressed this issue in the *Bahel*
case.  So I think another panel of the circuit would be very

I5BHNG2

hard pressed to reevaluate that issue in light of *Bahel*.  It would really require the circuit to sit *en banc*.  I think that's not at all likely to happen.

With respect to the argument about whether Congress intended Section 666 to apply to an organization like the United Nations, cases again and again have talked about the purpose of Section 666, which is to safeguard federal money.  The purpose of Section 666 is to ensure that federal money that is going to organizations is not squandered through corruption.  The federal government spends, as the Court knows, hundreds of millions of dollars every single year on the United Nations.  So using that statute to enable the federal government to enforce -- to ensure that U.S. money is not going to fund an organization that is afflicted with bribery and corruption is exactly in line with what Congress intended Section 666 to be about.

I don't think the fact that it applies to an organization like the U.N. but not to foreign governments is at all strange.  There is the FCPA which applies outside the United States to foreign officials, and there's Section 666 that applies to state and local governments and to federally funded organizations.  I'm not at all conceding that Section 666 wouldn't have some potential application outside the United States.  That wasn't presented in this case.  Here, the U.N. is headquartered right here in New York.  This was not an

I5BHNG2

         1    extraterritorial application of Section 666, and they're not

         2    arguing that; that wasn't the argument that was just raised.

         3            So for all those reasons, I don't think that is

         4    remotely a substantial issue that's likely to result in a

         5    reversal or a new trial.

         6            With respect to the second and last issue that the

         7    defense raised, *McDonnell*, there's several reasons why

         8    *McDonnell* does not at all raise an issue that's likely to lead

         9    to a reversal or new trial.

        10            Number 1, as the Court again alluded to, the Court

        11    instructed the jury on *McDonnell* with respect to Section 666,

        12    and that wasn't because the government necessarily concedes

        13    that the Court had to do so, but we requested that instruction

        14    in an abundance of caution.  And, in fact, the Court gave, I

        15    think, a broader, more robust instruction than the government

        16    had even proposed.  So I think the Court did, in fact, adopt

        17    much of what the defense was requesting with respect to a

        18    *McDonnell* instruction.  So with respect to 666, they were

        19    instructed on *McDonnell*.

        20            With respect to the FCPA, there is no court that has

        21    found that *McDonnell* applies to the FCPA.  So for the defense

        22    to argue that that is a substantial issue that's likely to lead

        23    to reversal or a new trial, what they're saying is that this is

        24    going to be the first case that leads to a court deciding that

        25    *McDonnell* applies to the FCPA.  There are very good reasons why

I5BHNG2

the Court, this Court, addressed that issue and held to the

contrary.  And specifically, it's because, among other things,

the FCPA is explicitly much broader than Section 201 or Section

666, and it applies, by its own terms, to corrupt payments that

are designed to obtain an unfair business advantage.  There's

no way to read that language as requiring proof of an official

act.

         So that's the FCPA.  And then, of course, there's even

less reason to think that *McDonnell* would apply to Antiguan or

Dominican law.

         Just another point that gets, I think, less to the

sort of legal issue and more to a factual sufficiency,

evidentiary sufficiency argument that was alluded to by the

defense.  They claim that the government proved or attempted to

prove four official acts.  I understand why they're making that

argument and why they articulated it that way to the circuit.

It's easier to point at the four actions that the government

talked about, but the government did not in its pretrial

briefing or at trial ever confine itself to those four specific

acts.  We focused on those four acts and argued that they were

important evidence of the scheme and of the crime, but the

official act that the government has always been most focused

on, both in its legal arguments to the Court and in its

arguments to the jury, was the defendant's agreement with

Ambassador Ashe and Ambassador Lorenzo to establish a formal

I5BHNG2

U.N. center in Macau.  That was the subject of the agreement;
that was the official act, at the end of the day, that was the
subject of the corrupt agreement.

So whether or not a particular U.N. document or the
revision to that U.N. document was an official act, regardless
of whether a particular contract was an official act, and
certainly regardless of whether a trip to Macau was an official
act, the government's going to argue about particular official
acts, but even if the circuit doesn't agree, there's really no
way to dispute that an agreement to establish an official U.N.
center in Macau was an agreement to obtain official action.
That was the subject.  And so, again, I don't think arguments
about the four actions that did take place before the
defendant's plan was disrupted and he was arrested at all raise
a substantial issue that could potentially lead to a reversal
or a new trial, let alone likely to do so.

Unless the Court has any questions, I'll sit down.

THE COURT:  OK.  Thank you.

Mr. Genser.

MR. GENSER:  Yes, if I can just respond a little bit
on risk of flight.

THE COURT:  Yes.

