I7CVSENC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                                15 CR 706 (VSB)

NG LAP SENG,

             Defendant.               TELEPHONE CONFERENCE

------------------------------x

                           New York, N.Y.
                           July 12, 2018
                           4:28 p.m.

Before:

              HON. VERNON S. BRODERICK,

                           District Judge

                   APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
JANIS ECHENBERG
DANIEL C. RICHENTHAL
DOUGLAS ZOLKIND
    Assistant United States Attorneys

GEORGE BAUER
CHENG ZHANG
TAI H. PARK
CHRISTOPHER GREER
XUE HUANG
    Attorneys for Defendant

ALSO PRESENT:  JOSHUA ROTHMAN, Pretrial Services

I7CVSENC

1          (In chambers)

2          MS. ECHENBERG:  This is Janis Echenberg, for the

3     government.  And Daniel Richenthal is on the line, as well as

4     Doug Zolkind.

5          MR. PARK:  And this is Tai Park, Christopher Greer,

6     and Cheng Zhang for Mr. Ng on the line.

7          Good afternoon.

8          MR. ROTHMAN:  And Josh Rothman from pretrial services.

9          THE COURT:  Okay.  This is Judge Broderick.  We are in

10    my chambers.  As my deputy clerk mentioned, we have a court

11    reporter here.  I appreciate everybody getting on the phone so

12    quickly.

13         I wanted to discuss with the parties -- I know,

14    Mr. Park, your application to -- that Mr. Ng not have to

15    surrender tomorrow and to talk about a -- because I actually --

16    the information I have is somewhat limited in the sense that

17    although I've had various correspondence from the parties over

18    the past several days or perhaps week, I don't have any records

19    and only briefly spoke with some of the physicians that were

20    conducting the MRIs of Mr. Ng the other day.

21         Let me ask Mr. Park, with regard to -- you referenced

22    a Dr. Pan as Mr. Ng's attending physician.

23         I'm sorry, who just joined the call?  This is Judge

24    Broderick.

25         MR. BAUER:  Sorry, your Honor.  This is George Bauer

I7CVSENC

```
1    from Kirkland.

2              THE COURT:  All right.  Mr. Bauer.

3              I was just saying, I was asking Mr. Park about Dr.

4    Pan.

5              Am I correct that Dr. Pan is his primary cardiologist,

6    for lack of a better term, and not the physician who performed

7    the invasive procedure, the putting in the stint?

8              MR. PARK:  That's correct, your Honor.  Dr. Michael

9    Adubato was the cardiologist who performed the stent

10   implantation.

11             THE COURT:  Okay.

12             Mr. Park, I just ask that although we were able to

13   recognize -- you just need to -- everybody needs to make sure

14   they state who they are.

15             This is Judge Broderick.  Who just joined the call?

16             MS. HUANG:  Hi, your Honor.  Xue Huang on the line.

17             THE COURT:  I'm sorry, was that Xue Huang?

18             MR. PARK:  Yes, your Honor.  For the record it's

19   X-U-E, H-U-A-N-G.  She is a lawyer assisting us in representing

20   Mr. Ng.

21             THE COURT:  Mr. Park, you just have to remember --

22             MR. PARK:  I'm sorry.  Sorry, Judge.  Sorry.

23             THE COURT:  So my question went to -- so I think I

24   have the answer to that.

25             How long has Dr. Pan been the treating cardiologist,
```

I7CVSENC

1    do you know, Mr. Park?

2              MR. PARK:  I don't.

3              Xue, do you have that information?

4              MS. HUANG:  Mr. Pan has been the same treating

5    physician since he was arrested in the United States, so

6    roughly around 2015.

7              THE COURT:  All right.

8              Now, Mr. Park, with regard to the doctor's schedule,

9    you mentioned that he has hospital duties tomorrow.  Are those

10   duties -- if you know, are they just rounds, in other words,

11   his responsibility to visit his patients in the hospital or is

12   he on call tomorrow?

13             MR. PARK:  I believe he's on call.

14             Again, Xue can correct me if I'm wrong, but my

15   understanding is that he is on call tomorrow.

16             THE COURT:  We couldn't hear anything.

17             MS. HUANG:  Your Honor?

18             THE COURT:  Yes.

19             MS. HUANG:  I'm sorry, your Honor.  He is on ICU duty

20   tomorrow.

21             THE COURT:  Okay.

22             Do you know what times that is to and from?

23             MS. HUANG:  We were told that he would be there for

24   all day.  He will be unavailable for a hearing for the entire

25   day.  The only time he will be available is -- he indicated to

I7CVSENC

1    us it would be Monday.

2                  THE COURT:  Okay.

3          I guess my question would be is he unavailable during

4    business hours?  In other words, is it something where he could

5    come for a hearing at the end of the day or -- I'm just trying

6    to figure out his schedule and whether there would be

7    availability at the end of the day or not.

8                  MS. HUANG:  (Inaudible)

9                  THE COURT:  I'm sorry.  We actually -- we didn't

10   actually get anything that you just said.  I'm not sure if

11   you're on a cellphone, if you'd just speak directly into it; or

12   if you have us on speaker, if you could take us off speaker,

13   that might help.

14                 MS. HUANG:  Yes, your Honor.  I'm not on a speaker

15   right now, I'm at the hospital.  The reception here is poor.

16                 THE COURT:  Okay.

17         Do you know would he have availability at the end of

18   the day?

19                 MS. HUANG:  We can ask again, your Honor.  He told us

20   that he's available on Monday morning or today after 6 p.m.,

21   that's when he indicated -- what he told us.  He told us

22   because he's on ICU duty tomorrow, so he will be unavailable.

23   We did not ask whether he will be available for the after

24   hours.

25                 THE COURT:  Okay.

I7CVSENC

1        I would like to get that information, just so that I

2   can have an understanding of when he would be available.  To

3   the extent I'm going to hold any kind of a hearing, it would be

4   where I would require testimony rather than something over the

5   phone.

