UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

NG LAP SENG, AKA DAVID NG, AKA
DAVID NG LAP SENG,

Defendant.

Case No. 15-cr-706-3 (VSB)

---

**NG LAP SENG'S EMERGENCY MOTION FOR COMPASSIONATE
RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)**

---

**BRAFMAN & ASSOCIATES, P.C.**
*Attorneys for Ng Lap Seng*
767 3rd Avenue, 26th Fl.
New York, New York 10017
Tel: (212) 750-7800
Fax: (212) 750-390

## PRELIMINARY STATEMENT

Federal inmate Ng Lap Seng (Register # 92441-054), through undersigned counsel, files this emergency motion, under 18 U.S.C. § 3582(c)(1)(A), for an order granting Ng "compassionate release" and directing him to serve the remainder of his prison sentence in home confinement (where he would be subject to GPS-enabled electronic monitoring and the condition of supervised release that are set forth in the Judgment in a Criminal Case) or, alternatively, for an order recommending that the Federal Bureau of Prisons ("BOP") grant his § 3582(c)(1)(A) petition that was mailed and faxed to the BOP on March 27, 2020.

This Court did not intend to impose a potential death sentence on Ng during the original sentencing. Given the recent coronavirus disease (COVID-19) pandemic, the high risk of infection within federal prisons, and Ng's advanced age and serious underlying medical conditions, it is likely that he will soon contract the virus and become critically ill or die from it. Thus, there are "extraordinary and compelling reasons" for allowing Ng to serve the remainder of his prison sentence in home confinement. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

## BACKGROUND

Ng was born in June 1948. (Ex. A: Passport). Before this Court in June 2018, Ng was convicted of several bribery and money laundering offenses and was sentenced to 48 months in prison.[1] (ECF Doc. 783 (Judgment) at 1–3). Ng's convictions arose out of his acts of paying two United Nations ("U.N.") ambassadors more than $1 million to obtain the U.N.'s commitment to use his Macau real estate development as the site for an annual U.N. conference. (Ex. B: PSR ¶¶ 20–21, 27).

---

[1] Ng's crimes of conviction were 18 U.S.C. §§ 371, 666; 15 U.S.C. §§ 78dd-2, 78dd-3; and 18 U.S.C. § 1956(a)(2)(A), (h). (ECF doc. 783 at 1–2).

Since July 18, 2018, Ng has been serving his sentence at the Allenwood Low Security Federal Correctional Institution ("FCI Allenwood Low") in Pennsylvania. (*See* ECF Doc. 839 (Surrender Date Order)); *see* https://www.bop.gov/inmateloc/ (last visited Apr. 5, 2020). Ng shares a bunk bed with his roommate, with Ng sleeping in the lower bunk and his roommate in the upper.  Based on credits for good conduct time, Ng's projected release date is December 23, 2021. *See* https://www.bop.gov/inmateloc/.



Ng has an extensive history of medical issues. In 1997, Ng was diagnosed with ███████ ██████████████████ and █████████. In 2000, he was admitted to a hospital where he was diagnosed with ████████████████ and "████████████████████████████ ██████████ Ng has also been diagnosed with ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ (Ex. B ¶¶ 141–44; Ex. C: Medical Records; ECF Doc. 817-2: Medical Record).

A physician who examined Ng on June 27, 2018 (a couple of weeks before he began his prison sentence) found that he must "improve[] control  of his █████████████" for him "to have  a reasonable chance of serving his sentence and emerging in good health."  The physician also found that, unless Ng's "control" of █████ medications, exercise, and diet is "tightened," he is "likely to  develop  complications  from  ██████  such as  ████████████████████████ ████████████████████████████████ In addition, Ng is ██████████

is a former tobacco user, has had  and one ▮▮▮▮▮▮▮ , and has had a ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . (Ex. C).

On March 27, 2020, Ng mailed and faxed to the warden of FCI Allenwood Low a petition for the BOP to move this Court for Ng's compassionate release. (Ex. D: BOP Petition with Proof of Fling); *see* 28 C.F.R. § 571.61(a). On April 3, 2020, one of the undersigned (Stuart Gold) called Ng's case manager to check on the status of Ng's petition, received a voicemail recording, and left a message asking for a callback. As of the filing of this motion, the undersigned have not heard back from the warden or case manager.

