UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                              :

UNITED STATES OF AMERICA,            :

                       v.                  :

                                              :

NG LAP SENG,                             :

                              Defendant.    :

                                              :
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __5/8/2020__

S5 15-CR-706 (VSB)

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge:

Before me is the motion of Ng Lap Seng ("Defendant" or "Ng") pursuant to 18 U.S.C. §
3582 (c)(1)(A) "for an order granting [him] 'compassionate release' and directing him to serve
the remainder of his prison sentence in home confinement . . . or, alternatively, for an order
recommending that the Federal Bureau of Prisons ("BOP") grant his § 3582(c)(1)(A) petition."
(Ng Comp. Rel. Mem.)[1]  Ng states that there are extraordinary compelling reasons justifying
compassionate release presented by "the recent coronavirus disease (COVID-19) pandemic, the
high risk of infection within federal prisons, and Ng's advanced age and serious underlying
medical conditions," which make it "likely that he will soon contract the virus and become
critically ill or die from it."  (*Id.* at 1.)  Because Ng has not exhausted his administrative
remedies and, in any event, I find that he has not met his burden of establishing that there exist
extraordinary and compelling reasons to reduce his sentence and grant his release, Defendant's
motion for compassionate release is denied without prejudice.

---

[1] "Ng Comp. Rel. Mem." refers to Ng Lap Seng's Emergency Motion for Compassionate Release Under 18 U.S.C. §
3582(C)(1)(A).  (Doc. 935.)

I.       **Background and Procedural History**[2]

After initially being charged in a sealed complaint on October 5, 2015, Ng and his co-defendants were charged in an indictment on October 20, 2015.  On June 30, 2016, Superseding Indictment S4 15 Cr. 706 (the "S4 Indictment") was filed against Ng and others, charging Ng with bribery, money laundering, and conspiracies to commit bribery and money laundering. (Doc. 211.)  The S4 Indictment charged that from 2011 through September 2015, Ng and others engaged in an international bribery and money laundering scheme to, among other things, bribe John Ashe[3] ("Ashe")—the former Ambassador to the United Nations ("UN") from Antigua and Barbuda and President of the UN General Assembly ("UNGA")—to obtain official actions benefitting Ng's interests in certain business opportunities, including the construction of a multi-billion dollar conference center in Macau, China (the "Macau Conference Center").  (*See id.* ¶¶ 1, 4–5, 14.)  It further charged that Ng continued this scheme after Ashe left the UN in December 2014 by providing benefits to one or more officials at the United Nations Development Programme ("UNDP") in exchange for further support for the Macau Conference Center.  (*Id.* ¶ 9.)

On November 22, 2016, the Government filed Superseding Indictment S5 15 Cr. 706 (the "S5 Indictment").  (S5 Ind.)[4]  In addition to the previous charged offenses, the S5 Indictment added three counts against Ng alleging that he violated and conspired to violate the Foreign Corrupt Practices Act ("FCPA").  (*Id.* ¶¶ 1–22, 24–27.)  It also included allegations about the

---

[2] The facts contained in this section are taken from the allegations in the Sealed Indictment filed in this case on April 24, 2017 ("Indictment").  (Doc. 2.)  These facts are merely provided for background, and I do not rely upon them in deciding Defendant's motion.

[3] On June 22, 2016, John Ashe died.  As a result, the Government sought and obtained an order dismissing all charges against Ashe.  (*See* Doc. 216.)

[4] "S5 Ind." refers to the S5 Indictment, filed on November 22, 2016.  (Doc. 322.)

United Nations Office for South-South Cooperation ("UNOSSC"), "an office within UNDP that focuses on issues related to cooperation among developing countries." (*Id*. ¶ 4.)  According to the S5 Indictment, since 2008, "UNOSSC has run an annual 'Global South-South Development Expo' (the 'UNOSSC Expo'), hosted in a different country or city each year." (*Id*.)  The S5 Indictment also added allegations concerning Ng's international bribery and money laundering scheme.  For example, the S5 Indictment alleged that Ng's "principal objective . . . was to obtain official action from the UN with respect to a multi-billion dollar conference center that NG hoped to build in Macau, China . . . using his company." (*Id*. ¶ 11.)  In particular, Ng sought "Formal UN Support" for the Macau Conference Center, which was defined to include the "establish[ment] [of] the Macau Conference Center as the permanent site of the annual UNOSSC Expo and as a location for other meetings, forums, and events associated with the UN."[5] (*Id*.)

The S5 Indictment alleged that, to carry out his objective, Ng paid bribes to Francis Lorenzo, the Deputy Permanent Representative to the UN for the Dominican Republic from 2004 up to and including October 2015, in addition to Ashe. (*Id*. ¶ 9.)  During the time period that Ashe served as UNGA President, Lorenzo served as a Special Adviser to the UNGA President.  Ng paid these bribes to Ashe and Lorenzo "for the purpose of obtaining official action for the benefit of NG and his company, as opportunities arose, by each of the Ambassadors, and for the purpose of having the Ambassadors influence, exert pressure on, and advise other UN officials and diplomats, including the UN Secretary-General, intending for those officials and diplomats to take official action, as opportunities arose, to advance the interests of Ng and his company," and to "reward [Ashe and Lorenzo for] their efforts to take, and to influence other

---

[5] The term "Formal UN Support" is used in this Opinion & Order as that term is defined in the S5 Indictment. (*See* S5 Indictment ¶ 11.)

UN officials and diplomats to take, official action for the benefit of NG and his company."  (*Id*. ¶ 10.)

