```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                                :
                                      :    Docket #1:15-cr-00706-
 UNITED STATES OF AMERICA,            : VSB-3

                    Plaintiff,        :

   - against -                        :

 NG LAP SENG,                         : New York, New York
                                        October 16, 2015
                    Defendant.        :

------------------------------------ :  DETENTION HEARING

                     PROCEEDINGS BEFORE
              THE HONORABLE JUDGE KEVIN N. FOX,
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:           UNITED STATES ATTORNEY'S OFFICE
                         SOUTHERN DISTRICT OF NEW YORK
                         BY:  DANIEL C. RICHENTHAL, ESQ.
                         One St. Andrew's Plaza
                         New York, New York 10007
                         212-637-2109

For Defendant:           BRAFMAN & ASSOCIATES, P.C.
                         BY:  BENJAMIN BRAFMAN, ESQ.
                              JACOB KAPLAN, ESQ.
                         256 Fifth Avenue, Suite 2nd Floor
                         New York, New York 10001
                         212-750-7800

Interpreter Present:     Mr. Yumo




Transcription Service:   Carole Ludwig, Transcription Services
                         155 East Fourth Street #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| **Exhibit** <u>**Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | **Voir** <u>**Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS              3

 2           THE CLERK:  U.S. v. Ng Lap Seng. Counsel, please

 3   state your name for the record?

 4           MR. DANIEL RICHENTHAL:  Good morning, your Honor;

 5   Daniel Richenthal for the government.  With me is Special

 6   Agent Jason Alberts of the Federal Bureau of Investigation.

 7           HONORABLE KEVIN N. FOX (THE COURT):   Good

 8   morning.

 9           MR. BENJAMIN BRAFMAN:  Good morning, your Honor.

10   Benjamin Brafman for Mr. Ng, who is present. With me at

11   counsel table is Mr. Yumo and Jacob Kaplan, an associate in my

12   office.  Good morning, sir.

13           THE COURT:  Good morning. All right, it's my

14   understanding that the defendant wants to reopen the

15   detention hearing that was held when he was first

16   presented, is that correct?

17           MR. BRAFMAN:  Yes, your Honor.  That hearing was

18   with respect to a Complaint that was later dismissed.  So

19   this would be his first actual detention hearing based on

20   the pending Complaint. But since the government filed the

21   hearing minutes of the September 24th hearing before

22   Magistrate Judge Netburn, I do want to revisit part of

23   what was said there because I think, based on what was

24   said by the government, I think Judge Netburn was,

25   unfortunately, pushed, if you will, into detaining the
```

```
 1                        PROCEEDINGS                4
 2   defendant based on what I think is, well, a lot of
 3   inaccurate information.  And at the time, in fairness to
 4   the defendant, who speaks no English whatsoever and is
 5   using a court-appointed interpreter today, he was
 6   represented at that hearing by a young lawyer who has zero
 7   experience in this building but spoke fluent Mandarin.
 8   And if you look at the transcript of those minutes, there
 9   almost was no response to the government's argument -- in
10   fairness to him, lack of time to prepare adequately and
11   review the documents, which I think show that the
12   government's representations were inaccurate.  And,
13   second, I think just lack of experience in handling a bail
14   matter.
15           So what I would like to do, with the Court's
16   permission, is do this as expeditiously as possible.  And
17   we thank you for making time for hearing us.  But what I'd
18   like to do is set out the proposal that we have in terms
19   of why we think we have a package of bail conditions that
20   are absolutely adequate to ensure this defendant's
21   appearance whenever necessary and make certain that he
22   does not flee the jurisdiction.
23           And then what I would like to do is I would like
24   to briefly revisit several of the arguments which the
25   government made at the time of the initial hearing.  And I
```

```
 1                        PROCEEDINGS              5
 2  do that because I have already provided your Honor with
 3  that transcript, and I think it's very important if your
 4  Honor is to consider the fact that Judge Netburn
 5  originally detained the defendant for me to be able to
 6  point out why I think the Court detained the defendant and
 7  also why the information that the Magistrate Judge Netburn
 8  was provided with was in part specifically inaccurate.
 9  Whether inaccurate by design or inaccurate because of
10  inattention to detail, it doesn't matter; I can show that
11  it was at least partially inaccurate in some important
12  areas.
13          So if I may, sir, I'd like to simply outline for
14  the record the bail proposal that we have prepared that we
15  would ask your Honor to consider and that we submit under
16  3142 is more than adequate to ensure the defendant's
17  appearance. I note specifically, your Honor, that the
18  defendant is 68 years old. He has no prior criminal record.
19  And the basic argument that the government made to detain
20  him is that he is wealthy.
21          THE COURT:  Let me stop you for a moment because,
22  if I'm understanding correctly, your position is that your
23  client was detained under an accusatory instrument that no
24  longer exists and there's a new accusatory instrument, and
25  the instant proceeding is to determine whether he should be
```

```
 1                          PROCEEDINGS                    6

 2   detained under that new accusatory instrument?

 3            MR. BRAFMAN:  That's correct.

 4            THE COURT:  All right, let me see if the

 5   government is moving to have your client detained under the

 6   new accusatory instrument; and if so, I'll entertain their

 7   arguments in support of that application, and then I'll

 8   hear you if you wish to be heard at that time.

 9            MR. BRAFMAN:  Very good, your Honor.

10            THE COURT:  Does the government wish to have

11   Mr. Ng detained under the accusatory instrument that now

12   exists against him?

13            MR. RICHENTHAL:  Yes, your Honor.

14            THE COURT:  What theory or theories are you

15   seeking to have him detained under that accusatory

16   instrument?

17            MR. RICHENTHAL:  Risk of flight.

18            THE COURT:  All right, I'll hear you in connection

19   with that application.

20            MR. RICHENTHAL:  It would be difficult to over-

21   describe how extreme the risk is here, as Judge Netburn

22   recognized and as defense counsel seems to recognize in

23   proposing 24-hour armed private security guards.  Mr. Ng is

24   a man who isn't just wealthy; he's wealthy beyond anyone's

25   imagination. He's worth nearly two billion dollars. He
```

1                          PROCEEDINGS                    7

2  makes nearly $300 million annually.  He has $1 billion of

3  property in China. He has property elsewhere. He has a $30

4  million private airplane. He was on his way to a private

5  airplane when he was arrested. So there's really no

6  question about his resources.

7           But Mr. Ng shouldn't be detained because he's

8  wealthy. We don't detain people because they're wealthy.

9  We detain people if they present a risk of flight that

10 cannot be mitigated.  And this is such a case. It's such a

11 case because of his wealth, but it's also such a case

12 because of who he is, what he's done and who he's connected

13 to. Mr. Ng has passports in multiple countries, none of

14 which is the United States. His home country is China, with

15 which we do not have an extradition treaty. That is also

16 the country in which he resides.  That is the country in

17 which he has his billion dollars of property.  That is the

18 country in which he is the head of a major casino and real

19 estate develop company in Macau.  That is the country to

20 which he will undoubtedly go if released by this Court. But

21 he has passports from other countries, as well, countries

22 in the Caribbean, Portugal, perhaps ones we don't even know

23 about.  But he does not have a United States passport.

