```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/15/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :
                                                        :
          - against -                                   :          S5 15-CR-706 (VSB)
                                                        :
                                                        :          **<u>OPINION & ORDER</u>**
NG LAP SENG,                                            :
                                                        :
                              Defendant.                :
                                                        :
------------------------------------------------------- X

<u>VERNON S. BRODERICK, United States District Judge</u>:

Before me is Defendant Ng Lap Seng's ("Defendant" or "Ng") emergency request that I

reconsider my May 8, 2020 Opinion & Order denying his 18 U.S.C. § 3582(c)(1)(A) motion for

compassionate release.  Because Ng has satisfied his exhaustion requirement, and because there

have been material changes in the facts supporting my earlier decision denying Ng's

compassionate release motion, Defendant's motions for reconsideration and compassionate

release are GRANTED.

## I.    <u>Background and Procedural History</u>

Background relating to Defendant's trial, conviction and sentencing can be found in my

May 8, 2020 Opinion & Order denying Defendant's initial motion for compassionate release.

*United States v. Ng Lap Seng*, 459 F. Supp. 3d 527, 529–31 (S.D.N.Y. 2020).  I denied

Defendant's motion for two main reasons.  First, I found that Defendant had failed to satisfy the

exhaustion requirement under § 3582(c)(1)(A).  *Id.* at 538.  Second, I found that, on the merits,

Defendant had failed to meet his burden to establish that there were "extraordinary and

compelling reasons" to reduce his sentence and grant his release.  *Id.* at 544; *see also* §

3582(c)(1)(A).

On July 1, 2020, I received a letter from Defendant detailing, in part, that his health had worsened over the time that he had spent in prison, (Doc. 957); a day later, defense counsel submitted a filing summarizing Defendant's letter and asking that I treat it as a request for reconsideration of his motion for compassionate release, (Doc. 958.)  On July 16, 2020, I granted Defendant's request for his July 1, 2020 letter to be treated as a motion for reconsideration. (Doc. 959.)   The Government submitted its response in opposition to Defendant's motion for reconsideration on July 22, 2020.  (Doc. 960.)  Defense counsel later submitted several letters informing me about Defendant's updated medical information and which included Defendant's medical records from April-August 2020, which, according to defense counsel, showed that Defendant's "health continues to deteriorate."  (Docs. 961–62, 967.)  On August 26, 2020, the Government issued a letter response to defense counsel's several letters and their characterization of Defendant's medical records.  (Doc. 969.)

On December 15, 2020, Defendant filed the instant emergency letter motion for reconsideration.  (Doc. 974.)  In the coming weeks, defense counsel submitted three additional letters.  Two of these letters informed me about a purported increase of COVID-19 cases at Defendant's facility, FCI Allenwood Low, and that Defendant's roommate had tested positive for COVID-19.  (Docs. 975–76.)  The third attached a letter written by Defendant's daughter in support of his motion for reconsideration.  (Doc. 977.)  The Government filed its response in opposition to Defendant's motion for reconsideration on January 8, 2021, (Doc. 980), which it re-filed on February 2, 2021, with an updated and corrected signature block and updated information about COVID-19 vaccinations in Federal Bureau of Prisons ("BOP") facilities, (Doc. 981.)