MR. GENSER:  Your Honor, at every point when there's
been a bail determination, the government has stood up and told
the Court the parade of horribles and the enormous incentives

I5BHNG2

that Mr. Ng has to flee and how the conditions, the very strict
conditions that the Court has set, aren't going to be
sufficient.  Every time the government's been wrong, and
they're wrong again.

          I want to also point out that earlier the Court asked,
well, does the certainty of the sentence that the Court has
imposed make the risk of flight more acute?  And I think I
agree that it could in some respects, but in another respect,
it doesn't.  It's at least a wash, or maybe it even reduces the
incentive to flee because you're taking the uncertainty, which
includes a very, very high end range of potentially more than
25 years in jail that the defendant faced, that the government
argued created an enormous incentive to flee, and you are
replacing that with the certainty of, relative to that level, a
much more moderate amount.

          So from that perspective, in some ways it actually
reduces the incentive to flee because the real concern is that
Mr. Ng was going to spend the rest of his life in jail, and
we're very grateful that, based upon the sentence that your
Honor imposed, he's likely not to spend the rest of his life in
jail.  So I would just point that out as well.  I don't think
that the risk of flight is a serious issue.

          The other point I want to make is that the strength of
the appellate prong of this discussion and the faith that
Mr. Ng has in those arguments and in the appellate team that

I5BHNG2

1    he's assembled, very able team, including Ms. Murphy and also

2    Paul Clement, former Solicitor General of the United States,

3    lots of appellate experience.

4            THE COURT:  Some would say able is probably putting it

5    mildly.

6            MR. GENSER:  I'm trying to be modest about my partner

7    who I think is terrific.

8            But I think the point is, your Honor, that Mr. Ng now

9    has something else to hope for, something that he believes in,

10   and he believes in his chances on appeal as Ms. Murphy

11   outlined.  And he's committed to that.  He's committed to

12   pursuing that, and I think that factors in and reflects back on

13   the question of risk of flight.

14           So I think when you considered all that together,

15   there's no material increased incentive.  And to the extent

16   there was, your Honor's seen he has no -- he's expressed his

17   feelings about the case, and your Honor can tell he's resigned

18   to seeing this through, complying with the Court's rulings.

19   And the whole concept of risk of flight is not what should hold

20   up granting bail pending appeal.

21           Thank you.

22           THE COURT:  OK.  Thank you.

23           Ms. Murphy?

24           MS. MURPHY:  So first on 666, we acknowledge 666 is

25   not going to knock out every charge in this case, but our

I5BHNG2

1     argument on 666 is very important because it does matter for

2     several of the counts in this case.  So if the Second Circuit

3     agrees with us that it shouldn't have been in this case, that

4     will be critical to conspiracy, to 666, and also to the money

5     laundering charges.

6          As for the *Bahel* decision, the Court just did not

7     address the question of organization there.  The notion that

8     the court would need to go *en banc* to answer a question that

9     *Bahel* just wasn't confronted with and it doesn't address at all

10    is simply not correct.  The court can't kind of *sub silentio*

11    have interpreted statutory language that nobody put at issue in

12    the *Bahel* case.  And given that we believe there's textual

13    arguments here about reading organization narrowly and not just

14    arguments generally about how to read statutes as a general

15    matter, this is just clearly an open question on which *Bahel* is

16    relevant but is not conclusive.

17         The government also notes that applying 666 to the

18    United Nations would achieve the government's interests.  Well,

19    that can be said of applying any number of federal criminal

20    statutes in kind of what is essentially a sort of

21    extraterritorial context that involves foreign nationals and

22    foreign officials.  That's precisely why there's a canon of

23    interpretation that the courts are not supposed to read

24    statutes to create undue interference with foreign nations

25    unless the statute makes clear that that was Congress' intent.

I5BHNG2

1    And this statute just does not make that clear at all.  I think

2    it is notable that in comparing that to the FCPA, you can see

3    in the FCPA when Congress wants to reach a foreign

4    international organization, it knows how to do so and says so

5    on the face of the statute.

6          If I could just make a couple quick points about

7    *McDonnell*.  The government notes that the Second Circuit would

8    be the first court to hold that *McDonnell* applies to the FCPA.

9    They'd be the first court to rule on that issue that we're

10   aware of.  We're talking about a two-year-old decision and a

11   statute on which cases are rarely brought to trial and there

12   are very few appeals.  While there are a few cases that have

13   mentioned the issue, we're not aware of any court that has

14   actually confronted the question squarely and resolved the

15   question of whether the FCPA is impacted by the *McDonnell*

16   decision.  That alone cuts in favor of treating that as a

17   substantial question since the Second Circuit has also said

18   part of the consideration in the substantial question analysis

19   is whether you're dealing with a novel question, which that

20   question really is here.