6        So let me ask this:  As I understand it, Dr. Pan would

7   be available before noon; is that correct?

8        MR. PARK:  On Monday, your Honor.

9        THE COURT:  On Monday.

10        Let me hear from the government.

11        First of all, if I do hold a hearing, does the

12   government intend to have a physician available or will the

13   government rely on whatever submissions they have made or will

14   make?

15        MS. ECHENBERG:  Yes, your Honor.  The government would

16   intend to have our expert cardiologist at minimum.

17   Unfortunately, he also is available Monday, but in the

18   afternoon.  So we may have to have a bifurcated hearing if the

19   Court's schedule allowed for that.  I believe he's available

20   after 3 p.m.

21        THE COURT:  Okay.

22        Let me ask Mr. Park, Ms. Huang, whether -- I

23   understand the doctor -- is the doctor available later in the

24   day, again, on Monday at all?

25        MR. PARK:  Once again, he had indicated -- Judge, this

I7CVSENC

1      is Tai Park.

2              Dr. Pan had indicated that he's not available on

3      Monday -- after noon on Monday.  We did not press him on that,

4      but that was the information he gave us.

5              THE COURT:  Okay.

6              MR. PARK:  Just to continue a minute, I actually think

7      that if your Honor's schedule would permit -- obviously it's an

8      inconvenience -- but if that's what we can do given the various

9      doctors' busy schedules, we would obviously not object to

10     having bifurcated proceedings where in the morning we hear as

11     much as we can and then reconvene sometime when the

12     government's expert is available.

13             THE COURT:  Okay.  Thank you, Mr. Park.

14             Ms. Echenberg.

15             MS. ECHENBERG:  Yes.  I was just going to note also

16     that our cardiologist is on standby, to the extent you wanted

17     to hear from him on this call.

18             THE COURT:  Okay.

19             I think the issue for me is it's hard for me to make

20     an assessment.  I understand there's an issue with regard to

21     blood pressure.  I don't have an understanding about what that

22     actually means.  And by that I mean the following -- well, why

23     don't I do this:  I understand that the government believes

24     that Mr. Ng should be remanded -- should go and report to

25     prison tomorrow.  However, I want to -- was someone going to

I7CVSENC

1    say something?

2              MR. RICHENTHAL:  Your Honor, this is Daniel

3    Richenthal.

4              It sounds like your Honor is inclined to grant the

5    defense request, so perhaps this is moot.  But I can elaborate

6    on why that serves you and also provide more context with

7    respect to both records we have been provided and records we

8    have not been provided, including with respect to Dr. Pan, if

9    that might influence the Court's view.  If it would not

10   influence the Court's view, then I will save the time of

11   everyone and I'll save my remarks for a more apt moment.

12             THE COURT:  You are correct in your assessment that I

13   am inclined to have a hearing.  However, if there are

14   documents, I would like to hear about documents that have not

15   been produced for whatever reason, including the documents

16   that -- I guess it was a call either yesterday or the day

17   before that I issued an oral ruling that should be turned over

18   relating to the Pinnacle entity, I believe.

19             MR. RICHENTHAL:  Yes, your Honor.

20             THE COURT:  So let me just first say that I think we

21   would have a bifurcated hearing on Monday.  I think it makes

22   sense to start that hearing at 9 o'clock or 9:30.  And then we

23   would hear from the government's expert.

24             Ms. Echenberg, did you say after 3 or 3 o'clock?

25             MS. ECHENBERG:  Yes, he's available after 3 p.m.

I7CVSENC

| | |
|---|---|
| 1 | THE COURT:  So we would start it at -- |
| 2 | THE DEPUTY CLERK:  Can you hold on one second? |
| 3 | I'm sorry. |
| 4 | (Pause) |
| 5 | THE COURT:  Sorry.  I was just talking with my staff |
| 6 | about scheduling and my schedule in particular. |
| 7 | I think actually we may need to start a little bit |
| 8 | earlier to make sure that we get Dr. Pan -- his testimony. |
| 9 | So I'm thinking about -- well, 8:30, if possible |
| 10 | earlier, but 8:30, I think, is probably the earliest we could |
| 11 | start.  We would hear from Dr. Pan at that time.  And then we |
| 12 | would have the government's expert at about -- at 3 o'clock or |
| 13 | so. |
| 14 | MS. ECHENBERG:  I apologize, your Honor.  I misspoke. |
| 15 | He said he's available from 3:30 on. |
| 16 | THE COURT:  Okay. |
| 17 | So we would start at 3:30 and have it. |
| 18 | But I will say this:  I think that this shouldn't be |
| 19 | something that's an extended amount of time.  I view getting |
| 20 | the testimony as efficiently obviously as possible; but that it |
| 21 | shouldn't be more than an hour or two, I would say, with regard |
| 22 | to each of the experts. |
| 23 | So Mr. Richenthal, what were the documents that are in |
| 24 | the mix in terms of that the government hasn't received that |
| 25 | you were either promised or that you believe would be things |

I7CVSENC

1    that I should have for Monday's hearing?

2              MR. RICHENTHAL:  There are a number of documents, your

3    Honor.

4              So first, we have not received any documentation,

5    whether it be a record, a note, correspondence, electronic or

6    otherwise, since last night.  We understand that Mr. Ng

7    complained of a variety of alleged maladies from last night

8    into this morning; and that NYU determined, notwithstanding

9    that, that he was appropriate to be discharged.  We have not

10   received any documentation of those complaints or the doctors,

11   either of those complaints, including, but not limited to the

12   discharge paperwork itself.