## THE COMPASSIONATE RELEASE STATUTE

The "compassionate release" provision of 18 U.S.C. § 3582(c) provides the following:

The [sentencing] court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A). Under the Sentencing Commission's policy statement on compassionate release, the sentencing court must also find that "the defendant is not a danger to

the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G.

§ 1B1.13(2).

## **ARGUMENT**

### I.     **The Exhaustion Requirement Should be Excused**

This Court should excuse Ng's failure to exhaust his administrative remedies and consider

the present motion. As an initial matter, § 3582(c)(1)(A)'s exhaustion requirement is not a

jurisdictional bar to this Court's consideration of Ng's request for compassionate release. "If the

Legislature clearly states that a prescription counts as jurisdictional, then courts and litigants will

be duly instructed and will not be left to wrestle with the issue; but when Congress does not rank

a prescription as jurisdictional, courts should treat the restriction as nonjurisdictional in character."

*Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1850 (2019) (brackets and internal quotation

marks omitted). Section 3582(c)(1)(A) "lacks the sweeping and direct language that would

indicate a jurisdictional bar rather than a mere codification of administrative exhaustion

requirements." *See Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003) (concerning the Prison

Litigation Reform Act); *see also United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015) (finding

that § 3582(c) is not "phrased in jurisdictional terms" and thus "the statutory indicators point

against jurisdictional treatment").

Although exhaustion is apparently mandated by § 3582(c)(1)(A), Ng satisfies the each of

the three exceptions to the exhaustion requirement. Just last year, the Second Circuit stated the

following in *Washington v. Barr*:

> Even where exhaustion is seemingly mandated by statute or decisional law,
> the requirement is not absolute. The Supreme Court itself [in *McCarthy v.
> Madigan*, 503 U.S. 140, 146 (1992)] has recognized exceptions to the exhaustion
> requirement under "three broad sets of circumstances."
>
> First, exhaustion may be unnecessary where it would be futile . . . .

4

[Second,] exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief. . . . .

Finally, exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice. In particular, "an unreasonable or indefinite timeframe for administrative action" may sufficiently prejudice plaintiffs to justify a federal court in taking a case prior to the complete exhaustion of administrative remedies. Not every delay will be sufficiently severe to justify waiver, however. Although, in most cases, "respondents would clearly prefer an immediate appeal rather than the often lengthy administrative review process," a mere preference for speedy resolution is not enough. Threatened or impending irreparable injury flowing from delay incident to following the prescribed administrative procedure militates in favor of waiving exhaustion, but only if there is a strong showing both of the inadequacy of the prescribed procedure and of impending harm."

*Washington*, 925 F.3d 109, 118 (2d Cir. 2019) (citations, ellipses, and brackets omitted); *see also*

*McCarthy*, 503 U.S. at 147 (providing that a party "may suffer irreparable harm if unable to secure

immediate judicial consideration of his claim"); *Bowen v. City of New York*, 476 U.S. 467, 483,

487 (1986) (excusing an administrative exhaustion requirement where the claimants would have

been "irreparably injured were the exhaustion requirement [was] enforced against them").

Here, Ng satisfies all three exception to the exhaustion requirement (even though he need

only satisfy one exception).  Turning first to the undue prejudice exception, Ng would suffer undue

prejudice if he were exhaust his administrative remedies before seeking federal court intervention.

There is an "unreasonable" and "indefinite" timeframe for the BOP to act on Ng's petition. The

BOP "makes a motion under    [§] 3582(c)(1)(A) only after review of the request by the Warden,

the General Counsel, and either the Medical Director for medical referrals or the Assistant

Director, Correctional Programs Division for non-medical referrals, and with the approval of the

Director, Bureau of Prisons."  28 C.F.R. § 571.62(a).[2]  Thus, the BOP process will not move

---

[2] Section 571.62(a) further provides the following:

quickly enough to afford Ng adequate relief, especially given the recent spike in § 3582(c)(1)(A) petitions to the BOP from the coronavirus pandemic.