Trial commenced on June 26, 2017.  On July 27, 2017, more than a month after trial began, the jury convicted Ng on all counts of the S5 Indictment, including bribery, money laundering, violations of the FCPA, and conspiracies to commit bribery, money laundering, and violations of the FCPA.  (*See* Doc. 572; Tr. 4336:22-4337:19.)  Ng's Sentencing Guidelines range was 235 to 293 months' imprisonment, (Doc. 843, at 32:3-34:5), and on May 11, 2018, I sentenced Ng to 48 months' imprisonment, a substantial variance.  After a series of letters requesting adjournment of his self-surrender date and a hearing related to various medical issues purportedly related to his request to adjourn his surrender date, (*see e.g.*, Docs. 793, 825, 820, 828, 829, 831, 832, 853), on July 17, 2018, I ordered that Ng surrender to his designated facility on July 18, 2018 at 12:00 p.m.  (Doc. 389.)  Ng's scheduled release date is December 23, 2021.  *Find an Inmate*, Fed. Bureau of Prisons (last visited April 28, 2020), https://www.bop.gov/inmateloc/.  Since being ordered to surrender on July 18, 2018, Ng has been serving his sentence at the Allenwood Low Security Federal Correctional Institution ("FCI Allenwood Low") in White Deer, Pennsylvania.[6]

On May 31, 2018, Defendant filed a Notice of Appeal, (Doc. 784), and an Amended Notice of Appeal was filed on June 8, 2018, (Doc. 785).  Ng's motion for bail pending appeal was denied on June 28, 2018.  (Doc. 803.)  Defendant's appeal was denied on August 9, 2019, and a Mandate issued on October 24, 2019, (Doc. 911).

Ng filed his emergency motion for compassionate release on April 6, 2020.  (Doc. 934.)  An amended motion was filed on April 8, 2020, (Doc. 935), and the Government filed its

---

[6] As of May 6, 2020, Defendant had served 656 days of his sentence.

opposition on April 10, 2020, (Doc. 936).  Ng filed his reply on April 13, 2020, (Doc. 937), and

the Government filed a memorandum in further opposition on April 14, 2020, (Doc. 938).  On

April 17, 2020, Ng filed a supplemental letter concerning exhaustion, (Doc. 944), and the

Government filed a supplemental letter concerning exhaustion, (Doc. 945).  On April 20, 2020,

Ng filed another supplemental letter related to the exhaustion issue.  (Doc. 946.)  Ng filed a letter

on April 26, 2020, asserting that "[t]he 30-day clock has now expired, rendering the exhaustion

issue moot."  (Doc. 948.)  By Order filed on April 28, 2020, I requested the Government

"confirm by close of business on April 28, 2020, that the Federal Bureau of Prisons has taken no

action on Defendant's request for compassionate release, and that I am therefore free to address

the substance of Defendant's motion for compassionate release."  (Doc. 949.)  The Government

responded that the BOP had denied Defendant's request for compassionate release by letter dated

April 20, 2020, and informed me that I have "authority to reach the substantive merits of the

defendant's motion starting . . . 30 days from March 30" when Defendant filed his request for

compassionate release with the BOP.  (Doc. 950, at 1 & n.1.)

## II.    Discussion

Defendant seeks an order "granting [him] 'compassionate release' and directing him to

serve the remainder of his prison sentence in home confinement . . . or, alternatively, for an order

recommending that the [BOP] grant his § 3582(c)(1)(A) petition that was mailed and faxed to the

BOP on March 27, 2020."[7]  (Ng Comp. Rel. Mem. 1.)  Ng asserts that "[g]iven the recent

coronavirus disease (COVID-19) pandemic, the high risk of infection within federal prisons, and

Ng's advanced age and serious underlying medical conditions, it is likely that he will soon

---

[7] With regard to Ng's alternative request for an order recommending that BOP grant his motion, in light of the Warden's denial of Ng's request I deny that portion of his motion as moot.

contract the virus and become critically ill or die from it," and therefore that "there are 'extraordinary and compelling reasons' for allowing Ng to serve the remainder of his prison sentence in home confinement."  (*Id.*).

In opposition, the Government argues that:  (1) Defendant has not exhausted his administrative remedies; (2) Defendant failed to "demonstrate that he, personally and individually, falls into the narrow band of inmates for whom 'extraordinary and compelling reasons' warrant immediate and permanent release"; and (3) even if Defendant had exhausted his administrative remedies and met his burden to establish an extraordinary and compelling reason, he is not entitled to release based on the factors set forth in Title 18, United States Code, Section 3553(a).  (*See* Govt. Opp. 1-3.)[8]  Based upon the Government's letter, if Defendant does not appeal BOP's denial of his request for compassionate release I am free to address the instant motion beginning on April 29, 2020.  (*See* Doc. 950.)  However, assuming Defendant does appeal and/or that the time for such appeal has not yet run, I would find that his motion must be dismissed because Defendant has failed to exhaust his administrative remedies.  In any event, I also find that Defendant has not established extraordinary and compelling reasons warranting a reduction in his sentence and his release.

### A.    *Applicable Law*

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute."  *United States v. Gotti*, — F. Supp. 3d —, No. 02 CR 743-07 (CM), 2020 WL 497987, at *1 (S.D.N.Y. Jan. 15, 2020).  Section 3582(c)(1)(A)(i), the compassionate release statute, provides one such exception.  The compassionate release statute permits a court to

---

[8] "Govt. Opp." refers to the Memorandum of Law of the United States of America in Opposition to Defendant Ng Lap Seng's Motion for Release.  (Doc. 936.)

"reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if

"it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such

a reduction is consistent with applicable policy statements issued by the Sentencing

Commission."[9]  18 U.S.C. § 3582(c)(1)(A).  The moving party bears the burden of proving that

extraordinary and compelling reasons exist.  *See United States v. Ebbers*, No. (S4) 02-CR-1144-

3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States v. Butler*, 970 F.2d

1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on

a given issue normally has the burden of proof as to that issue.")); *see also United States v.

Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) ("[I]f the

defendant seeks decreased punishment, he or she has the burden of showing that the

circumstances warrant that decrease." (quoting *Butler*, 970 F.2d at 1026)); *cf. United States v.

Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

Until recently, a court could not order compassionate release unless the BOP requested

such relief on a prisoner's behalf by filing a motion.  *See* U.S.S.G. § 1B1.13 (stating, among

other things that "[u]pon motion of the Director of the Bureau of Prisons under 18 U.S.C. §

3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of

supervised release with or without conditions that does not exceed the unserved portion of the

original term of imprisonment)"); *see also Gotti*, 2020 WL 497987, at *1 ("Until last December,

a court could not modify a defendant's duly-imposed sentence on compassionate release grounds

---

[9] The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13, although I note that the Sentencing Guidelines have not yet been revised to take into account the First Step Act.  *See United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, *2 (S.D.N.Y. Apr. 3, 2020).  The relevant section provides that a court may reduce the term of imprisonment if (1) "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); (2) "the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and (3) "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).  The Application Notes describe the circumstances under which "extraordinary and compelling reasons exist."  *Id.* § 1B1.13 Application Note 1.

unless it received a motion from the Bureau of Prisons asking that the court consider such modification.")  However, in December 2018, Congress passed the First Step Act, which did away with BOP's unilateral ability to deny a prisoner compassionate release but did not remove the BOP from the process entirely.  *See id.*  The statute is clear that a court may only grant compassionate release "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).