24           And he also doesn't have something else:  any

25 connections -- any connections of any kind -- to this

```
 1                         PROCEEDINGS                    8
 2    country. Mr. Ng comes here --
 3              THE COURT:  Well, doesn't he own property here?
 4              MR. RICHENTHAL:  Mr. Ng on September 8th purchased
 5    a $3.6 million apartment, which he promptly effectively
 6    gifted to codefendant Francis Lorenzo. Mr. Ng has never
 7    stayed at that apartment. Mr. Ng does not live in New York.
 8    When Mr. Ng comes to New York, which he does for only a few
 9    days at a time, principally to bribe people, he generally
10    arrives by private aircraft or first-class tickets. He
11    stays in a suite of rooms at the Waldorf, and then he
12    leaves.  That apartment is part of this case. It is not a
13    connection to the United States. But, of course, a $3.6
14    million apartment, while expensive for most of us, is not
15    expensive for Mr. Ng. Other than the fact that he purchased
16    property and promptly effectively gifted it to a
17    codefendant, he has not connections to this country. He's
18    never lived in this country. He has no family in this
19    country. He stays in this country a handful of days a year
20    in order to commit the offenses with which he's charged and
21    then promptly returns to China.
22              There's no reason in the world he would return to
23    face charges in this case. That was true on the original
24    accusatory instrument, no doubt, as Judge Netburn
25    recognized.  But that is far more true now because that
```

1                              PROCEEDINGS                        9

2    original instrument was strong, as Judge Netburn

3    recognized.   The new one is 37 pages long. And Mr. Ng faces

4    on the new one alone more than a decade in prison based on

5    the guidelines; up to 15 years in prison based on the

6    statutory maximum. And the investigation is active and

7    ongoing, and he knows that. He knows that because, for

8    example, he's listening to me right now talk about how his

9    $3.5 million apartment was effectively gifted to a

10   codefendant.   That's not in the Complaint. He knows that

11   because other materials filed in court have noted, among

12   other things, that a different codefendant, Jeff Yin, and

13   Mr. Ng, this defendant, were signators on a safe deposit

14   box in Manhattan which contained, among other things,

15   $430,000 in cash not disclosed to the government. He knows

16   that for a variety of reasons.

17              So this is a man of extraordinary wealth; it's a

18   man who has every incentive to flee. It's a man who has no

19   incentive to stay. But it's also a case about something

20   else. It's a man whose very conduct should give this Court

21   great pause. The conduct that's charged in the Complaint

22   is bribery of foreign officials.   That's exactly the kind

23   of conduct that should give this Court the greatest pause

24   for a defendant who has no connection to this country. It

25   is obvious this defendant is connected to foreign

```
 1                        PROCEEDINGS              10
 2   individuals. It is obvious this defendant is willing to
 3   use his great wealth to pay those individuals to do
 4   unlawful things.  There's no reason in the world he
 5   wouldn't keep doing that to secure his own freedom,
 6   especially given what he's facing.
 7           But there's another point here, too. Mr. Ng,
 8   according to his defense counsel at the original
 9   hearing -- and that defense counsel may not well be as
10   schooled in criminal proceedings as Mr. Brafman is -- but
11   that defense counsel knew Mr. Ng and stood up and argued
12   for Mr. Ng.  And that defense counsel described Mr. Ng as
13   a member of the Chinese government.  That's not
14   inconsistent with emails in the Complaint talking about
15   Mr. Ng's various connections to other business people and
16   other officials.  That again should give this Court
17   tremendous pause.
18           This is not a case in which we're asking your
19   Honor to detain him because he is wealthy; we're asking
20   your Honor to detain him because his access to resources
21   in physical form and in monetary form and in the form of
22   coconspirators not charged and associates not charged is
23   massive.  We're asking your Honor to detain him because he
24   doesn't just have those connections; he has every
25   incentive in the world to leave and none to stay. None.
```

1                               PROCEEDINGS                    11

2    Zero. Posting a $3.6 million apartment to a man like Ng

3    Lap Seng is meaningless. Posting tens of millions of

4    dollars to a man like Ng Lap Seng is meaningless.  There

5    is no reason for him to stay -- zero -- and every reason

6    to go.

7            But we also know something else about Mr. Ng. He

8    pays attention to the kinds of things I'm talking about.

9    In the late 1990s Mr. Ng was named in press reports and in

10   a Congressional report as having been involved in

11   filtering money to an American political party, which is

12   unlawful because he is not a United States citizen. After

13   those reports came out, Mr. Ng ceased coming to the United

14   States for years. He only returned and only briefly years

15   later and for days at a time. He was watching.

16           What else do we know of Mr. Ng? He was served

17   with a subpoena in connection with a different matter

18   arising in a different district. He was served in person by

19   agents of the Federal Bureau of Investigation.  He was

20   served with his translator sitting next to him.  There's no

21   question but that he understood what it was. And he didn't

22   appear, and he didn't ask to be excused from appearing; he

23   just didn't show, because Mr. Ng has no interest in

24   complying with the laws of this country because he is not

25   of this country. He comes here for days at a time to bribe

```
 1                        PROCEEDINGS              12
```

 2  people in this country, and then he leaves.

 3          So there's really no question -- and I'm not sure

 4  defense counsel even disputes that the access to resources

 5  here is massive, the incentive to flee is massive, the

 6  ability to flee is massive, and the history suggests a man

 7  who will do it.

 8          So then the question is are there any conditions

 9  or set of conditions that can keep him here?  The answer is

10  no.  And the answer is no even if your Honor were to

11  consider the proposal that he should buy his freedom.

12  That is not a reasonable proposal, and I'm going to

13  explain why. But even if it were reasonable in a

14  hypothetical case, it isn't here because he has no

15  connections to the United States at all.  This is not Mark

16  Dreyer or Bernie Madoff, American citizens, extensive

17  family connections here, extensive business connections

18  here. He has nothing like those men, as well as being far

19  wealthier and having far more international connections.

20  Those are not analogous cases.

21          Private security guards are not federal law

22  enforcement officers. A multimillion dollar apartment is

23  not a Bureau of Prisons facility. It doesn't have the

24  monitoring of a Bureau of Prisons facility; it doesn't have

25  bars. It doesn't ensure he won't meet with certain people

1                           PROCEEDINGS                    13

2   to effect his freedom. It has none of those things.  But

3   even if in a hypothetical case that might be appropriate,

4   your Honor shouldn't consider it because under the Bail

5   Reform Act and the Constitution, it is [indiscernible] that

6   the Second Circuit has blessed that. In a specific case

7   cited by Mr. Brafman the Second Circuit reserved that

8   question because in that case on its unique facts the

9   parties did not dispute whether it was appropriate.  And

10  later, in a case not cited in Mr. Brafman's letter, the

11  Second Circuit specifically noted in a reserved decision on

12  that question and said -- and this is *United States v.*

13  *Benke*, 369 Fed. App. 152 (2010), not in Mr. Brafman's

14  letter, the Second Circuit noted that was not the issue it

15  decided, and it further noted, "We did not there hold that

16  district courts must routinely consider the retention of

17  self-paid private security guards as an acceptable

18  condition of release before ordering detention." It didn't

19  just say that; it noted expressly, quote, "We remained

20  troubled by that possibility." And what was it referring

21  to when it said "that possibility"? It was referring to,

22  quote, "allowing wealthy defendants to buy their way out

23  by constructing a private jail."