II.     **Discussion**

      A.     *Applicable Law*

         **1.  Compassionate Release**

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020).  Section 3582(c)(1)(A)(i), the compassionate release statute, provides one such exception.  The compassionate release statute permits a court to "reduce" a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if "it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[1]  18 U.S.C. § 3582(c)(1)(A).  The moving party bears the burden of proving that extraordinary and compelling reasons exist.  *See United States v. Ebbers*, 432 F. Supp. 3d 421, 426–27 (S.D.N.Y. 2020) (citing *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *see also United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) ("[I]f the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.") (quoting *Butler*, 970 F.2d at 1026); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

      Until recently, a court could not order compassionate release unless the BOP requested

---

[1] The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13, although I note that the Sentencing Guidelines have not yet been revised to take into account the First Step Act.  *United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, *2 (S.D.N.Y. Apr. 3, 2020).  However, the Second Circuit recently interpreted § 1B1.13 in light of the First Step Act, and concluded that when a "compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms, apply to it."  *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020).  "Because Guideline § 1B1.13 is not 'applicable' to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling."  *Id.*  "However, courts remain free – even after *Brooker* – to look to § 1B1.13 for guidance in the exercise of their discretion."  *United States v. Burman*, No. 16 Cr. 190 (PGG), 2021 WL 681401, at *5 (S.D.N.Y. Feb. 21, 2021) (internal quotation marks omitted).

such relief on a prisoner's behalf.  *See* U.S.S.G. § 1B1.13; *see also Gotti*, 433 F. Supp. 3d at 614.

However, in December 2018, Congress passed the First Step Act, which did away with BOP's

unilateral ability to deny a prisoner compassionate release but did not remove the BOP from the

process entirely.  *See Gotti*, 433 F. Supp. 3d at 614.  The statute clearly states that a court may

only grant compassionate release "upon motion of the Director of the Bureau of Prisons, or upon

motion of the defendant after the defendant has fully exhausted all administrative rights to appeal

a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility, whichever is

earlier."  18 U.S.C. § 3582(c)(1)(A).

## 2. Motion for Reconsideration

The standard for reconsideration "is strict, and reconsideration will generally be denied

unless the moving party can point to controlling decisions or data that the court overlooked—

matters, in other words, that might reasonably be expected to alter the conclusion reached by the

court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  A motion for

reconsideration is "neither an occasion for repeating old arguments previously rejected nor an

opportunity for making new arguments that could have been previously advanced."  *AP v. United

States DOD*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005).  A motion for reconsideration should be

denied if the moving party "merely offers substantially the same arguments he offered on the

original motion."  *United States v. Kerik*, 615 F. Supp. 2d 256, 276 n.27 (S.D.N.Y. 2009)

(internal quotation marks omitted).

The decision of whether to grant or deny a motion for reconsideration is "within 'the

sound discretion of the district court.'"  *Premium Sports, Inc. v. Connell*, No. 10 Civ.

3753(KBF), 2012 WL 2878085, at *1 (S.D.N.Y. July 11, 2012) (quoting *Aczel v. Labonia*, 584

F.3d 52, 61 (2d Cir. 2009)).  Generally, a party seeking reconsideration must show either "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal citation omitted).

### B.    *Application*

#### 1.  **Exhaustion**

In my May 8, 2020 Opinion & Order, I found that Defendant had failed to satisfy the requirement in § 3582(c)(1)(A) that Defendant "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf."  In that Opinion & Order, I determined that 1) Defendant had "not yet satisfied this exhaustion requirement due to his failure to fully appeal the warden's denial of his request," but also that 2) "the Government has waived the exhaustion issue in this case by asking me to consider the substantive merits of Ng's application."  *Ng Lap Seng*, 459 F. Supp. at 538.

Now, however, Defendant represents that he has satisfied the exhaustion requirement by filing both a BP-10 Form with the appropriate Regional Director and a BP-11 Form with the General Counsel.  (Doc. 974, at 1 n.2); *see also* 28 C.F.R. § 542.15(a) ("An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response.  An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response.").  The Government does not contest Defendant's representation, nor does it raise the issue of exhaustion in its opposition letter brief, which addresses only the merits of Defendant's claim.  (Doc. 981.)  Accordingly, I find that

Defendant has satisfied the exhaustion requirement and, in any event, that the Government has waived this issue.  *See United States v. Russo*, 454 F.Supp.3d 270, 275 (S.D.N.Y. 2020) (finding "the Government can waive the affirmative defense of exhaustion.").