21         The one other point that I would make on *McDonnell* is

22   while the government has an argument that maybe there is one

23   official act here, and I don't mean to concede that there is,

24   but that doesn't really get them all the way home since we are

25   entitled to bail if we're likely to get a new trial.  And I

I5BHNG2

1   don't think there's any dispute, I don't even hear the

2   government disputing that they relied on many official acts

3   here, four in particular and perhaps some others, and we

4   believe that they invited the jury to convict on things that

5   they classified as official acts that we believe, as a matter

6   of law, are not official acts.

7          So absent an instruction that made crystal clear to

8   the jury that they could not do that, we believe we have a

9   substantial question about whether the FCPA charges can stand

10  and the 666 charges, since both of them rely on the official

11  acts.  And as I noted at the beginning, without those two

12  pieces, there has to be a new trial.

13          THE COURT:  OK.  Thank you.

14          I've considered the arguments of the parties, and I

15  looked and, as counsel knows, I have given a substantial amount

16  of time to the issue of bail here.  I do think that the

17  sentence, certainty of the sentence of 48 months is something

18  that does weigh, tilt, on balance, because I think if it wasn't

19  clear from the amount of time I spent on it that it was a very

20  close call for me in making the determination that bail --

21  there could be conditions that would satisfy that.  I think, on

22  balance now, that I find that the defense has not met its

23  burden with regard to clear and convincing evidence that there

24  isn't a risk of flight here.

25          Again, these are close calls.  And I would say that

I5BHNG2

1    when I made the decision with regard to granting bail, there

2    were arguments -- I don't know whether they were explicitly

3    articulated here.  I think they may have been -- that the

4    methodology that I was using, in other words, the fact that

5    Mr. Ng was a person of means and could actually accomplish a

6    lot of the things that were requested in the bail package

7    itself would be something that wouldn't be -- again, I think it

8    is appropriately considered under the Bail Reform Act; some of

9    my colleagues have disagreed about that.  That's the only point

10    I would make on that.

11          Now, with regard to the issue that the appeal is going

12    to raise substantial questions of law or fact likely to result

13    in either reversal or new trial and otherwise, I think, as I

14    mentioned and as my questions may have indicated, there are six

15    counts here.  With regard to the *McDonnell* issue, as I was at

16    the time, I was convinced that the jury instruction that I

17    utilized was sufficient to address the concerns relating to

18    that.

19          With regard to the 666, while I do agree that *Bahel*

20    isn't on point, and I think I've discussed this in the past, it

21    is a reference point for me both in terms of 666 and statutes

22    like 666, but also with regard to, as I mentioned earlier in

23    the sentencing, with regard to the considerations relating to

24    the application, and this is a guideline issue, of 2C1.1 to

25    organizations like the United Nations.

I5BHNG2

So I think, everything considered with regard to that, I find that there isn't clear and convincing evidence that there's a likelihood to be reversal and a new trial here.

Putting that aside, and I understand that the FCPA, that no one has addressed the issue of the FCPA and how that relates to it, in other words, the defense doesn't have in its quiver of arguments that there are cases that basically indicate that, in fact -- that would support the argument that if there's clear and convincing evidence, that it should be applied. Again, in connection with the decision with regard to how to construct the jury charge, I think we spent, I think, the better part of a day, if not more, on the jury charge issues. I'm not saying that it's necessarily the amount of time we spent on it, but there was a substantial amount of time I spent both discussing with the parties the FCPA and the implications of *McDonnell* as well as thinking about it on my own.

Again, I think, on balance, I don't find that there's clear and convincing evidence that there's likely to be a reversal there and a new trial on that.

I understand the argument with regard to the money laundering counts, obviously, as it relates to the relationship between the unlawful activity alleged, both 666 and otherwise, but I don't see that there is a likelihood, again, with regard to the bribery -- excuse me, the money laundering charge as it

I5BHNG2

1    relates to violation of foreign law that there is, again, clear

2    and convincing evidence that that count will be reversed

3    because, although I recognize there is some connection, I don't

4    believe that it is such that that count will be reversed.

5           Just more globally, I think I may have alluded to this

6    in my questioning, the proof, at least in my mind, the proof

7    that the government would have put forward with regard to all

8    of the counts, I think, would be, if not identical,

9    substantially -- not materially different with regard to any of

10   the six counts in light of what the other -- in light of the

11   underlying facts here and the charges.

12          So, on that basis, I would deny defendant bail pending

13   appeal.

14          Is there anything else that we need to deal with?

15          MR. ZOLKIND:  Not from the government, your Honor.

16          THE COURT:  All right.  From the defense?

17          MR. GENSER:  No, your Honor.

18          THE COURT:  All right.  Thank you very much.

19          It was a very good argument, and we'll stand

20   adjourned.

21          (Adjourned)

22

23

24

25