13             Let me note in that respect that our understanding is

14   that the cause of this may well be the continued role that

15   Pinnacle is playing; namely, that Pinnacle receives records and

16   then it chooses to pass them to the defense, and then defense

17   chooses to pass them to us.  That takes time; in our view,

18   unnecessary time.  In fact, twice in the past 48 hours we've

19   received documentation with a fax header where the fax header

20   expressly indicates that Pinnacle had the record at least three

21   hours -- if not greater -- than the time period when we

22   received them.

23             So we are not blaming anyone for this, but we think

24   that your Honor's order, especially as orally modified as of

25   two days ago, contemplated that Pinnacle would provide all

I7CVSENC

1    records directly to the government and to the defense and not

2    play what I would call (inaudible).  So we would ask that if

3    that is not what's happening, that it start happening.

4                So first, all records -- (inaudible).

5                THE COURT:  Okay.  This is Judge Broderick.  Who

6    just -- I'm sorry.  Who just entered the call?

7                Was that Ms. Huang?

8                MR. RICHENTHAL:  This is Daniel Richenthal, your

9    Honor.

10               I think Ms. Huang just identified herself as the

11   person who rejoined the call.

12               THE COURT:  Okay.  All right.

13               So you were saying the Pinnacle records.

14               MR. RICHENTHAL:  I would say there are three

15   categories, your Honor.

16               So first is all records corresponding to notes in the

17   care, custody, or control of Pinnacle.  We say that because we

18   understand it to be playing a role in this process as an

19   intermediary.  It may not be the case that all records are

20   being passed from Pinnacle to the defense and then to us.  And

21   even if they are, it's taking hours and hours, when, in our

22   judgment, it should not.  So that's the first category, all

23   records corresponding to notes in the custody of Pinnacle.

24               In our judgment, they should be transmitted to both

25   parties simultaneously.  There's no reason why these records

I7CVSENC

```
 1   should be provided to the defense sooner than the government,

 2   nevermind hours in advance.

 3          Second and specifically -- and some of these

 4   categories overlap, but I'm trying to be as scant as

 5   possible -- we have not received any documentation, not even

 6   one word, since last night, which we know can't be correct,

 7   because Mr. Ng was discharged after speaking to multiple

 8   doctors last night and this morning.  So we would like those

 9   records as promptly as possible.

10          And then third, specific to Dr. Pan, Dr. Pan, to the

11   government's understanding, has seen the defendant

12   approximately three times in approximately three years.  He

13   last saw him on June 15th -- that's one five -- at which point

14   he determined that there was essentially nothing wrong with the

15   defendant; he merely needed to stop smoking and start taking

16   astabi (ph).  He was not the treating physician on any of the

17   recent developments, including, but not limited to, the stent;

18   nor was he in a position to advise that a stent was needed.

19   That was Dr. Kosta.

20          So we are not quite sure why Dr. Pan is back in the

21   picture.  Obviously Mr. Ng is entitled to consult anyone he

22   wishes.

23          That said, we have some concern that Mr. Ng put Dr.

24   Pan back in the picture after being weeks out of the picture,

25   because Dr. Pan may have a certain view that's not the same as
```

1    other doctors.  So we specifically requested all correspondence

2    with Dr. Pan.

3              THE COURT:  Okay.  All right.

4              With regard to those categories, Mr. Park, Mr. Bauer,

5    what is the defense position, first concerning the materials

6    that may have been generated last night, since Mr. Ng's -- or

7    prior to Mr. Ng's -- since the last time the documents were

8    transmitted from NYU Langone.  Has the defense come into

9    possession of those yet or is that something that has yet to be

10   requested or is in the process, after having been requested?

11             MR. PARK:  This is Tai Park.

12             George or Mr. Cheng Zhang should feel free to jump in.

13   Cheng has been largely dealing with the documents.

14             I believe that -- I'm sorry, go ahead.

15             MR. BAUER:  This is George Bauer, your Honor.

16             With respect to the discharge papers and any records

17   since last night, we have not received any.  My understanding

18   is that Mr. Ng was discharged this afternoon.  I don't know if

19   Xue is still on the line, because she may have a better

20   understanding of what was provided to Mr. Ng at that time.  As

21   far as we know, those papers have not been released to us yet,

22   so we don't have anything to provide to the government in that

23   regard just yet.

24             If I may address the other categories that

25   Mr. Richenthal had addressed.

I7CVSENC

<pre>
 1          With respect to the records from Pinnacle, I believe

 2     the fax header that Mr. Richenthal was referring to was the fax

 3     from when Pinnacle received the document to when the government

 4     ultimately received the document.

 5          I can tell your Honor that we've communicated to

 6     Pinnacle to provide records to us as soon as possible.  As soon

 7     as we receive the documents, we provide them to the government

 8     as soon as possible.

 9          As far as I am aware, every document that Pinnacle has

10     regarding Mr. Ng has been sent to defense and has been sent to

11     the government.  So the government currently has everything --

12     to my understanding, currently has everything that Pinnacle has

13     concerning Mr. Ng.

14          THE COURT:  Okay.

15          MR. BAUER:  The last category, Dr. Pan, we provided

16     the report from the most recent visit on 6/15.  We have not

17     provided -- I don't think we have in our possession the reports

18     from Mr. Pan, his appointments from years ago.  We did not

19     think they were relevant.  But if your Honor disagrees, we can

20     endeavor to collect those documents and provide them as soon as

21     possible as well.