Moreover, any further delay from the BOP will most likely irreparably harm Ng. As discussed in more detail below, the coronavirus is spreading rapidly in America, including in Pennsylvania and BOP prisons. Every passing day greatly increases the probability that Ng will contract the coronavirus and incur serious illness or death. Waiting 30 or even a couple of days might prove to be too long. *See Matter of Extradition of Toledo Manrique*, No. 19-mj-71055, 2020 WL 1307109, at 1 (N.D. Cal. Mar. 19, 2020) ("[T]he government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire [Correctional Facility] before seeking release is impractical. By then it may be too late. (citation omitted)); *cf. United States v. Sloane*, No. 19-cr-10117 (D. Mass.), ECF Doc. 647 (Mar. 19, 2020, Order) (in denying compassionate release, citing the defendant's failure to "suggest a life-threatening condition to

---

(1) The Warden shall promptly review a request for consideration under [§] 3582(c)(1)(A). If the Warden, upon an investigation of the request determines that the request warrants approval, the Warden shall refer the matter in writing with recommendation to the Office of General Counsel.

(2) If the General Counsel determines that the request warrants approval, the General Counsel shall solicit the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division depending upon the nature of the basis of the request. The General Counsel will solicit the opinion of the United States Attorney in the district in which the inmate was sentenced. With these opinions, the General Counsel shall forward the entire matter to the Director, Bureau of Prisons, for final decision, subject to the general supervision and direction of the Attorney General and Deputy Attorney General.

(3) . . . If the Director, Bureau of Prisons, grants a request under 18 U.S.C. 3582(c)(1)(A), the Director will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on behalf of the Director of the Bureau of Prisons to reduce the inmate's term of imprisonment to time served.

28 C.F.R. § 571.62(a)(1)–(3).

support a claim that [§ 3582(c)(1)(A)'s] exhaustion requirements may be excused during this national [coronavirus] emergency").

Because numerous BOP officials must act on Ng's petition and because the coronavirus is spreading rapidly in Pennsylvania and BOP prisons, Ng also satisfies the futility and inadequate-relief exceptions to the exhaustion requirement. *See Washington*, 925 F.3d at 120–21 ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate.").

In *Mathews v. Eldridge*, the Supreme Court held that "cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." 424 U.S. 319, 330 (1976). "That reasoning explains the Second Circuit's holding [in *Washington*] that even statutory exhaustion requirements are 'not absolute.'" *United States v. Perez*, No. 17-cr-513, 2020 WL 1546422, at 2 & n.2 (S.D.N.Y. Apr. 1, 2020) (Torres, J.). Ng "has presented his claim to the BOP, so the situation here is analogous." *Id.* at 2 n.2 (record citation omitted).

Judges, including one in this District, have waived § 3582(c)(1)(A)'s exhaustion requirement in circumstances similar to Ng's case. *See Perez*, 2020 WL 1546422, at 3 (Torres, J.) (finding that the defendant's "undisputed fragile health, combined with the high risk of contracting COVID-19 in the MDC, justifie[d] waiver of [§ 3582(c)(1)(A)'s] exhaustion requirement"); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at 2 (D. Conn. Apr. 2, 2020) (waiving § 3582(c)(1)(A)'s exhaustion requirement because, inter alia, (1) "if Defendant contracts COVID-19 before her [administrative] appeals are exhausted, that undue delay might cause her to endure precisely the catastrophic health consequences she now seeks to avoid," and

(2) she "would be subjected to undue prejudice—the heightened risk of severe illness—while attempting to exhaust her appeals"); *id.* (citing a case wherein the District Court for the District of Columbia waived § 3582(c)(1)(A)'s exhaustion requirement "in light of COVID-19 pandemic and defendant's underlying health issues").

In *United States v. Hart*, No. 17-cr-248 (S.D.N.Y.), a case before Your Honor, the Government acknowledges that the Second Circuit in *Washington* stated that exceptions to the exhaustion requirement are applicable to cases where exhaustion is mandated by statute. *Hart*, No. 17-cr-248, ECF Doc. 248 (Gov't Resp.) at 2. But the Government then goes on to argue that that statement by the Second Circuit is "not accurate." *Id.* at 2–3. For obvious reasons, this Court should follow the Second Circuit's statement in *Washington* that undue prejudice could excuse the exhaustion requirement rather than adopt the Government's argument that the Second Circuit had made an inaccurate statement.