Requiring inmates to exhaust their administrative remedies before seeking court intervention serves several purposes.  First, it protects administrative agency authority by guaranteeing agencies the "opportunity to correct [their] own mistakes."  *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).  Second, it promotes efficiency, since claims "generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court."  *Id*.

"The provenance of an administrative exhaustion requirement determines its scope." *United States v. Monzon*, No. 99cr157 (DLC), 2020 WL 550220, at *1 (S.D.N.Y. Feb. 4, 2020). There are two types of exhaustion requirements:  jurisdictional requirements and non-jurisdictional requirements.  Jurisdictional exhaustion requirements "govern a court's adjudicatory authority" and are not subject to any exceptions.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (internal quotation marks omitted).  Non-jurisdictional requirements, also referred to as "claim-processing rules," can be "forfeited if the party asserting the rule waits too long to raise the point."  *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004).  The Second Circuit has not yet

squarely answered the question of whether the exhaustion requirement of § 3582(c) is jurisdictional.[10]  *See Monzon*, 2020 WL 550220, at \*2.

### B.   *Application*

#### 1.  **Exhaustion**

Here, the Warden of MDC of the Federal Correctional Complex, Allenwood, denied Defendant's March 30, 2020 request for compassionate release on April 20, 2020.  (Doc. 950-1.) According to the Government, I had "authority to reach the substantive merits of the defendant's motion starting" on April 29, 2020—30 days from March 30, 2020.  (*See* Doc. 950, at 1.) Although I address the substance of Defendant's motion given the Government's apparent waiver of the exhaustion issue, I still address the exhaustion issue because Defendant has not yet appealed BOP's denial and thus, under my reading of the statute, has not satisfied the statute's exhaustion requirement by "fully exhaust[ing] all administrative rights to appeal [the] failure of the Bureau of Prisons to bring a motion on [his] behalf . . . ."  18 U.S.C. § 3582(c)(1)(A).  I find Defendant's arguments for avoiding the statutory language at issue unavailing.

As I have previously held, *see United States v. Hart*, 17 CR. 248 (VSB), 2020 WL 1989299, at \*4 (S.D.N.Y. Apr. 27, 2020), it does not matter whether section 3582(c) is a jurisdictional statute or a non-jurisdictional claim-processing statute, because its exhaustion

---

[10] Other courts of appeal are split on the question of whether section 3582(c) as a whole is jurisdictional or non-jurisdictional.  *Compare United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013) (considering section 3582(c) a jurisdictional rule), *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *United States v. Williams*, 607 F.3d 1123, 1125–26 (6th Cir. 2010), *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010), *and United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993), *with United States v. May*, 855 F.3d 271, 274–75 (4th Cir. 2017) (considering section 3582(c) a claim-processing rule), *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245 (11th Cir. 2017), *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015), *and United States v. Weatherspoon*, 696 F.3d 416, 421 (3d Cir. 2012).  And while the Second Circuit has not weighed in on whether the exhaustion requirement of section 3582(c)(1)(A) is jurisdictional, it has, "in a related context . . . firmly disagreed with the characterization by certain other circuits that § 3582(c)(2) is jurisdictional."  *United States v. Haney*, No. 19-cr-541 (JSR), 2020 WL 1821988, at \*2 (S.D.N.Y. Apr. 13, 2020) (citing *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013)).

requirement is clearly statutory and therefore mandatory.  *See Monzon*, 2020 WL 550220, at \*2

("It is unnecessary to resolve here whether § 3582(c) creates a jurisdictional bar to the

modification of Monzon's sentence or simply sets forth a statutory exhaustion requirement.");

*United States v. Tyreek Ogarro*, No. 18-cr-373-9 (RJS) (Apr. 14, 2020), 2020 WL 1876300, \*3

("But regardless of whether the statute is jurisdictional or a claim-processing rule, its exhaustion

requirements are clearly mandatory.").  I am not persuaded by Defendant's argument that section

3582(c) does not create a mandatory administrative exhaustion requirement.  The language of the

statute is clear on its face that a court can only act if the BOP files a motion for compassionate

release or "upon motion of the defendant after the defendant has fully exhausted all

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the

defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  Contrary to Defendant's

arguments, this language does not leave room for court-made exceptions.  *See United States v.

Roberts*, No. 18-cr-528 (JMF), 2020 WL 1700032, at \*2 (S.D.N.Y. Apr. 8, 2020) ("Given

Congress's decision to mandate exhaustion and to specify a single alternative, the Court is not

free to infer a general 'unwritten 'special circumstances' exception.'") (quoting *Ross*, 136 S. Ct.

at 1857.  Although I recognize that some of my colleagues have found otherwise, *see Russo*,

2020 WL 1862294, at \*3–7; *Haney*, 2020 WL 1821988, at \*3–4; *United States v. Perez*, No. 17

Cr. 513-3 (AT), 2020 WL 1546422, at \*2–3 (S.D.N.Y. Apr. 1, 2020), and see the logic of these

decisions, in particular in light of the current COVID-19 pandemic that 30 days or more is a

significant length of time for prisoners to have to wait before seeking judicial relief, I conclude

that I am bound by the Supreme Court's clear statement in *Ross* that "mandatory exhaustion

statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion."  136 S. Ct.

at 1857.  Without more explicit guidance from Congress, the Supreme Court, or the Second

Circuit, I am not prepared to read an exception into the statute.  Accordingly, I join the "many

other courts to have considered Section 3582(c)(1)(A)'s exhaustion requirement and found it to

be mandatory."  *United States v. Demaria*, No. 17 Cr. 569 (ER), 2020 WL 1888910, at *4

(S.D.N.Y. Apr. 16, 2020) (collecting cases); *see also United States v. Ogarro*, No. 18-cr-373-9

(RJS), 2020 WL 1876300, at *2–5 (S.D.N.Y. Apr. 14, 2020); *United States v. Rabadi*, No. 13-

CR-353 (KMK), 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020).