24            It is true the Second Circuit has not decided if

25  that's proper. It is not true the Second Circuit has

1                          PROCEEDINGS                    14

2    decided your Honor must consider it, and your Honor should

3    not. It is not appropriate for a wealthy defendant to buy

4    his freedom in this manner.  The government does not have

5    to give in to Mr. Ng's demand that he live in a multi-

6    million dollar apartment because he prefers not to be

7    detained. But even as I said, in a hypothetical case that

8    might be appropriate; this is not such a case. Every reason

9    to leave, every incentive to leave, every resource with

10   which he could leave, and no reason to stay. I don't know

11   if your Honor has ever seen a case that presents a risk of

12   flight like this case. He must be detained.

13           THE COURT:  Mr. Brafman, you earlier made

14   reference to a letter that the government sent to me in

15   connection with this proceeding. I also received a letter

16   that you authored, and I reviewed that prior to the

17   proceeding.

18           MR. BRAFMAN:  Thank you, your Honor. Your Honor,

19   if I may, one of the things that struck me when

20   Mr. Richenthal spoke, quite frankly, was the statement to

21   the effect that the risk of flight cannot be mitigated.

22   And I think the proposal that we submit to the Court

23   mitigates it to the point where it's just impossible for

24   him to flee unless they believe that the Guideposts staff

25   that we propose, which is headed by Bart Schwartz, who was

1                              PROCEEDINGS                    15

2    formerly chief of the criminal division, would let this

3    defendant -- Criminal Division of the Southern District of

4    New York -- would cavalierly take that responsibility and

5    allow this man to flee.  There is nobody in this district,

6    to my knowledge, who in the past has been allowed to live

7    in an apartment armed by an agency approved by the Southern

8    District as unquestionably honest has been able to flee or

9    did flee.  So we're not suggesting that we cavalierly

10   construct a make-believe prison.  The apartment has one

11   entrance.  There will be two armed 24-hour security people

12   who are either current off-duty law enforcement or former

13   law enforcement people.  And the proposal by Guideposts

14   Solutions, whose principal is Bart Schwartz, has done this

15   repeatedly.  They've never done it with any failure.

16           In addition, what we are also proposing is that

17   the defendant be permitted to post the apartment. I think

18   he is wrong to say that the apartment was gifted to

19   Mr. Lorenzo. I have a copy of the deed to that apartment,

20   which shows that Mr. Ng is the only owner. It is not

21   encumbered. He bought it; it's fully paid for, and its

22   market value fluctuates between $3.8 million to $4 million.

23   In the Lorenzo bail proceeding where Mr. Lorenzo was

24   granted bail over vigorous objection by Mr. Richenthal,

25   they tried that, as well, and it didn't work; and

```
 1                       PROCEEDINGS                    16
 2  Mr. Lorenzo was granted bail. Interestingly, the two UN
 3  officials, who are the principally charged defendants in
 4  this Complaint, have each been given bail. They have each
 5  been given bail substantially less onerous than the bail
 6  that we propose.  Now, they have not satisfied the
 7  specific conditions yet, so they remain in custody; but
 8  independent magistrates reviewing the very same case gave
 9  them each bail.
10           Mr. Yin, who is the person who is alleged to have
11  done all of my client's bidding, because my client speaks
12  zero of English, Mr. Yin was given bail. Unfortunately for
13  Mr. Yin, the government later alleged that he lied
14  subsequently about assets. He was then re -- not rearrested
15  but while still in custody, the issue of bail was revisited
16  and his bail was revoked not because he didn't qualify for
17  bail.
18           So the question here, your Honor, is is the
19  defendant charged with a crime for which he is eligible for
20  bail? And the answer unequivocally is yes, he is eligible
21  for the bail. Indeed, unless the government satisfies its
22  burden of showing that there are no combination of
23  conditions that would make it, you know, possible for this
24  defendant to flee, he is entitled to bail, and bail should
25  be provided unless the government meets its burden. And all
```

```
1                          PROCEEDINGS                    17
```

2  I've heard, again, is that he's wealthy, he has contacts

3  overseas, he's not a citizen, and therefore he should not

4  get bail. In the FIFA case in the Eastern District, the

5  Court did set bail recently, and the bail included the

6  posting of 24-hour armed security guards. In the cases in

7  this district that we have cited bail was provided to

8  people with extensive wealth.  And every day extremely

9  wealthy people are prosecuted in this courtroom; they are

10  released on bail despite the fact they have billions of

11  dollars sometimes in assets in the insider trading cases

12  tried in this building. Many of those defendants have

13  hundreds of millions of dollars in assets available to

14  them.  And the fact that someone is wealthy was not the

15  dispositive factor.

16             So I want to just lay out for the record my

17  proposal so we don't miss anything. In addition to the

18  apartment, which is my client's -- and I defy them to prove

19  otherwise -- we would post an additional $5 million of a

20  bond fully secured by cash, so it would be a total of $9

21  million between the property and the cash. He would be

22  subject to home detention with electronic monitoring. He

23  has surrendered all of his passports.  And let me just say

24  something so the government doesn't get a chance to

25  misspeak. The defendant's passports are in their custody.

1                              PROCEEDINGS                    18

2   The one passport that is of interest is a passport not to

3   the Dominican Republic, as has been previously suggested

4   before Magistrate Netburn, but to an island of Dominica.

5   And what they did was they gave him an honorary passport --

6   I have a copy of it. It's expired; he doesn't have the

7   original. He has no other passports. He would not apply for

8   any other passports. The defendant would be restricted,

9   obviously, to this apartment and only be permitted to leave

10  to come to court with armed guards.

11          I would also tell you that the defendant's

12  daughter, Janet Ng, who is present in the courtroom, has no

13  prior criminal record, is prepared to post her passports

14  and to give the passports to the custody of the U. S.

15  Attorney's Office because she wants to be able to stay with

16  her father and be able to take care of him during this

17  extended period.

18          This is a case that's going to require a

19  substantial amount of work and time in order for the

20  defendant to defend himself.  And as I will show you in a

21  moment, I think this case is eminently defensible because

22  I think the government has again and again and again

23  jumped to conclusions for which they have voiced those

24  assertions in open court and only to be shown that they

25  are wrong.

1                              PROCEEDINGS                    19

2              So let me also indicated, your Honor, that the

3    defendant is 68. He is a Type 2 diabetic whose sugar

4    glucose readings are off the charts. He has coronary heart

5    condition and twice before suffered mini-strokes. During

6    the period when the government suggests he should have

7    come to the United States, he was ill.

8              There's also something else. They throw out

9    countries. He has ties to Canada, they say. His two

10   children went to high school in Canada. The family had

11   immigrated there for a period of time. And during the

12   period when he was not in the United States, the records

13   show that he was in Canada a lot.  And, unfortunately,

14   tragedy struck in Canada where his young son was fatally

15   injured in an automobile accident.  So he had to bury his

16   son. He had his daughter, who's present in the courtroom,

17   who was studying in Canada. So the trips to Canada are not

18   nefarious; they were personal in nature.