## 2.   Extraordinary and Compelling Circumstances

In my previous order denying Defendant's motion for compassionate release, I determined that "Defendant does appear to suffer various health conditions and is of an age that place him in the category of inmates at a higher risk of serious illness or death should he contract COVID-19."  *Ng Lap Seng*, 459 F. Supp. at 538.  Nevertheless, I determined that Defendant failed to "establish[] that there exist extraordinary and compelling reasons to reduce his sentence" for the following reasons:  "(1) Ng intend[ed] to live with other individuals in his apartment [in New York City] upon leaving prison; (2) there [had] been no reported COVID-19 cases in FCI Allenwood Low, (3) the low levels of community spread and death in Union County, the county where FCI Allenwood Low is located; (4) the low levels of community spread and death in counties surrounding Union County; and (5) the high levels of community spread and death in New York County and in New York City."  *Id.* at 544.

Defendant's instant motion succeeds where his previous motion failed because these factors that weighed against Defendant's request have, in large part or entirely, abated in the past several months.  First, from a public health perspective, Defendant's destination upon release will be much safer now than it was in May 2020.  As I explained in my previous order, and as Ng now acknowledges, (Doc. 974, at 3), he is subject to removal as soon as he is released from prison despite the supervised release term I imposed at sentencing, *Ng Lap Seng*, 459 F. Supp. at at 538.  Defendant no longer requests that I release him to his home in New York City, where he had planned to live in his apartment with multiple other people, *see id.* at 542–43, but rather

"order his immediate release to ICE custody," after which he would be removed to China, (Doc. 782), and soon after reside in Macau, "where there is minimal exposure to COVID-19," (Doc. 974, at 3.)  Macau has reported fewer than 50 total COVID-19 cases and zero COVID-19 deaths in the entirety of the pandemic.  *See COVID-19 Tracker, Macau*, Reuters https://graphics.reuters.com/world-coronavirus-tracker-and-maps/countries-and-territories/macau/ (last visited Mar. 10, 2021).  Mainland China, where Defendant will be removed, (Doc. 782), has also reported very low COVID-19 levels since mid-March 2020—averaging far fewer than 100 cases per day for nearly an entire year straight despite having the world's largest population, *see COVID-19 Tracker, Mainland China*, Reuters https://graphics.reuters.com/world-coronavirus-tracker-and-maps/countries-and-territories/china/ (last visited Mar. 10, 2021).

Second, the risk to Defendant from contracting COVID-19 at FCI Allenwood Low has increased, and the level of the virus in Union County has also increased from the levels in May 2020.  At the time of my previous order, FCI Allenwood Low had no reported COVID cases either among prisoners or staff, and Defendant argued only that the Federal Bureau of Prison's ("BOP") plan to combat COVID-19 was ineffective.  *Ng Lap Seng*, 459 F. Supp. at 541–42.  As of this writing, the facility has three reported active COVID-19 cases among its incarcerated population and none among staff.  *COVID-19 Coronavirus, COVID-19 Cases*, Federal Bureau of Prisons (last visited Mar. 10, 2021), https://www.bop.gov/coronavirus/.  However, the facility has reported that 287 prisoners and 19 staff members have recovered from COVID-19, meaning that the facility has had, at minimum, more than 300 cases of COVID-19 at some point in the past.  *See id.*  On December 21, 2020, Defendant represented that confirmed cases among incarcerated people at FCI Allenwood Low had "more than doubled, from 57 to 135." (Doc.

975) (citing BOP's official statistics).  A week later, Defendant was informed that his cellmate

had tested positive for COVID-19 and about half of the incarcerated individuals in his unit had

tested positive in the prior two weeks.  (Doc. 976.)  The Government does not meaningfully

dispute this information—it confirms that Defendant's cellmate and "a number" of individuals in

his unit tested positive for COVID-19, and adds only that those individuals were properly

isolated such that reported infection rates in the facility dropped thereafter.  (Doc. 981, at 2.)