22          THE COURT:  Okay.

23          So first let me just --

24          MR. RICHENTHAL:  Your Honor, this is Mr. --

25          THE COURT:  One moment, Mr. Richenthal.
</pre>

I7CVSENC

```
1        With regard to the Pinnacle records, Mr. Bauer, is

2   there any reason why those records that Pinnacle provides to

3   the defense can't be transmitted simultaneously to the

4   government?

5        MR. BAUER:  There is none, your Honor.  I don't

6   believe the government had previously asked us to have Pinnacle

7   send it to them directly.  But we are happy to tell them to do

8   that moving forward, to the extent they come into possession of

9   any additional records.

10        THE COURT:  All right.  That's fine.

11        With regard to Dr. Pan, I think it does make sense to

12   have the complete records, since Dr. Pan is going to be the

13   expert who testifies on Monday, to have all of his treating --

14   all of the records that he has regarding his meetings and

15   diagnoses and treatment of Mr. Ng since he became his

16   physician, that those should be produced, so that the defense

17   has them and so that the government has them.  So I'd ask you

18   to endeavor to get that done and hopefully get them produced

19   from the doctor to the government and to yourself by at some

20   point tomorrow.

21        Let me just look.

22        With regard to the -- I just wanted to speak about the

23   discharge papers and the like.

24        What I'd like, Mr. Bauer, Mr. Park, is to endeavor to

25   get those documents.  If they are already -- if Mr. Ng already
```

I7CVSENC

1    has copies of them, then they can be turned over.  But more

2    likely from -- make sure that we have all of those documents

3    that might be available from the hospital, I'd like to get

4    those also produced by tomorrow.

5         And I'm sorry, so who was -- was that Mr. Richenthal

6    who wanted to say something?

7         MR. PARK:  No, this is Tai Park, your Honor.

8         I just wanted to respond to Mr. Richenthal's question

9    about Dr. Pan and why he's being proposed.

10        In all candor, I was at the hospital today to

11   understand what was happening firsthand.  Mr. Bauer is actually

12   out of the office today and so I've taken kind of the laboring

13   oar on the letter, etc.

14        But I was there and Dr. Pan came to the room.  As the

15   kind of the person with the history with Mr. Ng, he clearly is

16   the person who is a cardiologist well-versed with all of the

17   records that have been generated in the past several days and

18   can speak to what treatment in his professional opinion is

19   necessary.

20        I don't think that you or the government will find

21   that he is in any way interested in hyperbole or saying things

22   that particularly favors the defense.  But I think it's a

23   neutral evaluation from an attending physician who knows

24   Mr. Ng's medical history quite well.

25        I have not thought about calling the doctors who

I7CVSENC

1    requested the angiogram or who performed the stent; I don't

2    think that's necessary.  If your Honor thinks after the hearing

3    on Monday that you require additional information, certainly we

4    can see if those folks are available.  But we do not currently

5    intend to rely on them.

6              THE COURT:  Okay.

7              What I would say is this with regard to -- I'm sorry,

8    yes, Mr. Richenthal?

9              MR. RICHENTHAL:  Just two comments on the record, your

10   Honor.  I'll save any comments on the substance for the

11   appropriate moment.

12             With respect to the records, this is the first we've

13   heard that we didn't have all of Dr. Pan's records, even though

14   Dr. Pan is affiliated with NYU.  So we agree that we should get

15   all of his records.

16             And then second, with respect to Pinnacle, our request

17   is actually twofold.

18             So one is (inaudible) records of NYU Langone and its

19   affiliates, which includes Dr. Pan.  And obviously that's of

20   principal interest to us.

21             Second is correspondence between Pinnacle and these

22   doctors themselves, because we are, to put it mildly,

23   concerned.  And Pinnacle, as a representative of Mr. Ng --

24   statements to doctors are not privileged.  We think it's

25   appropriate that Pinnacle, playing the medical role it's

I7CVSENC

1    playing, produce to us correspondence with the doctors

2    themselves, even if that correspondence is what I would call

3    Pinnacle-generated as opposed to NYU-generated.

4            THE COURT:  Just to be clear, I had thought that --

5    and again, I don't have the transcript in front of me from the

6    other day.  But just to be clear, my order relating to Pinnacle

7    included correspondence, both to and from -- because I don't

8    see how it would necessarily be privileged when they are even

9    communicating with defense counsel.  But again, I'll hear from

10   the party -- from the defense on that in a moment.

11           But with regard to communications with the doctors and

12   Pinnacle, that those emails or what have you should be among

13   the documents that are produced from Pinnacle.  And it may

14   be --

15           MR. RICHENTHAL:  This is Dan Richenthal again.

16           I'm sorry.

17           THE COURT:  So just to be clear on what I meant my

18   order to say, if I wasn't clear the other day.

19           So Mr. Richenthal, you were about to say something?

20           MR. RICHENTHAL:  I'm sorry, your Honor.

21           What I was going to say is that is our view.  I'm

22   mentioning it expressly we haven't received any such documents

23   which we find it difficult to believe do not exist,

24   including -- because we understand, as is true for most

25   services of this ilk -- that when there are conversations with

I7CVSENC

1   a doctor or his or her office, those conversations are

2   documented in some way, whether it be by email or by what I

3   would call a log, L-O-G, of their documents.  We have received

4   no records from Pinnacle of any kind, no emails of any kind, no

5   correspondence of any kind.

6         All we have received to date in its entirety actually

7   is what I would call the report that's produced or drafted or

8   signed by a doctor after a procedure is performed.  We have not

9   received in any way, including several weeks now, notes, to the

10  extent they exist outside that report; the documentation of the

11  procedure as it occurs, to the extent it exists outside that

12  report; or correspondence on any of those subjects.

13        We only have what I would call the final report.

14        So that's why we are being very precise when we say

15  notes and correspondence because, frankly, based on past

16  experience, hospitals have far bigger files than just a final

17  report.  So we want more than we've gotten with respect to NYU.

18  If there's nothing from Pinnacle, so be it.  That's very, very

19  difficult to believe in light of the role it's playing in this

20  circumstance.