In *Hart*, the Government further argues the following:

> *Perez* . . . erred in relying on *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976), for the proposition that a court may consider claims notwithstanding a party's failure to satisfy statutory exhaustion requirements. *See Perez*, 2020 WL 1546422, at *2 n.2. *Mathews* held that the complex statutory exhaustion requirement at issue had been *satisfied*, not that it could be ignored. *See* 424 U.S. at 329 (petitioner "fulfilled" statute's "crucial prerequisite" when "he specifically presented the claim that his benefits should not be terminated" through his answers to a state agency questionnaire, and his claim "was denied by the state agency and its decision was accepted by the SSA [Social Security Administration]").

*Hart*, No. 17-cr-248, ECF Doc. 248 at 3 n.2.   But like in *Matthews*, Ng has satisfied § 3582(c)(1)(A)'s "crucial prerequisite" by filing a § 3582(c)(1)(A) petition with the BOP. *See Perez*, 2020 WL 1546422, at 2 n.2 ("Perez has presented his claim to the BOP, so the situation here is analogous [to that in *Mathews*]." (record citation omitted)).   It is puzzling what the

Government in *Hart* believes is the "crucial prerequisite" to § 3582(c)(1)(A), if not the actual filing of a BOP petition.

In *Hart* (No. 17-cr-248, ECF Doc. 247 (Apr. 3, 2020, Order) at 1–2), Your Honor directed the Government to discuss *United States v. Monzon* and *United States v. Bolino*, wherein the district courts denied motions for compassionate release based on the defendants' failures to exhaust their BOP remedies. *See Monzon*, No. 99-cr-157, 2020 WL 550220, at 1–2 (S.D.N.Y. Feb. 4, 2020); *Bolino*, No. 06-cr-806, 2020 WL 32461 at 1–2 (E.D.N.Y. Jan. 2, 2020). But the defendants in *Monzon* and *Bolino* did not argue that they had satisfied any of the exceptions to the exhaustion requirement. *See Monzon*, No. 99-cr-157, ECF Doc. 474-1 (Compassionate Release Mot.); *Bolino*, No. 06-cr-806, ECF Docs. 520 (Compassionate Release Mot.), 522 (Compassionate Release Reply).[3] Thus, the *Monzon* and *Bolino* opinions are inapposite to this case, where Ng is invoking the exceptions to the exhaustion requirement.

If this Court finds that the exhaustion requirement presently precludes the granting of compassionate release, it is respectfully requested that this Court issue a recommendation to the BOP that it grant Ng's petition as soon as possible. *See United States v. Knox*, No. 15-cr-445, 2020 WL 1487272, at 2 (S.D.N.Y. Mar. 27, 2020) (Engelmayer, J.) (granting the defendant's "request for a recommendation that BOP allow him to serve the remainder of his sentence with 1 month in a halfway house and 6 months in home confinement"); *United States v. Hernandez*, No. 19-cr-834 (S.D.N.Y.) (Engelmayer, J.), ECF doc. 440 (Mar. 25, 2020 Order) ("The Court . . . state[s] the following, as it may be instructive guidance to the Bureau of Prisons in considering an application by Mr. Hernandez for release on home confinement      Had the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have

---

[3] Indeed, the defendant in *Monzon* did not even ask "ma[k]e a request to the warden of his facility to make a motion on his behalf." 2020 WL 550220, at 1.

exposed him to a heightened health risk [from the coronavirus], the Court would have directed that these four months be served instead in home confinement.").

## II.   The Coronavirus Pandemic Presents Extraordinary and Compelling Reasons for Granting Compassionate Release to Ng

Men who are 65 years old older and "people of any age who have serious underlying medical conditions" are at high risk of serious illness and death from COVID-19.[4] Underlying medical conditions include ███████████████████████████████████████████████ ██████████s, and conditions that cause a person to be immunocompromised (e.g., smoking).[5] Because Ng is a 71-year-old male with multiple underlying health issues (e.g., ███████ and ████████████ he is at a high risk for serious illness and death if he becomes infected with the coronavirus.