Ng and the Government state that because Ng initially submitted his request for

compassionate release to the BOP on March 30, 2020, Section 3582(c)(1)(A)'s "lapse of 30

days" language is satisfied, permitting judicial consideration of Ng's motion.  I note that various

decisions in this district have interpreted "lapse of 30 days from the receipt of such a request by

the warden," 18 U.S.C. § 3582(c)(1)(A), to mean that the statute's exhaustion requirement is

satisfied merely upon the passage of 30 days from the date the warden receives a defendant's

request that the BOP file a compassionate release motion on its behalf, regardless of whether the

BOP has failed to take action on the request.  *See, e.g.*, *Russo*, 2020 WL 1862294, at *6 ("As

previously explained by the Court, the plain language of Section 3582(c) evinces congressional

intent that a defendant has a right to a prompt and meaningful judicial determination of whether

she should be compassionately released, regardless of whether administrative remedies have

been exhausted.  There is no other way to read the language giving a defendant the right to make

a judicial motion for compassionate release thirty days after making an application to the BOP,

without needing to wait for the administrative process to be completed."); *Haney*, 2020 WL

1821988, at *3 ("Importantly, § 3582(c)(1)(A) does not contain an exhaustion requirement in the

traditional sense.  That is, the statute does not necessarily require the moving defendant to fully

litigate his claim before the agency (*i.e.*, the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court.").[11] This interpretation of the statute would permit judicial consideration of Ng's motion at this time, because even though the warden denied Ng's request on April 20, 2020, thirty days have passed since the initial request on March 30, 2020.

Other courts have interpreted the "lapse" language to require the passage of 30 days without BOP action on the request, in essence reading the language as a futility provision. *See United States v. Schultz*, No. 17-CR-193S, 2020 WL 1872352, at *5 (W.D.N.Y. Apr. 15, 2020) ("Congress already accounted for a common exception to exhaustion—futility—by implementing the 30-day lapse provision, thereby affording inmates access to judicial review if the Bureau of Prisons fails to act on motions to reduce sentence within 30 days of receiving them."); *see also United States v. Cassidy*, No. 17-CR-116S, 2020 WL 1969303, at *4 (W.D.N.Y. Apr. 24, 2020) (describing the condition as requiring that "the warden of the facility take[] no action on the request within 30 days of receiving it"); *Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (stating that the exception to exhaustion in section 3582(c)(1)(A) "provides that Defendants can bypass exhaustion altogether if the warden fails to act on an

---

[11] The BOP itself appears to have adopted the former interpretation. *See First Step Act: Frequently Asked Questions*, Fed. Bureau of Prisons (accessed May 7, 2020) ("[U]nder the FSA, an inmate may now file a motion for compassionate release directly with the sentencing court 30 days after making a request to the BOP or after exhausting their administrative remedies."), https://www.bop.gov/inmates/fsa/faq.jsp#fsa_compassionate_release. However, I do not give deference to the BOP's interpretation of the statute's exhaustion requirement, as the BOP does not have "the sort of specific responsibility for administering the law that triggers *Chevron*." *Sash v. Zenk*, 428 F.3d 132, 136 (2d Cir. 2005), *as amended on denial of reh'g*, 439 F.3d 61 (2d Cir. 2006). Instead, 18 U.S.C. § 3582(c)(1)(A) tasks the BOP only with deciding whether to make a compassionate release motion on a defendant's behalf, and nothing more. Furthermore, the BOP's interpretation appears on the BOP's First Step Act FAQs page, which is in the nature of "interpretations contained in policy statements, agency manuals, and enforcement guidelines," that "are beyond the *Chevron* pale." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

administrative application for compassionate release within 30 days"); *United States v. Gileno*, No. 3:19-CR-161-(VAB)-1, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action.  As a result, the Court cannot consider his motion to modify his sentence."); *Gotti*, 2020 WL 497987, at *1 (stating that the condition would be satisfied "assuming the Director fails to act on the inmate's request within thirty days"); *United States v. Bolino*, No. 06-CR-0806 (BMC), 2020 WL 32461, at *1 (E.D.N.Y. Jan. 2, 2020) (A defendant "must exhaust her administrative remedies before seeking judicial relief, or she must show that she submitted a request for compassionate release and that 30 days have lapsed since the request was submitted without action by the BOP." (citing *United States v. Hassan*, No. Cr-10-187, 2019 WL 6910068, at *1 (D. Minn. Dec. 19, 2019)).  This latter interpretation would foreclose judicial consideration of Ng's motion until Ng "fully exhausted all administrative rights to appeal [the] failure of the Bureau of Prisons to bring a motion on [his] behalf . . . ."  18 U.S.C. § 3582(c)(1)(A).

I agree with the courts that have interpreted Section 3582(c)(1)(A)'s "lapse" language as requiring the BOP's failure to respond to a prisoner's request for a compassionate release motion within thirty days, giving the court discretion to hear a compassionate release motion if the BOP has failed to timely consider the request.  Although definitions of "lapse" include "a passage of time," other definitions include "a slight error typically due to forgetfulness or inattention," and "the termination of a right or privilege through neglect to exercise it within some limit of time." *Lapse*, Merriam-Webster.com Dictionary, Merriam-Webster (accessed May 4, 2020), *available at* https://www.merriam-webster.com/dictionary/lapse.  Applying the first definition would

substantially undermine one of the goals of an exhaustion requirement—protecting agency authority, expertise, and the opportunity to correct mistakes—"as it [would] allow[] a defendant to come to court before the agency has rendered a final decision" and foreclose higher-level BOP review of a request. *Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020).  The first reading would also—in many cases—render the statute's provision regarding full exhaustion of administrative remedies meaningless, as defendants like Ng would forego appealing a warden's denial of their compassionate release request if the 30-day period was nearing an end.  Indeed, given the BOP's regulations regarding its deadlines for considering compassionate release requests, it is unlikely in the normal case that a defendant could exhaust his administrative remedies within 30 days.  If Congress desired to so fundamentally change the compassionate release process by circumventing the BOP's full administrative review, Congress could have used clearer language, as it did elsewhere in the First Step Act.  For example, in the very next subsection of the statute, Congress implemented a fourteen day deadline for the BOP to process a terminally ill defendant's request for compassionate release.  *See* 18 U.S.C. § 3582(d)(2)(A)(iv) ("The Bureau of Prisons shall . . . in the case of a defendant diagnosed with a terminal illness . . . not later than 14 days of receipt of a request for a sentence reduction . . . , process the request.")[12] Although I recognize that the First Step Act introduced several progressive reforms to the federal prison system, including "improving application of compassionate release," 164 Cong. Rec. H10346-04, H10362 (daily ed. Dec. 20, 2018), and "expedit[ing] compassionate release