19             I want to talk about the two investigations which

20   the government just throws out as if it's evidence the

21   defendant is not going to rely on the order of this Court.

22   During the Clinton campaign there was an investigation

23   involving a Chinese national named Charlie Trie. Charlie

24   Trie was accused of funneling money through Asian-

25   Americans and others to the Clinton campaign. After an

1                              PROCEEDINGS                    20

2   extensive investigation that went on for years and years

3   and years, Mr. Trie, the principal culprit, if you will,

4   was permitted to plead guilty to a misdemeanor, and he got

5   probation. That case, Mr. Ng did come up as someone who was

6   alleged to have been involved in that case. He was never

7   arrested, he was never charged.  And for the government to

8   suggest that he hid from the United States authorities

9   because of that case is preposterous because at the end of

10  the day, Mr. Trie, the principal defendant, got a

11  misdemeanor and probation, and Mr. Clinton ran for

12  President successfully, and his wife is doing it again now.

13  So that suggests where that investigation figures in the

14  hierarchy of reasons for the defendant to run away.

15              Second, in 2014, while the defendant was in New

16  York, he was handed a subpoena.  The subpoena called for

17  him to be a witness in connection with a grand jury

18  investigation in Las Vegas into the Sands Hotel, which was

19  looking to see whether the Sands Hotel had been involved

20  in improperly handling currency transactions for thousands

21  of people. One of them was Mr. Ng, who was a well-known

22  gambler. He did not ignore it. We don't have the letter

23  because the letter is in Macau, and the defendant's been

24  detained. But what we do have is as DHL tracking

25  certificate, which I showed the government, which shows

1                          PROCEEDINGS                    21

2    that a day after the subpoena was served, a letter was sent

3    and delivered to Daniel Bogan, who was the United States

4    Attorney at the time in Las Vegas, Nevada.  Now, the people

5    who wrote the letter did not have the sophistication

6    perhaps to address is to the Assistant United States

7    Attorney who may have been handling the matter; but we

8    believe, and have a good-faith basis to believe, that a

9    letter on Mr. Ng's behalf was sent to them.

10            But more importantly, Judge, since that subpoena,

11   he's been back in the United States at least a half a dozen

12   times, and on each occasion he was trailed by FBI agents.

13   In the initial Complaint they talk about him landing in a

14   private plane, and on one occasion they have him going to

15   Las Vegas, the very place where this grand jury was

16   supposed to be conducting the investigation.  So to the

17   extent that he was seeking to avoid compliance with an

18   investigation in Las Vegas, he knew that the government

19   knew he was here; he knew that he was in Las Vegas; and no

20   agent came to him and said, "By the way, buddy, you've

21   ignored a subpoena for a couple of months.  Come with us."

22            So to the extent that the defendant, who speaks no

23   English -- and they are assuming that someone translated

24   the subpoena for him and somebody did write a letter to the

25   U.S. Attorney's Office.  That's not an indication that he

```
 1                      PROCEEDINGS              22

 2   ignores the legal process; that's not an indication that he

 3   is going to flee and become a fugitive. He's 68 years old,

 4   and he's not well. He has massive wealth, which he does not

 5   want to forfeit.  And the only way that he is able to fight

 6   these charges is if he stays here.  And he's 68 without any

 7   criminal record.

 8              And I just want the Court to please give me just

 9   one more moment, because I think this is extremely

10   important.  The defendant, despite these charges, is known

11   throughout the world as an extraordinary philanthropist.

12   Now, they may say, sure, he's looking to bribe the world by

13   giving $20 million to this hospital and this organization.

14   That's easy for them to just throw darts at.  But they have

15   no proof whatsoever.  The two principal people in the UN

16   who were, in effect, the bribees, if you accept the theory

17   of the case, have been granted bail. His assistant, who was

18   the direct intermediary between Mr. Ng, if you believe that

19   theory, and the UN officials, he was granted bail.  And he

20   lost his bail only because he lied.  And what the Court

21   must know and what the Court must understand is when he was

22   originally arrested, all he was charged with was making

23   statements which they believed not to be true when customs

24   forms were filled out -- not by him but by Mr. Yin, because

25   he speaks no English.  But the irony of this is that the
```

1                              PROCEEDINGS                    23

2   defendant and the defendant's assistant voluntarily

3   disclosed the large amounts of cash that they had to

4   customs people.  This was a --

5          THE COURT:  Well, what difference does that make?

6   That accusatory instrument is gone now.

7          MR. BRAFMAN:  No, but --

8          THE COURT:  We have a different accusatory

9   instrument, and we're talking about bail with respect to

10  those charges.

11         MR. BRAFMAN:  Yes.  But let me explain why it

12  matters, because the government alleges that the money that

13  was brought in on those occasions was the bribe money that

14  ultimately made its way to the people he is charged with

15  bribing in this case. So it does matter because, to the

16  extent that you are bringing in bribe money, voluntarily

17  disclosing this money to a member of the government saying

18  I have $390,000 here, is not a smart thing to do for

19  someone they concede is smart if you actually intend to

20  bribe the money.

21         And the reason why it's relevant, your Honor, even

22  though that accusatory instrument is dismissed is because

23  of the following.  At the hearing before Judge Netburn on

24  that issue, one of the arguments they made in the Complaint

25  was that with respect to the money, Mr. Yin on the

1                              PROCEEDINGS                    24

2  defendant's behalf said that the defendant was going to

3  bring the money in for the purposes of gambling, and that

4  the agent who signs that Complaint swears under oath that

5  for the period in question, during June of 2014, the

6  defendant and Mr. Yin was under constant surveillance, and

7  they never went to a casino, they never went to Atlantic

8  City, so, therefore, the lie shows that the money was

9  really for a bribe and not for gambling.  Well, truth be

10 told, nine days later, when they were trying to remand

11 Mr. Yin, in the government's letter dated September 29th,

12 eight days after our hearing, in a footnote on page 3 of

13 that letter, they conclude that in Mr. Yin's bag they found

14 a receipt from the casino in Atlantic City for $300,000

15 dated June 14, 2014, and that additional funds were

16 deposited and withdrawn on June 16, 2014, the specific

17 period when in the Complaint the FBI says they followed

18 them, they never went to Atlantic City; therefore that

19 money was for bribes.

20         So the reason it's important for your Honor is

21 because the theory is they bring all this money in in cash

22 because, ostensibly, they're going to give it to the UN

23 officials.  The defendant, when he lands, his assistant

24 discloses the money, the money is counted.  Customs notes

25 it's 300,000, it's 500,000, whatever the amount is.

1                              PROCEEDINGS                    25

2   Particularly unusual when you're landing by private plane

3   because Customs generally checks to see who the people are;

4   they do not regularly search the plane. And the facts would

5   show that this money was voluntarily shown them, not that

6   they found it in a search in some secret compartment. And

7   when the government argues that that money is evidence of

8   their intent to come here for a couple of days to bribe,

9   it's not true.  They come here for a couple of days to buy

10  antiquities; and when they raided the safety deposit box of

11  Mr. Yin, they found valuable antiquities.  And they come

12  here to gamble, and the defendant and Mr. Yin have

13  repeatedly said that.