The recent outbreak demonstrates "that the overall situation at FCI Allenwood Low is worse

today than it was in May of last year."  *United States v. Shkreli*, No. 15-cr-637(KAM), 2021 WL

148405, at *3 (E.D.N.Y. Jan. 16, 2021).

  While the Government is correct that the facility's outbreak went down relatively

quickly, it does not present empirical evidence as to why that reduction occurred other than to

attribute it to isolating infected prisoners, *see* (Doc. 981, at 2), and it is also true that cases shot

up very quickly in the first place, *see United States v. Mieses*, No. 17 Cr. 251 (PGG), 2021 WL

124420, at *4 (S.D.N.Y. Jan. 13, 2021) (noting that the number of confirmed cases at FCI

Allenwood Low grew from 5 to 136 in just three weeks).  "The crowded nature of federal prisons

in particular presents an outsized risk that the COVID-19 contagion, once it gains entry, will

spread."  *United States v. Ciprian*, No. 11 Cr. 1032-74 (PAE), 2021 U.S. Dist. LEXIS 18698, at

*6 (S.D.N.Y. Feb. 1, 2021).  As of December 18, 2020, at least 20% of all incarcerated people in

state and federal prisons had at one point tested positive for COVID-19, "a rate more than four

times as high as than the general population."  Beth Schwartzapfel, Katie Park & Andrew

Demillo, *1 in 5 Prisoners in the U.S. Has Had COVID-19*, The Marshall Project, (Dec. 18, 2020)

https://www.themarshallproject.org/2020/12/18/1-in-5-prisoners-in-the-u-s-has-had-covid-19.

The Government notes that BOP has begun vaccinating federal prisoners, including those at

Defendant's facility, (Doc. 981, at 3), but does not provide any timeline for when, or if, Defendant might be vaccinated or whether or not his vaccination might be delayed because of his immigration status.  In any event, the Government does not address the fact that its prior argument that BOP and FCI Allenwood Low had implemented measures that would prevent or limit the spread of COVID-19 proved to be wrong or at least materially flawed.  As such, there are legitimate unanswered questions about whether or not another outbreak can be avoided before the FCI Allenwood Low inmate population can all be vaccinated.

At the time of my previous order, Union County, Pennsylvania, where FCI Allenwood Low is located, reported just 88.7 cases and 2.2 deaths per 100,000 residents.  *Ng Lap Seng*, 459 F. Supp. at 543.  Now, Union County is reporting more than 11,750 cases and 184 deaths per 100,000 residents.  *National, Deaths reported per 100,000 residents by county*, The Washington Post (last visited Mar. 10, 2021), https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/?itid=hp_rhp__no-name_hp-in-the-news%3Apage%2Fin-the-news.  The COVID-19 situation is also worse in the counties surrounding Union County—Lycoming, Snyder, Centre, Mifflin, Northumberland, and Clinton—than it was in May 2020.  *See id.*; *Ng Lap Seng*, 459 F. Supp. at 543 (noting that those counties had six total combined deaths from COVID-19 as of May 2020).  Given that COVID-19 has, in the recent past, infiltrated Defendant's facility and spread considerably, the increased numbers in Union County and its surrounding counties mean that Defendant is at higher risk than he was in May 2020.  Put simply, the data no longer "support the inference that Ng would be more at risk of contracting COVID-19" after he is released than he would by remaining in his facility.  *Ng Lap Seng*, 459 F. Supp. at 543–44.

Finally, it remains unchanged and essentially uncontested that Defendant's age and

comorbidities put him at greater risk of severe illness or death should he contract COVID-19. While the parties disagree about whether, and/or to what extent, Defendant's health has deteriorated since May 2020, *see* (Docs. 960–62, 967, 969), the Government still acknowledges that Defendant "is older and has diabetes Type II, risk factors recognized by the Centers for Disease Control and Prevention," and that "Type II diabetes, in particular, is an extraordinary and compelling circumstance that could justify a court's exercise of discretion to grant a requested reduction of sentence." (Doc. 960, at 2.) As such, I find that "extraordinary and compelling reasons warrant" Defendant's release. 18 U.S.C. § 3582(c)(1)(A).