21        THE COURT:  Okay.

22        I think, Mr. Bauer, can you speak to the Pinnacle

23  records concerning communications with -- whether it's with --

24  there may not have been -- I think you indicated the other day

25  that you had never had any communications -- by "you" I'm

I7CVSENC

| | |
|---|---|
| 1 | referring to Kirkland -- with Pinnacle.  But if you could talk |
| 2 | about that, but also talk about whether there are |
| 3 | communications with the physicians that have been treating |
| 4 | Mr. Ng and/or communications, quite frankly, to Mr. Ng or his |
| 5 | family members or whomever, one of his agents, so to speak, |
| 6 | also.  And whether you're aware one way or the other whether |
| 7 | they exist or don't exist. |
| 8 | MR. BAUER:  Your Honor, so first with respect to the |
| 9 | oral order on, I believe it was, Wednesday or Tuesday that your |
| 10 | Honor had alluded to earlier, my understanding was that oral |
| 11 | order was concerning a Dr. Bhatt, B-H-A-T-T, who was Mr. Ng's |
| 12 | neurologist, who had not provided a report up to that time. |
| 13 | And I believe the order -- the oral order was concerning Dr. |
| 14 | Bhatt and any reports and any correspondence with Mr. -- Dr. |
| 15 | Bhatt either between the defendant or Pinnacle or anyone else. |
| 16 | We've since provided that examination report and have confirmed |
| 17 | with Pinnacle that there was no correspondence with Dr. Bhatt's |
| 18 | office to provide. |
| 19 | To the broader set of correspondence involving |
| 20 | Pinnacle, I do not believe that we've asked them for all |
| 21 | correspondence with any doctor concerning Mr. Ng.  We can |
| 22 | certainly go back and do that, if that is the order from the |
| 23 | Court.  I'm not sure it's particularly relevant to this issue, |
| 24 | this particular request, but if that is the Court's order, we |
| 25 | can go back and confirm with them. |

I7CVSENC

1          But when we went to them with respect to Dr. Bhatt's

2     correspondence, they had told us that they communicated with

3     the offices via telephone, so there is unlikely to be any

4     correspondence.  But we can go back to them and ask them for a

5     collection of all of their -- whatever documents there are,

6     whatever correspondence there is, we can ask them to provide

7     that.

8          THE COURT:  Okay.

9          Mr. Bauer, you should start that ball rolling.

10          But just to put a finer point on it, I will issue a

11     written order with regard to the three categories of documents

12     that we've just discussed, including Pinnacle.

13          And just to be clear on it, with regard to Pinnacle,

14     I'm really talking about including communications that -- and

15     that could include emails, but it also would include if they

16     received a call and someone logged in the call or took notes

17     relating to a call.  Basically it's the documentation relating

18     to whatever the services that they are providing to Mr. Ng.  So

19     if they got a call and they don't document it in any way, okay,

20     that's fine.  But if there is documentary evidence relating to

21     those communications, I would direct that they be produced.

22          I'll issue an order with more specifics.  Obviously

23     the parties can take a look at that order and decide whether

24     I've missed something or not.  But I think just to make it

25     easier for the parties, I'm going to do that so that everybody

I7CVSENC

1   will be working off the same paperwork.

2           I would also, Mr. Bauer, like to, once those records

3   have been produced, have someone from Pinnacle available on

4   Monday so that they can attest that they have produced all of

5   the records in response to the order that I'm going to issue

6   later on today.

7           Let me ask whether there's -- because as I understand

8   it, we're going to be starting a hearing with Dr. Pan at 8:30

9   in the morning on Monday.  We will start with the government's

10  expert at 3:30 in the afternoon.  I'm going to issue an order

11  relating to the three categories of documents:

12          The discharge papers and documentation that had been

13  generated by NYU Langone since the last production that were

14  from last night and anything that was generated today or that

15  may be generated; the Pinnacle records that include

16  communications in whatever format, whether they are from email

17  or documenting contacts with physicians, Mr. Ng, Mr. Ng's

18  family members, or anyone who is his proxy concerning the

19  services that Pinnacle is providing; and all of whatever Mr. --

20  Dr. Pan's medical records are that he has concerning Mr. Ng and

21  his treatment of Mr. Ng during the pendency of this -- since he

22  became Mr. Ng's physician here in the United States.

23          Are there any questions with regard to the documents,

24  first of all?  Okay.

25          MR. RICHENTHAL:  Your Honor, this is Daniel

I7CVSENC

1   Richenthal.

2          I take it that the order also will cover, as we

3   understood the prior order to cover, what I would refer to

4   colloquially as the materials underlying final reports.  Again,

5   all we received is final reports; we have not received any

6   underlying notes or other records or test materials themselves.

7          THE COURT:  Just to put a finer point on it, I want

8   Mr. Ng's medical file as it relates from NYU Langone or

9   whatever treatment facilities we are talking about.  In other

10  words, so that would include whatever the packet of information

11  that was generated by the hospital with regard to Mr. Ng's

12  treatment:  Doctors' notes, nurses' notes, time period of

13  injections, if he received any, medications that he received,

14  the time he may have been woken up last night to give him

15  medication.  Whatever it is, I want the file turned over so

16  that everybody has it.  So whatever went into the -- that

17  should include materials that go into whatever final reports

18  that may have been issued.

19         And so yes, Mr. Richenthal, it does include that to

20  the extent -- and I will include that in the order that I

21  issue.

22         Mr. Park, Mr. Bauer, any questions with regard to the

23  documents?

24         MR. PARK:  No, your Honor.

25         I do want to make sure that we're clear, Judge, on

I7CVSENC

1    what documents you would like presented to you.  Presumably you

2    don't want a download of every document.

3            Before moving off of documents, I wanted to make sure

4    we covered that, Judge, so that we meet your expectations.

5            THE COURT:  Okay.

6            So I would say they are really in two categories.

7            One is categories of documents that you believe are of

8    support or will aid your witnesses in testifying and support

9    the view, from the government's perspective, that Mr. Ng --

10   that he should surrender to the facility, I guess it would be

11   on Tuesday; and any support that the defense has from a

12   documentary standpoint that they believe support Mr. Ng not

13   having to surrender on Tuesday and being given more time.