Moreover, Ng will likely become infected with the coronavirus if he remains in prison. The coronavirus "has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it." *Rodriguez*, 2020 WL 1627331, at 1. The disease "may kill 200,000 Americans and infect millions more," and there is not yet any "approved cure, treatment, or vaccine to prevent it." *Id.* The CDC (Centers for Disease Control and Prevention) has reported

---

[4]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (bold omitted); https://www.nytimes.com/2020/02/20/health/coronavirus-men-women.html.

[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html; https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html; https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e3.htm?s_cid=mm6913e2_w; https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center; https://www.heart.org/en/about-us/coronavirus-covid-19-resources; ███████████████████████████http://jamanetwork.com/journals/jama/fullarticle/2763130; https://jamanetwork.com/journals/jamacardiology/fullarticle/2763844; *Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503, at 3–4 (S.D.N.Y. Mar. 26, 2020) (Torres, J.); *United States v. Rodriguez*, No. 03-cr-00271, 2020 WL 1627331, at 7 (E.D. Pa. Apr. 1, 2020).

that (with respect to "confirmed and presumptive" positive coronavirus cases) more than 300,000 people in the United States have the coronavirus and more than 7,600 people in the United States have died from the coronavirus.[6] In Pennsylvania, the coronavirus has infected more than 11,500 people and has killed 150 people.[7]

"Public health officials have warned of the dangers of the coronavirus spreading in prisons and jails after more than 500 prisoners were infected in China on the onset of the outbreak [in February 2020], and now, correctional facilities in the U.S. are faced with the exact circumstances for which they are openly unprepared."[8] As reported by the CDC, inmates face a high risk of contracting the virus:[9]

> People in correctional and detention facilities are at greater risk for . . . COVID-19, because of close living arrangements with other people. The virus is thought to spread mainly from person-to-person, through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or be launched into the air and inhaled into someone's lungs. It is possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes; however, this is not the most likely way the virus spreads.

Indeed, the coronavirus is already wreaking "chaos" inside BOP prisons. *Basank*, 2020 WL 1481503, at 3. As of April 5, 2020, 138 BOP inmates and 59 BOP staff members have tested positive for the coronavirus. (Ex. E: Copy of BOP's Webpage). The BOP itself has recently conceded that there are "a growing number of quarantine and isolation cases in [its] facilities." (Ex. F: Copy of BOP's Webpage).

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 5, 2020).

[7] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited Apr. 5, 2020).

[8] https://www.huffpost.com/entry/coronavirus-elderly-prisoners-compassionate-release_n_5e6fc975c5b63c3b648298d0.

[9] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html.

Although the BOP has instituted measures to prevent the coronavirus from spreading in its prisons, those measures are not adequate to protect Ng from getting the coronavirus. The BOP began taking preventive measures on March 13, 2020, when it (1) "issued directives suspending social and legal visits, curtailing movement, cancelling staff travel and training, limiting access for contractors and volunteers, and established enhanced screening for staff and inmates for locations with sustained community transmission and at all medical centers," and (2) implemented "staggered meal [and recreation] times" and other "operations to maximize social distancing . . ., as much as practicable."[10] On March 18, 2020, the BOP stated that it has "[a]mple" cleaning, sanitation, and medical supplies "on hand and ready to be distributed or moved to any facility as deemed necessary."[11] Since March 26, the BOP has required newly admitted inmates to be "assessed using a screening tool and temperature check"; "[a]symptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff," and "[s]ymptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation."[12] Since April 1, 2020, the BOP has required inmates to "be secured in their assigned cells/quarters" for a 14-day period.[13]

Notwithstanding the BOP's preventive measures, Ng is still highly susceptible to catching the coronavirus. *See Rodriguez*, 2020 WL 1627331, at 1, 8 ("Prisons are tinderboxes for infectious disease    Many of the recommended measures to prevent infection are impossible or unfeasible

---

[10]  Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), *available at* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

[11] *Id.*

[12] https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

[13] *Id.*

in prison.").[14] The BOP allows inmates to "have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education," and affords "limited group gathering[s] . . . to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access." (Ex. F). Moreover, "hundreds of thousands of correctional officers and correctional healthcare workers enter [prisons] every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day." (Ex. G: Aff. of Dr. Brie Williams ¶ 5).[15] "Access to testing for correctional staff has been extremely limited, guards have reported a short supply of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms." (*Id.*). "Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within . . . and prisons." (*Id.* ¶ 7). Although social distancing could help prevent the spread of the coronavirus, "[e]ffective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands." (*Id.*).