---

[12] Additionally, in section 3582(d)(3) of the statute, Congress tasked the BOP with compiling an annual report of compassionate release statistics, including the total number of compassionate release applications submitted, approved, and denied, as well as "the number of motions filed by defendants with the court after all administrative rights to appeal a denial of a sentence reduction had been exhausted . . . and the time that had elapsed between the date the request was first received by the [BOP] and the date the defendant filed the motion with the court."  18 U.S.C. § 3582(d)(3).  These reporting obligations would be undermined if a defendant could file a compassionate release motion in court prior to a final BOP determination on the request, which, again, would be the likely result if the statute's exhaustion provision only required a defendant to wait 30 days prior to seeking relief in court.

applications," 164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018), I cannot conclude that the Act

went so far as to render meaningless the BOP's consideration of such applications in the first

instance without specific language evidencing such a Congressional intent.

      I am not insensitive to the view that there could be "many cases where the BOP either

[can] not act within 30 days on such a request or, even if it did act, its review would be

superficial." *Haney*, 2020 WL 1821988, at *3.  However, the statutory framework in light of

BOP policy mitigates this concern.  A BOP Program Statement outlines in detail the

administrative appeal process for compassionate release applications.  *See* Fed. Bureau of

Prisons, U.S. Dep't of Justice, Program Statement No. 5050.50, "Compassionate

Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and

4205(g)," (Jan. 17, 2019), available at: https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

The Program Statement explains that a prisoner seeking compassionate release must first file a

request with the prison warden asking the BOP to move for compassionate release on the

prisoner's behalf.  *See id.* at 3 (citing 28 C.F.R. § 571.61).  If the prison warden denies that

request, the prisoner must appeal the denial through the BOP's Administrative Remedy

Procedure outlined in 28 C.F.R part 542, subpart B.  *See id.* at 15 (citing 28 C.F.R. § 571.63).

Thus, the same exhaustion procedure for routine administrative grievances (*i.e.*, the use of forms

BP-9 through BP-11) applies to requests for compassionate release.[13]  The BOP's obligation to

respond to a compassionate release application is as follows:

> [O]nce filed, response shall be made by the Warden or CCM within 20 calendar
> days; by the Regional Director within 30 calendar days; and by the General Counsel
> within 40 calendar days.  If the Request is determined to be of an emergency nature

---

[13] 28 C.F.R. § 542.15(a) provides the procedure for routine administrative grievances, and states that "[a]n inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response.  An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response."

which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing.  If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level.  Staff shall inform the inmate of this extension in writing.  Staff shall respond in writing to all filed Requests or Appeals.  If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.

28 C.F.R. § 542.18; *see also* Fed. Bureau of Prisons, U.S. Dep't of Justice, Program Statement

No. 1330.18, Administrative Remedy Program (Jan. 6, 2014), available at

https://www.bop.gov/policy/progstat/1330_018.pdf.  Therefore, BOP policy provides a clear

timeline for the consideration of a compassionate release application, and provides that the

BOP's failure to timely consider an appeal at any given stage will be deemed a denial, mitigating

the concern that the BOP will prejudice a defendant's application by delaying an appeal.  To

further mitigate this concern in the instant context, in addition to the above, 28 C.F.R. §

571.62(c) states that "[i]n the event the basis of the request is the medical condition of the

inmate, staff shall expedite the request at all levels."  28 C.F.R. § 571.62(c).  And, as discussed

above, terminally ill prisoners are afforded a further expedited review.

Because I read Section 3582(c)(1)(A)'s "lapse of 30 days" language to require the BOP's

failure to respond to a compassionate release request within thirty days of its submission to the

BOP, I conclude that Ng must fully exhaust the BOP appeals process to satisfy Section

3582(c)(1)(A)'s exhaustion requirement.  Although I find that Ng has not yet satisfied this

exhaustion requirement due to his failure to fully appeal the warden's denial of his request, I also

find that the Government has waived the exhaustion issue in this case by asking me to consider

the substantive merits of Ng's application.  *See Russo*, 2020 WL 1862294, at *5 ("[O]ne key

consequence of the section not being jurisdictional is that the Government can waive the

affirmative defense of exhaustion."). Accordingly, I proceed in the alternative to consider the merits of Ng's application for compassion release.

### 2. Extraordinary and Compelling Circumstances

I now turn to the substance of Defendant's motion for compassionate release. For the reasons that follow, on the current record I do not find that Defendant has met his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant his release. Specifically, although Defendant does appear to suffer various health conditions and is of an age that place him in the category of inmates at a higher risk of serious illness or death should he contract COVID-19—facts that the Government does not seriously dispute—Defendant has not demonstrated it is likely, contrary to his assertion, that "he will soon contract the virus and become critically ill or die from it." (*See* Ng Comp. Rel. Mem. 1.)

Before addressing the substance of Ng's compassionate release motion there is a threshold issue that prevents Ng from remaining in this country once he is released from prison. "Ng requests that he be resentenced to time served and (as one of the many supervised release conditions) be confined to his apartment until December 23, 2021, his projected release date." (Ng Reply 7.)[14] I sentenced Ng to, among other things, 48 months' imprisonment on each count of conviction to run concurrently and three years' supervised release. (Judgment at 3, 4-6.)[15] Therefore, assuming Ng met the criteria for compassionate release—which as discussed below he does not—in order to grant Ng the relief he seeks I would need to adjust the length of his supervised release term and add a condition of home confinement to the terms of his supervised release. However, such efforts would be futile since Ng is subject to removal as soon as he is

---

[14] "Ng Reply" refers to Ng Lap Seng's Reply in Further Support of His Motion for Compassionate Release. (Doc. 937.)

[15] "Judgment" refers to the Judgment in a Criminal Case that was filed as to Ng in this case. (Doc. 783.)

released from prison, and Ng acknowledge as much at the time of his sentencing.