14            I will also tell you that this is perhaps the most

15  unusual -- the most unusual bribery case in the history of

16  this courthouse. Now, they'll say, yeah, because it's so

17  vast. No. It's because this UN project that is at the

18  centerpiece of this case, which they claim was the corrupt

19  program, is probably one of the most well-known, well-

20  documented, well-studied, well-vetted programs ever by the

21  UN because it was supposed to develop the entire Southeast

22  Asia, where underdeveloped countries were trying to draw UN

23  investment, UN businesses, convention centers, hotels,

24  casinos, because it was going to develop this island and

25  all of the countries that joined.  There are hundreds of UN

1                          PROCEEDINGS                    26

2   officials who were involved in promoting this operation.

3           So what the government has is they've taken a

4   slice of a very big story; they've made it into what they

5   believe to be nefarious as a result of emails that my

6   client never issued, that my client was never copied on,

7   and that my client can't read. Because they've been sent by

8   his assistant, their argument is well, it must be binding

9   on my client. We're not here to try the case, Judge. My

10  client enjoys the presumption of innocence even if he's a

11  rich foreign national.

12          I have a bail package that doesn't make it possible

13  for this defendant to flee unless you believe that Guideposts

14  is a corrupt organization -- and the government would never

15  dare make that argument. That is a proven track record of 100%

16  success. So close to $10 million, the posting of passports,

17  the surrendering of any travel documents, the agreement not

18  to file for any, for his daughter to voluntarily give you her

19  passports and agree to stay here with someone who's accused of

20  a nonviolent offense, who has no criminal record whatsoever

21  in the United States or anywhere else, I think that is a

22  powerful argument as to why he should be entitled to bail.

23          I understand their concerns, and I think we've

24  addressed them.  And without the component of the 24-hour

25  security, I would think that they have the better argument.

1                              PROCEEDINGS                    27

2   When we have that component, the argument that he made that

3   a risk of flight cannot be mitigated is a statement that is

4   simply not true.  We're going to mitigate it to the point

5   where it's nonexistent.  And for their argument that we

6   want to control who visits him, we want to control how he

7   talks to people, we want to control that, they don't have

8   any control in the MDC. Once a person is approved for a

9   visit, they don't know what they're talking about inside.

10  And if they want us to establish a preapproved list of

11  visitors, we will do that.

12          And I want to make one final observation, Judge,

13  because I think this Court very much understands the

14  ability -- the right of a defendant to be able to appear

15  and present a defense.  This case is perhaps one of the

16  most massive undertakings that I have ever tried.  And I

17  have been involved in some fairly complicated cases. My

18  client speaks no English. The apartment that he is going to

19  create into a real prison is two blocks from our office.

20  And we can have an interpreter, and his daughter, who

21  speaks English, would be living there with him. This case

22  requires a slew of computer assets, a slew of paralegal

23  assets, and the interviewing of dozens of people, who

24  because of their foreign status, may not even be able to

25  get into the MDC for reasons having nothing to do with

1                         PROCEEDINGS                    28

2   criminality or may not want to go to a prison but who we

3   nevertheless need to interview.

4            In addition, it has taken me almost two weeks to

5   be able to just understand what my client has been trying

6   to explain about the vastness of the undertaking.  And for

7   the government to suggest that this is someone who comes

8   into the United States only for the purposes of bribing

9   this individual suggests to me that they haven't even begun

10  to investigate the balance of this UN program, which they

11  claim at its heart is fundamentally corrupt. I don't

12  represent Mr. Lorenzo, who has bail. I don't represent

13  Mr. Ashe, who has bail over the government's objections.

14  But I think that I have presented to your Honor a case as

15  to why bail, in the interest of justice, should be strongly

16  considered by the Court.  And when we look at the component

17  of the -- if we add to the component the armed security

18  guards, I think we've made a powerful case that they have

19  not been able to rebut.  What they have said over and over

20  and over and over again is that the defendant is wealthy,

21  he has access to enormous resources.

22           And I want to close by showing you why a comment

23  that sounds onerous is really completely innocuous.

24  Mr. Richenthal just a moment ago said that the defendant

25  was on his way to a private plane when he was arrested.

1                          PROCEEDINGS                    29

2   What he doesn't tell the Court, but which is evident from

3   the allegations in the initial Complaint, is he was in and

4   out of the United States six times during the spring and

5   summer of 2015 just prior to his arrest, each time on a

6   private plane, each time where the government tracked it

7   because they were following him.  They saw him land, they

8   followed him to his hotel.  They clearly didn't follow him

9   to Atlantic City, but they followed him to his hotel.  They

10  followed him back to the airport. He knew about the

11  subpoena in Las Vegas, he knew about the Charlie Trie

12  investigation 15 years ago, and he kept coming back to the

13  United States and not secretly, under his own name, by

14  private plane -- that's not a crime. So to suggest he was

15  arrested on the way to a private plane, suggesting that he

16  was going to flee by private plane, is just wrong.  They

17  could have arrested him at any moment that they wanted to

18  during the five or six years that they I think had him

19  under surveillance, or certainly within the four or five

20  months that we know they were tracking his every move.

21  They sought to arrest him at that moment.

22          We -- they have had months and months and months

23  to prepare the case against Mr. Ng, and what they came up

24  with in the initial investigation was false statements made

25  by Mr. Yin to a customs official on behalf of my client

1                          PROCEEDINGS                      30

2   after years of investigation with respect to the reason

3   they brought in the money that they voluntarily disclosed.

4   That was the case.  And the only reason he was detained on

5   that very weak, completely defensible case was because

6   they made comments to the Court which were completely

7   inaccurate or at least they didn't provide the whole

8   picture.

9              Now what they've done is they've taken that

10  money and they've weaved it into a bigger bribery case.

11  But the underlying facts about my client are the same;

12  he's still 68, he's still not well, he still has no

13  criminal record.  Yes, he's rich.  And, yes, we have asked

14  for a proposal that while reasonable people might say is

15  arguably difficult to maintain, I think the history in this

16  district and in other districts is that while Judge Pauley

17  may not be a big fan of this process, the argument that

18  Judge Rakoff makes is very telling, because the argument

19  before Judge Pauley was that, you know, rich people should

20  not be able to construct a prison.  But rich people should

21  not be put in prison because they are rich.  So Judge

22  Rakoff very correctly points out that the bail program in

23  the United States is weighted very heavily in favor of

24  people who have assets, because there are people right now

25  at Riker's Island and in the MCC who can't post $5,000

1                              PROCEEDINGS                    31

2    bail.  That's not fair, but those are the facts.

3              So we have a person who can afford the private

4    security guards. He shouldn't be denied that right simply

5    because he's rich because it's the wealth which is having

6    him detained in the first place.  And you know why we know

7    that, sir? We know that because bail has been set in the

8    case of Mr. Ashe and Mr. Lorenzo and Mr. Yin where, in my

9    opinion, the evidence that you see on its face in the

10   Complaint as to those people, the evidence is substantially

11   more compelling than the -- and, nevertheless, you know,

12   they have been given bail because they have a right to

13   bail.