### C.   *Sentencing Factors*

Given this finding, I must now "assess the section 3553(a) factors to determine whether those factors outweigh the extraordinary and compelling reasons warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Broadus*, No. 17-cr-787-2 (RJS), 2020 WL 3001040, at *3 (S.D.N.Y. June 4, 2020) (internal quotation marks omitted). In doing this analysis, "[a] district court is not required to 'discuss every §3553(a) factor individually' or to make 'robotic incantations' in sentencing decisions." *United States v. Cabassa*, No. 19-3874-cr, 2021 WL 28150, at *2 (2d Cir. Jan 5, 2021).

I cannot find that the sentencing factors listed in § 3553(a) continue to outweigh the reasons warranting release listed above. Indeed, some of the §3553(a) factors weigh in favor of Defendant's release. Given that Defendant will be removed from the United States upon his release, he presents virtually no risk to the United States and thus there is no need "to protect the public from further crimes" or "to afford adequate deterrence to [future] criminal conduct." 18 U.S.C. § 3553(a)(2)(B–C). Older offenders, like, Defendant, are also "substantially less likely

than younger offenders to recidivate following release."  U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3 (2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.  Further, Ng has now served a much greater percentage of his sentence than he had in May 2020.  I sentenced Ng to 48 months in prison on May 11, 2018, and with good time, he is scheduled to be released from prison on December 23, 2021, meaning he is scheduled to serve a little over 43 months in prison.  *Find an Inmate*, Fed. Bureau of Prisons (last visited Feb. 17, 2021), https://www.bop.gov/inmateloc/.  As of this writing, Defendant has already served about 34 months—more than three-quarters of the total 43 months—in prison.  The ten months that have elapsed between my initial order and this instant order constitute more than 20% of Defendant's scheduled 43 months in prison.  *See Ng Lap Seng*, 459 F. Supp. at 541 (noting that, had I released Defendant in May 2020, his sentence "would be reduced by more than 18 months.").  As such, there is less of a risk that reducing Defendant's sentence now will undercut the seriousness of his offense.  *See* § 3553(a)(2)(A).

I also note that "the pandemic, aside from posing a threat to [Ng's] health, has made [his] incarceration harsher and more punitive than would otherwise have been the case."  *United States v. Rodriguez*, No. 00 CR. 761-2 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020).  "[F]ederal prisons, as prime candidates for the spread of the virus . . . have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal."  *Id.*  (internal citation and quotation marks omitted).  The risk that COVID-19 posed and poses to Ng, a 72-year-old with underlying health conditions, paired with the various lockdowns and restrictions in place, "means that the actual severity of [Ng's] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing."  *Id.*

(internal quotation marks omitted); *see also United States v. Mcrae*, No. 17 CR. 643 (PAE), 2021 WL 142277, at \*5 (S.D.N.Y. Jan. 15, 2021) (granting compassionate release to a prisoner housed at FCI Allenwood Low, and observing that "a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison").  Although this fact alone is insufficient, *see Rodriguez*, 2020 WL 5810161, at \*3, it militates in favor of reducing Ng's sentence.

Taking all the § 3553(a) factors together and in light of my analysis above, it is clear that the sentencing factors neither outweigh the extraordinary and compelling reasons warranting compassionate release nor undermine the goals of Defendant's sentence, which is already substantially complete.

## III.   Conclusion

Defendant's motion for reconsideration and motion for compassionate release are GRANTED.  The Clerk is directed to terminate the open motion at Document 974.

The Federal Bureau of Prisons is further directed to notify United States Immigration and Customs Enforcement that Defendant's sentence is completed.

SO ORDERED.

Dated: March 15, 2021
         New York, New York

Vernon S. Broderick
United States District Judge