14           The second category of documents I think relate to an

15   issue that was more recently raised, which is the blood

16   pressure issue.  I'd like to know whether Mr. Ng has been

17   monitoring his blood pressure.  And to the extent he has been

18   monitoring the blood pressure, the documents relating to that.

19   In other words, if he keeps a log himself, because I know

20   physicians sometimes ask their patients to keep a log of their

21   blood pressure, or whether that's historically or whether he's

22   been more recently asked to do that so that the doctors can

23   assess how the medication -- the new medication he is

24   receiving, how it works.

25           I'd like to also get a sense of what medications he

I7CVSENC

1    was taking before for high blood pressure, if any, and what

2    medications he's taking now, including what types of

3    medications they may be.  I think there are certain different

4    types of medications, some of which are more -- may have more

5    side effects and may also be more powerful.  But I want to get

6    a sense of what medications he's currently on and the views of

7    the experts concerning what the effect of that has been.

8          As I understand it, the issue with the spike in blood

9    pressure -- what I don't know is whether this is something

10   where Mr. Ng's blood pressure has been fluctuating over the

11   past several months or whether this is an incident where it's

12   happened because he is under some kind of stress relating to

13   him needing to report or relating to his illnesses or something

14   that caused his blood pressure to spike more recently.

15         And so to the extent that he or someone else is

16   monitoring his blood pressure now, I'd like to see those

17   records to see what the record of his blood pressure is and

18   whether or not it's been stable over time.  And obviously I'd

19   like to hear from the experts with regard to that and with

20   regard to, if it's not stable, what the physicians' positions

21   are with regard to how long it would take to tinker with the

22   medications and the dosage such that his blood pressure is well

23   managed, for lack of a better term.

24         So those are the principal two categories of documents

25   that I at least had in mind that I would like to have presented

I7CVSENC

1    to me.  Because obviously I'm not a physician, so I'm going to

2    be relying on the doctors' testimony as it relates to the

3    documents themselves and that might support their respective

4    views with regard to Mr. Ng's treatment or whether or not he

5    can safely report to the facility that he's been designated to.

6              MR. PARK:  Understood, your Honor.

7              THE COURT:  Yes, Mr. Richenthal.

8              MR. RICHENTHAL:  Judge, two small items on a different

9    subject after the hearing.

10             First, while I don't have my rule book in front of me,

11   I think Federal Rule of Criminal Procedure 26.2 applies to this

12   hearing, that is, reverse 3500 material.  We are prepared to

13   release the notes we have with respect to our expert on

14   whatever schedule your Honor deems appropriate, and we ask that

15   the defense do so simultaneously.

16             Given how quickly things have developed, we do not

17   have notes that were retained that were ever discussed with

18   them.  Frankly it's been (inaudible) for the defense as well,

19   but to the extent either side does, we would ask for

20   simultaneous exchange of 26.2 material.

21             THE COURT:  All right.

22             Let me hear from the defense.  Any objection to that?

23             MR. PARK:  This is Tai Park.

24             Not from me, your Honor.

25             THE COURT:  Okay.

I7CVSENC

1          Mr. Bauer?

2          MR. BAUER:  No, your Honor, except to say I don't

3    think we have an expert retained on our end.  The only doctors

4    we've dealt with are Mr. Ng's doctors whose reports we've been

5    providing and whose -- to the extent there are any additional

6    documents, we'll be supplementing pursuant to your Honor's

7    order.

8          MR. RICHENTHAL:  Your Honor, this is Daniel

9    Richenthal.

10         I'm sorry.

11         I was just going to say my understanding of the rule

12   is it matters not whether someone is retained; it simply

13   matters if someone is calling the witness.

14         So if Kirkland & Ellis, Park Jensen, or any other

15   representative of the defense has what would be deemed 26.2

16   material, irrespective of whether they retained Dr. Pan, we

17   think we are entitled to that material, and we intend to give

18   them the same with respect to our expert.

19         THE COURT:  In other words, for Dr. Pan, notes

20   relating to communications with Dr. Pan, am I hearing that

21   correctly, Mr. Richenthal?

22         MR. RICHENTHAL:  Yes, your Honor.

23         Our retained cardiologist, we have a handful of notes

24   from conversations with him.  We would turn those over,

25   provided the defense is turning over the same material.

I7CVSENC

1    Exactly right.  Conversations with the lawyers or

2    representatives with the witness, that is what 26.2 material

3    requires be produced.

4              THE COURT:  Okay.

5              So I would direct that those materials be produced by

6    the close of business tomorrow.  To the extent there are notes

7    that are generated after that time frame, that the parties make

8    efforts to produce those as soon as they can, but no later than

9    the beginning of the hearing.  In other words, if they are

10   generated, I'd like you to produce them as they are generated,

11   but no later than the start of the hearing or at least, I

12   should say, no later than 8 o'clock on Monday.

13             MR. RICHENTHAL:  And then the final related point,

14   your Honor –– this is again Daniel Richenthal –– is because the

15   defense is the moving party here, our understanding is the

16   scope of the hearing is essentially cabined by the letter they

17   filed this afternoon; that is, physicians that allege

18   cardiological issues, principally high blood pressure, alleged

19   high blood pressure are the bases to ask for an adjournment.

20   We are not aware, in other words, if the defense is seeking

21   adjournment on another basis, be it neurological or strategic

22   or otherwise, we intend to rely on that.  If the defense has an

23   interest in expanding the scope of the bases upon which it is

24   asking for an adjournment, we ask that that scope be disclosed,

25   because we may need to retain other experts or have other

I7CVSENC

1    experts available.