---

[14] *See also* https://www.pennlive.com/coronavirus/2020/03/one-of-32-federal-inmates-transferred-to-allenwood-complex-tested-for-coronavirus.html ("Clearly, the BOP cannot guarantee the safety of BOP inmates, employees, their families and the broader community." (internal quotation marks omitted)).

[15] Dr. Williams is a "Professor of Medicine at the University of California, San Francisco ('UCSF') in the Geriatrics Division," the director of "UCSF's Amend: Changing Correctional Culture Program" and "UCSF's Criminal Justice & Health Program," and is a former "consultant for the California Department of Corrections and Rehabilitation, as well as for other state prisons." (Ex. G ¶ 2). Dr. Williams has focused his clinical research on "on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research." (*Id.*). Dr. Williams made his affidavit "in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines." (*Id.* ¶ 4).

"Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital." (*Id.* ¶ 17). Although Special Housing Unit cells "have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, such cells "rarely have intercoms or other ways for sick inmates to contact officers in an emergency" and "many patients with COVID-19 descend suddenly and rapidly into respiratory distress." (*Id.*).

Moreover, the BOP has not even been observing the CDC's recommendations on the coronavirus. Just a couple of weeks ago, a senior BOP officer of FCI-Oakdale "transported a sick prisoner to the local community hospital for tests, spending six hours in close contact with the ailing man."[16] Although the prisoner tested positive for the coronavirus, the BOP's chief health officer ("CHO") ordered the officer "back on the job, according to an email reviewed by The Marshall Project."[17] The BOP's decision that "[o]fficers should work unless they showed symptoms . . . contradicts the recommendations the Centers for Disease Control was giving for first responders and other frontline workers and the specialized guidance it issued a day later for prisons and jails, calling for people who have had close contact with a confirmed case of COVID-19 to isolate themselves at home for 14 days."[18] As of the filing of this motion, five FCI-Oakdale prisoners have died from the coronavirus, including the prisoner who was transported by the senior BOP officer.[19]

---

[16]   https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

[17] *Id.*

[18] *Id.*

[19] *Id.*

The rapidly growing number of confirmed positive COVID-19 cases with respect to BOP inmates and staff members demonstrates that the BOP's measures are ineffective.[20] As reported by the BOP, the following lists the total number of BOP inmates and staff members who have tested positive for the coronavirus:[21]

| DATE | Number of Inmates | Number of Staff Members |
|---|---|---|
| March 24, 2020 | 6 | 4 |
| March 26, 2020[22] | 10 | 8 |
| March 27, 2020 | 14 | 13 |
| March 31, 2020 | 28 | 24 |
| April 2, 2020 | 75 | 39 |
| April 3, 2020 | 91 | 50 |
| April 4, 2020 | 120 | 54 |
| April 5, 2020 | 138 | 59 |

Whatever precautions the BOP has or will have in place, it is inevitable that Ng will come into close contact with BOP staff, other prisoners, and surfaces/objects touched by BOP staff and

---

[20] On March 23, 2020, 32 inmates were transferred to the Allenwood Federal Correctional Complex; one of those inmates, who was placed in FCI-Low, had the coronavirus. https://keller.house.gov/media/press-releases/after-bop-inmate-moved-fcc-allenwood-gets-tested-covid-19-congressman-fred; https://www.pennlive.com/coronavirus/2020/03/one-of-32-federal-inmates-transferred-to-allenwood-complex-tested-for-coronavirus.html.