Section 3582(c) only permits me to "reduce" a term of imprisonment, not to resentence. *See Roberts*, 2020 WL 1700032, at *3 ("At most, Section 3582(c) allows a court to 'reduce' a term of imprisonment if the requirements for compassionate release are satisfied."); *cf. Dillon v. United States*, 560 U.S. 817, 831 (2010) (holding that Section 3582(c)(2), which also authorizes courts to "reduce" a defendant's "term of imprisonment" under certain conditions, only allows for the reduction of a sentence, not "a resentencing").  "Thus, the only way to grant [Ng] the relief [he] seeks (*i.e.*, release from prison) under Section 3582(c) is to reduce [his] sentence to time served — in other words, to permanently release [him]."  *Roberts*, 2020 WL 1700032, at *3.  Indeed, as noted above, this is precisely the relief Ng seeks.  However, upon his release from prison Ng will be taken into immigration custody even if I reduce Ng's sentence to time served with a period of supervised release with one of the conditions of his supervised release being that he be confined to his apartment until December 23, 2021.  First, the Order of Judicial Removal ("Removal Order") explicitly states that "pursuant to Section 238(c) of the INA, 8 U.S.C. § 1228(c), the defendant shall be removed from the United States promptly upon his release from confinement, or, if the defendant is not sentenced to a term of imprisonment, promptly upon his sentencing, and that the defendant be ordered removed to The People's Republic of China." (Doc. 782, at 1-2.)  The clear meaning of this section is that Ng is subject to removal once he is released from prison or, had he not been sentenced to time in prison, as soon as he was sentenced.  Ng's contrary interpretation of the Removal Order is wrong and contrary to his belief and understanding at the time of his sentencing.  In connection with his sentencing, Ng agreed to waive his rights to challenge his removal as well as other rights under the Immigration and

Naturalization Act ("INA"), and agreed to entry of the Removal Order.[16]  (*See generally* Doc.

779.)  Even if Ng had not waived his rights under the INA, the INA provides that "the Attorney

General may not remove an alien who is sentenced to imprisonment until the alien is released

from imprisonment," and that "[p]arole, supervised release, probation, or possibility of arrest or

further imprisonment is not a reason to defer removal."  8 U.S.C. § 1231(a)(4)(A).  The INA

further provides that "[t]he Attorney General shall take into custody any alien who is [deportable

or inadmissible under various provisions of the INA] when the alien is released, without regard

to whether the alien is released on parole, supervised release, or probation, and without regard to

whether the alien may be arrested or imprisoned again for the same offense."  8 U.S.C. §

1226(c)(1).  In other words, when Ng is released from BOP custody—regardless of whether he is

subject to a supervised release term with a condition that he be confined to his apartment—he

will be taken into immigration custody and removed to China.[17]  At Ng's sentencing, Defense

counsel acknowledged that Ng would be taken into immigration custody and deported

---

[16] Ng claims that "[u]nder the INA, 'the order of removal shall become final and shall be executed at the end of the prison term in accordance with the terms of the order.'"  (Ng Reply at 6 (citing INA § 238(c)(3)(iii)).  Here, as discussed above, the end of the prison term means when Ng is released from BOP's custody.  In any event, Ng has "waived his right to notice and a hearing under Section 238(c) of the INA," and "waived the opportunity to pursue any and all forms of relief and protection from removal."  (Doc. 782, at ¶¶ 7-8.)

[17] Any supervised release term would begin upon Ng's release from prison and the custody of the BOP.  *See United States v. Johnson*, 529 U.S. 53, 57 (2000) ("The quoted language directs that a supervised release term does not commence until an individual 'is released from imprisonment.'  There can be little question about the meaning of the word 'release' in the context of imprisonment.  It means '[t]o loosen or destroy the force of; to remove the obligation or effect of; hence to alleviate or remove; ... [t]o let loose again; to set free from restraint, confinement, or servitude; to set at liberty; to let go.'  Webster's New International Dictionary 2103 (2d ed. 1949).  As these definitions illustrate, the ordinary, commonsense meaning of release is to be freed from confinement.").)  In addition, a supervised release condition of confinement to his apartment is not considered imprisonment and therefore would not prevent Ng's removal to China.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 849 (2018*)* (rejecting dissent's view that "even aliens 'released on parole, supervised release, or probation' are 'in custody'" under 8 U.S.C. § 1226(c)(1)); *see also United States v. Thomas*, 135 F.3d 873, 875 n.3 (2d Cir. 1998) ("We find *Jones'* reasoning to be sound, and, adapting it to the case before us, conclude that home detention, like community confinement, cannot be deemed "imprisonment" under the Guidelines (at the very least in circumstances like the instant one).").

immediately upon his release from prison.[18]  (Doc. 843, at 68:22-69:4 ("And then he's already

consented to deportation.  The impact of that is that he won't be brought before an immigration

judge, but he will be sent, if he is sent to jail at the close of the sentence, he will be sent

immediately to ICE custody and he could languish there for an indeterminate amount of time

before he is deported back to China.  I don't know how long that could last.  It could be a matter

of days, it could be weeks and months.")  Ng submitted the Affidavit of Joel M. Sickler ("Sickler

Affidavit"), who counsel described as someone with "substantial expertise in U.S. Bureau of

Prisons conditions and designations," to provide me with "information regarding the prison

conditions to which Mr. Ng would be subjected should his sentence include a period of

incarceration, by virtue of his status as a deportable alien."  (Doc. 782.)  In his discussion of Ng's

status as a deportable alien, Sickler does not mention Ng being on supervised release prior to

deportation.  In fact, the term "supervised release" does not appear in the Sickler Affidavit.