14             So for the reasons we have suggested, your Honor,

15   and unless the Court has specific questions, I will rely on

16   my record. I think the conditions that we have proposed

17   satisfy the obligation under 3142, it is to prepare a

18   proposal that can reasonably assure that the defendant will

19   not pose a danger to the community -- and I have not heard

20   that argument made by the government -- and it will ensure

21   that he will show up when he is required, in addition to

22   which, he is making his daughter, who is in the courtroom

23   today and has no criminal record, no ties to the criminal

24   case, no allegations against her, he's making her also a

25   captive under the same conditions.  She will live in his

1

2  apartment.  And I dare say, Judge, that in order for this

3  defendant to be able to effectively represent himself, we

4  need your Honor to consider the nature of the charges, the

5  nature of the defenses that may be available, the fact that

6  the defendant is obviously presumed to be innocent; and I

7  think, as we say in our letter, detention is really to be

8  strictly limited in cases where there is a reason -- of the

9  fear of violence, whether you have a recidivist, whether

10  you have someone who is charged in an offense where the

11  presumption is against bail. None of that applies here. If

12  the defendant isn't substantially wealthy, he gets bail,

13  and we probably don't even have this discussion because I

14  think the government ultimately consents, most

15  respectfully.

16         So we're having this discussion because I think

17  the defendant does have substantial wealth, and for that

18  reason only. And his ties to the United States, he was

19  here again and again and again.  So he obviously wants to

20  be able to come here. You can bribe someone from Macau.

21  You don't have to come to the United States. If you're as

22  important as he is, you could send somebody. He comes

23  here.  There are business opportunities that he is

24  exploring that would come out at a trial.  There are ties

25  to the United States that we will be able to develop,

2  business ties, important ties. He stands to lose hundreds

3  of millions of dollars if he is suddenly classified as a

4  fugitive from justice because of hundreds of millions of

5  dollars of bank loans that require him not to be a

6  fugitive from justice in any shape or form.

7          So the reason for him to want to defend himself,

8  first and foremost, he wants to clear his name. He's 68.

9  He's never been accused or he's never been prosecuted of

10  any crime. In most areas of Asia he is considered an

11  extraordinary philanthropist, not a briber, not a corrupt

12  man. He has an extraordinary reputation. I could fill this

13  building with letters from organizations that he has

14  helped found, that he has helped subsidize.  And in terms

15  of the donations he has given to struggling countries, the

16  reason they gave him an honorary passport in the Dominica

17  is because he gave them approximately $20 million after

18  they suffered a substantial storm that required this help.

19  So it wasn't a bribe; it was an honorary award which has

20  since expired.

21          I ask your Honor most respectfully to impose

22  bail with the conditions that we have provided or any

23  additional conditions that the Court deems appropriate,

24  with the understanding that until all of the conditions

25  are in place, that the defendant would not be released.

```
 1                         PROCEEDINGS                  34

 2   And we ask you to permit him to do what every person

 3   arrested in the United States is entitled to do, defend

 4   his case with the presumption of innocence that includes

 5   the right to bail, even for a noncitizen.

 6              Thank you for your patience, sir.

 7              THE COURT:  The letter that you say was sent to

 8   the United States Attorney regarding grand jury subpoena,

 9   what does that letter say?

10              MR. BRAFMAN:  It's my -- we don't have the letter,

11   but it's my understanding that the letter said as follows,

12   in words or substance -- and I'm taking this on a

13   representation of people in Macau who told me this -- who

14   told our interpreter this.  That the letter was essentially

15   asking for his excusal because he was not well and he had

16   to go back to China.  The date of the subpoena -- it was

17   not a forthwith subpoena, but it was a subpoena returnable

18   in a couple of days to Las Vegas.  The defendant had

19   planned to go back -- I'm sorry -- it was a couple of

20   months.  And the letter -- and when he went back to Las

21   Vegas in the summer or the spring of 2014, the agents were

22   following him. So if there was a need for him to appear or

23   if he had forgotten or if he was careless in his response

24   to the subpoena, the way it's done is either a friendly

25   reminder or ran arrest. It's not you wait another year and
```

1                              PROCEEDINGS                    35

2    then you use it as a reason to deny him bail.

3              As for second, there is really a legal issue as to

4    whether or not a Chinese citizen, a Chinese citizen in

5    China has the obligation to travel that far to appear. Had

6    he retained counsel in the United States, it would have

7    been worked out. He was not the target of the

8    investigation, Judge.  What happened was the casino in

9    question was under an IRS audit as a result of thousands

10   of high-roller people who were either accused or suspected

11   of trying to launder money through the casino.  The casino

12   and its ownership were under investigation.  There were

13   hundreds of people, because I know lawyers in other cases

14   who had clients who were involved as potential witnesses.

15   No one followed up.  There was never an attempt to reach

16   him in Macau. The DHL letter that went to the United

17   States Attorney has the return address in Macau of Mr. Ng

18   Lap Seng. All they had to do was say your excuse is not

19   acceptable, or here's the new adjourned date.  There's no

20   further correspondence, and there's no further attempt to

21   contact him.  That is not evidence of reckless disregard of

22   formal process of someone who doesn't read or write English

23   and who is not subject to arrest. For the government to try

24   and move to hold him in contempt for failure to apply --

25   comply with that subpoena, that would be a very defensible

1                          PROCEEDINGS                    36

2    case.  And I haven't tried to do that.

3              And I also -- and I've said this before -- but if

4    you're looking at his mindset, if he is worried that he's

5    not complying with the subpoena issued by the government in

6    Las Vegas, why go to Las Vegas when the FBI knows that

7    you're there? Why go to Las Vegas, where they can detain

8    you or they can grab you or they could re-subpoena you with

9    a forthwith subpoena.  The furthest thing from his mind was

10   that he was not complying with that subpoena, and I believe

11   he had a reason to believe that it had been adjourned,

12   because there's no response to his letter.  And I know

13   Mr. Richenthal is champing at the bit to be able to tell

14   you that he spoke to the Assistant United States Attorney

15   and they didn't get a letter.  Well, then, I would like him

16   to explain what DHL delivered on that date, two days after

17   the subpoena was issued and why it has the defendant's

18   return address in Macau if it didn't relate to the

19   subpoena. No one in their right mind just picks that U.S.

20   Attorney out of a Yellow Pages to send a letter to two days

21   after being given a subpoena.  And if he wasn't remanded

22   and if we were able to review his files personally in

23   Macau, I think we would be able to ultimately produce the

24   letter.  They're going to tell you that no one in the U.S.

25   Attorney's Office remembers getting the letter.  Well, it

1
2   came to Mr. Bogan, who was the U.S. Attorney's Office.  And
3   in my experience, if you don't write to the assistant,
4   sometimes it doesn't get there.  But whether it got there
5   or not, nobody responded.  And when you write for a grand
6   jury adjournment, ostensibly it's the only reason that you
7   are writing to them, if you write for a grand jury
8   adjournment and the assistant or the government doesn't
9   respond, you don't have a new date for your appearance. And
10  under the rules as I understand them, if you don't show up,
11  you have a good-faith explanation for at least why you
12  thought you didn't have to show up on that date.