2                    THE COURT:  Okay.

3                    Mr. Park?  Mr. Bauer?

4                    MR. PARK:  Mr. Richenthal is unduly concerned.

5            Can I just say, your Honor, that Mr. Ng has had his

6    extended family here prepared and ready to say good-bye to him

7    because he has been prepared to surrender.  The only reason I

8    am bringing this to your attention is because we are gravely

9    concerned about the imminence of his getting locked up after

10   having undergone these procedures.  So we will restrict

11   ourselves to that issue.

12                   THE COURT:  I guess the issue, Mr. Park, is --

13                   MR. RICHENTHAL:  Your Honor, I'm sorry --

14                   THE COURT:  Mr. Richenthal, one moment.

15           The issue though is does it just relate to the issue

16   of his blood pressure and the blood pressure spiking and

17   getting it under control, or does it relate to not only the

18   blood pressure, but relates to the fact he had the stents put

19   in and he had a minor stroke?  In other words, is it the full

20   panoply of Mr. Ng's health issues or does it just relate to --

21   because as I understand it, he was readmitted for a very high

22   blood pressure.  I'm just trying to figure out what the actual

23   scope -- in other words, are you saying it's all of those

24   things or just the blood pressure?

25                   MR. PARK:  Well, just to be clear, your Honor -- this

I7CVSENC

1    is Tai Park -- the blood pressure was what caused initially for

2    them to undergo the implanting the stents.  They thought that

3    was a big solution.

4          He then had another high blood pressure, as I

5    understand it, that caused him to rush back into the hospital.

6    And they did an MRI and found strokes.

7          The high blood pressure, as I understand it, one of

8    the risks that uncontrolled high blood pressure could result in

9    is another stroke.  In other words, blood -- part of the brain

10   bleeding and causing a much more major incident regarding the

11   stroke.  I believe that's all what is the entire package of

12   what happened this past week.

13         The gist of our application, your Honor, is let him go

14   home, get acclimated to the medication to control his blood

15   pressure, try to get him to stabilize before he has to go and

16   surrender.

17         So I don't know how else to describe the scope, but

18   if -- we are not, for example, your Honor, going to engage in

19   any dialogue or discussion or submission about the fact that

20   the MRI of his spinal cord showed a serious chronic situation

21   there.  That's not what we are going to do.  Dr. Pan wouldn't

22   be qualified to do that.  He would be talking about what is the

23   recommended -- what is the recommended course right now, given

24   the very intense few days that Mr. Ng has had in the hospital

25   this week relating principally to his blood pressure issues.

I7CVSENC

1          THE COURT:  Okay.

2          I'm sorry.  Mr. Park, you were finishing a thought?

3          MR. PARK:  I was just saying I hope that's clear.

4          THE COURT:  All right.

5          Mr. Richenthal?

6          MR. RICHENTHAL:  Your Honor, unfortunately, it isn't,

7   and here's why:  So Mr. Park just mentioned the risk of stroke.

8   We actually think that the medical assessment that he just

9   described is inaccurate and we can prove that.

10          But putting aside the substance for a moment, when

11   you're talking about a stroke, you're no longer talking a

12   cardiological event; you're talking a neurological event.

13          Dr. Pan is not a neurologist.

14          The government does have a board-certified neurologist

15   who we have retained as an expert, who would be qualified to

16   talk about potential risks of stroke.  I assume the defense

17   would call a neurologist as well.  But that's just a different

18   doctor for a different purpose, which is exactly why I asked my

19   question.

20          What we fear -- and I don't think it's unduly based; I

21   think it's been grounded in the past several days and weeks --

22   is that we'll hear from cardiologists, and then people who are

23   not qualified to talk about neurological events are going to

24   opine on neurological events, and your Honor will not have a

25   complete record on which to make a prompt ruling.

I7CVSENC

```
1          So if the defense position is that the alleged high

2    blood pressure is not simply -- is problematic from a

3    cardiological perspective and not manageable, but is

4    problematic from a neurological perspective and is not

5    manageable, we think it should make a neurologist available so

6    your Honor has a complete record, or it should abandon that

7    theory and focus principally -- if not entirely -- on high

8    blood pressure and its connection to potential cardiological

9    events.

10          THE COURT:  Okay.

11          MR. PARK:  Your Honor --

12          THE COURT:  Yes, Mr. Park.

13          MR. PARK:  If I could respond to that, your Honor.

14          Your Honor is obviously well-positioned, after

15   cross-examination of a cardiologist, to determine whether he is

16   going well abroad of his expertise or not.  And we'll weigh it

17   accordingly.

18          This is not a trial.  All we are trying to get before

19   your Honor is somebody who knows Mr. Ng's history and can make

20   a reasoned judgment about what makes sense under the

21   circumstances.  To say that because he's a cardiologist he

22   can't talk about what the potential impact of uncontrolled high

23   blood pressure is on various parts of the body, that's frankly

24   absurd.

25          Again, it may well be, your Honor, that because of his
```

I7CVSENC

1    limited expertise you give it less weight, which is fine.  But

2    to say that and therefore he can't even talk about what

3    possible impact an uncontrolled high blood pressure -- spike in

4    blood pressure might have on the fact that he just had a stroke

5    this week, that's just not -- that can't be right, Judge.

6          Cardiologists are well-equipped to talk about

7    potential collateral consequences, and that's all we are

8    talking about.  And if he wants to have -- if Mr. Richenthal

9    wants to have a neurologist, their own expert, on standby to

10   rebut any potential concerns about the impact of Dr. Pan's

11   testimony about consequences of high blood pressure to the

12   brain, then they can certainly do so and I'd be pleased to

13   cross-examine him.

14         THE COURT:  Okay.

15         This is what we are going to do with regard to this.

16         Obviously it's the application of the defense, and so

17   however they want to prove up the support for their application

18   that Mr. Ng should remain out, they can do.

19         Look, there's no jury here.  I'll hear the testimony.

20   I'll either discount it, if I think it's outside of Dr. Pan's

21   expertise, or give it whatever weight it includes.