[21] The undersigned have been periodically checking the BOP's website (https://www.bop.gov/coronavirus/) for the number of confirmed COVID-19 cases with respect to BOP inmates and staff members. Since April 2, 2020, the firm has been making PDF copies of BOP's website. (*See* Exs. E, H (Copies of BOP Webpages)). Interestingly, the BOP reported the number of "COVID-19 Tested Positive Cases" until April 2, 2020, and has been reporting the number of "*Open* COVID-19 Tested Positive Cases" since April 3, 2020. Thus, it appears that the number of "COVID-19 Tested Positive Cases" is greater than that reported by the BOP since April 3, 2020.

[22] https://www.bop.gov/resources/news/20200326_statement_from_director.jsp (last updated Mar. 26, 2020) ("As of March 26, out of over 146,000 inmates in our custody, ten inmates have tested positive. Out of over 36,000 staff, eight staff have tested positive.").

other prisoners. Indeed, Ng still shares a bunk bed with a roommate. Allowing Ng to serve the remainder of his prison sentence in home confinement, where he will isolate himself as much as possible, will best ensure that he will not get infected with the coronavirus. *See United States v. Resnick*, No. 14-cr-810, 2020 WL 1651508, at 8 (S.D.N.Y. Apr. 2, 2020) (McMahon, C.J.) ("[Mr. Resnick's] environment [at home] will be significantly better than Devens FMC [Federal Medical Center], where despite the BOP's best efforts, Mr. Resnick is constantly at risk from contamination both from within and without the prison walls, and where access to PPE [personal protective equipment] for inmates is essentially non-existent.").

## III.     Ng is Not a Danger to Others

Ng "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *See* U.S.S.G. § 1B1.13(2).[23] Although Ng's offense conduct was serious, he is a first-time offender whose offense conduct did not involve "a crime of violence, a violation of [18 U.S.C. §] 1591 [certain sex trafficking crimes], a Federal crime of terrorism, . . . a minor victim[,] or a controlled substance, firearm, explosive, or destructive device." (*See* PSR ¶¶ 127–32); *see* 18.U.S.C. § 3142(g)(1), (3)(A)–(B). Moreover, Ng has no "history relating to drug or alcohol abuse." (*See* PSR ¶ 146); *see* 18.U.S.C. § 3142(g)(3)(A).

## IV.     The § 3553(a) Factors Favor Compassionate Release

Consideration of the § 3553(a) factors, "to the extent that they are applicable," weigh in favor of granting Ng compassionate release. *See* 18 U.S.C. § 3582(c)(1)(A).

---

[23] *See also* Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., & Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations—COVID-19 in Jails and Prisons*, New Eng. J. Med. (Apr. 2, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMp2005687?query=RP (encouraging the release of "as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm").

First, Ng is a 71-year-old first-time offender who has a host of underlying medical issues, is at a high risk of becoming severely ill or dying from a coronavirus infection, and has no history of violent conduct. *See* 18 U.S.C.§ 3553(a)(1). Given Ng's advanced age, medical issues, and good behavior in prison (he has not incurred any disciplinary infractions), there is little to no likelihood that he will commit another crime, especially if he will be in home confinement and subject to GPS monitoring and supervised release. *See* 18 U.S.C.§ 3553(a)(2)(B)–(C). Granting Ng compassionate release based on the coronavirus pandemic would not send a message that white-collar crime does pay. *See* 18 U.S.C.§ 3553(a)(2)(B).

Because BOP medical staff will be occupied with treating many coronavirus patients, Ng would receive "the most effective" medical care outside of prison, specifically from his primary care physician. *See* 18 U.S.C.§ 3553(a)(2)(D). The § 3553(a)(2)(A) factor—"the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"—is largely overcome by the unreasonable threat of seriousness illness and death in Ng's current conditions of confinement and the fact that he has already served almost one-half of the imposed prison sentence. Because Ng has served almost half of his prison sentence and is approximately "a year and a half away from release [based on good time credits], granting his motion sufficiently minimizes sentence disparities between him and similarly situated defendants." *See Rodriguez*, 2020 WL 1627331, at 12 (citing 18 U.S.C. § 3553(a)(6)).

In sum, allowing Ng to serve the remainder of his prison sentence in home confinement under GPS monitoring and supervised release conditions would provide him with a punishment that is "sufficient, but not greater than necessary" given his high risk of seriousness illness or death from a coronavirus infection.