Instead, Sickler describes a process where Ng will be taken by Immigration and Custom

Enforcement ("ICE") Agents from BOP's custody into ICE's custody.  (Doc. 782-1, at ¶ 31

("When the prisoner's sentence is complete, they are placed in ICE custody and their status is

changed from 'prisoner' to 'detainee.'  Armed ICE agents transport the detainee (typically by

bus) to another detention center once they are formally released from BOP custody to await the

process of being physically removed from the U.S.  Unfortunately, this involves further

incarceration at what are typically county jails (contracted by ICE) to further wait on processing

---

[18] Current counsel's argument that I am not precluded from sentencing Ng to a period of "home confinement notwithstanding an ICE detainer," (Ng 4-17 Supp. Ltr. 3), misses the point since the INA's statutes cited above clearly indicate that a defendant's supervised release term is not an impediment to removal.  Indeed, defendants are routinely removed from this country upon the completion of their terms of imprisonment even though a court may have imposed a term of supervised release at the time of their sentencing.  *Cf. Straker v. Jones*, 986 F. Supp. 2d 345, 362 (S.D.N.Y. 2013) ("Under [8 U.S.C. § 1226(c)], an alien's release to probation or supervised release, from a period of imprisonment, assuredly counts as a 'release' within the meaning of the statute.").  "Ng 4-17 Supp. Ltr." refers to Ng's supplemental letter to me dated April 17, 2020.  (Doc. 944.)

to finally be sent home.").)  Defense counsel used the Sickler Affidavit to request a downward

variance for Ng based upon the possibility he would be held in immigration custody for an

extended period of time and his ineligibility for early release to a half-way house.  (Doc. 843, at

68:22-69:4, 68:19-21, 69:11-13 ("He won't be eligible for early release.  That's 10 percent of

any sentence up to six months . . . . Halfway house, and that credit which is 10 percent up to six

months, that is laid out in Mr. Ziegler's affidavit.").)  Assuming I signed the Removal Order—

which I in fact eventually did—the Government estimated that Ng would be in immigration

custody for approximately two weeks prior to being deported.  (*Id*. at 76:21-25.)

Granting Ng compassionate release would therefore mean reducing his sentence to time

served which would result in him being sent home to China.  Therefore, it does impact my

analysis of the factors set forth in 18 U.S.C. § 3553(a) because rather than remaining in this

country under home confinement until December 23, 2021—the date Ng is expected to be

released from BOP custody—Ng would be home in China within weeks of his release from

prison.  This would mean the 48 month sentence I imposed would be reduced by more than 18

months.  After considering the section 3553(a) factors at Ng's sentencing I imposed a sentence—

48 months' imprisonment—that represented a substantial variance from the applicable guideline

range—235 to 293 months' imprisonment—I do not find that the circumstances have changed,

including due the current health crises due to COVID-19, so dramatically so as to warrant a

sentence of time served.

Ng broadly claims that "the coronavirus is spreading rapidly in America, including in

Pennsylvania and BOP prisons," and with every passing day it is increasing the probability that

he "will contract the coronavirus and incur serious illness or death."  (Ng Comp. Rel. Mem. 6.)

Ng argues that "[a]lthough the BOP has instituted measures to prevent the coronavirus from

spreading in its prisons, those measures are not adequate to protect Ng from getting the coronavirus." (*Id*. at 12.) He also argues that the structure of BOP institutions and BOP's programing are conducive to the spread of COVID-19 within these institutions. (*See id*. at 11-13.) Although the spread of COVID-19 throughout the United States, the structural and programming issues within BOP institutions, and the spread of COVID-19 within the BOP prison system are all relevant to the risk to Defendant of contracting COVID-19, that data does not warrant Defendant's conclusion that Ng "will contract the coronavirus and incur serious illness or death." Although Ng cites to certain data he claims supports this statement, (*id*. at 15; Ng Reply 4-5), he does not cite the most relevant data specific to the area of the country where FCI Allenwood Low is located, including data for FCI Allenwood Low and/or the other correctional institutions within the Federal Correctional Complex, Allenwood.[19] Ng does not cite this most relevant data because it does not support his argument that he is at risk. Nor does Ng cite data from New York City or Manhattan in his effort to establish that there are extraordinary and compelling reasons for his release, and the argument that he would be less likely to contract the virus by living in his apartment in Manhattan. The COVID-19 statistics for New York City and Manhattan compared to Union County and the surrounding area suggest Ng would be more at risk in New York City and Manhattan.

As of May 4, 2020, FCI Allenwood Low does not have a single reported case of COVID-19 among its inmates or staff. Nor do the other institutions within FCC Allenwood. Ng does not appear to dispute the fact that FCI Allenwood Low does not have any COVID-19 cases. (*See* Ng Reply 4.) Instead, Ng argues that "BOP's own statistics demonstrate that its action plan is

---

[19] The Federal Correctional Complex, Allenwood ("FCC Allenwood") consists of FCI Allenwood Low, FCI Allenwood Medium and United States Penitentiary Allenwood. Northeast Region Locations, Federal Bureau of Prisons (last visited 4/30/20), https://www.bop.gov/locations/map.jsp?region=Northeast%20Region.

ineffective to prevent the coronavirus from spreading to Ng's prison." (*Id.*)  However, the fact that FCI Allenwood Low does not currently have a single reported case of COVID-19 belies this assertion.  In addition, the BOP has "122 institutions, 6 regional offices, a headquarters, 2 staff training centers, and 22 residential reentry management offices," and "administer[s] contracts with private corporations to operate 12 additional correctional institutions," *Our Locations*, Federal Bureau of Prisons (last visited 4/30/20), https://www.bop.gov/locations/; however, as of April 30, 2020, there are only "50 BOP facilities and 21 RRCs affected nationwide" by COVID-19, *COVID-19 Coronavirus, COVID-19 Cases*, Federal Bureau of Prisons (last visited May 7, 2020), https://www.bop.gov/coronavirus/.  In other words, FCI Allenwood Low is not the only institution within the BOP system that does not have reported COVID-19 cases.  Therefore, the blanket claim that BOP's action plan is ineffective is a generalization and an overstatement. Moreover, the blanket claim that the structure of BOP institutions and BOP's programing are conducive to the spread of COVID-19 assumes that the spread of COVID-19 cannot be mitigated with the implementation of BOP's action plan.  Ng does not provide support for this assertion and it is at best speculation that borders on hyperbole.

Ng's request to be released from FCI Allenwood Low to live in his apartment in Manhattan until December 23, 2021, also appears to be based upon the underlying assumption that the risk of him contracting COVID-19 is lower if he is permitted to live in his Manhattan apartment.  This assumption does not appear to be based upon any evidence other than Ng's generalization about COVID-19's spread within BOP's institutions.