13          And finally -- and, again, I'd like him to
14  explain this to you, sir, if he can -- if my objective is
15  to avoid compliance with lawful process in Las Vegas, why
16  am I going there? He gambled in Atlantic City. If he
17  wanted to gamble, just gamble, he could have gone to
18  Atlantic City or one of the casinos close to here. He went
19  to Las Vegas, into the arm of the law enforcement agency
20  they claim he was seeking to avoid. It just doesn't make
21  any sense. And it's certainly not enough, your Honor -- I
22  say this with great -- it's not enough to detain someone
23  because of a screwup in connection with a subpoena of more
24  than a year and a half ago, where there was no follow-up by
25  the government. Of course, the way it generally works,

1                              PROCEEDINGS                    38

2  Judge, if you don't show up on the day that you're supposed

3  to be there, you don't get arrested. I've never seen

4  anybody, in 40 years, get arrested for failure to comply

5  with a subpoena. Your lawyer gets a letter or you get a

6  follow-up visit, or you get a forthwith subpoena,

7  especially if they know where you are. You don't get

8  arrested.  And here what they're trying to do is they're

9  not arresting him for it; they're looking to detain him.

10 They're looking to detain him, arguing with no facts, that

11 he should be detained because this failure to respond to a

12 subpoena shows that he has no respect for lawful process.

13 It's just -- you know, it's just not a compelling argument,

14 your Honor.

15         THE COURT:  When did you receive the receipt from

16 the courier, DHL, indicating that a letter was transmitted?

17         MR. BRAFMAN:  We got it this past week.  We were

18 trying to actually find the letter, and I gave it to the

19 government this morning because I knew it was going to come

20 up.  But to be honest with you, Judge, I wanted to find the

21 actual letter. So we didn't find the letter, but the

22 defendant knew that something had been written or someone

23 in his office knew that something had been written.

24         THE COURT:  And in the week that you've had this,

25 was there something that prevented you from contacting the

1                          PROCEEDINGS                    39

2   United States Attorney's Office to see whether that letter

3   was received and whether a response was given?

4          MR. BRAFMAN:   There was nothing that prevented me

5   from doing it. I also saw that it went through the U.S.

6   Attorney.  The copy of the subpoena that we have is

7   virtually illegible because it's a copy of a fax -- of a

8   fax. I don't have the original -- and I can show it to you,

9   Judge. It's just not legible. I was assuming that they

10  would have something to show that he did or did not appear.

11  And when I spoke to Mr. Richenthal this morning and told

12  him about DHL, he said they contacted the United States

13  Attorney, as far as they're concerned there is no letter.

14  Now, I don't know who he spoke to there. But whether there

15  was a letter or not, we have proof that a letter was mailed

16  to them and received by them, because we have a receipt

17  that it was received.  We have a receiver's name is Daniel

18  Bogan; it's signed for. Someone received it; it's signed

19  for by A. Nimo, N-i-m-o, and it's received on September 12,

20  2014, at 1357.

21          So you can't conclude that he just shipped an

22  empty envelope to the United States Attorney's Office with

23  his home address in Macau so that maybe one day if he was

24  detained in the United States, he could have this argument.

25  It just doesn't make any sense. I think the compelling

PROCEEDINGS                    40

1

2  argument is that the letter was sent. I think if he were to

3  be able to go to Macau -- look, your Honor, the man works

4  out of 20 different offices in Macau at different times.

5  His holdings are very extensive; the real estate, there's

6  residential condominiums, there's hotels. I don't know

7  where to even begin searching for the actual letter.  So to

8  answer your question, Judge, I think the government will

9  tell you that they called the U.S. Attorney, and they don't

10 have a record of receiving the letter.  That doesn't mean

11 he did not in good faith communicate with them. And one

12 thing we do know is they also don't have any further

13 correspondence from the U.S. Attorney to Mr. Seng saying

14 where are you, you didn't show up when you were supposed

15 to, which is how it would normally happen and certainly in

16 this district.

17         THE COURT:  Well, you, too, have no letter from

18 the United States Attorney acknowledging receipt and

19 advising what the United States Attorney's response is to

20 the letter delivered by DHL. If the responsive letter, if

21 one existed, said thank you very much for your letter but

22 come on down to the grand jury anyway, and he didn't show

23 up, that would be an important thing to know.

24         MR. BRAFMAN:  Yes, your Honor.  And I think you

25 would be right then in holding it against him.  But if they

1                        PROCEEDINGS                    41

2    had that letter, they would give it to you or they would

3    give it to us.  They don't have that letter.

4          THE COURT:  And neither do you. You've had a week

5    to contact the United States Attorney --

6          MR. BRAFMAN:  Yes.

7          THE COURT:  -- if you wanted to, to say, "I have

8    this document from DHL, it says a letter came. I have

9    another document saying someone named Mico received it.

10   Was there a response? Can you provide me the response so

11   that in support of my argument to the Court, I will know

12   what response was given?"

13         MR. BRAFMAN:  Correct --

14         THE COURT:  But let's move on.

15         MR. BRAFMAN:  Okay.

16         THE COURT:  You've mentioned a number of times an

17   apartment that you propose to support the bail that you're

18   urging, but you haven't identified the apartment.  What

19   apartment is it?  Where is it?

20         MR. BRAFMAN:  It's at 240 East 47th Street. It's

21   across the street from the United Nations. It is an

22   apartment, a one and a half bedroom apartment -- two

23   bedroom apartment -- there are two apartments that are

24   combined on the same floor. It's at 240 East 47th Street.

25   And it's owned by the defendant. I have a copy of the deed.

1                          PROCEEDINGS                    42

2  The only name on the deed is the defendant's.

3               THE COURT:  You propose a financial incentive for

4  your client to remain, which in total would be $9 million

5  property and a bond of some sort. For a person who

6  according to the Pretrial Services Report earns $25 million

7  a month, why is $9 million an incentive for him to stay?

8  That --

9               MR. BRAFMAN:  Your Honor --

10              THE COURT:  -- is an, seemingly for a person of

11 his circumstances, an insignificant amount of money.

12              MR. BRAFMAN:  Your Honor, if it were just as

13 financial package, I would agree with you.  But I think the

14 amount of money is one item, but I think if we were to

15 propose $25 million, the government would say not enough.

16 And then if we were to propose 30 million, they would say

17 not enough.  So I don't want to bid against myself, because

18 the component of this package that would be most compelling

19 is the armed guards, who would not let him leave the

20 apartment. But if what your Honor wants to do is set a

21 higher financial component, I would obviously, you know, be

22 willing to listen to what your Honor thinks is reasonable.

23              The difficulty in this case is that it's not

24 unusual -- and I don't say this to embarrass Mr. Ng --

25 everything he said to Pretrial Services is correct. But

1                          PROCEEDINGS                    43

2     when you make $300 million a year in the nature of his

3     business it doesn't mean they give you $300 million a year.