22         Similarly with regard to the government, if the

23   government believes that -- obviously they can make the

24   argument that it's beyond the scope of his expertise.  But I

25   also think the government is -- and again, it's up to the

I7CVSENC

```
1    government to decide what witnesses to have available, but can
2    have a neurologist who can perhaps speak to the relationship,
3    at least as I understand it from the government's view, with a
4    more neurologically based comment as it relates to the impact
5    of Mr. Ng's most recent medical issues in that regard.  So I
6    would obviously allow that to happen.
7              MR. RICHENTHAL:  This is Daniel Richenthal, your
8    Honor.
9              We may well, therefore, have a neurologist not just on
10   standby, we may have a neurologist listen to Dr. Pan's
11   testimony to assist in both cross-examination and potentially
12   testify himself.  That sounds like it may be warranted and
13   we'll use our discretion in that respect.
14             The reason I say that, it's not the case that Mr. Ng
15   had strokes independent of other things; he only had a stroke
16   because he had a stent.  In fact, there's no dispute about that
17   at all.  That's one of the things the neurologist was prepared
18   to say; although Mr. Ng's own doctors have said that.  So we
19   may well take your Honor up on the suggestion.  This is why I
20   raised this question.
21             THE COURT:  And that's fine.
22             Look, as I said, I'll leave it up to the parties how
23   they wish to prove or rebut whatever the testimony is.  I think
24   it was good that we had the conversation, because we now at
25   least know that the spinal issue is something that's not a
```

I7CVSENC

1    topic of conversation that will happen on Monday.

2           Is there anything else?  Any other questions that

3    either party has?

4           First the government.

5           MR. RICHENTHAL:  Our only question, your Honor, is

6    what is the defense's ultimate ask?  If it asks for a delay

7    till Tuesday, which I understand is going to be granted, it has

8    not told us what it actually ultimately seeks.  In order to

9    both properly prepare for the hearing and, frankly, confer with

10   our experts, we'd like to know what the ultimate ask is.

11          THE COURT:  From the reading of the -- well, Mr. Park,

12   Mr. Bauer, do you have a view as to what the ultimate -- it

13   sounds as if it's until the blood pressure medication is able

14   to stabilize Mr. Ng's blood pressure, but I'll allow -- go

15   ahead and say what your position is concerning what the

16   ultimate request is going to be.

17          MR. PARK:  Your Honor is exactly right, it is to give

18   Mr. Ng sufficient time for his treating physician to feel

19   comfortable that his blood pressure situation has stabilized.

20   And again, as I've indicated in my letter, Dr. Pan said a few

21   days; he was not able to be any more specific in terms of the

22   duration.  And I believe it's, in part, because this is just

23   kind of -- it's just fast-breaking.  And hopefully he can

24   provide more clarity for us on Monday.

25          THE COURT:  All right.

I7CVSENC

1          Obviously, Mr. Park, to the extent that that view is

2     refined, in other words, that either you or Mr. Bauer or

3     someone on the defense has a conversation with Dr. Pan and he

4     puts a finer point on it, even if you don't take specific

5     notes, I would ask that you disclose that to the government so

6     that everybody is on the same page concerning what the ask is

7     going to be, whether it's two days, whether it's a week,

8     whether it's -- whatever it may be.  Or whether the doctor is

9     going to say that the monitoring of Mr. Ng's blood pressure

10     over the weekend appears to indicate that his blood pressure

11     has, in fact, stabilized, and there hasn't been the

12     fluctuations, and that the blood pressures remain within a

13     certain band that the doctor feels that he won't require

14     additional time to make that determination.

15          So I just ask that if there's more of a finer point,

16     that you communicate that with the government.

17          MR. PARK:  Understood, your Honor.

18          THE COURT:  All right.

19          Is there anything else that we need to deal with?

20          I heard from the government.

21          MR. RICHENTHAL:  Nothing further from me, that is,

22     Daniel Richenthal.

23          Ms. Echenberg and Mr. Zolkind are in a different state

24     than I am right now, so I don't know if they have anything, but

25     nothing from me.  Thank you, your Honor.

I7CVSENC

```
 1                MS. ECHENBERG:  Nothing from the government.

 2                THE COURT:  Okay.  All right.  Thank you.

 3                I assume Mr. -- yes?  Mr. Park?

 4                MR. ROTHMAN:  This is Josh Rothman.

 5                I just want to let everyone know that I just got

 6       notified that Mr. Ng is back in the residence.

 7                THE COURT:  Okay.  Thank you, Officer Rothman.

 8                Let me ask Mr. Park, Mr. Bauer, anything else we need

 9       to deal with right now?

10                MR. PARK:  No, your Honor.

11                Just, I guess, the one thing is to make a specific

12       order indicating that the new surrender date is Tuesday at 12

13       p.m. pending the hearing.

14                THE COURT:  And I will indicate that in the order.

15                But orally the new surrender date is Tuesday at noon.

16                Also we've had this conference and other conference,

17       it's not clear to me -- I think I indicated the other day what

18       the law is concerning Mr. Ng's right to be at these

19       conferences.  Mr. Park, Mr. Bauer, do you waive Mr. Ng's

20       presence for purposes of this conference?

21                MR. PARK:  Yes, your Honor.

22                And I specifically discussed that with him today, and

23       he waives this conference, as well as the hearing on Monday.

24                THE COURT:  Okay.  All right.  Thank you.

25                Anything else?  Because I'm about to adjourn the
```

I7CVSENC

1    conference.

2            All right.  Hearing nothing, we're going to adjourn

3    the conference.  We'll issue the order shortly, and I'll see

4    everybody Monday at 8:30.  Thank you.

5            MR. PARK:  Thank you very much.

6            MS. ECHENBERG:  Thank you, your Honor.

7                            *    *    *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25