## V.      Ng's Proposed Conditions of Home Confinement

Ng's proposed conditions of home confinement would ensure that he will otherwise comply with the terms of his home confinement. Ng proposes to be on home confinement under GPS-enabled electronic monitoring at his Manhattan apartment and under the supervised release conditions that are set forth in the Judgment in a Criminal Case. (*See* ECF Doc. 783 at 4–6). If granted compassionate release, Ng would live in an apartment he owns in Midtown Manhattan

███████████████████████████ (*See* PSR ¶ 140). Ng would post his Manhattan apartment, which he bought for more than $3.5 million in September 2015, to secure a bond for his compassionate release. (*See* Ex. I: Property Records). Ng could also post a cash bond if that is deemed necessary by the Court.  Either Ng's daughter or wife would live with him in the apartment to provide him case, and he plans to hire a live-in housekeeper to provide additional help. Having private security guards to enforce the home detention would increase Ng's (and the guards') risk of obtaining the coronavirus, but he would hire security guards if that is deemed necessary by the Court. If Ng will need a medical visit, his primary care physician (Dr. Stephen Pan of NYU Langone Medical Center) works in Midtown Manhattan. (*See* Ex. C: Medical Records).[24]

## **CONCLUSION**

Courts around this country have been releasing prisoners (or not sending defendants to prison) based on the coronavirus pandemic.[25] For the aforementioned reasons, this Court should

---

[24] Ng served his pretrial home confinement without incident.

[25] *See, e.g.*, *United States v. Marin*, 15-cr-252 (E.D.N.Y.) (Chen, J.) (Mar. 30, 2020 Order) ("The Court grants Defendant Jose Maria Marin's motion . . . for compassionate release [from FCI Allenwood Low] . . . for the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence"); https://intallaght.ie/judge-of-the-fifagate-case-authorizes-the-early-release-of-the-former-cbf-president/ (stating that Jose Maria Marin served his prison sentence at FCI Allenwood Low); *Resnick*, 2020 WL 1651508, at 8 (McMahon, C.J.) (granting compassionate release to a 65-year-old inmate with diabetes and end-stage liver disease); *Perez*, 2020

do the same for Ng and order that he be released immediately to home confinement. In the

alternative, this Court should recommend to the BOP that it grant Ng's petition as soon as possible.

Proposed orders are attached at exhibits J and K.

Respectfully submitted,

Benjamin Brafman, Esq.
Jacob Kaplan, Esq.
Stuart Gold, Esq.
Brafman & Associates, P.C.
767 3rd Avenue, 26th Fl.
New York, NY 10017
Tel: (212) 750-7800
Fax: (212) 750-3906

---

WL 1546422, at 4 ("Perez's medical condition, combined with the limited time remaining on his prison
sentence and the high risk in the MDC posed by COVID-19, clears the high bar set by §
3582(c)(1)(A)(i)."); *Rodriguez*, 2020 WL 1627331, at 12 ("Mr. Rodriguez has now served the lion's
share of his sentence. But his sentence did not include incurring a great and unforeseen risk of severe
illness or death. For this reason, I will grant Mr. Rodriguez's motion for a sentence reduction.");
*United States v. Campagna*, No. 16-cr-78, 2020 WL 1489829, at 3 (S.D.N.Y. Mar. 27, 2020)
(Schofield, J.) ("Defendant's compromised immune system, taken in concert with the COVID-
19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's
sentence on the grounds that he is suffering from a serious medical condition that substantially
diminishes his ability to provide self-care within the environment of the [Brooklyn Residential Reentry
Center]."); *United States v. Huneeus*, No. 19-cr-10117 (D. Mass.), ECF Doc. 642 (Mar. 17, 2020,
Order) (granting the defendant compassionate release "in light of the national state of emergency due
to the global COVID-19 pandemic and [his] unique health circumstances"); *United States v. Fellela*,
No. 19-cr-79, 2020 WL 1457877, at 1 (D. Conn. Mar. 20, 2020) (granting compassionate release to an
inmate whose "age, physical, and medical condition ma[d]e him within the highest risk group of death
if he were to become infected with the COVID-19 virus").