Since July 18, 2018, Ng has been serving his sentence at the FCI Allenwood Low.  Ng's release date is December 23, 2021.[20]  FCI Allenwood Low is located in Union County,

---

[20] As of April 30, 2020, Defendant, assuming continued good behavior, has 602 days remaining until his release

Pennsylvania.  *FCI Allenwood Low*, Federal Bureau of Prisons (last visited April 28, 2020),

https://www.bop.gov/locations/institutions/alf/.  According to Ng, he "shares a bunk bed with his

roommate," and he sleeps "in the lower bunk and his roommate in the upper."  (*Id*. at 3.)  To the

extent that Defendant's reference to the fact that he has a roommate is meant to suggest that his

roommate presents an added risk to him, Ng offers no evidence concerning how long his

roommate has been at the facility, how long he and the roommate have lived together, what if

any health issues his roommate had or may have, and he does not claim that his roommate is or

has been ill.  Therefore, I find that the fact that Defendant has a roommate to be of minimal

support for his argument that there are extraordinary and compelling reasons for his release.

At FCI Allenwood Low "[a]ll visiting at th[e] facility has been suspended until further

notice."  (*Id*.)  The limitation on social visits is just one part of the transmission mitigation

measures implemented by the BOP to prevent the spread of the virus.  *See BOP Implementing*

*Modified Operations*, Fed. Bureau of Prisons (last accessed May 4, 2020)

https://www.bop.gov/coronavirus/covid19_status.jsp.

Ng does not propose that he live alone in his Manhattan apartment.  Rather, he indicates

that he intends to live with his daughter and/or wife and a "live-in housekeeper" (Ng Comp. Rel.

Mem. 18), and private security guards if I deem them necessary for him to be released.  Each of

these individuals are potential spreaders of COVID-19, and Ng does not provide information

relevant to assessing the risk to him from residing in his apartment.  Specifically, Ng does not

provide any information concerning his apartment building, wife and daughter, or the live-in

housekeeper.  For example, Ng does not provide any information concerning whether:  (1) any of

the residents of his building have had COVID-19; (2) the building has implemented any

---

date.

measures to limit the spread of COVID-19 among building residents and staff; (3) his wife and/or daughter currently live in the apartment or somewhere else; (4) his wife and/or daughter had or have COVID-19; (5) his wife and/or daughter have been practicing appropriate hygienic measures and social distancing; (6) the live-in housekeeper had or has COVID-19; and (7) the live-in housekeeper has been practicing appropriate hygienic measures and social distancing.

Putting to the side the potential risk to Ng's health that the live-in housekeeper, his wife, and daughter might pose, New York City has widely been considered the COVID-19 epicenter for the United States and the world.  *See, e.g.*, *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, Centers for Disease Control and Prevention (last updated May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.  The level of community spread of COVID-19[21] in New York City and New York County is materially greater than the level of community spread of COVID-19 in Union County—where FCI Allenwood Low is locate—and the surrounding counties.  As of May 7, 2020, 19,141 people have died from, and 185,653 people have been infected with, COVID-19 in New York City, which translates to 226.7 deaths per 100,000 residents and 2,198.7 people infected per 100,000 residents.  *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (last viewed May 7, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Spotlight&pgtype=Homepage.  In New York County—where Ng intends to live—as of May 7, 2020, there have been 2,399 deaths and 23,529 people infected with COVID-19, which translates to 147 deaths per 100,000 residents and 1,441.3 people infected per 100,000 residents.  *National*, *Deaths reported per 100,000 residents by county*, The

---

[21] "Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected."  *Frequently Asked Questions, Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control and Prevention (last visited May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#In-Case-of-an-Outbreak-in-Your-Community.

Washington Post (last viewed May 7, 2020),

https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=hp_rhp__no-name_hp-in-the-news%3Apage%2Fin-the-news.  By contrast, as of

May 7, 2020, in Union County, Pennsylvania—where FCI Allenwood Low is located—there has

been 1 death and 40 people infected with COVID-19, which translates to 2.2 deaths per 100,000

residents and 88.7 people infected per 100,000 residents.  *Id.*  Union County is bordered by

Lycoming County, Snyder County, Centre County, Mifflin, Northumberland, and Clinton

County.  Lycoming County has had 4 deaths, Snyder County one death, and Centre County one

death due to COVID-19, and the remaining counties have had no deaths due to COVID-19.[22]  *Id.*

These statistics support the inference that Ng would be more at risk of contracting COVID-19

where he released and required to stay in his apartment in Manhattan than he would be by

remaining in FCI Allenwood Low.

Therefore, based upon the fact that (1) Ng intends to live with other individuals in his

apartment; (2) there have been no reported COVID-19 cases in FCI Allenwood Low, (3) the low

levels of community spread and death in Union County, the county where FCI Allenwood Low

is located; (4) the low levels of community spread and death in counties surrounding Union

County; and (5) the high levels of community spread and death in New York County and in New

---

[22] In Snyder County there has been 1 death and 33 people infected with COVID-19, which translates to 2.5 deaths per 100,000 residents and 81.5 people infected per 100,000 residents.  In Centre County there has been 1 death and 116 people infected with COVID-19, which translates to 0.6 deaths per 100,000 residents and 71.9 people infected per 100,000 residents.  In Clinton County there has been 0 deaths and 35 people infected with COVID-19, which translates to 0 deaths per 100,000 residents and 89.6 people infected per 100,000 residents.  In Lycoming County there has been 4 deaths and 99 people infected with COVID-19, which translates to 3.5 deaths per 100,000 residents and 86.2 people infected per 100,000 residents.  In Northumberland County there has been 0 deaths and 112 people infected with COVID-19, which translates to 0 deaths per 100,000 residents and 121.3 people infected per 100,000 residents. In Mifflin County there has been 0 deaths and 48 people infected with COVID-19, which translates to 0 deaths per 100,000 residents and 103.5 people infected per 100,000 residents.  *National*, *Deaths reported per 100,000 residents by county*, The Washington Post (last viewed May 7, 2020), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=hp_rhp__no-name_hp-in-the-news%3Apage%2Fin-the-news.

York City, I find that Defendant has failed to meet his burden of establishing that there exist extraordinary and compelling reasons to reduce his sentence and grant his release.

## III.    __Conclusion__

My decision in this case is based on the unique circumstances of Defendant Ng and the context in which his motion has been made.  For the reasons stated above, because (1) I find that Defendant has not exhausted his administrative remedies; and (2) I find that Defendant has not sufficiently established extraordinary and compelling circumstances justifying the reduction in his sentence and his release from custody, Defendant's motion for compassionate release is DENIED.

The Clerk's Office is directed to terminate docket entry 934, 935, 943, 944, and 946.

SO ORDERED.

Dated:    May 8, 2020
          New York, New York

Vernon S. Broderick
United States District Judge