4     It's sort of like Donald Trump saying he's worth $10

5     billion and then 20 other people look at his financial

6     statements and say, "I don't think that property is worth

7     20 billion, and I don't think your cash flow." Mr. Ng makes

8     $300 million a year in the income based on all of his

9     corporate interests.  That doesn't mean all of that money

10    trickles down in liquid assets to his. I will also tell you

11    that many of these properties are encumbered, and much of

12    that money goes to keep the loans current on a regular

13    basis that are astronomical and involve a substantial

14    amount of interest. Could Mr. Ng put up more money if that

15    was the key to your Honor giving me a bail package that we

16    could live with?  Within reason, the answer is yes.  But if

17    that were our approach, if we came to the government and

18    said, "Would you take $25 million?" Mr. Richenthal would

19    say no, because he has too much money.  So that doesn't

20    mean anything. So I think --

21              THE COURT:  But that's irrelevant because he

22    doesn't determine what bail, if any, will be set for your

23    client to be at liberty.  That's the determination of the

24    Court.

25              MR. BRAFMAN:  Yes.

1                          PROCEEDINGS                    44

2              THE COURT:  So if he says no, what difference does

3  it make?

4              MR. BRAFMAN:  All right, so then I'm saying to the

5  Court I can't just make up a number, but what I will tell

6  the Court is that we did not mean to say to your Honor it's

7  9 million or nothing.  What I am saying is that's a

8  significant package because of all of the bells and

9  whistles that are powerful that we're wrapping it up in.

10  But if what the Court wants to do is set a higher financial

11  component including the conditions we have provided, then

12  we will do our best to meet those conditions if they are

13  within his ability.  And all I ask your Honor to understand

14  is that being as wealthy as he is and being able in the

15  United States to access that wealth that is largely in the

16  form of property and rentals and interest payments, which

17  sometimes go directly to the bank, is not [indiscernible]

18  to do is to set a $15 or 20 or 25 million component.  The

19  defendant would then have the obligation to meet that

20  staggering sum and actually try and post it.  And maybe it

21  means borrowing money against the property, maybe it means

22  selling a piece of property, maybe it means accessing an

23  account through international efforts that we have not yet

24  taken.

25              What I have proposed to the Court is something we

```
 1                         PROCEEDINGS                    45
```

 2   could do immediately.  We could do it through Mr. Mo's

 3   escrow account, and then we could do it within reason. If

 4   the Court were to impose an additional financial component

 5   and that would require the defendant to meet that condition

 6   before being released, we would do our best to meet that

 7   component. So I hear what your Honor is saying, and I

 8   understand that relative to the defendant's wealth it

 9   doesn't sound like a lot of money. In the other cases, the

10   amount of bail set was not relative necessarily to each of

11   the defendant's earnings or wealth. It was a significant

12   amount of money, and in the Mr. Yin case it was $1 million,

13   in the Lorenzo case it was $2 million, and in Mr. Ashe's

14   case it was $1 million.  And if you look at the Complaint,

15   they are considered to be very wealthy people.  They have

16   more ties to the United States -- I get that component.

17   But in terms of --

18             THE COURT:  Well, that's irrelevant.  Bail is an

19   exercise that requires an individual assessment of --

20             MR. BRAFMAN:  Yes.

21             THE COURT:  -- the defendant. So what other

22   people's bail conditions are is interesting perhaps but

23   irrelevant.

24             MR. BRAFMAN:  Well, it's interesting and relevant

25   to --

```
 1                          PROCEEDINGS                    46
 2              THE COURT:  It's not relevant.
 3              MR. BRAFMAN:  Okay.  I don't want to argue with you
 4    because --
 5              THE COURT:  I'm interested in your client and
 6    whether bail can be fixed for him, if there are conditions.
 7    What can be fixed for other people is irrelevant to Mr. Ng
 8    and his situation.  If I'm convinced that bail can be fixed
 9    for him, bail will be fixed for him.  If I'm not convinced
10    that bail can be fixed for him, he'll be detained.  I'm only
11    interested in him and his circumstance and whether bail can
12    be fixed for him.
13              MR. BRAFMAN:  Well, if -- your Honor, we could do
14    this one of two ways, your Honor.  We could either take a
15    short adjournment with the Court's permission so I could
16    confer with the defendant to have a good-faith basis to
17    make a representation as to additional assets that we
18    could not only offer to the Court but that would be
19    available within a reasonable period of time.  I can't offer
20    a building in Macau that may have a value of $1 trillion
21    because they're never going to take it and they never could
22    exercise on it if he didn't show up.
23              So I hear what you're saying, sir, and I want to
24    give you a good faith -- a good-faith proposal, but I
25    need -- it's not my money, and I need to make it through
```

1

2    my client.  But I also need him to understand that if we

3    propose $25 million, that he will not get out -- and your

4    Honor accepts it -- he will not get out until the $25

5    million is actually posted.  And regardless of how wealthy

6    a person is, being able to garner that much in liquid

7    assets to be able to post it in all cash is sometimes more

8    cumbersome than it may appear to an Assistant United

9    States Attorney who says you're fabulously wealthy.

10             So I'd like a short adjournment. Maybe your

11   Honor could -- or we could submit this in written form to

12   the Court. My preference would be a short adjournment so I

13   could talk to Mr. Ng privately, confer with his daughter

14   and his lawyer who is more involved in his business assets

15   than I am.

16             THE COURT:  What amount of time, when you say

17   adjourned, are you speaking about?

18             MR. BRAFMAN:  I'm talking about a few minutes,

19   Judge. If your Honor has another matter --

20             THE COURT:  Do you want --

21             MR. BRAFMAN:  If your Honor --

22             THE COURT:  -- do you want the adjournment

23   before I give the government an opportunity to respond to

24   the comments you have made?

25             MR. BRAFMAN:  Well, I think it's better that we

| | PROCEEDINGS | 48 |
|---|---|---|

```
 1
 2    have all of the arguments on the other issues besides the
 3    money issue so that I have an understanding, if that --
 4    what the Court wants to hear is all the arguments and then
 5    also a different financial package that we have submitted.
 6            THE COURT:  Well, I'm not saying that I want to
 7    hear a different financial package; I just question the
 8    financial component that you made reference to, given, as
 9    I said before, bail requires an individual assessment and
10    given his particular circumstance, what that component
11    meant in relation to the information in the Pretrial
12    Services Report. I don't mean to convey to you that I
13    think this number's the wrong number and it has to be
14    higher or any such thing; I'm just questioning information
15    that you provided to me, no more, no less.
16            So I will give you an opportunity to consult
17    with your client. I do have other people waiting to be
18    entertained by me who also want to see if they can be
19    released on bail. So I'll proceed to the next scheduled
20    matter, and then we'll come back to you later in the day.
21            MR. BRAFMAN:  So can we step out and confer with
22    him?
23            THE COURT:  Certainly.
24            MR. BRAFMAN:  Thank you, your Honor.
25            (Whereupon, the matter is adjourned.)
```

49

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the case of USA v. Ng Lap
Seng, Docket #15-cr-00706-VSB-3, was prepared using digital
transcription software and is a true and accurate record of
the proceedings.


Signature_____*Carole Ludwig*_____

Carole Ludwig

Date:    March 5, 2021